FILED
2012 Nov-14  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION


APRIL K. BARNETT                                    Plaintiff

V.                          CIVIL ACTION NO. 1:12cv1745-VEH

JP MORGAN CHASE BANK,                               Defendant
NATIONAL ASSOCIATION




## COURT REPORTER'S TRANSCRIPT OF MOTION HEARING

BEFORE HONORABLE VIRGINIA EMERSON HOPKINS
UNITED STATES DISTRICT COURT JUDGE

November 6, 2012
Birmingham, Alabama




APPEARANCES:

REPRESENTING THE PLAINTIFF:     DAVID A. MCDONALD, ESQUIRE

REPRESENTING THE DEFENDANT:     SANDY G. ROBINSON, ESQUIRE
                                MICHAEL E. TURNER, ESQUIRE



COURT REPORTER:  Margaret Wasmund, RMR, CRR
                 351 Oak Lane
                 Remlap, AL  35133
                 601-329-6113/205-680-2107
                 margaretwasmund@gmail.com

TABLE OF CONTENTS

WITNESSES FOR THE DEFENDANT:

VICKI LANDIS

   Direct Examination By Ms. Robinson:  ...................10

   Cross-Examination by Mr. McDonald: .....................20

VICKI LANDIS - Recalled

   Direct Examination By Ms. Robinson:  ...................36

   Cross-Examination By Mr. McDonald: .....................40

1          (November 6, 2012, 3:02 p.m.)

2              THE COURT:  Good afternoon.

3              MS. ROBINSON:  Good afternoon, Judge.

4              MR. TURNER:  Good afternoon.

5              THE COURT:  All right.  Tell me who I've got in the

6      courtroom, please.

7              MR. MCDONALD:  Your Honor, David McDonald for the

8      plaintiff.

9              THE COURT:  All right.

10             MS. ROBINSON:  Sandy Robinson for the defendant,

11     Judge.

12             MR. TURNER:  Michael Turner for the defendant, Your

13     Honor.

14             THE COURT:  Thank you.  We are here because the

15     plaintiff, through counsel, has filed a motion to compel

16     discovery responses and for sanctions.  And the parties have

17     not been able to resolve all their areas of disagreement,

18     although it appears they've narrowed them.  Initially, let me

19     start off with the plaintiff's motion for the Court to accept

20     late filing because her filing of the areas that remained not

21     worked out was about 45 minutes late under the Court's order.

22     And that motion is granted.  That's Document 31.

23         All right.  Under Document 30, which is the plaintiff's

24     notice of remaining discovery issues, the issues that seem to

25     be -- well, one thing that needs to be done initially is the

```
 1    plaintiff has never identified to me -- to the Court -- what

 2    portions of the transcript or recording are unintelligible.  I

 3    mean, you've referred to jargon and code words.  And I am

 4    sympathetic to the fact that you don't know what their

 5    abbreviations, acronyms or internal jargon means, but I don't

 6    know that it's fair for you to expect the defendant to know

 7    what you don't know without being more specific.  Can you be

 8    more specific about what abbreviations, acronyms or internal

 9    jargon you can't understand?

10             MR. MCDONALD:  Yes, Your Honor.  And I did fail to do

11    that in that last pleading to the Court because I was trying to

12    convey to the Court the problems that I was struggling with.  I

13    can give some specific examples to the Court today because it's

14    all in abbreviation and shorthand in their documents.

15         My bigger concern on that point is simply that when the

16    defendant produces documents pursuant to 33(d) and says, "Here

17    they are," I think that the rules provide that when you're

18    talking about interrogatory responses when you say, "Tell us

19    what each of these folks know about these particular areas,"

20    that we're entitled to a discovery response -- an interrogatory

21    response.

22             THE COURT:  We're in a different area.  I'm under the

23    section where you're talking about voice recordings between --

24    it's your Interrogatory No. 5.

25             MR. MCDONALD:  Yes.
```

```
 1            THE COURT:  And you say that there are abbreviations

 2    and jargon used in the internal documents.  I thought those

 3    were the -- it was internal documents related to the voice

 4    recordings.  I thought that's what your abbreviations and

 5    jargon complaint related to.  Is your abbreviations and jargon

 6    complaint broader than that?

 7            MR. MCDONALD:  Yes, it is.  I threw that in yesterday

 8    afternoon as an example -- a further example building upon my

 9    prior motions explaining to the Court what the plaintiff's

10    perspective is is that when a defendant answers interrogatories

11    and says, "Well, we don't have any information other than what

12    is contained in our internal notes.  Here they are."  And I had

13    filed a motion a couple of times explaining from the

14    plaintiff's perspective how FRCP 33(d) is supposed to operate,

15    whereas if I'm able to read a business record just as well as

16    they are and if it's complete and totally explains it, then

17    that's a valid production.

18        But in this case, one of the reasons why I think I'm

19    entitled to an interrogatory response, but not the sole reason,

20    is that because all of their internal notes are shorthand.  And

21    I did fail yesterday to attach that to the pleading in the

22    court primarily because I was just short on time.

23            THE COURT:  All right.  That's fine.  We'll just

24    start at the beginning and go to the end because it's not going

25    to save any time to jump around.  So thank you.
```

1        All right.  Let's turn first to the issue of whether or

2   not the defendant has waived privilege, whether or not the

3   defendant's privilege log is inadequate and what I should do.

4   All right.  First of all, the rule requires a party who is

5   asserting privilege as -- the rule as explained by the Eleventh

6   Circuit when a party asserts privilege, then the person who is

7   invoking privilege -- and it's not attorney/client and/or

8   work -- it's not attorney/client and/or work product.  It's one

9   or the other or both.  So any time you say "and/or," I'm

10  telling you that's inadequate.  It's one or the other or both.

11  But it's not and/or.  This is not and/or time.  You don't come

12  before a court and say "and/or," just like you wouldn't go to a

13  jury and say "and/or."

14       All right.  The party who invokes attorney/client

15  privilege has the burden of proving that an attorney/client

16  relationship existed.  Well, I don't think that that part is in

17  dispute, is it, Mr. McDonald?

18            MR. MCDONALD:  There's no dispute that there's

19  attorneys because they've said that there was attorneys.

20            THE COURT:  And that the person communicated with is

21  the client?  Is there a dispute about that?

22            MR. MCDONALD:  That is a dispute because I can't

23  tell.  They say -- they do say "Chase," but they haven't

24  identified the employee.  And the concern that I come across is

25  that it looks like there's other people involved -- third

1    parties that are involved.

2            THE COURT:  Okay.  But you agree that these

3    attorneys -- that attorneys represent Chase and so we have an

4    attorney/client relationship existed.  The issue that you're

5    getting to is whether the particular communication was

6    confidential.  It became nonconfidential because it was

7    disclosed outside the attorney/client privilege core group of

8    people.

9            MR. MCDONALD:  That and whether, as Your Honor

10   touched on in the Standard case, whether communications to the

11   counsel and the context in which the communications were being

12   made were for the rendering of legal advice or whether it was

13   just a communication of business information, because what it

14   is, it's all contained upon business records that they

15   maintained regularly.  In other words, none of the

16   communications that I could tell that are being the basis of

17   their redactions are memos or special other privileged -- when

18   you would normally see a communication with outside counsel, it

19   would be a memo.  These are contained actually within their own

20   business records.

21           THE COURT:  Yes.  And that doesn't surprise me at all

22   necessarily.  I mean, banks are regulated entities, have

23   in-house lawyers.  They have lawyers that aren't in-house

24   lawyers.  And especially to the extent they have in-house

25   lawyers, those things are going to be written by -- internally

 1    because they're employee/employers.

 2        But I think you're afraid I'm trying to trick you because

 3    you don't seem to want to narrow any issue at all.  And I am

 4    simply trying to get to the point is is not whether an

 5    attorney/client relationship existed, but whether or not the

 6    communications were confidential.  That means intended to

 7    remain confidential under circumstances expected and understood

 8    to be confidential.  And that's what they have to prove.

 9            MR. MCDONALD:  Right.  And that is the main thrust.

10            THE COURT:  Yes.  The issue is is it confidential?

11            MR. MCDONALD:  Yes.

12            THE COURT:  The issue is not attorney/client

13    relationship?

14            MR. MCDONALD:  Yes.

15            THE COURT:  Okay.  I'm really not trying to trick

16    you.

17            MR. MCDONALD:  And I'm not trying to be evasive, but

18    I wanted to make sure that I fully informed Your Honor that the

19    other concern that I had was because when I see things that are

20    on business records, the first thing I start to think is is:

21    Well, is this just information communicated to a lawyer that's

22    contained in the ordinary course of business and is a business

23    record?  And then in those circumstances, my understanding is

24    that doesn't automatically cloak it with some sort of

25    privileged communication.

```
1              THE COURT:  No, because it's not confidential.
2              MR. MCDONALD:  Right.
3              THE COURT:  It's not seeking legal advice.
4              MR. MCDONALD:  Right.
5              THE COURT:  Okay.  All right.  So I don't find that
6   Chase has presented evidence that would show that their
7   documents were intended to remain confidential or seeking legal
8   advice, contained legal advice, were not disclosed to third
9   parties.  You haven't given me any evidence.  So this is an
10  evidentiary hearing.  So let's see your evidence.
11             MS. ROBINSON:  All right.  Your Honor, we will call
12  our witness to the stand.  Do you want to go through the issues
13  and have the testimony all at once or do you want to do it
14  piece by piece?
15             THE COURT:  I want to do all the issues relating to
16  privilege --
17             MS. ROBINSON:  Yes, ma'am.
18             THE COURT:  -- now.
19             MS. ROBINSON:  Okay.
20             THE COURT:  You have to -- you have to prove to me
21  that your assertion of privilege is justified.
22             MS. ROBINSON:  Yes, ma'am.
23             THE COURT:  Okay.
24             MS. ROBINSON:  I understand.  If you would, go ahead
25  and take the stand.
```

1    Do you want the witness here, Your Honor?

2         THE COURT:  In the witness box.

3         MS. ROBINSON:  Right here.

4                    **VICKI LANDIS,**

5    was thereupon called as a witness and, having first been duly

6    sworn, testified as follows:

7         THE CLERK:  State your name for the record.

8         THE WITNESS:  Vicki Lynne Landis.

9         THE CLERK:  Spell your first and last name.

10        THE WITNESS:  V-I-C-K-I, L-A-N-D-I-S.

11        THE REPORTER:  And your middle name.

12        THE WITNESS:  Lynne, L-Y-N-N-E.

13                **DIRECT EXAMINATION**

14   BY MS. ROBINSON:

15   Q.  Vicki, would you please tell the judge who your employer

16   is and what your job is.

17   A.  JP Morgan Chase Bank, NA.  And I'm a home lending research

18   officer.

19   Q.  In that capacity, have you reviewed the discovery requests

20   and responses that were made to Chase and responses made by

21   Chase, including documents that were produced?

22   A.  Yes, I have.

23   Q.  In connection with that, did you see documents that had

24   been redacted that contained the legend at the top "LPS"?

25   A.  Yes, I did.

```
 1    Q.  Do you know what LPS is?

 2    A.  Yes.  LPS is a communication system that's secured we use

 3  to communicate between our various litigation teams and our

 4  outside counsel.

 5    Q.  So in what context would the LPS software system be used

 6  to communicate with outside counsel?

 7    A.  They would be communicating with outside counsel on active

 8  foreclosure files, active bankruptcy files or evictions on a

 9  loan that's in REO.

10    Q.  And so where something shows LPS, that's a communication

11  from someone inside Chase with an outside lawyer?

12    A.  Yes.

13    Q.  And does the communication from Chase to the outside

14  lawyer using the LPS system give the outside lawyer any access

15  to the internal Chase files?

16    A.  No.  Absolutely none.

17         MS. ROBINSON:  Your Honor, I never understood clearly

18  until last night that the claim here was that the confidential

19  information had not been kept confidential because it was

20  shared with LPS.  And so what I'm demonstrating to the Court by

21  offering this evidence is that LPS is just the name for a

22  software program that they use to communicate.  This is not

23  disclosure outside the client, Chase, attorney relationship.

24  That is not a disclosure to an outside party.  That's just a

25  database that she used.
```

1              THE COURT:  So is it -- are you saying, Ms. Landis,

2     that Chase has a computer software system that a person who

3     works for Chase who wants to communicate -- and who is on a

4     litigation team who wants to communicate with outside counsel

5     can push a button and every document associated with that

6     button push on the computer gets LPS printed at the top, or are

7     you saying something different?  How does LPS -- how is LPS

8     activated?

9              THE WITNESS:  LPS is activated by -- the same as -- I

10    would liken it to Outlook e-mail or an IM system.  The

11    difference with LPS is it's secured.  So either the person in

12    Chase or our attorney outside Chase activates it by opening the

13    program.  And then they're able to communicate with their

14    liaison in whatever specific department that they're working

15    for Chase on.

16             THE COURT:  So it's like a specific dedicated e-mail

17    or chat process?

18             THE WITNESS:  I would say yes.  It's secured.  The

19    only people allowed in it and that can access it are Chase

20    employees in those litigation areas and any outside counsel

21    which we have approved to have access.  And they can only

22    access in what we send to them.  They can't retrieve something

23    we haven't sent through LPS.

24             THE COURT:  So what puts LPS onto the documents?  How

25    does that LPS come to appear apparently on paper copies of

1       these documents?

2               THE WITNESS:  We can print out the communications

3       that are in LPS.  And so they're provided as part of the

4       discovery.  What you'll see is the entries in LPS will also be

5       a part of the NOTS screen from our 3270 Explorer program.  It

6       maps over to our servicing program, but our servicing program

7       does not map into LPS.

8               THE COURT:  I am an English major and have been a

9       lawyer for over three decades.  We didn't have the Internet

10      when I was in school.  I don't understand the concept of

11      mapping over.  However, what I'm going to do before you try and

12      teach me anything about computers is I'm telling you that so

13      that you'll understand the level of -- you basically cannot

14      talk down to me about computers because you won't be able to

15      use words that are simple enough to offend me.

16              THE WITNESS:  Okay, Your Honor.

17              THE COURT:  I just want to find out from Mr. McDonald

18      whether knowing this, what besides LPS has caused you to

19      think -- what besides the fact that LPS appears on documents as

20      identified in their log causes you to think that these

21      documents have been communicated outside of the litigation

22      teams and outside counsel who are approved to receive

23      communications relating to active foreclosure files, active

24      bankruptcy files and evictions on loans that are in REO,

25      whatever REO is.

1          MR. MCDONALD:  When I saw this and started doing

2     research on LPS, I saw that LPS markets itself as a company who

3     helps mortgage service providers once they get into a situation

4     of a foreclosure or someone who is in back payment situations.

5     They come in and offer not only their computer software, my

6     understanding -- and if Your Honor will allow me to ask the

7     witness some questions -- is that this software is not,

8     according to my information, just leased out or sold like

9     Outlook Express could be where Your Honor could go buy the

10    program and use it yourself, but it's part of a package in

11    which LPS renders not only its service program that's being

12    discussed here, but its manpower.  In other words, those folks

13    participate in the generation of information and the direction

14    of information between counsel and between other Chase

15    employees.

16         THE COURT:  You mean, they participate in a manner

17    that's different from the way telephone operators used to --

18    I'm not this old, but I've seen movies -- you'd have to place a

19    call to the operator and the operator would have to transfer

20    your call to the party that you wanted to speak to.

21         MR. MCDONALD:  Yes.

22         THE COURT:  You mean, participate in a way other than

23    that?

24         MR. MCDONALD:  Yes.  That they're actually a vendor

25    that renders additional services, not just their trademark

```
 1    software programming, but there's actually people involved in
 2    these transactions.
 3            THE COURT:  I'm sorry.  You keep saying people
 4    involved in these transactions.  And that's about as vague as
 5    what you accused them of saying.
 6            MR. MCDONALD:  Right.  So here's my understanding.
 7    And that's why it would be great if I can ask the witness.  But
 8    Chase employees manage the account, let's say, of Mr. Barnett.
 9    If Chase's records show at some point in time that she falls
10    behind on her payments, then the software program that they are
11    using at that time, which is MPS, gets transferred over to LPS,
12    all owned, I believe, by this LPS company.
13        But in the transition of the change in the use of the
14    software, there are also LPS employees involved in collection
15    efforts.  For example, it's not just Chase employees now at
16    this time making telephone calls to the potential delinquent
17    account.  It's LPS employees.  It's not just Chase employees
18    who are making the reports.  It's LPS.  They are rendering a
19    support service for service providers in this industry.  They
20    would be like a specialized temp agency.  And that's why when I
21    look at their logos that's on Chase American documents and then
22    I ask that question:  Is LPS folks being -- do they have access
23    to this?  And I didn't get an answer.
24            THE COURT:  Okay.  Well, let me ask that question.
25    Do LPS folks have access to these documents?
```

```
 1              THE WITNESS:  I'm not aware of any LPS employees have

 2    access to any of our system.

 3              THE COURT:  And yet I don't know whether you would

 4    know.

 5              THE WITNESS:  You may be right, Your Honor.  I'm not

 6    sure that I would.  In all of the documentation that I've ever

 7    reviewed, it indicates who is inputting it.  I've never seen

 8    anything from an LPS employee.

 9              THE COURT:  And yet, I don't know -- I mean, really,

10    I don't know whether you should know or whether you should have

11    seen it.

12              THE WITNESS:  I don't know, Your Honor.  Because to

13    be able to say that another entity that owns a program for

14    which we've purchased licenses and which we've been assured is

15    secured is actually able to somehow hack into the system, I

16    just don't know.

17              THE COURT:  He's not calling it hacking.  He's

18    calling it -- what did you mean when you said a litigation

19    team?  Are there any people -- you said it was used to

20    communicate between litigation teams within Chase and outside

21    teams -- outside counsel.

22              THE WITNESS:  Yes, Your Honor.

23              THE COURT:  Are there any people included in your

24    description of litigation teams other than outside counsel and

25    Chase employees?
```

```
1              THE WITNESS:  No, ma'am.  We have an internal
2     foreclosure litigation team, internal bankruptcy litigation,
3     internal eviction and REO teams.  We don't outsource those.
4              THE COURT:  Okay.  Well, Mr. McDonald is just dying
5     to ask you some questions.  So I guess I'll let him, because it
6     seemed to me that the -- is your entire basis for thinking that
7     if they ever were privileged, they weren't privileged and
8     they're just -- I don't know what you're saying they are --
9     business records.  But I mean, part of the business of a lender
10    is to collect money.  So if it's in litigation to collect
11    money, just because they're in business to collect money that's
12    owed to them, why is that not still privileged?  So you go
13    ahead.
14             MR. MCDONALD:  Yes.  To answer that one question, I'm
15    looking at the Freiermuth case when we talk about how just
16    because a fact gets communicated to counsel doesn't
17    automatically make it privileged.
18             THE COURT:  I understand that.  I understand the
19    basic concepts.  It is computer software where you lose me, not
20    the law of attorney/client privilege.
21             MR. MCDONALD:  Right.  May I --
22             THE COURT:  Yes.
23             MR. MCDONALD:  May I approach the witness and show
24    her this document?  And then I can ask her.
25             THE COURT:  Well, we have an Elmo.  So why don't we
```

```
 1    turn the Elmo on.  She'll see it.  Ms. Robinson will see it.

 2    I'll see it.  You can see it.  And then we don't have to worry

 3    about do we have enough copies.

 4              MS. ROBINSON:  Can you see that, Ms. Landis?

 5              THE WITNESS:  It's sideways.

 6              MR. MCDONALD:  Sideways?

 7              THE WITNESS:  Now it's upside down.

 8              MR. MCDONALD:  Now it's upside down.  I've got three

 9    choices.

10              THE WITNESS:  There you go.

11              MR. MCDONALD:  I know I can get it sooner or later.

12              THE COURT:  You can zoom in.  It's kind of floating.

13              MS. ROBINSON:  Can you give me the page number,

14    David?  We're having a technical issue.

15              MR. TURNER:  David, I'm sorry.  Technological

16    difficulties.  I pulled the plug out of the thing.

17              THE COURT:  That's called human error.

18              MR. TURNER:  That is human error that I am capable

19    of.

20              THE COURT:  That is not technology.

21              MR. TURNER:  That is human error.

22              MR. MCDONALD:  It is a Chase 848.

23              MS. ROBINSON:  848?

24              MR. MCDONALD:  Yes.

25              MS. ROBINSON:  Kim, we need you, too.
```

MARGARET WASMUND, RMR, CRR

```
1              MR. TURNER:  I'm sorry.  I apologize.  I was moving

2    the microphone.

3              THE COURT:  Georgia, do you want to go sit --

4              LAW CLERK:  Sure, Judge.

5              THE COURT:  -- maybe someplace where there's a

6    juror -- we can turn on the jury.  You can be a juror.

7              MS. ROBINSON:  Make it bigger?

8              THE WITNESS:  Just a smidgen.  Just a little bit.

9              MR. MCDONALD:  Sure.

10             THE WITNESS:  It didn't do anything.

11             MR. MCDONALD:  That's not doing it.

12             THE WITNESS:  No.  That's making it dark.

13             THE COURT:  Do you know how to show him how to make

14   it bigger?  Well, you just made it smaller.

15             MS. ROBINSON:  Thanks, Kim.

16             MR. TURNER:  Thank you very much.

17             THE COURT:  That's bigger.

18             THE WITNESS:  That's bigger.

19             MR. MCDONALD:  Is that perfect?

20             THE WITNESS:  Uh-huh.

21             THE COURT:  Thank you.

22        Can you see it, Georgia?

23             LAW CLERK:  I can, Judge.  Thank you.

24             MR. MCDONALD:  Are we ready?

25             THE COURT:  We are.
```

|   |   |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MR. MCDONALD: |
| 3 | Q.  Ms. Landis, your understanding is that the LPS desktop is |
| 4 | a software program that's leased from LPS? |
| 5 | A.  I don't know if it's leased or purchased.  I know it's |
| 6 | what we utilize.  And we understand it to be completely secure. |
| 7 | Q.  And there are numerous entries on this -- it's about a |
| 8 | five-page document.  And it's 1 through 22.  They all look |
| 9 | pretty much the same as this, but what I want to do is show you |
| 10 | one that hadn't been redacted and ask you -- this is Chase 848. |
| 11 | I want to ask you about Entry No. 6.  Do I need to zoom in |
| 12 | better on that? |
| 13 | A.  No.  I can see that one. |
| 14 | Q.  And you know who James Patrick is? |
| 15 | A.  I haven't met him.  I know he's an employee.  But beyond |
| 16 | that, I don't know. |
| 17 | Q.  Is he on the litigation team? |
| 18 | A.  He would be in one of our litigation groups, yes.  They're |
| 19 | the only ones that have access. |
| 20 | Q.  What is this document that has 23 entries?  And I'll show |
| 21 | you what it concludes with on No. 23. |
| 22 | THE COURT:  You need to go up.  Okay. |
| 23 | BY MR. MCDONALD: |
| 24 | Q.  Can you read that okay, No. 23? |
| 25 | A.  Yes. |

1  Q.  How is this document, first of all, generated where it's

2  got 23 different entries?

3  A.  I'm not sure your question.  It's printed out.  Each entry

4  is given a number as it's entered.  Then the next entry will

5  have the next number in sequence.

6  Q.  And where is that information stored?

7  A.  In LPS.

8  Q.  And when you say "in LPS," what does that mean?  Is that

9  at the LPS company site or are you talking about within the LPS

10  software program?

11  A.  It's within the LPS software program that we are

12  utilizing.

13  Q.  And who has custody of the LPS software program?

14  A.  I'm not sure what you mean by custody.

15  Q.  Yeah.  Lawyers talk like lawyers.  I'm sorry.  All right.

16  To use the analogy that we used earlier about Outlook Express,

17  if I write an e-mail and I send it and save a copy of it in

18  Outlook Express, it's saved on my computer; right?

19  A.  That's my understanding, yes.

20  Q.  In my possession?

21  A.  Yes.

22  Q.  When a document is generated using the LPS software, is

23  that document automatically saved?

24  A.  Yes.  This is saved.

25  Q.  And where -- in whose computer is that document saved?

1    A.   It's in Chase's system.

2    Q.   Where?  Did you know where the physical location of

3    Chase -- where it is?

4    A.   No.  I don't know where the main storage systems are at.

5    Q.   But you know that the documents when it's generated,

6    there's one localized, centralized location where all of these

7    entries are stored and it's all at Chase?

8    A.   They're all at Chase.  They're different locations, as we

9    have different backups for security reasons.  So there will be

10   more than one location with the information, but it's all under

11   Chase's control.

12   Q.   And the computer decides where -- which particular main

13   frame or computer to store the information?

14   A.   I'm not sure a computer decides that or our tech

15   department does, but.

16   Q.   And how is this information accessed by people that are

17   outside of Chase?  Are they given a particular code to be able

18   to access it?

19   A.   If we're talking about the attorneys that have been given

20   access to it, yes, they have specific access privilege.  And

21   they're the only ones who can get in.  Like you and I couldn't

22   just go in because we wanted to.  If you don't have access, you

23   can't get into it.

24   Q.   And the access code is generated and delivered to the

25   attorney at the time when some form of litigation is

1   contemplated by Chase?

2    A.   It's when they're approved for referrals from Chase and

3   access to the system.

4            THE COURT:  All right.  So that sounds a lot to me

5   like attorneys who are approved, for example, to write title

6   insurance.  So you're on an approved list.  So are you saying

7   there's an approved list of attorneys for access to LPS

8   documents?

9            THE WITNESS:  Yes.  And they're given access when

10  they're approved to represent us.  And then they only have

11  access specific to those cases which they accept referral on.

12  They can't see other people's cases.

13           THE COURT:   There's an approved list.  All right.

14  BY MR. MCDONALD:

15   Q.   And then just one final question on this point.  What did

16  you do specifically to make sure that the only people who

17  accessed the information in these LPS notes made the basis of

18  Chase's privilege were accessed by other Chase or outside

19  counsel?

20   A.   I'm not sure I understand your question.  It's who has

21  these entries?

22   Q.   Yeah, in this particular incident.  Did you have an

23  opportunity to review this particular document that's Bates 847

24  through 852 before you came here today?

25   A.   Yes, sir.

1   Q.  And tell me what you did to make sure -- satisfy yourself

2   that the only people who had access to the information that's

3   contained on this, most of which is redacted, were either Chase

4   employees or Chase's outside counsel?

5   A.  In looking at the unredacted entries, those are the only

6   names that are on the entry.  So you can see who is actually

7   sending and who is receiving based on that information.

8   Q.  Well, yes, on the unredacted entries.  But did you look at

9   LPS notes, Chase 847 to 852, the documents that have been

10  redacted, to assure yourself that none of the people whose

11  names have been redacted are people that are outside of Chase

12  employees?

13  A.  Yes, sir.  There was no one outside of Chase employees.

14  Q.  And where -- and there was nobody other than Chase lawyers

15  who received these documents, Documents 847 to 852?

16  A.  That's correct.

17          MR. MCDONALD:  Thank you.

18          THE COURT:  All right.  Have we resolved your issue

19  about LPS?

20          MR. MCDONALD:  Yes, Your Honor.

21          THE COURT:  All right.  Is there anything else that

22  this witness needs to -- is there any other issue regarding

23  privilege?  Because I'm not going -- I'm not going to go to

24  waiver.  So since I'm not going to find that there's a waiver

25  of the right to assert any privilege, what else do we need to

```
1    go into in terms of evidence that causes you to think that

2    their privilege log is inadequate?  You, Mr. McDonald.

3              MR. MCDONALD:  Yes.  Your Honor, based on her

4    testimony that it was just between Chase and outside counsel,

5    then I'm going to withdraw the objection to the privilege log.

6              THE COURT:  All right.  Then I think if you have

7    nothing else you intend to prove through this witness, she can

8    step down.

9              MS. ROBINSON:  You can step down for now.

10             THE COURT:  Always accept an invitation to step down.

11             MS. ROBINSON:  Your Honor, I'm not sure what else is

12   going to come up.  Can I ask her just to stay here in case

13   there's another evidentiary issue?

14             THE COURT:  Of course you can.  It's a public

15   courtroom.  And absolutely, I would like her to stay rather

16   than leave and we need her.

17        All right.  So the privilege log issues are withdrawn.

18   Does that mean there's no longer an issue regarding whether or

19   not any of these documents as to which privilege has been

20   asserted have been established to be entitled to that privilege

21   status?  Does that mean that's just gone?  We're not dealing

22   with privilege anymore.  You said privilege log.  Are there any

23   documents for which they have claimed privilege that you are

24   still asserting they have not established the entitlement to

25   that privilege?
```

```
 1              MR. MCDONALD:  Not based on this witness' testimony,
 2     Your Honor.
 3              THE COURT:  Okay.  So now we need to turn to the
 4     interrogatories; is that correct?
 5              MR. MCDONALD:  Yes.
 6              THE COURT:  All right.  Let's turn to Interrogatory
 7     No. 3.  In Interrogatory No. 3, the plaintiff is seeking
 8     employee witness information from the defendant.  There are
 9     Subparts A through J to Interrogatory No. 3.  The defendant has
10     provided names and -- I'm sorry -- names, addresses and
11     telephone numbers for these employees and witnesses, but has
12     not summarized the knowledge of these persons or indicated
13     which of A through J caused them to identify them.  Or maybe
14     it's all of them.
15         But under Federal Rule of Civil Procedure 33(d), the
16     burden -- the defendant can just produce business records to
17     address interrogatories only if the burden of deriving or
18     ascertaining the answer will not be -- will be substantially
19     the same for either party.  It seems to me that at a minimum,
20     Chase should identify as to each witness for Interrogatory
21     No. 3 which subparts caused you to identify them.
22              MS. ROBINSON:  Your Honor, if I could speak just to
23     the -- kind of how we got to where we are in terms of these
24     documents.  There are notes maintained by Chase that have been
25     produced to the plaintiff that show for a particular day, a
```

1    particular employee code took some action with regard to the

2    account, either spoke to the plaintiff or her husband or made

3    some entry or whatever else.  And those are sometimes

4    abbreviated, you know, the conversations in the notes.

5          So how we got here is they asked us to identify anybody

6    from Chase who had contact with the file.  So we went and

7    pulled out all the employee codes.  And then we matched those

8    up to names.  And then they said, "Tell us what each one of

9    those people knows."  And we said, "We don't know what they

10   know other than the fact that they made an entry -- on January

11   1st, 2011, they made an entry that they talked to the plaintiff

12   and this is what happened."

13         We can't add anything to what's in the documents that have

14   been produced about what activity the particular person took.

15   And because we've matched the codes with the person's name,

16   we've -- you know, we all have the same information.  Here's

17   the employee code.  Here's the person's name.  Here's what they

18   wrote down that they did on January 1st.  And so that's why

19   we're referring them under Rule 33(d) to the documents because

20   they can match up, like we can, Employee No. 32 is Sandy

21   Robinson.  On January 1st, she talked to the borrower and said,

22   "Please send your payment in."

23              THE COURT:  Okay.  All right.  Having heard that,

24   Mr. McDonald, what more is it that Rule 33(d) requires them to

25   give you?

1          MR. MCDONALD:  Well, I still don't have names and

2     addresses.  I got a promise to get them.  But we will hopefully

3     get them soon.

4          THE COURT:  Well, she just said she gave you names.

5          MS. ROBINSON:  We gave you names.

6          MR. MCDONALD:  She gave names, yes.

7          THE COURT:  Okay.  And now you're saying you haven't

8     gotten addresses, but those are promised.

9          MR. MCDONALD:  Those are promised.

10         MS. ROBINSON:  Yes, Your Honor.  I don't know if you

11    looked at the letter that was attached to Mr. McDonald's filing

12    yesterday, but after we met yesterday, what I told him we would

13    do is we would identify which of these people were still Chase

14    employees and those could all be contacted through us.  And the

15    ones who no longer worked for us we would give the last known

16    addresses and phone numbers.

17         THE COURT:  All right.  And have you agreed on a date

18    by which you'll do that?

19         MS. ROBINSON:  No, Your Honor.  But we're prepared to

20    do that within the next two weeks.  We've got somebody

21    compiling that right now, Judge.  We asked them to do it

22    immediately after Mr. McDonald and I met yesterday.

23         THE COURT:  Did you want to say something,

24    Mr. McDonald?

25         MR. MCDONALD:  Yes.  To answer your question about

```
1    33(d), 33(d) just says that it has to be equally available to
2    me and to them.  And I did not yesterday, because of time,
3    attach examples, but Your Honor, may I approach you and give
4    you --
5              THE COURT:  The reason y'all don't have time is
6    because y'all have asked for continuances.  I mean, if you
7    don't want this thing resolved, that's fine with me.  But it's
8    your motion.  I would think you'd want it resolved.  So to the
9    extent that y'all don't have time, it's because somebody got
10   sick and then you had vacation.  And that's not my fault.  And
11   my experience is is that attorneys wait until the very last
12   minute to pick up a file and work on it.  So I'm not real
13   sympathetic to the fact that you don't feel you had enough
14   time, because I entered my order last week.  And today is
15   Tuesday.  And I do know lawyers who work on the weekend.  And
16   I'm sure both of y'all do.  So I'm not real sympathetic to lack
17   of time in terms of working these things out.  You knew you
18   were going to be in this courtroom on this date at this time.
19   And you don't wait until 5:00 to get ready to file something
20   that's due at 5:00.
21        All right.  Now, having told you that I'm not very
22   sympathetic about the time thing, why -- she says she's
23   giving -- she's going to give you -- she's giving you the
24   names.  And she says that she's identified which code that's on
25   a document that name corresponds to.  And she says that within
```

1  two weeks -- which I compute to 14 days, which I compute to not

2  counting -- today is November 6th -- will be November 20th, she

3  will give you addresses and phone numbers for people who are no

4  longer Chase employees.  And she will identify which people are

5  still Chase employees.

6      Okay.  Now, what more is it that she hasn't given you that

7  she owes you?

8          MR. MCDONALD:  Well, I'd just go back to wanting an

9  answer to the interrogatories so that I can choose which ones

10  these folks have knowledge about because it's difficult to

11  determine from their own records which ones have knowledge.

12          THE COURT:  She says she only has their records.  Are

13  you saying she has to go conduct an investigation and interview

14  these employees so that she can -- so that she can answer your

15  questions?

16          MR. MCDONALD:  What I'm saying is is that if an

17  interrogatory has -- if a document has all kinds of Chase's

18  shorthand in it --

19          THE COURT:  That's a different issue.  I'm not

20  dealing with shorthand.  I'm dealing with -- is that your

21  complaint is that you can't understand them because of the

22  shorthand?

23          MR. MCDONALD:  Yes.

24          THE COURT:  Okay.  We'll deal with that then.  Let's

25  deal with the jargon in shorthand.  I don't understand why you

```
 1   haven't made a list of terms you don't understand and given

 2   them to her and said, I want -- and I think it should be under

 3   oath, Ms. Robinson, so that y'all can't later say that's not

 4   what that means to me.  I want these to be binding on Chase.

 5   If you see in a document ROA, it means -- if you see in a

 6   document relating to a foreclosure that's created by Chase ROA,

 7   it means whatever ROA means.  And then y'all are stuck with

 8   that answer.  Nobody can get up -- well, if somebody gets up on

 9   the stand and says ROA means something else, he can impeach the

10   heck out of them because it's under oath from a person with

11   knowledge, which is what an affidavit is, that that's what ROA

12   means.

13        You need to give them a list of the terms that you don't

14   understand what the heck they mean.  And then they need to give

15   you an affidavit from person or persons -- it might be multiple

16   people; I don't care -- that say when Chase says ROA, Chase

17   means this.  And then you can translate.  And then they don't

18   have to answer your interrogatory.  You can sit there and go:

19   Okay.  I can translate this Spanish document into English.  And

20   now, having translated it from acronym into English, I know

21   that they're talking about late payments.  And I know that

22   Employee 32 is Sandy Robinson.  And so I know that I do or do

23   not want to take this person's deposition.

24             MR. MCDONALD:  I'll do it.  Thank you.

25             THE COURT:  Well, is there something that won't work
```

1    about that?

2              MR. MCDONALD:  No, Your Honor.  There's nothing that

3    won't work about that.

4              THE COURT:  Okay.  How long will it take you to give

5    them a list of the acronyms, jargon or anything else that you

6    need them pinned down on so that you know what they mean by the

7    term so that you can then make effective and knowledgeable

8    decisions about how to proceed with your discovery?

9              MR. MCDONALD:  One week from tomorrow.

10             THE COURT:  Okay.  So that would be the 14th.  And

11   then I would think it shouldn't take y'all longer than a week

12   to define -- to give him a definition of your own terms.

13             MS. ROBINSON:  Your Honor, I was just going to say

14   I'm thinking of two problems.  One, it may take -- we may have

15   to find more than one person to make sure that we get the right

16   answer.  And two, it's right in the middle of Thanksgiving

17   week.

18             THE COURT:  No.  Actually, November 21st is not in

19   the middle of Thanksgiving.

20             MS. ROBINSON:  Okay.  Can we please have ten days,

21   Judge?

22             MR. TURNER:  It is Saturday of Thanksgiving week, I

23   think, if my math is right.

24             MS. ROBINSON:  Mr. Turner is saying --

25             THE COURT:  I'm not going to make you give it to them

1    on a Saturday.

2            MS. ROBINSON:  If we could just have to that Friday.

3    Rather than the 21st, that would be the 23rd.

4            THE COURT:  What day -- the 23rd is actually a legal

5    holiday; right?  Because Thursday is Thanksgiving Day.

6            THE CLERK:  It's not a legal holiday.

7            THE COURT:  It's not a legal holiday.  But most

8    people take it off.

9            THE CLERK:  Right.

10           THE COURT:  So the 23rd, 24th, 25th, 26th -- you can

11   have until the 26th, the Monday after Thanksgiving.

12           MS. ROBINSON:  Thank you.

13           MR. TURNER:  Thank you.

14           THE COURT:  In affidavit form.

15           MS. ROBINSON:  Yes, ma'am.

16           MR. TURNER:  Yes, ma'am.

17           THE COURT:  And you can have multiple affidavits.  I

18   mean, I would think you might have multiple affidavits.  You

19   might have a bankruptcy affidavit person and a foreclosure

20   affidavit person and some ROA affidavit person, whatever an ROA

21   is.  And that means you have to deliver it to him.  And if

22   you're running out of time, I suggest you e-mail it.

23           MS. ROBINSON:  Yes, ma'am.

24           MR. TURNER:  Yes, ma'am.

25           THE COURT:  So he has to have received it.  Now, they

```
 1    have to have received your list of terms by November 14th.  If
 2    it's not on your list, they don't have to define it for you.
 3    Okay.  And they have to have received it.
 4         All right.  Now, it seems that we're getting to
 5    Interrogatory No. 6.  It seemed to me 5 and 3 went together
 6    because it was the jargon issue.  Mr. McDonald?
 7              MR. MCDONALD:  Yes, Your Honor.
 8              THE COURT:  Is 5 encompassed within my ruling on 3?
 9              MR. MCDONALD:  Yes, Your Honor.
10              THE COURT:  Okay.  So now, we'll turn to 6, disputes
11    that are similar in nature to the ones that plaintiff has
12    brought against defendant.  Ms. Landis' declaration indicated
13    some uncertainty on her part about whether or not the document
14    request was limited to disputes relating to loans for real
15    property located in Alabama.  Is that -- she was comfortable
16    that your interrogatory was so limited, but she was not
17    comfortable that your discovery request was so -- your document
18    production request was so limited.
19         Is your document production request limited to loans
20    relating to real estate located in the state of Alabama or is
21    it limited in any other manner?
22              MR. MCDONALD:  It is limited to Alabama.  And I've
23    made offers to limit it to the scope and time for the period at
24    issue in this case.
25              THE COURT:  What would that scope of time be?
```

1          MR. MCDONALD:  The 2007 to two thousand -- I had said

2    through the end of discovery, but I changed it when making an

3    offer of compromise from 2007 through 2011.

4          THE COURT:  That would be December 31st?

5          MR. MCDONALD:  Yes, Your Honor.

6          THE COURT:  So January 1, 2007, to December 31, 2011?

7          MR. MCDONALD:  Yes, Your Honor.

8          THE COURT:  All right.  I found the explanation of

9    burdensomeness to be totally vague and unsatisfactory.  So if

10   you've got more to put on about burdensomeness.

11         MS. ROBINSON:  Yes, ma'am.

12         THE COURT:  Because just saying some people might

13   have to do some work and we might even have to hire a few,

14   that's not quantifiable.

15         MS. ROBINSON:  Yes, ma'am.  May I ask Ms. Landis to

16   take the stand again?

17         THE COURT:  Yes.  You're still under oath,

18   Ms. Landis.

19                         **VICKI LANDIS,**

20   was thereupon recalled as a witness and, having previously been

21   duly sworn, testified as follows:

22         THE COURT:  Ms. Landis, since you've been in the

23   courtroom, you now know that the document production request is

24   limited to real estate located in Alabama -- loans relating to

25   real estate located in Alabama.  And it's limited to disputes

```
 1   that Chase had knowledge of between January 1, 2007, and

 2   December 31, 2011, with the beginning and ending date

 3   inclusive.  Knowing that, please respond to Ms. Robinson's

 4   questions.

 5                    DIRECT EXAMINATION

 6   BY MS. ROBINSON:

 7    Q.  Now, Ms. Landis, in connection with this case, you

 8   executed an undue burden affidavit in connection with this

 9   particular issue about loans in Alabama; correct?

10    A.  Yes, I did.

11    Q.  And as part of your research, before you executed that

12   affidavit, did you --

13             THE COURT:  It's not an affidavit.

14             MS. ROBINSON:  Or a declaration.

15             THE COURT:  It's a declaration.  It doesn't state

16   it's on personal knowledge.  It doesn't even say it's stated on

17   information and belief.  It may be a Texas appropriate form.  I

18   have no idea.

19   BY MS. ROBINSON:

20    Q.  Before you signed the declaration, did you look into the

21   fact -- did you research the number of real estate loans that

22   Chase has in Alabama?

23             THE COURT:  Yes.  She said 80,000.

24             MS. ROBINSON:  Okay.

25             THE COURT:  I've read the declaration.
```

1          MS. ROBINSON:  Okay.

2     BY MS. ROBINSON:

3      Q.  What does dispute mean to you in terms of a customer that

4     might have a dispute with Chase?

5      A.  We categorize a dispute as any call or letter from the

6     borrower stating either they don't understand or they don't

7     agree with something.

8          THE COURT:  Okay.  Let me stop you right there.  Can

9     you narrow the term "dispute" down, Mr. McDonald?

10         MR. MCDONALD:  Yes, Your Honor.  I offered to.  It is

11    a situation where the homeowner pays off -- sends a payoff to

12    Chase American and they fail to do it and they fail to apply

13    those funds to pay it off in any fashion under those

14    circumstances, whether they sue them or there is an extended

15    period of time before it's completed.

16         MS. ROBINSON:  Your --

17         THE COURT:  I don't think that what you have said is

18    clear to me.  So why don't you say it with more words again.

19         MR. MCDONALD:  Okay.  It's a situation where the

20    homeowner sends a payoff amount to Chase to pay off the loan.

21         THE COURT:  It's to pay off in full?

22         MR. MCDONALD:  In full.

23         THE COURT:  This is not a partial payment?

24         MR. MCDONALD:  Correct.  And then Chase fails for

25    whatever reason to apply those funds to pay off the loan.

```
 1              THE COURT:  Well, what if Chase took the position
 2     that the full payoff was not full?  Would that be a dispute?
 3              MR. MCDONALD:  No.  That would not be a dispute.
 4     What I mean is where Chase has verified, either at the time or
 5     after the fact, that, in fact, like they did in the Barnetts,
 6     ultimately they concluded that the Barnetts had paid the entire
 7     payoff amount.  And the way for Chase to be able to narrow this
 8     down is they actually have a document that when someone
 9     requests a payoff amount and Chase gives it, they flag their
10     computer that says, "Check for loan payoff."  So as soon as
11     they give a payoff amount to a consumer who asks for it, then
12     it's in their computer.
13          And so what I'm asking is once in those situations where
14     the computer has been flagged because they sent off a payoff
15     amount to the debtor, the debtor paid that amount that was
16     reflected on Chase's own document, but Chase failed to apply
17     those funds to pay off the loan.
18              THE COURT:  Now, usually I assume you mean funds have
19     been received by the date due because usually there's a per
20     diem?
21              MR. MCDONALD:  Yes.
22              THE COURT:  Okay.  So whatever --
23              MR. MCDONALD:  They have a ten-day payoff period.
24              THE COURT:  Okay.  They have a ten-day payoff period
25     and they hold it level for that ten days?  They don't have a
```

1   per diem?

2           MR. MCDONALD:  No.  Not on the payoffs that I've

3   seen.  I don't know what -- they give a loan payoff.  And it

4   says, "This is good for ten day."  I think they even call it a

5   ten-day payoff.

6           THE COURT:  Okay.  So by dispute, he means a

7   situation in which -- and he's limiting it to residential

8   loans, because he said homeowner -- a residential loan where

9   Chase is the lender or holds the loan -- they've acquired the

10  loan and the customer has requested and received a ten-day

11  payoff amount, Chase has, in fact, received the funds in the

12  amount specified in the ten-day payoff within the ten-day

13  period and Chase has not applied the funds to that homeowner's

14  loan.  That's what he means by dispute.

15          THE WITNESS:  Okay, Your Honor.

16          THE COURT:  Okay.  Now, ask your question.

17  BY MS. ROBINSON:

18  Q.  Are you aware of any system that flags loans where

19  somebody has called to ask for a payoff?

20  A.  No.

21  Q.  Have you ever heard of that before Mr. McDonald just said

22  it?

23  A.  No.  The only scenario I can even think of would be if it

24  were a last minute short sale that was being offered and last

25  minute itself would flag a closing date, but it doesn't have

1    anything to do with generating payoffs.

2    Q.   So even if the term "dispute" were to be narrowed in the

3    way Judge Hopkins just articulated to you, would it still be

4    required to physically go look at every one of the 80,000 loan

5    files in Alabama to determine if that had happened?

6    A.   Yes.

7              MS. ROBINSON:   Your Honor, can I suggest that if we

8    could narrow it to lawsuits, we can get an answer in two weeks.

9    Otherwise, it's going to be the cumbersome going through every

10   file, as Ms. Landis had previously indicated.

11             THE COURT:   All right.   She's offering you lawsuits.

12             MR. MCDONALD:   May I ask the witness one question?

13             THE COURT:   Yes.

14                          **CROSS-EXAMINATION**

15   BY MR. MCDONALD:

16   Q.   Ms. Landis, what is a pending payoff loan indicator?

17   A.   I don't know in what context you're reading that so I

18   don't know.   I can't answer.

19             MR. MCDONALD:   May I?

20             THE COURT:   Yes.

21   BY MR. MCDONALD:

22   Q.   I just got this yesterday.   So I'm learning along with

23   you.

24   A.   Upside down.

25   Q.   I have no excuse for that other than nervousness.

1    Everything is kept on the computer system, either the LPS or

2    the MRS system; correct?

3    A.   I'm sorry.  I was reading this.  Could you state that

4    again?  I'm sorry.

5    Q.   Chase maintains a system so that everybody who interacts

6    with a customer homeowner can have the realtime information

7    about that customer; correct?

8    A.   Yes.  That's correct.

9    Q.   So there's someone sitting in a call center in Ohio or

10   Texas or wherever the call centers is, they're supposed to be

11   able to see the same information?

12   A.   Right.  Once they hit enter, we can all see it.

13   Q.   And Chase has policies and procedures on how to handle

14   particular events, particularly when someone calls and

15   requested their loan payoff amount; correct?

16   A.   Yes.  There's procedures on how to generate a payoff or

17   add a request.

18   Q.   There's procedures on how to generate the request and

19   convey it to the homeowner; correct?

20   A.   Yes.

21   Q.   And that's a ten-day payoff is the shorthand how you refer

22   to it?

23   A.   No.  It's just a payoff quote.  The good through date

24   would generally be through that date to the next payment due

25   date.

1    Q.   And how does Chase track -- once that request has been

2    made by the homeowner, how does Chase track whether a payment

3    has come in?

4    A.   The payment will appear in the cashiering screen if it

5    comes in.

6    Q.   And is there not a way, Ms. Landis, that Chase has

7    implemented to make sure that everybody who views the file is

8    able to know that okay, this customer, if they call in, they

9    requested a loan payoff X number of days ago?

10   A.   It doesn't indicate who requested the payoff.  We request

11   payoffs on our loans for various reasons -- for analysis,

12   status information.  There could be a hundred reasons why a

13   payoff is requested.  And not that many are actually requested

14   from our borrowers.

15   Q.   And you've never heard of a circumstance -- you're

16   unfamiliar with any procedure where once someone requests a

17   loan payoff that the computer is flagged to notify everybody

18   that a loan payoff document has been sent to the homeowner?

19   A.   The only purpose for ever indicating that a payoff has

20   been sent is to confirm that the customer request was complied

21   with.  There's no monitoring of payoff funds to be received

22   because they're not obligated to pay off just because they ask

23   for a quote.

24   Q.   But there is a way for you to be able to search the system

25   today if, for example, you were told Ms. Landis, by your boss,

1    I want you to check the system and I want you to identify every

2    homeowner who has made a payoff request within the past 60

3    days?

4    A.   No.   I'm not aware of anything like that.   Our payoff

5    requests are just payoff requests.   There is no separate field

6    for borrower or internal request or external.   It could be one

7    of our attorneys asking for it.

8    Q.   Well -- my mistake.   So there is a way for you to be able

9    to search the system to determine whether a payoff request has

10   been made within a certain period of time?

11   A.   Whether a payoff quote has been sent?

12   Q.   Correct.

13   A.   We can see if a payoff quote has been sent.   It will be a

14   comment in the servicing log.

15   Q.   And there's a search that you can do that will, for

16   example, if you want to know everybody in Birmingham who has

17   been sent a payoff request within the past 60 days, there's a

18   search that you can do to be able to develop that information

19   just through the computer system?

20   A.   I'm sure IT could pull some kind of report, but they

21   couldn't identify the purpose of the request or who requested

22   it.

23   Q.   But that particular search, the payoff request was sent

24   out for whatever reason within 60 days to everybody within a

25   specific geographical area, you can generate that report on the

1    computer system?

2    A.   If I understand your question correctly, we should be able

3    to identify how many payoff quotes were generated on a specific

4    loan.  What we can't do is identify whether it ever left our

5    office, it was for internal purposes, if it went to an attorney

6    or if it was actually a borrower request.

7    Q.   I understand.  Setting aside what the purpose was, we're

8    just establishing that can be done through the computer system?

9              THE COURT:  No, because you keep saying sent out.

10   And where she's -- she's saying we can generate whether or not

11   a payoff request -- whether or not a payoff amount was

12   calculated.  What we can't do is say whether or not it ever was

13   sent out because out implies -- means outside of Chase.  Is

14   that not what you're saying?

15             THE WITNESS:  Yes.  That's exactly what I'm saying.

16             THE COURT:  So she can say whether or not payoff --

17   payoff amounts have been calculated within the past 60 days.

18             MR. MCDONALD:  But not whether it was sent to

19   anybody.

20             THE COURT:  But not whether it was sent to anybody

21   because she doesn't know to whom it was sent.  She can't

22   determine to whom it was sent and whether they were a Chase

23   employee or someone who is not a Chase employee.  So then the

24   way -- when you say "sent out," that implies that it's going

25   outside of Chase.

1          MR. MCDONALD:  Yes.  And that's what -- that's what I

2    understood -- thank you, Your Honor, because I did

3    misunderstand that.

4    BY MR. MCDONALD:

5     Q.  Will you tell me what this means where we're talking about

6    the key identifier, that a payoff quote was ordered on a loan

7    today of a pending payoff loan?

8          MS. ROBINSON:  What document is that, David?  We

9    can't find it.

10          MR. TURNER:  What's the document number?

11          MR. MCDONALD:  That is Chase 2268.

12          MR. TURNER:  Thanks.

13    BY MR. MCDONALD:

14     Q.  Will you just tell me what this system is -- what this

15    Chase document is telling employees?

16     A.  This is how the individuals working in the payoff

17    department -- and by that, I don't mean receipt of payoff

18    checks, but generally payoff quotes -- this is how they monitor

19    their last request.  So say we get a request from a broker who

20    is working a short sale for a third party, they've asked for a

21    a payoff quote and they're calling in to say they didn't get

22    it, then this is how you would look at the last payoff.  And

23    they look at their system.  And they identify that the payoff

24    quote was ordered because the date ordered would be there for

25    the last one or whether or not it's still pending and it hasn't

1    generated yet.

2              THE COURT:  What does still pending/hasn't generated

3    mean?

4              THE WITNESS:  That means they got the request for a

5    payoff quote, but they may be waiting for outstanding

6    attorney's fees.  And especially if it's in litigation, we have

7    to wait for that before we can generate the final quote.

8              THE COURT:  Okay.  So before you can respond to the

9    payoff request with an amount?

10             THE WITNESS:  Yes.

11             THE COURT:  That's generated?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  As bad as lawyers.

16   BY MR. MCDONALD:

17   Q.  This No. 1 where it talks about check the PLO5 and verify

18   if payoff statement appears in the description column, you can

19   also view the date the quote was generated?

20   A.  Yes.  And you'll see that same comment in the call logs.

21   Q.  So you can conduct a search that determines each time a

22   payoff quote is generated?

23   A.  No, sir.  You can conduct a search for -- this PLO5

24   screen, that's a screen that's in MSP, which is our servicing

25   system.  I'm assuming that the tech department could conduct a

1    search off of PLO5 using a specific field and identify when the

2    last payoff quote was sent.  But it doesn't have a history.

3    Q.  When you say the tech department generates the searches,

4    do you formulate the searches or do you tell the tech

5    department, "This is the information that I need," and then

6    send them to generate the request?

7    A.  No.  What I'm saying is that if it's not some type of a

8    report which is systematically generated on a regular basis,

9    then we would have to send a request to what I term the

10   technology department.  It may have another name now.  But

11   those individuals have a greater skill in computers than I do.

12   And they could identify whether or not there's a field that

13   could be used to populate such a report.

14   Q.  And they would be the ones to be able to tell us exactly

15   whether they can conduct a search like I'm talking about, tell

16   us how many -- how many folks have been sent a payoff request

17   within the past couple of -- 60 days, for example?

18   A.  They would be the individuals to confirm if such a report

19   could be created if there is a field which houses that

20   information which we do not have.

21   Q.  And you're not familiar with which search fields are

22   available to Chase to conduct those types of searches?

23   A.  No.  I'm very familiar with those fields.

24   Q.  But a tech department would be more familiar with whether

25   they can conduct a search or generate some form of search to

1    get the particular information we're talking about now?

2    A.   What I'm saying is that a technology department would be

3    the one that would create a new search if such a field existed.

4    But if there's no field for them to pull to do an as if

5    equation for the report, they can't build the report.

6    Q.   And the information I think, if I understood from your

7    declaration, that I was asking for in this particular request

8    for production of documents, it is now tracked by Chase;

9    correct?

10   A.   We started tracking complaints in 2011.  But complaints

11   and disputes for our internal definition means anything that

12   came in where a borrower said, "I don't understand" or "I don't

13   agree."  And then the person who takes the call tries to

14   resolve it at that level.  All we have on that tracking is this

15   many disputes, this many resolved at the first call.  It

16   doesn't break out -- outside of department, it doesn't break

17   out what the dispute was.

18   Q.   How did Chase define its term "complaint," just anybody

19   who had a question?

20   A.   Dispute was defined as anyone that calls in with either --

21   I would say a disagreement about something that they saw and it

22   may just be a misunderstanding.  If they called in and said,

23   "You didn't give me credit for my last payment; I think my

24   payoff or my reinstatement is wrong," that would be a dispute.

25   And if the person taking the call says, "Which check are you

1    talking about?"  And they pull it and they explain to the

2    borrower they can find it, when it was posted and how it was

3    applied and the borrower's response is:  "Okay.  Now, I

4    understand.  I get it.  That's fine."  Then it's resolved.

5    Q.  What field was used or generated to be able to track those

6    complaints, as you do it now?

7    A.  They have reports that are specifically designed by each

8    department.  And they log their disputes as they come in for

9    each specific department at each desk.

10   Q.  What's the new field or is it not a new field?

11   A.  It is a new field, but not so much as in MSP.  They've

12   created a different -- my understanding is it's a different

13   report.  And I just took training on this.  But it's a specific

14   report that they built for disputes.  And they're calculated

15   each day at each desk and then surfaced up to their managers.

16   Q.  Can you tell us what -- do you know what the name of that

17   report is?

18   A.  I just took the training.  And I can't remember -- I'm

19   sorry.  I can't remember the name of it.

20   Q.  One last question.  The Attorney General of Alabama,

21   Luther Strange, propounded request for production or whatever

22   they call them out of his office upon Chase.  Were you involved

23   in generating that information for him?

24   A.  No.  I have not been involved in any of the discovery

25   responses.

1    Q.  Have you been involved in generating any type of discovery

2    responses in response to litigation in Alabama?

3    A.  I can't honestly say -- state specific.  I've been in

4    default servicing for almost 20 years.  And part of that time,

5    I worked as a paralegal.  And I did participate.  I can't tell

6    you for sure exactly which dates.

7              MR. MCDONALD:  Thank you, Your Honor.

8              THE COURT:  All right.  So are you saying to me now

9    that even with the narrowing that has been done -- and I'm kind

10   of repeating the question Ms. Robinson asked you -- that the

11   only way to pull this information -- the only way to answer

12   this interrogatory or -- I'm sorry -- to produce these

13   documents is to go through 80,000 loan files?

14             THE WITNESS:  We're going to have to look at each one

15   specifically because we don't keep that specific of a record.

16             THE COURT:  And to go through a loan file for the

17   type information that I'm asking about by somebody who has been

18   trained, as opposed to somebody that you hired and may be

19   perfectly bright but isn't familiar with Chase's documents, so

20   let's assume an experienced person who is used to looking at

21   Chase loan files --

22             THE WITNESS:  Yes.

23             THE COURT:  -- how long would it take them per loan

24   file to see if it's responsive?

25             THE WITNESS:  They would have to go back through all

MARGARET WASMUND, RMR, CRR

1    those years in the timing covered and look at all the call

2    records, any correspondence that's been sent.  We would have to

3    go through our imaging because it may have been disputed and

4    resolved and the case has moved on or the file has moved on.

5    It would definitely -- most of the files, you're looking at a

6    thousand pages maybe.  So --

7              THE COURT:  Per file?

8              THE WITNESS:  Per file.  Because they may have to

9    look at everything.  There's no indicator that's going to let

10   them know that, unless the dispute is currently pending and

11   then that would be easier to see.  But if it's something that's

12   been resolved --

13             THE COURT:  What if we limit it to currently pending

14   disputes?

15             THE WITNESS:  That would be much easier.  Without

16   knowing the exact number, I don't know what kind of a timeframe

17   to give.  But it would certainly be easier to identify.

18   Especially if they were loans that were currently in litigation

19   with the open dispute, those should be much simpler.

20             THE COURT:  Well, Mr. McDonald, why can't you at

21   least see if that doesn't solve your problem, loans currently

22   in litigation with an open dispute with a homeowner in Alabama.

23             MR. MCDONALD:  Your Honor, if we could -- if we could

24   do that plus any litigation that's been resolved during that

25   time period also.  Surely they would know if a case was filed

```
 1    and then resolved.
 2              THE COURT:  I don't understand why Alacourt wouldn't
 3    tell you what cases have been filed.  It won't tell you why
 4    they've been filed.
 5              MR. MCDONALD:  Right.  And that's --
 6              THE COURT:  But if it told you what cases would be
 7    filed, then they would only have to look for the lenders whose
 8    names are on those cases as opposed to 80,000 files where there
 9    might not be a dispute at all.
10              MR. MCDONALD:  Right.
11              THE COURT:  So I'm thinking that one way to handle
12    this is for you to identify cases that were filed against Chase
13    in Alabama courts for the time period you're interested in and
14    send them a list of the plaintiffs' names and them to then
15    check only those files.  That's still a thousand pages per
16    file.  And I don't know how long a list it would be.  But
17    Alacourt is as available to you as it is to them.  Or you could
18    take loans that are currently in litigation and have an open
19    dispute and you wouldn't have to go through Alacourt.
20              MR. MCDONALD:  I'll take the latter, Your Honor.
21              THE COURT:  All right.  About how long do you think
22    it would take to get a list to respond to that interrogatory
23    limited to loans currently in litigation?  I mean, how many
24    days.  I don't mean how many hours.  And there is an open
25    dispute.
```

1              THE WITNESS:  I would say maybe a couple of weeks.

2              THE COURT:  Okay.  Understanding, as I've been

3      reminded, that Thanksgiving is coming up, why don't we put this

4      to the Friday after the Monday that the other is due.  So

5      that's 26, 27, 28, 29, 30 -- November 30th.

6              THE WITNESS:  Yes, ma'am.

7              MS. ROBINSON:  And again, Your Honor, just to make

8      sure that I'm clear on it, we're talking about currently in

9      litigation with an open dispute with those other items the

10     Court previously articulated, the residential loan, the

11     customer requested.

12             THE COURT:  Residential properties in Alabama.

13             MS. ROBINSON:  Chase is the owner of the loan.  The

14     customer requested and received a ten-day payoff.  Chase had

15     received the funds in the amount specified.  And Chase -- the

16     complaint or dispute is that Chase did not apply the funds to

17     the payoff.

18             THE COURT:  If you want it that narrow.  Is that what

19     you want, Mr. McDonald?

20             MR. MCDONALD:  With the exception of Chase isn't the

21     owner of this loan.  Chase is the servicer.

22             THE COURT:  Yes.  I was going to say --

23             MS. ROBINSON:  Yes.  That's fine.

24             THE COURT:  -- owner or servicer.

25             MS. ROBINSON:  Okay.

1          THE COURT:  So then you're happy with that?

2          MR. MCDONALD:  Yes, Your Honor.

3          THE COURT:  Okay.  My wonderful court reporter will

4    e-mail me that language that she just said and then his

5    response to with adding -- anyway, through the "or servicer"

6    that I added.  And then I'll print that out.  And then

7    everybody will know what it has to be.  And I'll put it in the

8    order.

9        (Off the record discussion)

10          THE COURT:  Then I don't see any other issues that

11   have not been -- that you've notified me remain -- you, the

12   plaintiff -- have notified me remain and that we haven't dealt

13   with.  Are there any?

14          MR. MCDONALD:  There are none.

15          THE COURT:  All right.  Then what I will do is get an

16   order out no later than tomorrow that summarizes what everybody

17   is going to do and by when they're going to do it.  And it will

18   be consistent with what I said here in court.

19          MS. ROBINSON:  Thank you, Your Honor.

20          MR. TURNER:  Thank you, Your Honor.

21          THE COURT:  But it's better to have it in writing.

22          MS. ROBINSON:  Yes, agreed, because there were

23   several different deadlines.  I want to make sure we have it

24   all straight, too.

25          THE COURT:  Yes.  It's good for me because I don't

```
 1   want one side coming in and saying hold them in contempt.  And
 2   I'm saying I'm not sure what they were supposed to do by when.
 3   And it's good for y'all because y'all don't want to be calling
 4   each other as not having complied and then find out that I
 5   disagree.  I think they have.  So all right.  So the motion
 6   will be granted in part and otherwise denied.  And I will enter
 7   a written order accordingly.  Thank you.
 8             MS. ROBINSON:  Thank you.
 9             MR. TURNER:  Thank you, Your Honor.
10             THE COURT:  And Ms. Landis, again you can step down.
11             THE WITNESS:  Thank you.
12             THE COURT:  I have to add one thing.  Y'all had
13   talked about custody -- I'm sorry -- possession.  And it's
14   possession, custody or control.  So anything I am ordering
15   y'all to produce -- anything that y'all do produce, it's not
16   limited to possession.  And I will tell you that this came up
17   and I didn't like it.  For example, if Chase employs another
18   company to retain records for it, those are within their
19   control.
20             MS. ROBINSON:  Yes, ma'am.  That was inadvertently,
21   like, sloppy language.  Understood.  We were going to offer to
22   clarify that.
23             MR. TURNER:  We were going to correct that.  Nothing
24   intentional meant by it.  We will correct that.
25             THE COURT:  Okay.
```

1              MS. ROBINSON:  We weren't making a distinction.

2              THE COURT:  That general challenge is sustained.  And

3     I am accepting -- Ms. Robinson, I'm accepting your word as an

4     officer of Court that what you -- and Mr. Turner, I'm putting

5     you on the line, too, your word as an officer of Court --

6              MR. TURNER:  Yes, ma'am.

7              THE COURT:  -- that what y'all have turned over is

8     everything that you've agreed to turn over that has been

9     requested that is within Chase's possession, custody or

10    control.

11             MS. ROBINSON:  Yes, ma'am.

12             MR. TURNER:  Yes, ma'am.

13             THE COURT:  Okay.  All right.  Thank you.

14        (Proceedings concluded at 4:28 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


        I, Margaret Wasmund, RMR, CRR, Official Court Reporter

for the United States District Court for the Northern District

of Alabama, appointed pursuant to the provisions of

Title 28, United States Code, Section 753, do hereby certify

that the foregoing is a correct transcript of the proceedings

reported by me using the stenotype reporting method in

conjunction with computer-aided transcription, and that same is

a true and correct transcript to the best of my ability and

understanding.

        I further certify that the transcript fees and format

comply with those prescribed by the Court and the Judicial

Conference of the United States.




                              *Margaret Wasmund*
                              _____
                              MARGARET WASMUND, RMR, CRR
                              OFFICIAL COURT REPORTER