FILED

2013 Mar-01  PM 04:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 4

LANIER JEFFREY - VOLUME I

| | |
|---|---|
| 1    IN THE UNITED STATES DISTRICT COURT | 1    STIPULATIONS |
| 2    FOR THE NORTHERN DISTRICT OF ALABAMA | 2    (Continued) |
| 3    EASTERN DIVISION | 3 |
| 4 | 4    IT IS FURTHER STIPULATED AND AGREED |
| 5    CASE NUMBER:  1:12-CV-01745-VEH | 5    that it shall not be necessary for any |
| 6    APRIL K. BARNETT, | 6    objections except as to form or leading |
| 7        Plaintiff, | 7    questions, and that counsel for the parties |
| 8        vs. | 8    may make objections and assign grounds at the |
| 9    JP MORGAN CHASE BANK, | 9    time of the trial, or at the time said |
| 10   NATIONAL ASSOCIATION, formerly | 10   deposition is offered in evidence or prior |
| 11   CHASE HOME LOAN SERVICING, | 11   thereto. |
| 12   LLC, | 12 |
| 13       Defendant. | 13   IT IS FURTHER STIPULATED AND AGREED |
| 14 | 14   that the notice of filing of the deposition by |
| 15      DEPOSITION | 15   the Commissioner is waived. |
| 16        OF | 16 |
| 17     LANIER JEFFREY | 17 |
| 18    DECEMBER 11, 2012 | 18 |
| 19    VOLUME 1 (1-276) | 19 |
| 20 | 20 |
| 21   REPORTED BY: | 21 |
| 22    Kimberly B. Dowdy, CSR, RPR | 22 |
| 23  Henderson & Associates Court Reporters | 23 |
| 24   2101 Magnolia Avenue - Suite 400 | 24 |
| 25   Birmingham, Alabama 35205 | 25 |
| 1 | 3 |

| | |
|---|---|
| 1    STIPULATIONS | 1    APPEARANCES |
| 2 | 2 |
| 3    IT IS STIPULATED AND AGREED by and | 3   APPEARING ON BEHALF OF THE PLAINTIFF: |
| 4  between the parties through their respective | 4   KILBORN, ROEBUCK & MCDONALD |
| 5  counsel, that the deposition of MS. LANIER | 5   BY:  Mr. David A. McDonald |
| 6  JEFFREY may be taken before Kimberly B. Dowdy, | 6   913 Government Street |
| 7  Commissioner, at the offices of Bricker & | 7   Mobile, Alabama 36604 |
| 8  Eckler, LLP, 100 South Third Street, Columbus, | 8 |
| 9  Ohio, on the 11th day of December, 2012. | 9   KILBORN, ROEBUCK & MCDONALD |
| 10 | 10   BY:  Mr. Vincent F. Kilborn, III |
| 11    IT IS FURTHER STIPULATED AND AGREED | 11   1810 Old Government Street |
| 12  that the signature to and the reading of the | 12   Mobile, Alabama 36660 |
| 13  deposition by the witness is NOT waived, the | 13 |
| 14  deposition to have the same force and effect | 14   Mr. Darrell (Bubba) W. Grimsley, Jr. |
| 15  as if full compliance had been had with all | 15   ATTORNEY AT LAW |
| 16  laws and rules of Court relating to the taking | 16   21 South Section Street |
| 17  of depositions. | 17   Fairhope, Alabama 36532 |
| 18 | 18 |
| 19 | 19   APPEARING ON BEHALF OF THE DEFENDANT: |
| 20 | 20   CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL, |
| 21 | 21   LLP |
| 22 | 22   BY:  Ms. Sandy G. Robinson |
| 23 | 23   Riverview Plaza |
| 24 | 24   63 South Royal Street, Suite 700 |
| 25 | 25   Mobile, Alabama 36602 |
| 2 | 4 |

LANIER JEFFREY - VOLUME I

```
1        INDEX
2
3    EXAMINATION            PAGE:
4    By Mr. McDonald          6
5         INDEX OF EXHIBITS
6
7    Plaintiff's Exhibit No. 1.........99
     (E-mail Bates Chase 2452)
8
     Plaintiff's Exhibit No. 2.........124
9    (Payoff quote Bates Chase 2453)
10   Plaintiff's Exhibit No. 3.........130
     (E-mail Bates Chase 2457-2459)
11
     Plaintiff's Exhibit No. 4.........178
12   (Bates Chase 00768)
13   Plaintiff's Exhibit No. 5.........178
     (E-mails Bates Chase 00402-00415)
14
15   Plaintiff's Exhibit No. 6.........209
     (E-mails Bates Chase 2454-2456)
16   Plaintiff's Exhibit No. 7.........252
     (January 28, 2011 Bates Chase 00393)
17
18   ERRATA SHEET            274
19   DEPONENT'S CERTIFICATE   275
20   CERTIFICATE OF REPORTER  276
21
     (COUNSEL NOTE:  Counsel instructed court
22   reporter to mark confidential all pages in
     which Chase or Assurant employee names were
23   referenced, which are the following pages:
     10, 36, 42, 97, 101, 132-136, 139-141, 144,
24   156, 181, 186, 189, 206, 209, 252, 273)
25
                                            5
```

```
1        I, Kimberly B. Dowdy, CSR, RPR, a
2    Court Reporter and Notary Public of the State
3    of Alabama, acting as Commissioner, do certify
4    that on this date, as provided by the Alabama
5    Rules of Civil Procedure and the foregoing
6    stipulation of counsel, there came before me
7    at 100 South Third Street, Columbus, Ohio, on
8    December 11, 2012, beginning at 10:00 a.m.,
9    EST, MS. LANIER JEFFREY, witness in the above
10   cause for oral examination, whereupon the
11   following proceedings were had:
12            LANIER JEFFREY,
13   being first duly sworn, was examined and
14   testified as follows:
15       COURT REPORTER:  Would you like
16   the usual --
17       MS. ROBINSON:  Read and sign.
18       COURT REPORTER:  Okay.  Send it to
19   you?
20       MS. ROBINSON:  Uh-huh (in the
21   affirmative).
22   EXAMINATION BY MR. McDONALD:
23       Q.   Tell us your name, please.
24       A.   Lanier Jeffrey.
25       Q.   Where do you live, Ms. Jeffrey?
                                            6
```

```
1        A.   Columbus, Ohio.
2        Q.   Have you lived here all your life?
3        A.   No.
4        Q.   Just give us a history of where
5    you've lived.
6        A.   Boston, Massachusetts and
7    Springfield, Ohio --
8        Q.   Boston, Massachusetts is my
9    favorite city in the whole United States.
10       A.   Really?
11       Q.   Did you go to school in Boston?
12       A.   No.  I lived there in my
13   childhood.
14       Q.   Where did you go to just high
15   school?
16       A.   Springfield, Ohio.
17       Q.   Any other post high school --
18       A.   Columbus.  I went to Ohio State.
19       MS. ROBINSON:  Let him finish his
20   question because y'all are -- he pauses.  He's
21   kind of a slow southern talker, so make sure
22   he finishes his question before you answer.
23       Q.   That's just because of the court
24   reporter and it's totally my fault.  I will
25   speed up, but I'm a little groggy this
                                            7
```

```
1    morning.
2        Who are you employed by?
3        A.   JP Morgan Chase.
4        Q.   And don't tell me your salary, but
5    how are you paid?  Are you paid by check?  Are
6    you paid by direct deposit?
7        A.   Direct deposit.
8        Q.   Direct deposit.  And your
9    understanding is that came -- that comes from
10   JP Morgan Chase?
11       A.   Yes.
12       Q.   How long have you been employed by
13   JP Morgan Chase?
14       A.   Six years.
15       Q.   And tell me what your job titles
16   have been since the beginning; take me in
17   chronological order.
18       A.   Senior operations specialist.
19       Q.   Is that what you are now?
20       A.   No.
21       Q.   That's what you started out?
22       A.   Started.
23       Q.   Okay.  Go ahead.
24       A.   Senior lead specialist.
25       MR. KILBORN:  I'm going to have to
                                            8
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

LANIER JEFFREY - VOLUME I

1  move over there. I can't hear.
2      MS. ROBINSON: Speak up just a
3  little bit, Lanier.
4      A.  Operations analyst. That's it.
5      Q.  That's it?
6      A.  Yes.
7      Q.  So today you are an operations
8  analyst?
9      A.  Yes.
10     Q.  What was the period of time when
11 you were senior operations specialist?
12     A.  From May of 2006 until 2008. I
13 can't remember the exact month.
14 Approximately two years.
15     Q.  And then you became senior lead
16 specialist. What was that time frame?
17     A.  From 2008 until March 2011.
18     Q.  And then since March of '11 to the
19 present you've been an operations analyst?
20     A.  Yes.
21     Q.  Tell me what a senior operations
22 specialist is.
23     A.  It is a specialized processor.
24     Q.  Assume I know absolutely nothing
25 about the inner workings of Chase -- JP Morgan

9

1      Vanderwater.
2      Q.  Did you have to take classes to
3  become a senior operations specialist?
4      A.  No.
5      Q.  So where did you come from before
6  you were hired by JP Morgan Chase?
7      A.  Assurant Solutions.
8      Q.  What were your responsibilities at
9  Assurant Solutions?
10     MR. KILBORN: Can you ask her to
11 speak up?
12     MS. ROBINSON: Speak up just a
13 bit, Lanier, because everybody is trying to
14 hear you.
15     MR. KILBORN: You've got a very
16 soft voice.
17     A.  Quality analyst and a loss
18 drafts processor.
19     Q.  How long did you work at Assurant
20 Solutions?
21     A.  Two years.
22     Q.  And would this have been 2004 to
23 2006?
24     A.  2003 to 2005.
25     Q.  Where did you work between 2005

11

1  Chase. What would your day-to-day duties have
2  been?
3      A.  At that time they were
4  processing payoff files, release of
5  disbursements of claim funds.
6      Q.  Anything else?
7      A.  That's about it.
8      Q.  And was there a particular
9  department within Chase that you were working
10 in as a senior operations specialist?
11     A.  Yes.
12     Q.  What was it?
13     A.  Loss drafts.
14     Q.  Has your entire career at JP
15 Morgan Chase been working within the Loss
16 Draft Department?
17     A.  Yes.
18     Q.  Who trained you to be a senior
19 operations specialist?
20     A.  All of the names of everyone?
21     Q.  Sure. Anyone that you can
22 remember.
23     A.  ███████████████████
24     Q.  ███ --
25     A.  █████████ And ████

10

1  and May of 2006?
2      A.  I did not work.
3      Q.  Why did you leave Assurant?
4      A.  I had a child.
5      Q.  So you were -- you had the most
6  important job between 2005 and May of 2006?
7      A.  Yes.
8      Q.  Where did you work before Assurant
9  Solutions?
10     A.  Ohio State University.
11     Q.  So you graduated and went straight
12 to Assurant?
13     A.  I didn't graduate, but I was
14 attending, yes.
15     Q.  And what does a quality analyst at
16 Assurant Solutions do?
17     A.  Audit files.
18     Q.  Tell me what -- just generally,
19 Ms. Jeffrey, walk me through what your
20 responsibility would have been in auditing a
21 file while you worked for Assurant.
22     A.  Call monitoring to ensure
23 policies were followed and file audits to
24 ensure that policies were followed with the
25 handling of the files.

12

3  (Pages 9 to 12)

LANIER JEFFREY - VOLUME I

1       Q.    So you would actually monitor
2   telephone conversations between another
3   Assurant employee and a customer?
4       A.    Correct.
5       Q.    And whose customers were Assurant
6   talking to?
7       A.    Various mortgage companies.
8       Q.    Describe for me what Assurant as a
9   company does.
10      A.    They are a third-party
11  processing center for mortgage companies.
12      Q.    And what mortgage companies was
13  Assurant acting as a third-party processor
14  during the time you worked for them?
15      A.    I can't remember all of them.
16  First Horizon, Wells Fargo, Auquin Mortgage.
17      Q.    What about JP Morgan Chase?
18      A.    Not that I'm aware of.
19      Q.    Assurant while you worked for
20  them, you didn't do any services for JP Morgan
21  Chase while you were an Assurant employee?
22      A.    I did not.
23      Q.    Where was Assurant's offices that
24  you would go to?
25      A.    Springfield, Ohio.
                                            13

1       A.    No.  At that time I was in
2   quality assurance.
3       Q.    Tell us a little bit about what
4   hazard claims entailed when you worked for
5   Assurant.
6       A.    Hazard claims -- regarding
7   quality assurance?
8       Q.    First of all, tell us what hazard
9   claims are.
10      A.    Hazard claims are any -- any
11  time that you have damage done to your home
12  due to a natural disaster, flood, mold, et
13  cetera, that's a hazard claim.
14      Q.    Is it natural disaster -- would a
15  fire to a house, a single fire, constitute a
16  natural disaster under Assurant's definitions?
17      A.    I'm not sure.
18      Q.    You said flood or mold.  Tell me
19  how a mold damage to a house, for example,
20  becomes a natural disaster in Assurant's
21  definition.
22      A.    I wasn't saying that everything
23  has to be a natural disaster, but these are
24  examples of what a hazard claim is, mold.
25      Q.    Would a hazard claim while you
                                            15

1       Q.    And pardon my geographical
2   ignorance.  We are in Columbus, Ohio now?
3       A.    Yes.
4       Q.    How far from this office building
5   is Springfield?
6       A.    Forty-five minutes west.
7       Q.    Tell me a little bit what you
8   would do in your performance as an auditor
9   while you were monitoring telephone calls.
10      A.    I would go through the scorecard
11  and answer the applicable questions about the
12  call.
13      Q.    Would you do that realtime?
14      A.    No.  These were recorded calls.
15      Q.    So Assurant was -- were
16  these calls that the Assurant employees were
17  initiating?
18      A.    Receiving outgoing/incoming --
19  and incoming.
20      Q.    What were the calls about?
21      A.    Hazard claim payments.
22      Q.    Solely hazard claim payments?
23      A.    That I audited, yes.
24      Q.    Is that because you were in the
25  Loss Draft Department of Assurant?
                                            14

1   worked at Assurant constitute anything that
2   was substantial damage to a home?
3       A.    Correct.
4       Q.    What was your hesitation about a
5   fire constituting a hazard claim?  Was it just
6   the bad question I asked?
7       A.    It was just a bad question you
8   asked.
9       Q.    So a fire to a home would fall
10  within the category of a hazard claim?
11      A.    Yes.  It's just not a natural
12  disaster is what I was saying.
13      Q.    I got you.  I got you.
14            And in your monitoring, so some
15  Assurant employee would either get -- receive
16  a call from a borrower or would make a call,
17  correct?
18      A.    These were more with the
19  insurance companies for payments, receiving
20  payments, coordinating of payments on behalf
21  of the borrowers.  Our customer at that time
22  was the insurance company, State Farm,
23  Allstate, et cetera.  You were basically
24  making sure the payments were made on behalf
25  of the borrowers for their hazard claim
                                            16

## LANIER JEFFREY - VOLUME I

1  insurance.
2      Q.    Assurant was working for State
3  Farm?
4      A.    We are the interim between the
5  borrower and the insurance company, or they
6  were.
7      Q.    And your offices were independent
8  of any insurance company?
9      A.    Correct.
10      Q.    Your offices were independent of
11  any mortgage company?
12      A.    Correct.
13      Q.    You completely stand alone?
14      A.    Correct.
15      Q.    Do you know how Assurant was
16  compensated for its services when you were
17  working for them?
18      A.    I do not.
19      Q.    But you received a check and your
20  check was from Assurant?
21      A.    Correct.
22      Q.    When you would monitor these
23  telephone calls you said that you had some
24  sort of a sheet that you would fill out. What
25  is the name of that sheet?

17

1  She said she was talking to the insurance
2  companies.
3      Q.    And it was only the communications
4  between the insurance company and the Assurant
5  employee that you were monitoring?
6      A.    Correct.
7      Q.    And what type of issues were being
8  addressed during these telephone calls?
9      A.    Payment amounts received, due
10  dates, policy limits, deductibles.
11      Q.    So hypothetically somebody's house
12  catches fire and they've got insurance, and
13  the insurance company -- what's a big
14  insurance company?
15      A.    State Farm.
16      Q.    So State Farm calls Assurant, and
17  does Assurant give State Farm, for example,
18  what is the payoff amount?
19      A.    No. That department was
20  strictly the payments to ensure that they
21  have coverage on the home.
22      Q.    So what type of information would
23  the insurance company need from Assurant?
24      A.    If the payment was sent, how
25  much was sent, where it was sent.

19

1      A.    I don't remember.
2      Q.    Do you remember how many pages
3  long it was?
4      A.    It was actually web-based, so it
5  wasn't actual -- it was a scorecard but it
6  wasn't a piece of paper per se. It was audit
7  form.
8      Q.    So just walk me through what you
9  would do. You would listen to a tape
10  recording of the telephone call?
11      A.    Yes.
12      Q.    And you would grade the Assurant
13  employee based on what criteria?
14      A.    Whatever the question was on the
15  form. I don't recall what the questions are
16  as of today.
17      Q.    I understand you may not recall
18  the, you know, exact question or whatever, but
19  generally what was your responsibility to be
20  monitoring the Assurant employees for?
21      A.    To ensure that they applied the
22  policies in place for call handling.
23      Q.    Such as answering the borrowers'
24  questions?
25      MS. ROBINSON: I object to form.

18

1      Q.    And would Assurant be the one that
2  processes the money or are you directing it to
3  the mortgage company?
4      A.    I don't recall.
5      Q.    And tell me what your duties as a
6  loss draft processor while you worked for
7  Assurant entailed?
8      A.    The handling and processing of
9  hazard claims on behalf of the mortgage
10  companies.
11      Q.    So when you were there you
12  processed the claims?
13      A.    Correct.
14      Q.    The money would come to your
15  department?
16      A.    The money was received in a
17  different area and it was already deposited
18  in an account.
19      Q.    But the money would come to
20  Assurant?
21      A.    Yes.
22      Q.    Just a different department than
23  you?
24      A.    Correct.
25      Q.    You would make sure that the

20

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

**LANIER JEFFREY - VOLUME I**

1 claims were processed properly?
2    A.   Correct.
3    Q.   And what did that -- what were
4 some of the issues that you were having to
5 address to make sure that the claim was
6 processed properly?
7    A.   Disbursement of the funds,
8 verifying completion of the repairs, payment
9 to the contractors.
10    Q.   So you would deal many times in
11 instances where there wasn't a total loss?
12    A.   Correct.
13    Q.   So you were making sure that the
14 funds that are coming in from the insurance
15 company are being used to rebuild the house,
16 for example --
17    A.   Yes.
18    Q.   -- as opposed to being used to buy
19 BMW motorcycles or something else?
20    A.   Yes.
21    Q.   How would you do that?
22    A.   Through property inspections.
23    Q.   And who would do the property
24 inspections?
25    A.   I don't recall the name of the

21

1 company. There was an actual inspection
2 company that would go out and do the
3 inspections on our behalf and submit the
4 results to us.
5    Q.   Who would make the decision to
6 send the inspection company out? You as a
7 loss draft processor?
8    A.   The borrowers would call and
9 initiate the contact and advise when they're
10 ready for a certain inspection, and then we
11 would then place the order and ask the
12 inspectors to go out and make the inspection.
13    Q.   So in my continuing morphing
14 hypothetical, someone has a fire to their
15 house; it's not a total lost; they're going to
16 rebuild, okay? So you're on it. That's your
17 job as Assurant to make sure that the money is
18 handled properly, right?
19    A.   Correct.
20    Q.   The money would be in a different
21 department with Assurant so you never handled
22 the deposit of the money or the funding of the
23 money, correct?
24    A.   We did not touch the physical
25 checks, correct.

22

1    Q.   But you were the responsible party
2 for authorizing specific amounts to be
3 disbursed by Assurant?
4    A.   Correct.
5    Q.   And you would review, for example,
6 some type of document verifying that work had
7 been performed?
8    A.   Correct.
9    Q.   And what would you require as far
10 as information on that? Would you require an
11 affidavit? Would you require an affidavit
12 from the contractor or would you require
13 certification from the folks that you sent out
14 to do the inspection, both, what?
15    A.   It varies. Each mortgage
16 company has different specifications so it
17 depends on what company you're working for.
18    Q.   How would you know which mortgage
19 company specifications to apply in a
20 particular incident?
21    A.   Well, whatever mortgage company
22 you're assigned to you have their manual, so
23 you know their requirements.
24    Q.   At any given time when you were
25 operating as a loss draft processor for

23

1 Assurant, was it important that you be
2 knowledgeable about the different requirements
3 of the different mortgage companies that you
4 were dealing with?
5    A.   Yes.
6    Q.   So do you remember how many
7 different mortgage companies that you were
8 dealing with at that time?
9    A.   I do not.
10    Q.   But you had to have in front of
11 you either a hard form manual like this binder
12 that's sitting in front of me or some computer
13 screen that would tell you what the mortgage
14 company's requirements were for that
15 particular event?
16    A.   Yes.
17    Q.   Which was it or was it both?
18    A.   I don't recall.
19    Q.   It's not uncommon for different
20 mortgage companies to have different reporting
21 requirements, processing requirements, and you
22 had to be familiar with them?
23    A.   Yes.
24    Q.   How did you get familiar with
25 that?

24

6 (Pages 21 to 24)

LANIER JEFFREY - VOLUME I

1    A.    Training.
2    Q.    Would you go to seminars?
3    A.    There is a training class when
4  you first begin the position as well as side-
5  by-side training within the department.
6    Q.    So when you first went into --
7  let's -- into the loss draft as a loss draft
8  processor, how much training did you get at
9  Assurant?
10   A.    I don't remember.
11   Q.    Did you go off somewhere to, you
12  know, like a boot camp?
13   A.    There's a training class but I
14  don't remember how long it was.
15   Q.    You don't remember if it was three
16  weeks or three hours?
17   A.    I don't.
18   Q.    And you don't know whether it was
19  inside your office or at some place in
20  Tennessee or --
21   A.    It was in the building.
22   Q.    All right.
23        MS. ROBINSON:  Let him finish his
24  question, Lanier, because a lot of times he's
25  kind of stopping to think what he's saying.

25

1    Q.    I'm not a quick thinker.  And then
2  you were also assigned some side-by-side
3  trainer?
4    A.    Correct.
5    Q.    How long would you work with that
6  trainer before you were able to perform your
7  duties on your own?
8    A.    I don't remember.
9    Q.    You don't know -- you have no
10  judgment as to whether it was three days or
11  three months?
12   A.    I can make an estimation.
13  I'm not -- I can't be accurate.  Maybe two
14  weeks.
15   Q.    And then from then on you had a
16  supervisor?
17   A.    Correct.
18   Q.    Were your decisions while you were
19  monitoring telephone calls, for example, and
20  you were grading -- is that a fair term,
21  grading the Assurant employee who was talking
22  on the phone with the insurance company?
23   A.    Are you referring to quality
24  assurance or loss drafts?
25   Q.    Well, I'm jumping back to quality

26

1  assurance.  When you were doing that job was
2  someone monitoring you as you were monitoring
3  the other folks?
4    A.    Yes.
5    Q.    How was that done?
6    A.    There was an external quality
7  department that would audit our audits.
8    Q.    When you say external, were they
9  an Assurant department or an independent
10  company independent of Assurant?
11   A.    Assurant department.
12   Q.    What was that department called?
13   A.    I don't remember.
14   Q.    Starting with your duties as a
15  quality analyst at Assurant, were you in a
16  particular room, wing, floor, or what of
17  Assurant?
18   A.    It was a wing.
19   Q.    How many people roughly were part
20  of the quality analyst department or wing?
21   A.    Roughly a hundred.
22   Q.    And that's a hundred people like
23  you that are -- that are listening to tape
24  recordings of Assurant employees having
25  conversations with the insurance company?

27

1    A.    I'm not -- there's different
2  departments for different functionalities of
3  the company so I don't know what they were
4  doing.  That was my particular
5  responsibility.  I don't know what they were
6  doing.
7    Q.    This was the quality assurance
8  wing?
9    A.    Correct.
10   Q.    These are all people within
11  Assurant on this particular wing that are
12  monitoring some aspect of other Assurant
13  employees?
14   A.    Correct.
15   Q.    Why was that important?
16   A.    To ensure quality is maintained;
17  that policies are followed.
18   Q.    When you would listen to the
19  telephone recording, how was that stored?  Was
20  it on a computer, or was it on a cassette
21  tape, or what?
22   A.    It was an electronic recording.
23   Q.    After you listened to that
24  telephone recording, made your grading system
25  on the computer, what happened to that

28

LANIER JEFFREY - VOLUME I

1  recording when you worked at Assurant?
2      A.   It still remained within the
3  website.
4      Q.   Do you know what their retention
5  policy was at Assurant in retaining those type
6  of recordings?
7      A.   I do not.
8      Q.   Had you ever heard any of your
9  supervisors while you were at Assurant
10 mentioning the fact that these recordings
11 would be preserved for some time so that other
12 people could review them, like for example,
13 you in turn were audited by the separate
14 department?
15     A.   No, I don't recall them
16 referring to a retention policy.
17     Q.   But you do know that that
18 recording wasn't destroyed by you when you
19 worked at Assurant?
20     A.   Correct.
21     Q.   You didn't have authority to
22 destroy that recording?
23     A.   Correct.
24     Q.   What I'm trying to get at is how
25 was that recording sent to you.  Was it -- did

29

1  don't remember exactly what I would utilize
2  e-mail for other than asking for time off or
3  communicating to your department, your team,
4  whatever e-mails from your manager that you
5  might receive.
6      Q.   You mentioned the word team.  Was
7  Assurant segregated into different teams?
8      A.   Yes.
9      Q.   What was your team called?
10     A.   Loss drafts.
11     Q.   Loss drafts.  How many people were
12 in your loss draft team?
13     A.   Approximately 55.
14     Q.   Did you work closely with these
15 people?  Were they all in the same wing or
16 room with you?
17     A.   Fairly closely.
18     Q.   Was this a nine to five type of
19 operation or did you have different shifts of
20 people working within the Loss Draft
21 Department?
22     A.   The shifts varied.
23     Q.   Do you know how many shifts there
24 were?
25     A.   I do not.

31

1  you access like a main computer through your
2  computer, or was each recording e-mailed to
3  your computer, or what?
4      A.   We accessed a database, so to
5  speak, that housed all of the recorded calls
6  for applicable departments and we would
7  access the database, retrieve the call, and
8  listen to it.
9      Q.   What was the name of the software
10 program or what did you call that?
11     A.   I don't remember.
12     Q.   Do you remember any of the
13 programs that you used while you worked at
14 Assurant?
15     A.   Lotus Notes.
16     Q.   Lotus Notes?
17     A.   It's an e-mail system.
18     Q.   Right.  And is that how you
19 communicated with folks within Assurant?
20     A.   Yes.
21     Q.   What type of information would you
22 exchange with other Assurant employees by
23 e-mail?
24     A.   I don't specifically remember.
25 Vacation requests with your supervisor.  I

30

1      Q.   Would you communicate with the
2  folks that operated on the other shift?
3      A.   At times.
4      Q.   What would you use to communicate
5  with them, e-mail?
6      A.   E-mail generally.
7      Q.   The Lotus e-mail?
8      A.   Yes.
9      Q.   If you were working on one
10 particular file how would you know -- I'm
11 speaking only at Assurant -- how would you
12 know what other communications had been done
13 on that file?
14         MS. ROBINSON:  You talking about
15 by other Assurant employees?
16         MR. McDONALD:  I'll start with
17 that, yes, ma'am, yeah.
18     A.   Within loss drafts or --
19     Q.   Sure.  Well, within the company.
20 Let's start general.  Let's start with the
21 whole Assurant company?
22     A.   That I don't remember.  As far
23 as within loss drafts, we had a physical file
24 and there were records on a database that you
25 could read the notes for how the claim was

32

8 (Pages 29 to 32)

LANIER JEFFREY - VOLUME I

1  being handled prior to you taking over the
2  file.
3      Q.   So if you wanted to know, okay, I
4  got this file on Tuesday, but the file's been
5  opened for six months and you want to know
6  what's been going on in that file, you could
7  access other people's notes by going to a
8  particular database?
9      A.   Correct.
10     Q.   Do you remember the name of that
11 database?
12     A.   It was Draft Track.
13     Q.   Draft Track.  What type of
14 information was on Draft Track?
15     A.   Claim amounts, type of loss,
16 date of loss, borrower mailing address,
17 property address, and any notes pertaining to
18 the claim, inspection results, percentages of
19 that, et cetera.
20     Q.   It's pretty critical for you to be
21 able to do your job properly when you were at
22 Assurant to have access to the history of the
23 file, right?
24     A.   Correct.
25     Q.   I mean, can you think of a way to

33

1      Q.   Is that the same definition that
2  y'all use at Chase?
3      A.   Yes.
4      Q.   So when there's a Loss Draft
5  Department at Chase -- which is where you work
6  today, right?
7      A.   No.
8      Q.   Well, at one point in time when
9  you worked in loss draft was the term
10 that y'all used?
11     A.   Yes.
12     Q.   And that has to do with the check
13 that comes from the insurance company?
14     A.   Yes.
15     Q.   How did you get contact with JP
16 Morgan Chase when you decided to come back
17 into the easy part of the work force as
18 opposed to the hard part?
19     A.   Chase.com, applied for a job on
20 their website.
21     Q.   So you didn't have any contact at
22 JP Morgan Chase, you just cold called and
23 applied?
24     A.   Correct.
25     Q.   What were the -- what were they

35

1  be able to do your job properly and
2  efficiently if you couldn't see what other
3  people had done on that file?
4      A.   No.
5      Q.   It's just -- that's just common
6  sense.  Did you tell me what loss draft means
7  in laymen's terms?
8      A.   Loss draft is actually -- is
9  hazard check.
10     Q.   Tell me what that means.
11     A.   A hazard claim check received
12 from an insurance company, disbursement of
13 funds on behalf of a hazard claim policy
14 through an insurance company.
15     Q.   So the scenario would have been
16 someone's house burns, either it burns down or
17 burns partially, when the insurance pays all
18 or part of that claim y'all use the term loss
19 draft?
20     A.   Correct.
21     Q.   And that --
22     A.   Or hazard draft.
23     Q.   Or hazard draft.  And those terms
24 can be used interchangeably?
25     A.   Yes.

34

1  looking for?
2      A.   A loss draft analyst.
3      Q.   With some type of experience?
4      A.   Presumably.  It didn't
5  specifically state that but --
6      Q.   And did you interview for the job?
7      A.   I did.
8      Q.   Who interviewed you?
9      A.   ████████████
10     Q.   What was her job title do you
11 remember?
12     A.   Loss draft manager.
13     Q.   Okay.  And did you get, I presume,
14 hired right on the spot?
15     A.   I was offered the job that
16 day, but yes.
17     Q.   And you came on as a senior
18 operations specialist?
19     A.   Yes.
20     Q.   And what does that mean?
21     A.   A loss draft processor.  You're
22 considered a specialist because it's a
23 specialty area.
24     Q.   So did you have to take any
25 particular Chase courses to be deemed a

36

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

LANIER JEFFREY - VOLUME I

1  specialist or you were a specialist on day
2  one?
3      A.    On day one.
4      Q.    And is there a junior operation
5  specialist?
6      A.    No.
7      Q.    Could you give me kind of a chart
8  of people in the Loss Draft Department?  Do
9  people start out as a senior operations
10 specialist?  Are there other job descriptions
11 that --
12     A.    There was operations specialist,
13 senior operations specialist, team lead or
14 senior lead, and manager.
15     Q.    So if I drew a -- let's say a
16 chart within the Loss Draft Department you've
17 got the manager at the top?
18     A.    Yes.
19     Q.    And then you've got the -- who's
20 right underneath the manager?
21     A.    It would be the team lead also
22 referred to as senior lead.
23     Q.    Team or senior lead.  And then
24 underneath that is the senior operations
25 specialist?

37

1      Q.    The Gahanna office.  Is that the
2  name of a city?
3      A.    Suburb, yes.
4      Q.    How far is that from the building
5  that we're at today?
6      A.    Approximately 15 minutes.
7      Q.    Have you ever been in the building
8  we're in today?
9      A.    No.
10     Q.    Have you ever given a deposition
11 before?
12     A.    Yes.
13     Q.    Tell me about that.
14     A.    It was a lawsuit pertaining to
15 my mother.
16     Q.    It didn't have anything to do with
17 Chase?
18     A.    No.  No.
19     Q.    Have you ever testified in court
20 before?
21     A.    No.
22     Q.    Tell me what you did to prepare
23 for this deposition today.  Did you look at
24 any documents?
25     A.    Yes.

39

1      A.    Yes.
2      Q.    And then underneath that is the
3  operations specialist?
4      A.    Yes.
5      Q.    Can you think of any other
6  designations of folks who worked within the
7  Loss Draft Department?
8      A.    No.
9      Q.    How was it that you were able to
10 come in as a senior operations specialist and
11 in my mind skip operations specialist?  Based
12 on your experience at Assurant?
13     A.    Correct.
14     Q.    Does Assurant have employees that
15 are -- the only word I can think of is
16 embedded within Chase?
17     A.    I don't understand the question.
18     Q.    Are there Assurant employees that
19 operate and work in the same building that you
20 work in today?
21     A.    No.
22     Q.    Where do you work?
23     A.    I work at the Gahanna office.
24     Q.    How do I spell that?
25     A.    G-A-H-A-N-N-A.

38

1      Q.    Could you tell me what they are?
2      A.    The payoff claim file.
3      Q.    What is the payoff claim file?
4      A.    It is a physical copy of the
5  file that was processed during the time of
6  handling in the Loss Drafts Department.
7      Q.    What is contained in the payoff
8  claim file?
9      A.    Copies of letters, mailers if
10 applicable, copies of claim checks and/or
11 disbursement checks, copies of any applicable
12 inspections.
13     Q.    Inspections of the house?
14     A.    Correct.
15     Q.    Okay.  What about e-mail exchanges
16 within Chase, is that kept in a hard copy
17 form?
18     A.    At times.  Not always.
19     Q.    Who decides whether those types of
20 things are kept in the file?
21     A.    There are certain e-mail
22 exchanges that are required by policy to be
23 printed off and placed in the file, and other
24 than that it would be the processor's
25 determination.

40

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

LANIER JEFFREY - VOLUME I

1  Q.  What types of exchanges are
2  required by Chase's internal policies and
3  procedures to be kept in the physical file?
4  A.  At that time it was the e-mail
5  requesting the payoff.
6  Q.  Why is that important?
7  A.  To ensure for your audit purpose
8  that you requested the payoff within the
9  appropriate time frame.
10  Q.  That the payoff was requested
11  within the appropriate time frame?
12  A.  Correct.
13  Q.  And who in this case was the
14  e-mail requesting payoff from?
15  A.  Myself.
16  Q.  Who was it to?
17  A.  The Default Payoff Department.
18  Q.  The Default Payoff Department.  Do
19  you know who you address that to or did you
20  just address it to the Default Payoff
21  Department?
22  A.  It was to an analyst named Atia.
23  Q.  Is she a Chase employee?
24  A.  She was at that time.
25  Q.  She was at that time.

41

1  A.  The BPO -- well, that's the same
2  thing as an inspection but --
3  Q.  Was there just one BPO?
4  A.  Yes.
5  Q.  Did you order the BPO?
6  A.  I did.
7  Q.  We'll come back to that in a
8  minute, but why did you order the BPO?
9  A.  Per Fannie Mae's request.
10  Q.  What is in the payoff claim file?
11  A.  The Form 176.
12  Q.  What is that?
13  A.  An investor document.  One of
14  Fannie Mae's request forms.
15  MR. KILBORN:  I can't --
16  MR. McDONALD:  That's my fault
17  because I --
18  MS. ROBINSON:  You're soft and
19  she's responding to you.
20  MR. McDONALD:  -- I get quiet and
21  then she --
22  MS. ROBINSON:  Yeah.
23  MR. McDONALD:  In this room I
24  don't want you to think I'm yelling because of
25  the echo, but my partner can't hear.

43

1  A.  Uh-huh (in the affirmative).
2  Q.  Her last name start with an M?
3  A.  Do you have the document --
4  Q.  Oh, this is the document that Ms.
5  Sandy just gave me today.  Right.  Let me see.
6  Yeah, ██████████?
7  A.  Yes.
8  Q.  She was a Chase analyst at that
9  time?
10  A.  Yes.
11  Q.  Was there anything else in the
12  payoff claims file that you reviewed?
13  A.  There was an e-mail exchange
14  between myself and the investor.
15  Q.  And who is the investor?
16  A.  Fannie Mae.
17  Q.  What else?
18  A.  An e-mail between myself and the
19  supervisor of the department that I was
20  working in at that time.
21  Q.  And who was that?
22  A.  ████████████
23  Q.  ██████ --
24  A.  ███████████ I believe.
25  Q.  Anything else?

42

1  Q.  (BY MR. McDONALD)  Tell me what the
2  Form 176 is.
3  A.  It is a form to request various
4  things from Fannie Mae, depends on what
5  you're asking, but it's a standard form that
6  they have they want the servicer to fill out
7  when making requests.
8  Q.  It's a Fannie Mae document that
9  they want you to fill out when you're making a
10  request of Fannie Mae?
11  A.  Yes.
12  Q.  And did you fill out the Form 176?
13  A.  Yes.
14  Q.  And what information did you base
15  -- how did you get the information that you
16  put on Form 176?
17  A.  From our business records.
18  Q.  What business records did you
19  consult?
20  A.  Our servicing system.
21  Q.  What's the servicing system
22  called?
23  A.  MSP.
24  Q.  And MSP stands for what?
25  A.  Mortgage Servicing Package, I

44

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

LANIER JEFFREY - VOLUME I

1  believe.
2       Q.   Who has access to Mortgage
3  Servicing Package?
4       A.   I don't understand your
5  question.
6       Q.   MSP contains notes that are made
7  by different people, right?
8       A.   Yes.
9       Q.   In other words, different folks
10 get on or access MSP and whatever information
11 they think is relevant to the file they type
12 in, right?
13      A.   You're not required to notate in
14 MSP if that's what you're asking.
15      Q.   Well, who decides whether
16 something is worthy enough to make it to the
17 MSP?
18      A.   That would be that department's
19 determination.  I don't know about that.
20      Q.   How many departments access MSP?
21      A.   I'm not sure.
22      Q.   When you access MSP you see that
23 there are different codes and -- entered by
24 different people, right?  There's information
25 that's entered and then at the end the person

45

1  who is entering that information gives their
2  name or abbreviation of their name and the
3  code of the department they're working in,
4  right?
5       A.   Not always, no.
6       Q.   If you want to access MSP and
7  there's a note in there that you're not sure
8  whether that information is accurate, how do
9  you go about determining whether it's accurate
10 or not?
11      A.   When you say -- why would I need
12 to know?  I guess I don't understand the
13 question.  What would I need to know about a
14 note?  What would I be looking for?
15      Q.   I'll get to the documents in a
16 second, but as I understand it, MSP -- people
17 put information entered into MSP, right?
18      A.   Yes.
19      Q.   And that information is something
20 so there's a record of what has transpired on
21 the file, right?
22      A.   MSP is not just a system for
23 notations.  It's Chase's servicing system in
24 general, so there is payment history, there's
25 the borrower's origination information,

46

1  there's the borrower's contact information.
2  You don't necessarily need to access the note
3  screens to process a loan using MSP.  That's
4  not the sole purpose for using MSP.
5       Q.   There is information about -- in
6  this particular case entered into MSP that is
7  not strictly payment information, right?
8       A.   Yes, for all loans there is
9  additional information as well, yes.
10      Q.   Who decides what information to
11 enter onto MSP?
12      A.   I'm not sure.  It would vary by
13 department.
14      Q.   Well, is it safe to say that it's
15 supposed to be so that it helps other analysts
16 as they're trying to find out what happened in
17 a file?
18      MS. ROBINSON:  I'm going to object
19 to the form.  She said she doesn't know.  It's
20 department by department.
21      Q.   You can answer.
22      A.   I'm not sure.
23      Q.   So when you have looked at MSP
24 before -- in the ordinary course of your job,
25 you access MSP on a daily basis, right?

47

1       A.   Yes.
2       Q.   And you see in MSP that there are
3  actually notes entered into MSP, correct?
4       A.   I would not necessarily see the
5  notes when accessing MSP.
6       Q.   Why not?
7       A.   I wouldn't necessarily need to
8  access the note screen to do my job.
9       Q.   So you have the option when you
10 enter into MSP of just strictly staying within
11 the payment area and not going into the note
12 section?
13      A.   You access the applicable screen
14 that's relative to whatever it is that you're
15 trying to obtain from that system.  If I'm
16 trying to validate your phone number then I
17 would go to the screen that lists your phone
18 number.  I wouldn't necessarily scroll
19 through the entire loan to do the file.
20      Q.   But in performing your duties
21 within the Loss Draft Department, there's
22 nothing that prohibits you from going into any
23 area within the MSP system, right?
24      A.   There are access levels.  You
25 don't have access to every single screen

48

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

LANIER JEFFREY - VOLUME I

1   within MSP.  No, you don't.  It depends on
2   how your profile was set up when you were
3   boarded and how your supervisor requested
4   access for you.  So you would not have access
5   to all screens, no.
6       Q.    Well, at some point in time you
7   became the team leader of Loss Draft
8   Department or a team leader, right?
9       A.    Yes.
10      Q.    So you were one step below the
11  manager of the entire department?
12      A.    Yes.
13      Q.    And as a team leader in that
14  position is it your testimony that there were
15  certain areas of this MSP that you were
16  prohibited from reviewing?
17      A.    That is correct.
18      Q.    Do you know what levels those are
19  called?
20      A.    I don't.
21      Q.    Who would know?
22      A.    I'm not sure.
23      Q.    Well, when you were first set up
24  you were set up as a senior operations
25  specialist, right?

49

1   his question.
2       A.    Can you state the question
3   again?
4       Q.    At some point in time -- well, not
5   at some point in time.  You became the team
6   leader from 2008 to March of 2011, correct?
7       A.    Yes.
8       Q.    And you're saying that your access
9   to the MSP system did not increase, for lack
10  of a better term, you didn't have a greater
11  access to the MSP system as the team leader
12  than you did when you were the senior
13  operations specialist?
14      A.    That's correct.
15      Q.    You were still limited by the
16  person whose name you don't recall set you up
17  initially when you were hired on in May of
18  2006?
19          MS. ROBINSON:  Object to form.
20  You can answer.
21      A.    It was not limited by the person
22  that set up the access.  Each area within
23  Chase has access to regions of MSP that are
24  applicable to your job, so you're not able to
25  have free reign to the entire system and do

51

1       A.    Correct.
2       Q.    And the person who determined your
3   access level was the team leader, right?
4       A.    No.  There was one particular
5   person within the team that ordered access
6   for everyone but she was not the team lead.
7       Q.    She wasn't as high as the team
8   lead?
9       A.    No.  She ordered whatever access
10  was applicable to your job.
11      Q.    And she was supervised by the team
12  leader?
13      A.    I presume, yes.
14      Q.    Did your access level change as
15  you moved your way up from senior operations
16  specialist to team leader?
17      A.    No.
18      Q.    So even though you became team
19  leader you were restricted access-wise to the
20  MSP system by someone who was -- actually you
21  were supervising?
22          MS. ROBINSON:  I object to form.
23  She said that person only gave you the access
24  appropriate to your job not that they made the
25  decision.  You can answer if you understand

50

1   every functionality as the same person in
2   another department.  So no, everyone does not
3   -- managers do not have access to do certain
4   functions within the system as well if it's
5   not applicable to your job.  You have access
6   to all the screens applicable to what you do.
7       Q.    And your understanding is that
8   even as the team leader you did not have
9   access to all the notes that were being put
10  into the MSP system?
11      A.    I did have access to all the
12  notes.  I did not have access to all of the
13  screens.
14      Q.    What screens were you barred from
15  accessing?
16      A.    I can't say for sure.  I'm not
17  able to list all of them.
18      Q.    Can you list one?
19      A.    I don't recall the exact name of
20  the screen but it was a payoff-related
21  screen.  I believe it was the screen where
22  you actually pay off the loan and apply the
23  funds to that.  Only the payoff department as
24  far as I understand would have access to that
25  screen.

52

13  (Pages 49 to 52)

LANIER JEFFREY - VOLUME I

1    Q.    Who's the only person that would
2  have access to the screen?
3    A.    The payoff department, the area
4  that actually pays off loans.
5    Q.    You are familiar with this
6  particular file because you reviewed it
7  yesterday, correct?
8    A.    Correct.
9    Q.    Tell me in your own words before
10  we get into specifics what you think happened
11  here.
12    MS. ROBINSON:  Object just being
13  overbroad.  Do you want her to say what she
14  did?
15    MR. McDONALD:  Sure.
16    A.    So you're specifically asking me
17  what was my involvement in the case or I
18  don't understand the question.
19    Q.    Tell me what your involvement is
20  on this particular file.
21    A.    I reviewed the file, contacted
22  the borrower for missing documentation,
23  contacted the investor for processing for
24  process request, contacted the borrower to
25  provide the investor's response, re-evaluated

53

1  the file, and requested th payoff of the
2  loan.
3    Q.    You were prohibited by Chase's
4  system from actually applying the payoff to
5  the loan?
6    A.    That's not part of our job
7  functionality, yes.
8    Q.    I understand.  I'm saying that I'm
9  not trying to imply that that was your job.  I
10  just want to make sure I understand your job.
11    A.    That is correct.
12    Q.    Your job though was to determine
13  whether loan payoff was appropriate or not and
14  then to make a recommendation to the payoff
15  department based on your findings?
16    A.    No.
17    Q.    What was your job?
18    A.    Your job is to work with the
19  borrower to identify their intentions for the
20  claim funds.  If the loan is applicable for
21  payoff based off of various criteria you then
22  submit a request and advise the payoff
23  department to pay off the loan using the
24  funds.
25    Q.    And the funds in this case

54

1  originally went to the payoff department,
2  right?
3    A.    No.
4    Q.    Where did the funds originally go
5  to?
6    A.    The hazard claims processing
7  center.
8    Q.    What is the difference between the
9  hazard claims processing center and the payoff
10  department?
11    A.    The hazard claims processing
12  center is the area that actually handles all
13  insurance claim funds.
14    Q.    Did you ever see a copy of the
15  check?
16    A.    I did.
17    Q.    Do you know who stamped it in and
18  received it when it first came in?
19    A.    It would be the mailroom of the
20  Hazard Insurance Processing Center.
21    Q.    What does the stamp in the
22  mailroom of the hazard claim processing center
23  say on it?
24    A.    You're asking the date?
25    Q.    No.

55

1    MS. ROBINSON:  Are you going to
2  show her a document if you're asking her about
3  it?
4    MR. McDONALD:  Well, I just kind
5  of want to get a feel first.
6    MS. ROBINSON:  I just don't want
7  her to have to -- you know, you're going to
8  ask her --
9    MR. KILBORN:  That's not an
10  objection.  Just ask your question.
11    MS. ROBINSON:  Okay.  Well, I
12  object because if you're going to ask her a
13  question about a document --
14    MR. KILBORN:  That's a speaking
15  objection.  We're not going to permit that at
16  all.
17    MS. ROBINSON:  Well, we're only
18  going to have one lawyer on the Plaintiff's
19  side dealing.  Y'all can all come, but I'm not
20  going to have David asking the questions and
21  deal with you too, Vince.  I'm just objecting
22  because I would like for you to show her a
23  document, but go ahead and ask the question.
24    Q.    (BY MR. McDONALD)  Every lawyer
25  takes depositions differently, Ms. Lanier.

56

14  (Pages 53 to 56)

LANIER JEFFREY - VOLUME I

1   We'll squabble a little bit, but I like to try
2   to get a feel for the general knowledge of the
3   case and I'll get to exhibits later.
4           When a check comes into the hazard
5   claims processing center, are they noted in
6   any way by the hazard claims processing
7   center?
8       A.   Are the checks noted?
9       Q.   Yes.
10      A.   Meaning in the system or are
11  they physically tagged?
12      Q.   Both.  Let's start with the
13  physically tagged.
14      A.   Yes, they are date stamped.
15      Q.   They're date stamped.  And isn't
16  there something that identifies the hazard
17  claims processing center in addition to the
18  date stamp on the check so that --
19      A.   Like is there a department name?
20  Are you asking if their department name is
21  stamped on there?
22      Q.   Yes.
23      A.   I don't believe it is.  Can I
24  see the check?  I think it just says date
25  received.  I'm not --

57

1   processing center -- where is that located by
2   the way?
3       A.   For this particular loan it's in
4   Atlan -- Duluth, Georgia.  Excuse me.
5       Q.   So the check came into the hazard
6   claims processing center in Duluth, Georgia,
7   then it gets stamped physically, right?
8       A.   Yes.
9       Q.   And then gets entered into the
10  system?
11      A.   Yes.
12      Q.   Is this still part of the MSP
13  system?
14      A.   No.
15      Q.   What is the system?
16      A.   DTE.
17      Q.   What is DTE?
18      A.   Draft Track Enterprise.
19      Q.   Draft Track Enterprise.  What is
20  the purpose of the Draft Track Enterprise?
21      A.   It is the system of record for
22  our Hazard Insurance Processing Center.
23      Q.   What type of information is
24  contained on the Draft Track Enterprise?
25      A.   All information pertaining to

59

1           MS. ROBINSON:  Just answer what
2   you remember without the document because he
3   wants to ask you about the document later, so
4   if you don't remember without looking at it,
5   just tell him you don't remember.
6       A.   I don't remember.
7       Q.   But you do know that they're date
8   stamped so that Chase has a record of exactly
9   when that particular check was received?
10      A.   Yes.
11      Q.   And your recollection is that it
12  came to the hazard claims processing center?
13      A.   Yes.
14      Q.   What is the basis of that
15  recollection?
16      A.   The date stamp on the check and
17  a copy of the mail log.
18      Q.   What is the mail log?
19      A.   It's when any incoming check
20  comes into the mail department there's a log
21  attached to it that shows the check number,
22  check amount, loan number.
23      Q.   Is that computer generated?
24      A.   Yes.
25      Q.   So it comes into the hazard claims

58

1   the amount of the claim, type of claim, date
2   of loss, disbursement of the funds, borrower
3   contact information, and notes on actions
4   taken on the loan.
5       Q.   The note part of the DTE, are
6   there any notes in the DTE system that have to
7   do with communications with the borrower?
8       A.   Yes.
9       Q.   Who in the hazard claims
10  processing center interacts with borrowers?
11      A.   Any of the customer service
12  representatives and the processors if
13  applicable.
14      Q.   What would be the purpose of them
15  interacting with the borrower?
16      A.   Them being the processors or
17  customer service?
18      Q.   First with the processors in the
19  hazard claims department?
20      A.   If they were trying to validate
21  any piece of the claim or ask the borrower a
22  specific question to assist them in doing the
23  disbursements or possibly returning the phone
24  call from the borrower.
25      Q.   But the hazard claims processing

60

15 (Pages 57 to 60)

LANIER JEFFREY - VOLUME I

1  department, they're not the folks who give the
2  loan payoff, are they?
3      A.   No.
4      Q.   What's the name of that
5  department?
6      A.   People that apply the payoff to
7  the loan?
8      Q.   No.  Who -- all right.  My house
9  burns to the ground.  Chase is the service
10  provider.  My insurance company has called it
11  a total loss.  They want to pay it off.  When
12  I call and ask for the payoff amount, what
13  department do I get routed to at Chase?
14      A.   Customer service.
15      Q.   Customer service.  And customer
16  service gives me that information?
17      A.   That I'm not sure about.
18      Q.   But regardless, my check that gets
19  sent by me or my insurance company goes to the
20  Hazard Claims Loss Department in Duluth,
21  Georgia, right?
22      A.   Yes.
23      Q.   They input it, they stamp the
24  check, and then they also put it into the DTE
25  system?

61

1      A.   Yes.
2      Q.   What physically happens with that
3  check?
4      A.   If there is an attached letter
5  of intent from the borrowers stating they
6  want to pay off the loan they would forward
7  it to the Loss Draft Department in Columbus,
8  Ohio.  If there is not a letter attached it
9  would be deposited into the restricted escrow
10  account to begin the monitor claim process or
11  endorsed, depending upon certain criteria and
12  returned back to the borrower.
13      Q.   So if it has the letter -- the
14  right letter attached, then it goes to your
15  department?
16      A.   Immediately, yes.
17      Q.   Immediately.  How is it
18  transferred?
19      A.   Mailed overnight.
20      Q.   So do you get like one big
21  overnight shipment out of Duluth, Georgia
22  every day?
23      A.   Yes.
24      Q.   And that goes -- have you got a
25  mailroom in the loss claims department?

62

1      A.   Yes.  Escrow administration, the
2  overall department has a mailroom.
3      Q.   And then when that's opened,
4  confirmation of receipt of that, is that
5  entered also into the DTE system?
6      A.   No.
7      Q.   How is that noted?
8      A.   In your -- in the loss draft's
9  internal database.
10      Q.   And what is that called?
11      A.   At the time -- I don't know if
12  it even exists any longer.  At the time it
13  was an MDA tracker, MDA.
14      Q.   What did that stand for?
15      A.   I don't remember.
16      Q.   Did anybody outside of the Loss
17  Draft Department have access to the MDA?
18      A.   No.
19      Q.   What type of information would be
20  contained on that MDA?
21      A.   Claim check number, amount,
22  borrower's name, insurance company, document
23  -- any supporting information that was
24  received along with the check.
25      Q.   And then what would happen to the

63

1  check?
2      A.   Once the check is received by
3  the escrow administration mailroom they're
4  logged into their database, batched, and sent
5  to the Loss Draft Department where they are
6  in turn entered into the MDA tracker
7  database.
8      Q.   What is transferred to the Loss
9  Draft Department?
10      A.   A copy of the actual check
11  that's locked in the safe.
12      Q.   The real check comes up to
13  Columbus, Ohio, goes to the escrow -- goes to
14  the -- what did you call that department?
15      A.   Escrow Administration Mailroom.
16      Q.   Escrow Administration Mailroom, a
17  copy of the check is made, goes to your
18  department?
19      A.   To loss draft, yes.
20      Q.   The real check goes in an actual
21  safe?
22      A.   It's locked in a safe, yes.
23      Q.   And the safe is right onsite in
24  that same department?
25      A.   In that -- yes, in the secured

64

16 (Pages 61 to 64)

LANIER JEFFREY - VOLUME I

1    mailroom.
2        Q.    How big is that safe?
3        A.    I'm not sure.
4        Q.    Have you ever seen it?
5        A.    At the time it was like locked
6    file cabinets.
7        Q.    They just file them, I guess, by
8    alphabetically?
9        A.    I'm not sure what their filing
10   system is.
11       Q.    Then what happens?
12       A.    When the check copy is received
13   by loss drafts an analyst assigned to log in
14   all the checks would enter all of the
15   information into the MDA tracker database and
16   provide the check copies to the applicable
17   processor that's assigned to doing that
18   functionality.
19           MS. ROBINSON:  When you get to a
20   point, can we take a short break?
21           MR. McDONALD:  This is not an
22   endurance contest. Anytime you need a break.
23   We can take one now.  That's fine.
24           (Whereupon, a break was taken at
25       11:08 a.m. EST)

65

1        Q.    I may repeat a question or ask you
2    to summarize because this is the first time
3    that I'm actually kind of getting a picture of
4    different departments, okay, so that's why I
5    need you to help me.
6            I think you testified that there's
7    certain aspects of the MSP system that you
8    don't have access to?
9        A.    Correct.
10       Q.    But you don't know what
11   information is contained on that part of MSP
12   or do you?
13       A.    I do not.
14       Q.    How do you know that there's
15   certain aspects of it that you don't have
16   access to?
17       A.    When you are a new hire you get
18   a general overview of applicable systems that
19   Chase has that will be relevant to your job
20   so they introduce you to MSP, and they'll
21   tell you that there are certain -- I can't
22   remember the actual phrase for what they say,
23   but let's say platforms, and when you are
24   assigned to a platform that will contain
25   certain screens.  So there are various

66

1    platforms within the overall system but
2    you're not going to have free reign of all of
3    the platforms.
4        Q.    When you're accessing MSP, you
5    only access it through the computer, I guess,
6    at your desk?
7        A.    Yes.
8        Q.    You don't access it through a
9    personal computer, or iPad, or anything that
10   you have, correct?
11       A.    No.
12       Q.    When you're accessing it, are
13   there menus or platforms that show up that you
14   cannot enter into?
15       A.    No.
16       Q.    So they're not even on your
17   system?
18       A.    When you sign into the system it
19   will show a platform that is assigned to you,
20   for example, P8 may be a platform.  That
21   would be what you're assigned to.  If you
22   attempted to access a screen that wasn't
23   contained within that you would get an error
24   message on the system.
25       Q.    And the error message says not an

67

1    authorized user --
2        A.    Something to that nature.
3        Q.    -- something to that effect?
4        A.    Correct.
5        Q.    So you do have visibility of
6    different platforms, I mean, the fact that
7    there's a door there in laymen's terms, but
8    you can't open that door?
9        A.    Correct.
10       Q.    When you received your orientation
11   or at any time during the course of your
12   employment at Chase, did you learn who has
13   access to these other areas on the MSP system?
14       A.    No.
15       Q.    So even sitting here today, even
16   though you were a team leader for quite
17   sometime, you don't know or can't tell us who
18   had access to the full MSP system?
19       A.    No.
20       Q.    Do you remember the name of the
21   person who first set you up within your
22   particular platform, what her name was?  You
23   might have even given it to me and I didn't
24   catch it.
25       A.    No.

68

17  (Pages 65 to 68)

## LANIER JEFFREY - VOLUME I

1    Q.    Just so I have a better overview
2  of the different computer -- what's the term
3  you're most familiar with or comfortable with?
4  Is it computer systems, computer programs? I
5  want to know on a daily basis while you were a
6  team leader which computer --
7    A.    Systems.
8    Q.    -- systems that you accessed. So
9  we have MSP, right?
10   A.    Yes.
11   Q.    And we had the MDA?
12   A.    Yes.
13   Q.    And did we have the DTE?
14   A.    We had viewable access. You
15  could not --
16   Q.    You couldn't enter information but
17  you could view the information?
18   A.    Correct.
19   Q.    What else?
20   A.    CCW, Customer Care Workbench.
21   Q.    What was that?
22   A.    That is a system that Chase uses
23  to notate some information as well as submit
24  a request/route to another area to do an
25  action on the loan.

69

1  South Carolina.
2    Q.    Do these two Assurant sites, do
3  they have access to the CCW system?
4    A.    Yes.
5    Q.    Do they have full access to the
6  CCW system?
7    A.    I'm not sure.
8    Q.    Do you have full access to the CCW
9  system?
10   A.    Define full access for me.
11   Q.    Well, when we talked about MSP, as
12  I understand it, there's different platforms
13  that you are not able to access and that
14  you're not sure what, if any, information is
15  contained on those platforms, correct?
16   A.    Correct.
17   Q.    CCW, have you seen in accessing
18  that any platforms, portals, or whatever that
19  you are unable to enter, unauthorized to
20  enter?
21   A.    With CCW there are also
22  different available tools, so I'm not
23  familiar with all the full functionality of
24  CCW. As far as what we used it for, my
25  understanding of CCW was for routes and

71

1    Q.    When you say another area, do you
2  mean another department?
3    A.    Yes.
4    Q.    What is the difference between the
5  CCW and MSP?
6    A.    CCW is a supplemental system
7  that communicates to all of the mortgage
8  servicing systems that Chase has.
9    Q.    CCW has a broader accessibility
10  amongst all of the Chase departments?
11   A.    Yes.
12   Q.    And it's true that there are --
13  your former employer, Assurant, there's
14  Assurant employees within one of the Chase
15  buildings, right?
16   A.    No.
17   Q.    Where are they?
18   A.    In the processing centers
19  located throughout the country.
20   Q.    And do you interact with all these
21  different Assurant processing centers?
22   A.    Only two sites did we have to
23  interact with in my department.
24   Q.    Who are --
25   A.    Duluth, Georgia and Florence,

70

1  notes, and that I did have full access to.
2  Anything else -- there are other tools built
3  within CCW, but because I don't utilize them
4  I've never really been made aware of what
5  they do or what is contained within them, so
6  I can't speak to that. But within the
7  functionality that we use CCW for, I had full
8  access to open routes and place -- or view
9  comments.
10   Q.    What did you use CCW for?
11   A.    To communicate on escalated
12  requests with the processing center as well
13  as to move funds or request certain actions
14  to be taken on the loan by other departments.
15   Q.    What is an escalated request?
16   A.    If the borrower was to contact
17  the Hazard Insurance Processing Center and
18  make a request for whether a disbursement or
19  something, some kind of exception to the
20  process outside of their guidelines, they
21  would have to request approval from loss
22  drafts in Columbus to do so.
23   Q.    Such as?
24   A.    May I please have $30,000
25  instead of $20,000.

72

18  (Pages 69 to 72)

LANIER JEFFREY - VOLUME I

1    Q.    You're the one who makes that
2  decision?
3    A.    Whoever was working -- whoever
4  was assigned to handling those requests.
5    Q.    Is there a certain amount -- that
6  would be, for example, the operations analyst
7  or the senior operations analyst?
8    A.    Yes.
9    Q.    And I'm guessing that there's some
10 certain monetary amount where it gets bumped
11 up to you when you were the team leader that
12 you had to approve on?
13   A.    Even -- there wasn't a specific
14 dollar amount but there's still guidelines
15 for working the escalation request, even
16 within the Loss Drafts Department, that if
17 you're unsure it doesn't apply to the
18 guidelines that we have for answering the
19 question, you would escalate it to either a
20 team lead or the manager.
21   Q.    And what would you consult with in
22 order to make the final call?
23   A.    Sometimes it was just best
24 business decision.  As long as it was within
25 investor guidelines then you were able to

73

1  have discretion.
2    Q.    And the investor guidelines are
3  published by the various mortgage companies
4  that you were servicing?
5    A.    By the investors, Fannie Mae,
6  Freddie Mac, Ginnie Mae, financial investors.
7    Q.    I need to take a step back because
8  lawyers like to testify.  But let's take one
9  step back here and make sure I understand.
10    Is Chase a bank?
11   A.    Chase is a financial
12 institution, yes.
13   Q.    Is there a difference between bank
14 and financial institution in your --
15   A.    That's just how they word it
16 when they train you, so that's the same way
17 that we quote it.  We're a financial
18 institution.
19   Q.    It sounds more --
20        MS. ROBINSON:  Just ask her
21 questions.
22   Q.    In this case who owned, or who was
23 the investor, or whatever term you use, this
24 particular note, we're talking about April
25 Barnett?

74

1    A.    Who owned the loan or who
2  originated the note?
3    Q.    Let's start with who originated
4  the note?
5    A.    Without revealing the note I
6  couldn't answer that for you.
7    Q.    Does Chase originate notes?
8    A.    In general, yes.
9    Q.    In your -- when you worked in the
10 Loss Draft Department did you service notes
11 that were both originated by Chase and by
12 others?
13   A.    Yes.
14   Q.    Was there a distinction between
15 how notes originated by Chase and other loan
16 origination, either banks or financial
17 institutions?
18   A.    No.
19   Q.    So y'all monitored -- y'all
20 processed them the exact same way?
21   A.    Based off of who originated it.
22 It wasn't a criteria.  The investor was a
23 criteria.  The originator was not -- the
24 originating company to sign over a note to
25 the borrower is not something that we took

75

1  into account.  Who invested in the loan, we
2  did.
3    Q.    And is Chase a loan investor?
4    A.    I'm not sure.
5    Q.    What loan investors did you deal
6  with in the Loss Draft Department?
7    A.    Fannie Mae, Freddie Mac, Ginnie
8  Mae.
9    Q.    Just briefly can you tell me what
10 the difference is between Fannie Mae, Freddie
11 Mac, and Ginnie Mae?
12   A.    I don't understand the question.
13   Q.    Is there a difference between
14 those three financial institutions?  What are
15 they?
16   A.    Three different entities.
17   Q.    Right.  Do you know -- if you
18 know, fine, if you don't know, fine, but do
19 you know what --
20   A.    No.
21   Q.    -- each of those particular
22 financial institutions, if they are directed
23 to particular products or folks?
24   A.    I don't know.
25   Q.    Okay.  And you didn't service any

76

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

LANIER JEFFREY - VOLUME I

1  loans that Chase was the investor; is that
2  what you're saying?
3      A.   I don't remember.
4      Q.   So far we got the MSP, MDA, DTE,
5  and CCW.   Were there any other systems that
6  you accessed in your day-to-day duties in the
7  Loss Draft Department at Chase?
8      A.   There was the escrow
9  administration check log database.
10     Q.   What was that?
11     A.   That is a database that the
12 mailroom uses to log the checks.
13     Q.   Did you have full access to that?
14     A.   I'm not sure.
15     Q.   Did you have the ability to input
16 any information into escrow administration
17 check log database?
18     A.   As in could I log a check or as
19 in was there anything that I ever did in the
20 system logged?
21     Q.   Number one, did you ever log a
22 check?
23     A.   We did not enter checks, no.
24     Q.   Because that wasn't the
25 obligations of your department?

77

1      A.   Correct.
2      Q.   Second question is:  Did you input
3  any information; did you have that ability?
4      A.   Yes.
5      Q.   What type of information would be
6  entered into that escrow administration check
7  log database?
8      A.   The decisioning of the check,
9  where we wanted the check to go.
10     Q.   And what are the options there?
11     A.   I don't remember all of them.
12     Q.   Give me the ones you remember.
13     A.   Deposit to escrow, endorse to
14 borrower, sent to payoff.
15     Q.   Deposit to escrow, send to payoff?
16     A.   Endorse to borrower.
17     Q.   What was the third?
18     MS. ROBINSON:  That was three.
19     Q.   That was the only three.   Okay.
20          And was the only time that the
21 check was sitting in this bank vault was while
22 you were deciding which of these three to
23 direct the check to?
24     A.   I don't understand your
25 question.

78

1      Q.   Before we took a break, as I
2  understood it, when a check would come in
3  after it was logged in the processing center,
4  the name I've forgotten, it would immediately
5  -- the actual original check would go into
6  some vault onsite?
7      A.   Yes.
8      Q.   Within -- there's filing cabinets
9  in that vault?
10     A.   Yes.
11     Q.   I think you told me you never went
12 in it and you don't know the size of it, or
13 anything like that?
14     A.   Correct.
15     Q.   Would the check remain in that
16 vault while the Loss Draft Department was
17 determining which of these three options to
18 make a recommendation for that check?
19     A.   Yes.
20     Q.   What is the timeline that is
21 imposed upon your department, if any, to make
22 that decision?
23     A.   It would vary based on the
24 situation.  Standard time was 48 hours.
25     Q.   Is there a written guideline that

79

1  details the decision-making process and the
2  time frame in which those decisions should be
3  made?
4      A.   There are documented procedures
5  for each process within the department, yes.
6      Q.   What's that called, that guideline
7  section?
8      A.   There is not one guideline.  You
9  will have separate procedures -- at that
10 time.  As of today I don't know what they do,
11 but at that time there was separate
12 procedures for each situation:  Payoffs,
13 payoffs with LOA, payoffs without an LOA,
14 endorse and release.  There was various
15 processes that you would do in each of those,
16 had individual procedures, and within those
17 procedures there were guidelines listed.
18     Q.   Is that a written document that
19 you would consult?
20     A.   Yes.
21     Q.   Is that all part of a particular
22 manual?
23     A.   No.  At that time it was not.
24     Q.   So if I'm a Chase employee and I'm
25 charged with -- I'm in the Loss Draft

80

LANIER JEFFREY - VOLUME I

1  Department and I'm trying to make one of these
2  three decisions, do I consult a binder that
3  has this manual in it or what?
4      A.   They were imaged on -- I believe
5  it was in like a shared folder area where you
6  could go in and view the procedures or you
7  could print them off and put them in a binder
8  for yourself if you wanted.
9      Q.   What was the computer program or
10  software that I would access to be able to see
11  that?
12      A.   It should just be Microsoft
13  Word.
14      Q.   You don't know the name of those
15  particular sections?
16      A.   I guess I'm not understanding.
17  It's not a particular section that relates to
18  just day one do this, day two do that. It's
19  actual procedure for how you should process
20  the check from start to -- so it's if this,
21  then this; if that, then this. So it's not
22  one particular section you would go to just
23  to see a standard service level time.
24      Q.   Right. It's my mistake. Let me
25  tell you all I'm trying to get here is, is it

81

1  it falls within this category, either it goes
2  into escrow, or endorse and return to
3  borrower?
4      A.   The person that logs the checks
5  make the initial determination as to what
6  action needs to be taken on the draft. And
7  it's then assigned to the person who would
8  make the disposition.
9      Q.   The person who logs the check, are
10  they a senior analyst?
11      A.   I'm not sure.
12      Q.   When you were a team leader at the
13  time whose responsibility was it to log in the
14  checks?
15      A.   I don't remember.
16      Q.   You don't remember the name or you
17  don't remember what was the title of the
18  person?
19      A.   I don't remember their name.
20      Q.   What was the title of the person
21  within the Loss Draft Department whose
22  responsibility it was to log in the check and
23  make this initial determination?
24      A.   There wasn't a specific title;
25  you didn't have to be one of those four

83

1  sounds to me that like what you do is pretty
2  complicated, but there's a lot of different
3  guidelines. And I don't want the Library of
4  Congress roomful of guidelines. If I'm trying
5  to look in the documents that have been given
6  to me, or to ask Ms. Robinson in the future,
7  hey, can I look at this? What would I say?
8  Hey, I'd like to look at what it is that Ms.
9  Jeffrey was talking about. What would I ask?
10      A.   You would ask for the payoff
11  procedures.
12      Q.   And generally speaking, you would
13  make these decisions within 48 hours?
14      A.   The initial processing of the
15  check, the disposition of the check,
16  generally speaking.
17      Q.   Are you saying you would make the
18  decision of which of the three categories this
19  check should be falling into within 48 hours
20  or the actual disposition within 48 hours?
21      A.   Which one of the three
22  categories.
23      Q.   Are there different folks within
24  the Loss Draft Department that you would
25  assign it to once you make the decision, okay,

82

1  things to be a check logger. It was just a
2  function that was assigned to you.
3      Q.   When you were the team leader then
4  would you perform that function as the --
5      A.   If the person that was assigned
6  to that function on a regular basis wasn't
7  there and I needed to fill in for their job
8  function. You were assigned a function, so
9  if that function was assigned to you and you
10  were out, then whoever was assigned as your
11  backup would do the function on your behalf
12  while you weren't there.
13      Q.   When you reviewed this file
14  yesterday were you able to determine who the
15  person was that logged this check in?
16      A.   No.
17      Q.   Which of these systems would that
18  be reflected on, the MSP, the MDA, the DTE,
19  the CCW?
20      A.   The MDA.
21      Q.   MDA. Before I jump off this
22  topic, what other systems would you access in
23  the ordinary course of your business in the
24  Loss Draft Department?
25      A.   At this moment I can't think of

84

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

LANIER JEFFREY - VOLUME I

1  any others.
2      Q.   What is LPS?
3      A.   That is a default system.
4      Q.   What does that mean?
5      A.   It's a different line of
6  business. It's not related to loss drafts.
7  That's a system that the default side of our
8  business handles, uses.
9      Q.   So when you were operating within
10  the Loss Draft Department for checks,
11  irrespective of what your position was, senior
12  analyst, team leader, you never accessed the
13  LPS?
14      A.   Correct.
15      Q.   And when you say it was the
16  default system, can you tell me what that
17  means?
18      A.   It was a system utilized by
19  people that worked in the default piece part
20  area of Chase.
21      Q.   When you say default you mean like
22  a borrower's defaulted on a loan?
23      A.   Correct, you're past due.
24      Q.   You're an operations analyst
25  today?

85

1  dates into the system?
2      A.   You're asking what is my job
3  functionality today?
4      Q.   Yes, ma'am.
5      A.   I actually execute foreclosure
6  documents and submit them to the firms to
7  file with the courts to proceed with
8  foreclosure proceedings.
9      Q.   What type of documents are you
10  executing?
11      A.   Affidavits, assignments,
12  statement of reviews concerning complaints.
13      Q.   Where is your office located?
14      A.   Gahanna, Ohio.
15      Q.   And that's different than the Loss
16  Draft Department?
17      A.   Correct.
18      Q.   And is that the same office
19  building as the Assurant employees are
20  located?
21      A.   No.
22      Q.   I'm mistaken. Where are the
23  Assurant employees?
24      A.   Assurant is in the -- you asking
25  about the hazard insurance processing related

87

1      A.   Correct.
2      Q.   Is that a demotion?
3      A.   No. Lateral.
4      Q.   Lateral. So you moved out of the
5  Loss Draft Department?
6      A.   Correct.
7      Q.   So you're an operations analyst
8  for what department now?
9      A.   Document execution.
10      Q.   What is that?
11      A.   It's a default foreclosure area.
12      Q.   So today you access the LPS
13  system?
14      A.   Correct.
15      Q.   What type of information do you
16  input into the LPS system today?
17      A.   Dates of when the documents are
18  executed.
19      Q.   What documents?
20      A.   Foreclose documents.
21      Q.   Are you the one who shepherds a
22  particular loan through the foreclosure
23  process?
24      A.   No.
25      Q.   Tell me what you do. You enter

86

1  to Chase?
2      Q.   I'm asking about the Assurant --
3  the folks who are employed by Assurant. Is
4  the department in which the Assurant employees
5  function, is that called the hazard -- the
6  HIPC?
7      A.   Yes. So the office for the
8  Chase-related HIPC is Duluth, Georgia and
9  Florence, South Carolina.
10      Q.   The Chase-related HIPC is the ones
11  that are in Duluth, Georgia, Florence, South
12  Carolina?
13      A.   Yes.
14      Q.   But those are actually Assurant
15  employees?
16      A.   Yes.
17      Q.   Paid by Assurant?
18      A.   Yes.
19      Q.   Do you know why that is?
20      A.   No.
21      Q.   Why there's Assurant employees in
22  a department that's a Chase department?
23      A.   I don't understand the question.
24  Do I know why Chase uses third-party vendors?
25  No.

88

LANIER JEFFREY - VOLUME I

1   Q.   Yeah. Yeah.
2   A.   No.
3   Q.   In your experience when you worked
4   in the Loss Draft Department, did you -- you
5   communicated on a daily or at least regular
6   basis with Chase's HIPC?
7   A.   Yes.
8   Q.   And those were Assurant employees?
9   A.   Yes.
10  Q.   How would you communicate with
11  them?
12  . A.   Telephone, e-mail, or the CCW
13  routes.
14  ¹ Q.   And did -- and they regularly made
15  notations within the CCW files, correct, the
16  CCW system?
17  A.   In certain -- at certain points.
18  Not always, not the entire time that I worked
19  in that department they didn't have access to
20  that, but at a point before I left they did,
21  yes.
22  Q.   Do you know why it came about that
23  at one point in time they restricted and then
24  ultimately had more access to the CCW?
25  A.   I do not.

89

1   Q.   In fact, in your reviewing the
2   file either in preparation for this case or
3   just in an ordinary working on this Barnett
4   file, you did see that there are several notes
5   in the file from the HIPC department, correct?
6   A.   No.
7   Q.   You didn't see that?
8   A.   There are not any -- I didn't
9   see any CCW routes, comments, in that file.
10  Q.   Do you remember using, or
11  utilizing, or accessing CCW when you worked on
12  this file?
13  A.   Yes.
14  Q.   You do remember that?
15  A.   Yes.
16  Q.   You don't remember seeing any
17  communications in the CCW file from the HIPC?
18  A.   Correct.
19  Q.   And when you reviewed the file,
20  whatever you reviewed in preparation for this
21  deposition, you didn't see any notations from
22  the HIPC?
23  A.   Correct.
24  Q.   Do you remember anything that was
25  noteworthy from the CCW entries?

90

1        MS. ROBINSON:  I'm going to object
2   to the form as being overly broad.  You can
3   answer.
4   A.   I don't understand the question.
5   Q.   Well, I've never had access to CCW
6   so I'm not -- I'm trying to find out from you
7   today why things would be put into that
8   particular file and why you would access that
9   file.  And your recollection is you just don't
10  really have any recollection about accessing
11  that at all, right?
12  A.   You're asking the reason that I
13  access CCW?
14  Q.   Yeah.
15  A.   It was to move the funds from
16  one bucket to another at the time of payoff.
17  Q.   But did you have to review the
18  entries into the CCW system in order to
19  familiarize yourself as to what had transpired
20  in the case before you made that decision?
21  A.   No.
22  Q.   What did you look at?
23  A.   The MDA tracker and the physical
24  claim file.
25  Q.   Is there a thing called a DRI or

91

1   DRI note?
2   A.   I don't know what that is.
3        (Whereupon, a discussion was held off
4        the record and a break was taken at
5        11:49 a.m. EST)
6   Q.   Ms. Lanier, when you transferred
7   over to operations analyst today, and I think
8   you called it for default, is there another
9   name for that department that you're working
10  in now?
11  A.   Foreclosure.
12  Q.   What systems do you access today
13  that are different than the ones we've gone
14  through this morning?
15  A.   LPS.
16  Q.   LPS.
17  A.   LISA, L-I-S-A, DOCLINE, iVaults.
18  Q.   I-V-A-U-L-T?
19  A.   Yes.
20        MR. GRIMSLEY:  I'm sorry.  Would
21  you repeat?  Was it DOCLINE?
22        THE WITNESS:  DOCLINE,
23  D-O-C-L-I-N-E.
24  Q.   Anything else?
25  A.   We have a lot.  Hyundai, like

92

23  (Pages 89 to 92)

LANIER JEFFREY - VOLUME I

1    the car.  And there are also some databases
2    that we use, but I can't remember, explicitly
3    remember the names of them all because we
4    just have them saved as favorites because
5    there's so many of them, but there's some to
6    access our procedures, procedural memos, to
7    pull up -- to request information on power of
8    attorneys.  Like there's quite a few
9    databases that we use within the default
10   world to communicate to one another or ask
11   questions of one another.
12       Q.    Who trained you on the LPS system?
13       A.    The trainer, you want her actual
14   name?  I only remember her first name.
15       Q.    That's okay.
16       A.    Vera.
17       Q.    Vera.  And what do you use the LPS
18   system for?
19       A.    That's where we document when
20   the documents -- the foreclosure documents
21   are executed, that's where we retrieve images
22   of the foreclosure documents, and also the
23   system that we use to communicate with the
24   firms, the attorney -- the law firms that we
25   use for foreclosures.

93

1    whatsoever?
2        A.    No.
3        Q.    What about LPS employees?
4        A.    We do not communicate with them
5    either.
6        Q.    Where are they located?
7        A.    I'm not sure.
8        Q.    There's some folks that have been
9    identified in this case as consultants.  Do
10   you know -- I'm jumping back now when you were
11   in the Loss Draft Department what folks served
12   as consultants?
13       A.    The HIPC analysts, the people
14   that worked for Assurant, they're listed as
15   consultants for Chase.
16       Q.    Your lawyer handed me a document
17   today, I guess a couple of documents.
18           MR. McDONALD:  Is this one
19   document, Ms. Robinson?
20           MS. ROBINSON:  I've said this not
21   on the record.  Let me repeat it to make sure
22   we're all clear.  She had reviewed, you know,
23   like a little stack of documents and
24   everything that she looked at you've already
25   got except this.  These were the things that

95

1        Q.    How recently were you trained on
2    the LPS system?
3        A.    When I originally moved over
4    March 2011.
5        Q.    So within the past year, year and
6    a half?
7        A.    Yes.
8        Q.    How much training did you have on
9    it?
10       A.    It was incorporated within a
11   two-week overall foreclosure training class.
12       Q.    There's also -- there's actually
13   manuals that give you some directives of what
14   not to put on the LPS system and what to put
15   on it, right?
16       A.    I did not receive one of those.
17       Q.    You've never seen one?
18       A.    No.  We don't have a physical
19   LPS manual.  There may be one, but I don't
20   have one.
21       Q.    How do you communicate with the
22   Assurant employees now on your job?
23       A.    We don't utilize Assurant in my
24   position today.
25       Q.    No communication with them

94

1    she had reviewed that you had not already seen
2    in the prior production, and the last three
3    pages are just better color copies of
4    photographs the company -- the BPO, because we
5    had a really poor set of them the first time
6    around.  And I just re-numbered those like the
7    supplemental production starting with Chase
8    number 2452, and then the last three pages of
9    that 2461, 62, and 63 are just better copies
10   of something you already had.
11       Q.    (BY MR. McDONALD) Ms. Jeffrey, I'm
12   going to hand this entire stack to you and
13   then have you separate out the different
14   documents and then we'll just take them one at
15   a time.  Okay?
16       A.    If a document was attached to an
17   e-mail, do you want it attached with the
18   e-mail and stapled together?
19       Q.    Yes.
20           MS. ROBINSON:  And like this is a
21   good example.  She's stapling together 2457,
22   58, and 59, and she says attached BPO and Form
23   176.  So the BPO you already had, so there's
24   not another copy of it in here, but Form 176
25   you didn't have it before, so it's attached.

96

24  (Pages 93 to 96)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

LANIER JEFFREY - VOLUME I

1  See what I mean?
2  MR. McDONALD:  Yes.
3  MS. ROBINSON:  And as I said,
4  these photographs were attached to the BPO.  I
5  didn't give you another copy of it because you
6  already have it.
7  THE WITNESS:  Do you want me to
8  staple these two together or just leave it?
9  MR. McDONALD:  Those three can be
10  stapled, yes, please.
11  Q.  (BY MR. McDONALD) Okay.  I'll mark
12  each of these as separate exhibits, but the
13  documents, the Bates numbers that Ms.
14  Robinson already read into the record, where
15  did you find these, Ms. Jeffrey?
16  A.  These were what was provided to
17  me by the loss draft current manager when I
18  asked for a copy of the payoff file.
19  Q.  What's the name of the loss draft
20  current manager?
21  A.  [redacted]
22  Q.  Do you know how to spell her last
23  name?
24  A.  [redacted].
25  Q.  Do you know what file name these

97

1  documents came from?
2  A.  I don't.
3  Q.  Did you see any other documents
4  besides these?  Did you actually see that
5  file?
6  A.  She scan -- I asked for a copy
7  of the attachments from the MDA database and
8  a copy of the notes from the MDA database.  I
9  also reviewed a copy of the payoff file that
10  was imaged to our imaging system at the
11  completion of the payoff.
12  MS. ROBINSON:  And maybe I'm
13  causing the confusion.  She's reviewed more
14  than that, but all the other stuff she
15  reviewed you already have.  I think it was --
16  I mean, it wasn't a whole big stack, but it
17  was a little stack and all of it had been
18  previously produced except for this.
19  MR. KILBORN:  Do you have it where
20  you can give it to us?
21  MS. ROBINSON:  I've got somebody
22  trying to give me the Bates numbers.  I've got
23  somebody working on that this morning.  Let me
24  see if they've done it yet.
25  MR. KILBORN:  These are copies of

98

1  what was in the file?
2  MS. ROBINSON:  Right.  These are
3  copies from the file she reviewed of documents
4  y'all did not already have.
5  MR. KILBORN:  Right.
6  Q.  (BY MR. McDONALD) Ms. Jeffrey, I'm
7  marking as Exhibit 1, it looks like it's an
8  e-mail from you dated January 26, 2011.  You
9  reviewed that document --
10  A.  Yes.
11  Q.  -- in preparation for the
12  deposition and that's one of the documents
13  that Ms. Guyton gave you?
14  (Whereupon, Plaintiff's Exhibit Number 1
15  was marked for identification.)
16  A.  Yes.
17  Q.  When did she give you that
18  document?
19  A.  Last week.  I don't know the
20  exact date.  I don't remember the exact date
21  the e-mail came through, but it was last
22  week.
23  Q.  She sent it to you, these
24  documents to you, via e-mail?
25  A.  Correct.

99

1  Q.  And what was it -- you asked for
2  these very specific documents?
3  A.  I asked for a copy of everything
4  that was attached to the MDA database and a
5  copy of the notes from the MDA database.
6  Q.  What was your purpose in asking
7  for those?
8  A.  To prepare to answer your
9  questions.
10  Q.  And did you have any other
11  conversations with anybody else within Chase
12  about documents that you needed to prepare for
13  the deposition?
14  A.  No.
15  Q.  What did you and [redacted] talk
16  about other than you asking for those
17  documents and her sending them to you?
18  A.  We didn't talk.
19  Q.  If you would, please, read that to
20  me and then tell me what it is that document
21  is all about.
22  A.  From Lanier Jeffrey sent
23  Wednesday, January 26, 2011, 11:25 a.m. to
24  DCD Research copying [redacted] Subject:
25  Loan Number [redacted]4276-payoff request.

100

25 (Pages 97 to 100)

1     Attachments: LOA, underscore, 20101109,
2     underscore, 141700.pdf. Importance: High.
3         "Hello, ███. I have opened the
4     route to move the funds in R/E to suspense
5     for the payoff of this loan. Please pay off
6     the loan effective 9/7/2010 and charge the
7     shortage of $2,672.67, with brackets, 2672.67
8     plus $180 foreclosure attorney fee to our
9     cost center using the information below.
10    Please advise once the loan is paid in full.
11    Cost center 59231, payee 94012, reason code,
12    TX72. Thank you, Ms Lanier Jeffrey, team
13    lead, Loss Drafts Department."
14         Q.   Could I have that back? Tell me,
15    Ms. Jeffrey, who this ███ is again. We talked
16    about her earlier.
17         A.   One of the analysts in the
18    default payoff department.
19         Q.   And what is the system that you're
20    using right now to communicate with her in
21    Plaintiff's Exhibit 1?
22         A.   E-mail. I can't recall if at
23    that time it was Lotus Notes or Microsoft,
24    but it was an e-mail system.
25         Q.   So would the only person who would

101

1    have visibility to this particular e-mail is
2    you and Ms. ███?
3         A.   And the inbox that received the
4    e-mail, DCD Research, if they archive it.
5         Q.   Who is DCD Research?
6         A.   I don't know. That's the e-mail
7    address that we utilized to submit default
8    payoff requests, a general inbox. I'm not
9    sure who mans it.
10         Q.   Do you remember in reviewing this
11    file how many other e-mails that you'd sent to
12    Ms. Atia or anybody else involved in this
13    particular file?
14         A.   No.
15         Q.   What is the purpose in sending her
16    an e-mail as opposed to making a posting on
17    one of these other systems that we spent the
18    morning talking about?
19         A.   That was the method that we
20    submitted the request to the area per what
21    they advised us. That's how they wanted the
22    request to be submitted and so that's what we
23    did.
24         Q.   Who was they?
25         A.   Default Payoff Department.

102

1         Q.   Default Payoff Department. But
2    the Default Payoff Department, they don't make
3    the decision as to whether something gets paid
4    off or not. The Loss Draft Department does,
5    right?
6         A.   When you say make the decision,
7    they -- I don't understand. They apply the
8    money. They apply the funds and post the
9    payoff to the loan.
10         Q.   Yes, ma'am. At whose direction?
11         A.   Loss drafts.
12         Q.   Ultimately this was your decision
13    to have this paid off?
14         A.   Yes.
15         Q.   What is the "I have opened the
16    route to move the funds in R/E to suspense for
17    payoff of this loan," what does R/E mean?
18         A.   The restricted escrow account
19    that holds loss draft funds.
20         Q.   And this restriction escrow
21    account, is it just one account where all
22    payoff funds are placed?
23         A.   Restricted escrow is, for lack
24    of a better term, a bucket that's placed
25    within the borrower's records. That is a

103

1    particular account that houses all hazard
2    claim proceeds regardless if it's a rebuild,
3    payoff, whatever, that is the area that the
4    funds are deposited into, a restricted
5    special escrow account.
6         Q.   And that is borrower specific?
7         A.   The name of the bucket is the
8    same for everybody. It's called the same
9    thing.
10         Q.   My question is: Does Chase have
11    one restricted escrow account where all such
12    checks are deposited and then later disbursed
13    per borrower or is there a separate account
14    for each borrower?
15         A.   There are, I believe, two
16    accounts: One for home equity borrowers and
17    one for regular mortgage loans, but there
18    would be one bucket for all funds received
19    for all borrowers.
20         Q.   And who has that account, Chase
21    Bank, or is that deposit at a different bank?
22         A.   I'm not sure.
23         Q.   You make the decision as to
24    whether payment is to be disbursed from the
25    restricted escrow account but you're not sure

104

LANIER JEFFREY - VOLUME I

1  who is actually the holder of that restricted
2  account?
3      A.   Correct.
4      Q.   How, for example, do you know
5  whether there's interest earned on it or not?
6      A.   There are guidelines regarding
7  the interest on escrow that's a separate --
8      Q.   Department?
9      A.   There is -- there is a procedure
10 available to tell you what accounts earn
11 interest on escrow but I'm not familiar
12 exactly with what those specifications are.
13     Q.   Do you know if I had questions
14 about what department I would talk to?
15     A.   I would begin with Michelle
16 Guyton and she could probably direct you the
17 best way.
18     Q.   When you say I have opened the
19 route to move the funds in restricted escrow
20 to suspense for the payoff of this loan, can
21 you tell a southern boy what that means?
22     A.   I opened a CCW route, which is
23 just what I was telling you earlier, a
24 request to other areas to move money.  Loss
25 drafts doesn't have the ability to move funds

105

1  around within the loan as far as on the
2  servicing system, so another area has to move
3  it from one specific location to another
4  specific location of the loan.  Areas outside
5  of loss drafts don't have access to the
6  restricted escrow accounts, so they're not
7  able to pull the money from that account and
8  apply it to the loan, thus loss drafts has to
9  move the funds from our special bucket and
10 place it into a general suspense account so
11 that the department can take it and apply it
12 to the loan as needed.
13     Q.   You say charge the shortage of
14 $2,672.67, which is -- includes foreclosure
15 attorney fees to our cost center.  What is the
16 cost center?
17     A.   It is the overall area that you
18 work in, the department that you work in.
19     Q.   So in this particular instance you
20 were instructing her to charge cost to the
21 Loss Draft Department?
22     A.   To escrow administration, our
23 overall department.
24     Q.   Escrow administration is above the
25 Loss Draft Department?

106

1      A.   Yes.  Loss drafts is under the
2  escrow administration umbrella.
3      Q.   What other departments are under
4  the Escrow Administration Department?
5      A.   As of today I do not know.
6      Q.   At the time?
7      A.   Taxes, general hazard insurance,
8  and PMI.  That's all that I can recall at
9  this moment.
10     Q.   PMI stands for?
11     A.   Private Mortgage Insurance.
12     Q.   Who made the decision to charge
13 this cost to the cost center?
14     A.   I did.
15     Q.   Why?
16     A.   To pay off the loan.
17     Q.   Was there a determination that you
18 had made that there was an error in the Loss
19 Draft Department or what?
20     A.   I determined that in the best
21 interest of the loan we needed to pay off the
22 loan, so we would assume the difference in
23 the cost between paying off the loan and
24 available insurance proceeds.
25     Q.   Why based on your investigation

107

1  was there a discrepancy between necessary to
2  pay off the loan and the insurance proceeds?
3      A.   Was there or why was there?
4      Q.   Why?  I thought I heard you say
5  that there was.  Maybe I'm mistaken.
6      A.   The amount that we received for
7  the -- from the insurance company was not
8  enough based off of the default quote that we
9  received.  I don't know why it wasn't enough.
10 It just wasn't.
11     Q.   Sitting here today you don't know
12 why there were insufficient funds from State
13 Farm to pay off this loan; is that correct?
14     A.   No, I don't know.
15     Q.   You don't know today why there was
16 insufficient funds?
17     A.   No, I don't.
18     Q.   Who charged the $180 foreclosure
19 attorney fees?
20     A.   I don't know.
21     Q.   Did you talk to -- did you
22 interact with lawyers while you were in the
23 Loss Draft Department regarding foreclosure of
24 this particular account?
25     A.   No.

108

27  (Pages 105 to 108)

LANIER JEFFREY - VOLUME I

1      Q.   That would have come through the
2  default department or the foreclosure
3  department?
4      A.   I could presume. I'm not sure.
5  We didn't have any interaction with
6  foreclosure whatsoever.
7      Q.   Normally if there's attorneys
8  retained they deal with the Foreclosure
9  Department?
10      A.   I'm not sure. I'm assuming so.
11  I'm not sure.
12      Q.   This is your e-mail, right?
13      A.   Yes.
14      Q.   How did you obtain the information
15  that $18 had been incurred by the foreclosure
16  attorney's fees?
17      A.   I don't remember.
18      Q.   How were you able to ascertain
19  that those services had actually been
20  rendered?
21      A.   I don't remember.
22      Q.   Do you have authority to make
23  disbursements to attorneys that are
24  undocumented?
25      A.   I don't understand the question.

                                              109

1      Q.   Yeah. Sitting here today you
2  don't remember how you got a bill or how you
3  reached the conclusion that there were $180 in
4  foreclosure attorney fees, right?
5      A.   Correct.
6      Q.   So what I'm trying to establish or
7  figure out is, okay, you're not remembering it
8  today, but at some time you must have received
9  something, correct, that gave you an
10  indication that there had been attorney fees
11  incurred?
12      A.   Generally there would be some
13  indication on the system that X amount of
14  dollars is charged for this fee or that fee
15  on a given loan.
16      Q.   What system would that show up on?
17      A.   MSP.
18      Q.   You don't remember who the lawyer
19  was?
20      A.   Oh, I would have no idea.
21      Q.   Now that you're in the department
22  is there a particular law firm that you
23  normally deal with or is it different for
24  every borrower, state, what?
25      A.   It's state and region within the

                                              110

1  state.
2      Q.   Is there one general counsel law
3  firm that you deal with who then in turn
4  parcels it out to different states? Do you
5  have a lawyer who's a liaison?
6      A.   No.
7      Q.   But sitting here today you don't
8  remember receiving any itemization of services
9  rendered to justify or support the $180
10  foreclosure attorney's fees?
11      A.   I do not.
12      Q.   Was there an obligation for them
13  to have provided you that type of --
14          MS. ROBINSON: I'm going to object
15  to form. This is money that Chase paid out.
16  I mean, it wasn't out of a hazard insurance.
17  I'm just going to object to the form.
18      A.   Repeat the question, please.
19      Q.   Yeah. I'm just trying to get an
20  idea for restrictions on you. Because I'm
21  assuming you're working for a company that has
22  different guidelines that you have to follow
23  procedures and policies, that sort of thing.
24  So what I'm trying to understand is, you have
25  made a decision in this document that I didn't

                                              111

1  see before today. Okay.
2      A.   Okay.
3      Q.   So how it was that you were able
4  to reach the conclusion that $180 in for
5  foreclosure attorney's fees were warranted?
6      A.   There would have been an
7  indication on the servicing system MSP that
8  $180 was charged to the loan for FCL, ATTY
9  fee, which means foreclosure attorney fees.
10  We don't know who. We don't know why. We
11  just know it's there. Our job is to ensure
12  that it's paid to close the loan.
13      Q.   And when something is entered into
14  the MSP system isn't the author identified?
15      A.   No. You're talking about a note
16  or a field updated because there's a
17  difference.
18      Q.   Well, let's start with field. Are
19  you saying that this -- this $180 foreclosure
20  attorney fee would have appeared in a field?
21      A.   Correct.
22      Q.   So it's just a number naked
23  sitting out there?
24      A.   Correct.
25      Q.   And there's no way to trace that

                                              112

28  (Pages 109 to 112)

## LANIER JEFFREY - VOLUME I

1  back to a particular author?
2      A.  Not that I'm aware of.  There
3  may be, but I've never been trained to do
4  that.
5      Q.  So as best you recall sitting here
6  today what you did when you made this
7  determination at least as it relates to the
8  attorney's fees, was you assumed that because
9  it was on the MSP system that some other Chase
10  employee whose responsibility was to input it,
11  they did their job?
12      A.  Correct.
13      Q.  And that's what you have to do
14  when you're processing these types of claims
15  and you're accessing the different programs
16  and databases that we've talked about today
17  is, you've got to rely on the assumption that
18  the other Chase employees are giving you
19  correct information?
20      A.  Correct.
21      Q.  You didn't have any obligation in
22  performing your duties as team leader in the
23  Loss Draft Department in making this
24  determination to go back behind and verify
25  that this $180 in foreclosure attorney fees

113

1  confident is, is that you didn't because you
2  didn't have any obligation to go back behind
3  that number and try to determine how that
4  number was arrived at?
5      A.  Correct.
6      Q.  See where I'm going?  I'm trying
7  to figure out it's Chase's money, right?
8      A.  The amount that was charged to
9  the cost center?
10      Q.  Yes.
11      A.  Correct.
12      Q.  So Chase -- in the grand scheme of
13  things Chase is charging itself?
14      A.  Yes.
15      Q.  What is the purpose in your making
16  the decision as team leader in the Loss Draft
17  Department to write this memo directing them
18  how to assess these costs?
19      A.  To pay off the loan and close
20  the loan.
21      Q.  Is there no other methodology
22  that's available to you as the team leader to
23  just direct them the loan has been paid off,
24  pay off the loan?
25      A.  No.

115

1  charge was valid?
2      A.  With no affiliation to the
3  default department or formal training to make
4  an assessment like that, no, we are not
5  required to make an assumption on behalf of
6  another department.
7      Q.  I'm going to ask the similar
8  questions for the other 2,492.67.  Where did
9  you get that number from?
10      A.  I don't remember.
11      Q.  Would it have been on the same MSP
12  system?
13      A.  It may have been a screen quote.
14  Kind of what we called them when you try to
15  go to one screen that gives you a general
16  quote doesn't include everything within a
17  payoff but a general overview, or it could
18  have been an e-mail sent to us from default
19  saying it's this amount.
20      Q.  Even in your preparation for the
21  deposition today, the files that you reviewed,
22  all that type of stuff, you don't recall what
23  was the basis for that number?
24      A.  I do not.
25      Q.  And when you did it what we're

114

1      Q.  Do you know why that is?
2      A.  Well, you cannot pay off a loan
3  without cancelling the financial obligation
4  and that's applying money to the loan.
5      Q.  Well, we'll get into the documents
6  probably after lunch, but do you remember
7  looking at the initial quote to the -- to the
8  borrower as to what the loan payoff amount
9  was?
10      A.  I don't remember ever receiving
11  that.
12      Q.  You don't remember at any time
13  actually reviewing the initial loan payoff
14  quote?
15      A.  I do not.
16      Q.  You don't remember during the
17  course of your entire involvement as team
18  leader in the Loss Draft Department making a
19  side-by-side comparison to here's the loan
20  payoff quote and here's the actual check that
21  came in?
22      A.  On this case, no.
23      Q.  But that wouldn't have even been
24  your responsibility as team leader to do that?
25      A.  No.

116

29  (Pages 113 to 116)

## LANIER JEFFREY - VOLUME I

1     Q.    Would that have been your
2 responsibility as team leader of the Loss
3 Draft Department to make sure that that task
4 was done?
5     A.    No.
6     Q.    Would it have been the
7 responsibility of anybody within the Chase
8 organization to compare the initial payoff
9 quote given to the borrower and the check that
10 ultimately was received by Chase?
11     A.    I can't speak on anyone else's
12 responsibilities.
13     Q.    But you know it wouldn't have been
14 within the obligations of the Loss Draft
15 Department?
16     A.    Correct.
17     Q.    What is the cost center code, the
18 59231?
19     A.    That is the actual numerical
20 code assigned to escrow administration.
21     Q.    It's like talking to somebody from
22 NASA. I'm just having a tough time. How do
23 you remember all of this? Do you have a code
24 book where you can remember or is it just
25 because you use it all the time that you

117

1 remember this place is this code, whatever?
2     A.    Those -- that's a specific payee
3 reason, the cost center is affiliated with
4 our department. You would use that anytime
5 you order anything from a Post-it note to a
6 pen. Whatever is charged to your department,
7 that's the cost center. So that's something
8 that yes, you would fluidly use.
9     The payee and reason codes,
10 those were probably ascertained from my
11 manager at one point in time. There's
12 another area that has to give you the code.
13 You don't just know per se the payee code, so
14 we would have previously asked someone to
15 give us the code.
16     Q.    Payee code, I understand you asked
17 somebody, but what does that mean?
18     A.    I don't know. It's the
19 requirement of that area in order to apply
20 the money in a certain way, so that's one of
21 the reasons why we had to ask someone else.
22 We don't utilize that, so I don't know what
23 it pertains to or how it's applicable in
24 applying money to a loan, but that's
25 information that they needed and apparently

118

1 it was already assigned to each department,
2 so we just had to ask the right person to
3 find out what our applicable codes were, but
4 I don't know what they mean.
5     Q.    So before you wrote this
6 Plaintiff's Exhibit 1, you talked to somebody
7 to get that payee code?
8     A.    Correct.
9     Q.    Do you remember what their
10 department is, what their name would have
11 been?
12     A.    I don't remember.
13     Q.    And the reason code, now to me --
14 well, you tell me. Isn't that like the most
15 important on this piece of paper?
16     A.    I don't know. It's standard.
17     Q.    Oh, it's standard?
18     A.    It's a standard code that we
19 were provided when we needed to charge
20 anything to the cost center so I don't know
21 what it's indicative of.
22     Q.    How often when you were team
23 leader would you write e-mails similar to
24 Plaintiff's Exhibit 1?
25     A.    Similar as in payoff requests?

119

1     Q.    Yes.
2     A.    As a team lead, not very often.
3     Q.    What about as a senior analyst?
4     A.    Daily.
5     Q.    Daily?
6     A.    That's a responsibility of the
7 payoff analyst.
8     Q.    Okay. And when I say -- let me
9 make sure I don't confuse myself first before
10 I worry about confusing you.
11     But as I read this e-mail it's the
12 product of there is a dispute between the
13 borrower as to what is the true payoff amount
14 and Chase's records as to what's the true
15 payoff amount. Is that an accurate
16 description of Plaintiff's Exhibit 1?
17     A.    That's not indicative of a
18 dispute. It's indicative of a discrepancy
19 between the dollar amount but not a dispute.
20     Q.    Okay. And when you were the
21 senior analyst on a daily basis you would
22 write e-mails similar to Plaintiff's
23 Exhibit 1, which was a manifestation of a
24 discrepancy between what the borrower said is
25 the payoff amount and what Chase's records

120

30 (Pages 117 to 120)

## LANIER JEFFREY - VOLUME I

1 reflected was the payoff amount?
2     A.   No. I would regularly submit a
3 payoff request e-mail in general. There
4 wasn't always a discrepancy. You would
5 request via e-mail a loan to be paid off. So
6 that is a daily function. There is not a
7 daily issue with discrepancies.
8     Q.   All right. So my question though
9 is: On Plaintiff's Exhibit 1 this is not just
10 a garden variety payoff request, is it?
11     A.   No.
12     Q.   Because you've got numbers in
13 there, right?
14     A.   Correct.
15     Q.   If it was just a daily payoff
16 request the e-mail would read words to the
17 effect of, please pay off this loan; I've
18 opened up a path for you to do it. Correct?
19     A.   It would list that you've moved
20 the money. It would list the good through
21 date, and ask to pay it off, and ask that you
22 let me know when it's done, and place any
23 overage if applicable if there was -- like,
24 for instance, if there was a $500,000 claim
25 check and a $100,000 payoff, you would ask

121

1 that they put the money back in restricted as
2 escrow so that you could disburse it to the
3 borrower. So something to that nature would
4 be sent, but not necessarily that exact --
5 something to that nature containing the
6 details that were applicable to the payoff
7 department.
8     Q.   In this instance where there's
9 actually money that's being -- what did they
10 say -- charged to the cost center, how often
11 would you send e-mails that had that type of
12 determination?
13     A.   I don't remember. Not very
14 often.
15     Q.   When you said sometimes there was
16 overages in your example, the $500,000
17 insurance payment and the $160,000 payoff,
18 then the money -- the overage would go into
19 the restricted escrow account?
20     A.   It would be placed back in there
21 after the loan was paid off, and then loss
22 drafts would disburse the funds.
23     Q.   What's the time frame for
24 disbursing those funds back to the borrower?
25     A.   As of today or at that time?

122

1     Q.   At that time?
2     A.   I believe -- I don't explicitly
3 remember, but I believe it was seven days.
4     Q.   Was there interest calculated on
5 the funds while they were sitting in the
6 restricted escrow account?
7     A.   Again, that depends on state
8 variations and various things. So that isn't
9 something that the analyst has to -- that
10 system calculated, so there's different
11 criteria. Some loans, I believe, were; some
12 did not. So I can't speak to if it did or
13 not for sure. That was system generated.
14     Q.   You can't speak to the fact that
15 in any particular instance whether it was
16 done, but we do know that in certain cases
17 based on either the law, the mortgage, or the
18 state, interest was generated on funds placed
19 back into the restricted escrow account?
20     A.   Pertaining to the criteria,
21 correct. Yes.
22     Q.   And that inured to the benefit of
23 the borrower?
24     A.   Correct.
25     Q.   I'm going to mark this as

123

1 Plaintiff's Exhibit 2. It's Bates number
2 2453.
3     (Whereupon, Plaintiff's Exhibit Number
4 2 was marked for identification.)
5     Q.   Tell me what that is.
6     A.   This is a payoff quote received
7 from the default payoff department.
8     Q.   Now, that's a document, as I
9 understand your prior testimony, until you
10 were preparing for this deposition you had not
11 seen?
12     A.   That I had not seen? I have
13 seen it.
14     MS. ROBINSON: You asked her --
15     Q.   Is that generated by you?
16     A.   No.
17     Q.   Who generated that?
18     A.   The Default Payoff Department.
19     Q.   Let me see the date. Was
20 Plaintiff's Exhibit 2 generated in response to
21 your e-mail, Plaintiff's Exhibit 1?
22     A.   No.
23     Q.   Tell me what you know about
24 Plaintiff's Exhibit 2.
25     A.   It's a default payoff request.

124

31 (Pages 121 to 124)

LANIER JEFFREY - VOLUME I

1  It's a quote from the Default Payoff
2  Department.
3     Q.   Do you know who requested it?
4     A.   I believe I did.
5     Q.   And do you know the date that you
6  requested it?
7     A.   I do not.
8     Q.   What was the purpose of your
9  requesting that?
10    A.   To identify the difference in
11  the insurance -- the difference between the
12  payoff amount needed and the amount of
13  insurance proceeds that we had to apply
14  towards the loan.
15    Q.   And in Plaintiff's Exhibit 2 the
16  total amount of pay loan in full was 303,801
17  and 25 dollars?
18    MS. ROBINSON:  Twenty-five cents.
19    Q.   Twenty-five cents?
20    A.   Twenty-five cents.  Correct.
21    Q.   And was that the money that was
22  actually paid by the insurance company?
23    A.   I don't understand your
24  question.
25    Q.   Yeah.  I may be just completely

125

1  quote to send an e-mail.  What the default
2  quote would do is allow me to understand how
3  much I need to ask them to charge to the cost
4  center, the difference between how much we
5  have in restricted escrow, and how much we
6  need to close the loan.
7     Q.   Right.  And so my question is --
8  and I know, I go about it backwards.  My
9  question is:  So if I only had two documents
10  in this case and I was trying to figure out
11  what happened, are you telling me that I only
12  -- that I would look at Plaintiff's Exhibit 2,
13  look at the $303,801.25 and subtract the money
14  that's listed in Plaintiff's Exhibit 1, would
15  that not give me the money that the insurance
16  company had submitted?
17    A.   Generally, but not always.  With
18  default loans charges occur daily that change
19  the amount of the payoff.  That's the reason
20  why it's important to do it on a regular
21  basis and obtain current quotes.  Even with
22  good due dates when this loan that's in
23  default there's additional charges, from my
24  understanding, that are assessed.  That's why
25  we can't make our own determination on how

127

1  misunderstanding your testimony.  As I
2  understand it, Plaintiff's Exhibit 2 was
3  something that you requested to be prepared?
4     A.   From the default payoff quote.
5  That is how much that department determined
6  is required based off of servicing records to
7  pay off the loan in full.  It has nothing to
8  do with how much the insurance company
9  disbursed.
10    Q.   Do you know how much the insurance
11  company disbursed?
12    A.   There is a copy of the check
13  somewhere around here in the file.  I can
14  give you an approximate.  Without looking at
15  the copy of the check I can't tell you a
16  dollar amount.
17    Q.   Right.  And I'll get it for you
18  too.  What is the interplay between
19  Plaintiff's Exhibit 2 and Plaintiff's
20  Exhibit 1?  Can you look at Plaintiff's
21  Exhibit 2 that you requested from the default
22  department and Plaintiff's Exhibit 1, the
23  e-mail that you sent, and tell me how those
24  figures interact?
25    A.   I would not need the default

126

1  much it is to pay off the loan.  We have to
2  ask the area that is going to pay off the
3  loan.  So they would be better able to
4  explain to you the cost, why it's -- broken
5  down that way.
6     Q.   But at some point in time you were
7  able to do the deciphering and make the
8  decision on your end as to how much money to
9  charge off?
10    A.   We would use a quote and deduct
11  the insurance proceed amount.  Now, on here
12  there's a thing that says per diem.  I can't
13  remember if every day from when they sent it
14  maybe it's deducted, added, I'm not sure.  I
15  don't remember the specifics from two years
16  ago, so I'm not exactly sure.  Default would
17  be able to speak to that better for you.
18    It's possible that per diem was
19  charged each day or maybe taken away for X
20  amount of days that we didn't use -- I'm not
21  sure.  I'm not exactly sure on exactly what
22  the fluctuation was.  But it's possible that
23  this is a quote but it may have been less
24  than that.  It may have been -- generally
25  it's less than that.  They generally

128

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

LANIER JEFFREY - VOLUME I

```
 1  broadcast further to allow you time to have
 2  the funds moved and applied, then when they
 3  actually post it to the loan.  So generally
 4  it gives you some cushion in the amount, so
 5  it's generally less to pay off the loan than
 6  what is quoted on paper.
 7      The same way when a borrower
 8  requests it.  They're not going to give you a
 9  quote that's good through that day because
10  you're not going to pay it off today.
11  They'll pick a day that's in the future.
12      Q.   So, for example, I owe money
13  that's being -- a debt that's being serviced
14  by Chase.  I call them.  I ask for a payoff
15  amount.  They'll give me a date, for example,
16  maybe nine days in the future.  This is the
17  payoff amount as of that day?
18      A.   Yes.
19      Q.   So what happens if I send that
20  amount but I overnight it and Chase gets it
21  seven days earlier than the payoff deadline,
22  what does Chase do then?
23      A.   You would be refunded the
24  difference in the amount.
25      Q.   And the per diem stops getting
```
                                                              129

```
 1      MS. ROBINSON:  I was trying to
 2  tell y'all the page numbers.  I think it's 416
 3  and 417.
 4      Q.   Tell me what is the purpose for a
 5  BPO?
 6      A.   Loss draft doesn't utilize them
 7  so I'm not sure what Fannie Mae's purpose is.
 8  Fannie Mae requests the documents and we're
 9  not sure what the purpose is.
10      Q.   Do you order the BPO in this
11  particular case?
12      A.   Yes.
13      Q.   Why?
14      A.   Because Fannie Mae asked for it.
15      Q.   Do you know who at Fannie Mae
16  asked for it?
17      A.   It's a general inbox.  It
18  doesn't have a person's name.
19      Q.   Did they just send it to you via
20  e-mail or did they post it on one of the
21  systems we talked about?
22      A.   Via e-mail.
23      MS. ROBINSON:  I don't mean to
24  interrupt you, David, but you asked her what
25  that document was and she said it was her
```
                                                              131

```
 1  charged the day Chase receives it?
 2      A.   That I'm not sure about.
 3      Q.   All right.  I'm going to mark as
 4  Plaintiff's Exhibit 3 Chase Bates number 2457
 5  and 2459.  And you'll really have to bear with
 6  me because I haven't seen this particular
 7  document before.  Could you first of all just
 8  tell me what it is generally?
 9      (Whereupon, Plaintiff's Exhibit Number 3
10  was marked for identification.)
11      A.   This is an e-mail from myself to
12  the investor asking if we were -- if we are
13  able to process a short payoff of the loan.
14  And it attaches a copy of the Form 176, which
15  is a Fannie Mae document that they request
16  before considering any request from the
17  servicer.
18      Q.   And I think the e-mail also
19  indicates that there is a BPO attached?
20      A.   Yes.
21      Q.   What is a BPO?
22      A.   Brokers's Price Opinion,
23  overview of the property value, photos,
24  assessment of the value of the land and the
25  home.
```
                                                              130

```
 1  e-mail to Fannie, but it's also a thread.  You
 2  know, there's also the inner -- the e-mails
 3  from Fannie are on it, the same exhibit.
 4      Q.   Then this thread we start
 5  backwards, right, we start at --
 6      A.   Yes.
 7      Q.   You initiated this e-mail?
 8      A.   Yes.
 9      Q.   Friday November 5, 2010, who is
10  _____?
11      A.   She was another team leader in
12  the department.
13      Q.   Was she a Chase employee?
14      A.   Yes.
15      Q.   How do you know she was a Chase
16  employee?
17      A.   She sat in a desk right across
18  from me.
19      Q.   And she was -- how do you have two
20  team leaders at the same time?
21      A.   I don't understand.  What do you
22  mean?
23      Q.   Okay.  Before I get into this, I
24  probably need to get a better feel for team
25  leaders.  How many team leaders were there in
```
                                                              132

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

LANIER JEFFREY - VOLUME I



```
 1    your department?
 2         A.    Two.
 3         Q.    You and ████?
 4         A.    Correct.
 5         Q.    And how many people did you
 6    supervise?
 7         A.    Approximately ten employees.
 8         Q.    What is a team leader?
 9         A.    An interim subject matter
10    expert, someone that your analyst can go to
11    and ask for assistance/guidance.  At the
12    time that I worked there we were also the
13    auditors for the area.
14         Q.    So, in addition to everything else
15    you were listening to the recordings --
16         A.    No.
17         Q.    -- like you did in --
18         A.    File audits.
19         Q.    File audit.  Okay.
20               And how many people did you say
21    were within your team?
22         A.    Total or you're asking who was
23    under me?
24         Q.    Under you as --
25         A.    Approximately ten.
                                            133
```

```
 1         Q.    -- team leader?  Was ████
 2    underneath you?
 3         A.    Yes.
 4         Q.    Was he a Chase employee?
 5         A.    He was.
 6         Q.    Was there anybody in your team who
 7    was not a Chase employee?
 8         A.    No.
 9         Q.    Could you tell me the names of
10    folks that you remember that were within your
11    team?
12         MS. ROBINSON:  In November of
13    2010?
14         Q.    In November of 2010?
15         A.    ████
16         Q.    ████ was a team leader,
17    right?
18         A.    You're asking me who was under
19    me or who was on my team?
20         Q.    Wow.  So ████ was part
21    of your team.  This wasn't like a military
22    operation where you had a separate group, she
23    had a separate group?
24         A.    Correct.  We're all together.
25         Q.    You're all together.  So you're on
                                            134
```

```
 1    the same team, you're both team leaders.  Are
 2    you both working the same hours?
 3         A.    I don't remember.
 4         Q.    Generally?  She's not like the
 5    second-shift team leader.  You're just co-team
 6    leaders?
 7         A.    Correct.
 8         Q.    Who did you report to?  Who was
 9    the manager?
10         A.    At this time ████
11         Q.    She did too?
12         A.    Correct.
13         Q.    And when you told me earlier that
14    you had ten team members, that's including her
15    and all the other folks?
16         A.    No.  There was approximately 12
17    people.  She and I and then ten others
18    underneath ████
19         Q.    Okay.  Just whoever you remember.
20         A.    ████
21         Q.    ████
22         A.    ████
23    ████
24    ████.  And are you asking as
25    of the day the loan paid off or prior to
                                            135
```

```
 1    that?
 2         Q.    I'm asking pretty much during this
 3    entire time frame because I'll just tell you,
 4    I've got a lot of documents with different
 5    people and I'm trying to sort them out because
 6    when the e-mails are going back and forth, I'm
 7    trying to figure out who's in whose
 8    department.
 9         A.    ████  There were two
10    other individuals, but I don't remember their
11    names.
12         Q.    All right.
13         A.    That's the only ones I can
14    remember at this point in time.
15         Q.    So y'all are in the same office?
16         A.    Yes.
17         Q.    And did each person have an
18    office -- have their own office, is it
19    cubicles, is it an open area?
20         A.    It's an open area and some
21    managers have the cubicles.
22         Q.    And is there any other Chase
23    department on this particular floor or room?
24         A.    Oh, yes.
25         Q.    So help me visualize what we're
                                            136
```

34  (Pages 133 to 136)

LANIER JEFFREY - VOLUME I

| | |
|---|---|
| 1  dealing with.<br>2    A.    As far as the structure of<br>3  Chase's buildings?<br>4    Q.    Well, yes.  However you want to do<br>5  it.<br>6    A.    I guess I don't understand the<br>7  actual response maybe.  What is it you're --<br>8    Q.    Because when we're going through<br>9  the deposition, I'm trying to picture where<br>10  you are, and I need to know if your department<br>11  is in the middle of an island, or if there's<br>12  another department that's a set of cubicles<br>13  outside the door, or next door, or what?<br>14    A.    Well, within -- I don't know how<br>15  to explain this.  You have a big building;<br>16  three floors.  Each floor has separate wings.<br>17  There's different departments all over the<br>18  whole building.  You sit by areas that don't<br>19  even relate to your department per se.  There<br>20  may have been people outside of escrow<br>21  administration that sat at the cubicle next<br>22  to me.  It's just however Chase confined the<br>23  space to sit areas.  So it doesn't<br>24  necessarily mean that you are interacting<br>25  with those people or that they're even under<br><br>137 | 1  e-mail to your co-team leader, ▮▮▮▮▮<br>2    --<br>3    A.    It was to Fannie Mae.  I copied<br>4  her.<br>5    Q.    Hazard loss is Fannie Mae?<br>6    A.    Correct.<br>7    Q.    You're copying her because she's<br>8  by now helping you on the file?<br>9    A.    I copied her -- I don't remember<br>10  why.  A lot of times she and I, when we're<br>11  doing certain things, we would copy one<br>12  another in case there was a response and one<br>13  of us was out then we could cover for the<br>14  other person.  So that's more or less why.<br>15  It wasn't so much she's working on the file<br>16  but in case something needs -- an action<br>17  needs to be taken, I could copy someone else<br>18  and they could follow up in my absence.<br>19    Q.    In any particular file is it<br>20  assigned to, okay, you're the primary team<br>21  leader that's assigned to this file, or is it<br>22  just a group effort, whoever -- whenever the<br>23  question comes up whoever there handles it?<br>24    A.    At the time that we -- the<br>25  process changed over the course of the five<br><br>139 |
| 1  the same umbrella as you, but this is who is<br>2  sitting there.  You may not even know them.<br>3    Q.    So your personal experience you're<br>4  sitting right next to somebody, they're not in<br>5  your department, you don't even know who they<br>6  are?<br>7    A.    That's correct.<br>8    Q.    And they're talking on the phone<br>9  doing their job and you're talking on the<br>10  phone doing your job and you don't even<br>11  interact?<br>12    A.    Correct.<br>13    Q.    In this particular case, the Loss<br>14  Draft Department, were y'all at least in the<br>15  same wing?<br>16    A.    Yes.<br>17    Q.    What other departments were within<br>18  that same wing that you recall?<br>19    A.    The only department that I know<br>20  the names -- there were lots of areas that<br>21  sat by us.  The only names I know are those<br>22  that were also under our immediate umbrella,<br>23  which would have been the PMI, hazard, and<br>24  taxes.<br>25    Q.    And taxes.  So your November 5<br><br>138 | 1  years that I worked there.  At the time that<br>2  this was handled, payoffs was assigned to one<br>3  person and he worked all of the payoffs.<br>4    Q.    Who was that?<br>5    A.    ▮▮▮▮▮▮▮▮▮<br>6    Q.<br>7    A.    Correct.<br>8    Q.    And did he run everything by you<br>9  or was he autonomous to a certain level,<br>10  either have to do with the -- the<br>11  mortgage or anything like that?<br>12    A.    When you say what would -- I<br>13  don't understand.  What would he need to --<br>14    Q.    What would he need approval from<br>15  you for him to do his job?  In other words, if<br>16  he wrote a letter -- I see that he wrote<br>17  letters, if he wrote a letter to a client,<br>18  would you have to review it and approve it or<br>19  is that within the ambit of his job<br>20  responsibilities that he just did?<br>21    A.    It was within the ambit of his<br>22  job responsibilities.<br>23    Q.    So November 5, 2010, you write an<br>24  e-mail to hazard loss.  So you're not<br>25  directing it to anybody in particular at<br><br>140 |

HENDERSON & ASSOCIATES COURT REPORTERS, INC.<br>P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969