FILED
2013 Mar-22  PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## JASON BARNETT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

* * * * * * * * * * * * * * *

APRIL K. BARNETT,          *

    Plaintiff,          *

vs.          *     Civil Action No.
   *     1:11-CV-01608-RBP
JP MORGAN CHASE BANK,      *
NATIONAL ASSOCIATION,      *
formerly CHASE HOME LOAN   *
SERVICING, LLC,            *

    Defendant.          *

* * * * * * * * * * * * * * *

DEPONENT:          JASON BARNETT

DATE:          December 12, 2011

TIME:          3:20 p.m. - 5:45 p.m.

LOCATION:          Kilborn Roebuck & McDonald
    1810 Old Government Street
    Mobile, Alabama

REPORTED BY:          Dennise Wolstenholme, CCR

1

---

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

    VINCENT KILBORN, ESQ.
    DAVID A. McDONALD, ESQ.
    PERRY HALL, ESQ.
    Kilborn Roebuck & McDonald
    1810 Old Government Street
    Mobile, Alabama

    AND

    D. W. GRIMSLEY, JR., ESQ.
    WOOLLEY, EDGE & GRIMSLEY
    21 S. Section Street
    Fairhope, Alabama

ON BEHALF OF THE DEFENDANT:

    SANDY G. ROBINSON, ESQ.
    Cabaniss, Johnston,
    Gardner, Dumas & O'Neal
    700 Riverview Plaza
    Mobile, Alabama

ALSO PRESENT:          April Barnett

2

---

INDEX TO EXAMINATION

WITNESS:                    PAGE

JASON BARNETT

    Direct Examination by Ms. Robinson          5

    Cross Examination by Mr. Kilborn          109

Certificate of Reporter          112

* * * * * * * * * * * * * * * * * *

INDEX TO EXHIBITS

Plaintiff's Exhibit No. 2          96

3

---

S T I P U L A T I O N

    It is stipulated by and between the parties
hereto and their respective attorneys at law that the
deposition on oral examination of the witness, JASON
BARNETT, may be taken before DENNISE S. WOLSTENHOLME,
Certified Shorthand Reporter, and Notary Public, and
that the said deposition shall be taken in accordance
with, and when so taken, may be used in accordance
with the provisions of the applicable sections of the
Federal Rules of Civil Procedure.

    It is further stipulated that all notices
provided for by said applicable sections of the
Federal Rules of Civil Procedure are waived, as is the
reading over of said deposition to or by the witness,
the signing thereof by him, as is the signing and
certification of said DENNISE S. WOLSTENHOLME, and all
other requirements and technicalities of every sort
which should be a prerequisite to the use of said
deposition; including the filing of said deposition,
it being the intent of the parties hereto that said
deposition may be used in evidence as though all
requirements of said applicable sections of the
Federal Rules of Civil Procedure had been complied

4

1 (Pages 1 to 4)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  with.
2      All objections, save as to the form of the
3  question asked, are reserved until the time of trial
4  in accordance with the applicable provision of the
5  said Federal Rules of Civil Procedure.
6          * * * * * * * * * * * * * * * *
7
8          JASON BARNETT
9  having been first duly sworn to tell the truth, the
10  whole truth, and nothing but the truth, was examined
11  and testified as follows:
12          * * * * * * * * * * * * * * *
13          DIRECT EXAMINATION
14  BY MS. ROBINSON:
15  Q      State your name for the record, please?
16  A      Jason Barnett.
17  Q      And what's your middle name?
18  A      Andrew.
19  Q      Mr. Barnett, as you know my name is Sandy
20  Robinson.  I'm the lawyer representing Chase in the
21  lawsuit that your wife has brought --
22  A      Yes, ma'am.
23  Q      -- that you were originally a plaintiff to.

5

1  Q      Did you graduate?
2  A      1990.
3  Q      And do you have any further formal
4  education?
5  A      Yes, ma'am.  I have a degree from
6  Jacksonville State University, political science and
7  finance.
8  Q      Any further formal education?
9  A      No, ma'am.
10  Q      If you would just take me through your work
11  history beginning with graduation from college; would
12  that have been around 1994, '95?
13  A      '94, '95, yes, ma'am.
14  Q      And what kind of work did you do after you
15  got out of school?
16  A      Well, the first thing I did when I got out
17  is I did -- I worked for a company called Connerly
18  Promotions and what we did is we went around to like
19  people's houses with letters from -- we had contracts
20  with fire departments, police departments, stuff like
21  that.  And we would go around door-to-door taking up
22  money for, you know, charity for fire department
23  stuff.  We'd give them a letter and let them read, you

7

1  A      Okay.
2  Q      And you know the drill because you've been
3  sitting here watching us all day, that I'm going to
4  ask you questions that relate to what you may know
5  about the lawsuit.  And as you and I are doing it
6  already, let me finish my question, and I'll try to
7  let you finish your answer so that we can have a clear
8  record, and Dennise can write everything down.  What
9  is your date of birth, please?
10  A      1/20/72.
11  Q      And that makes you how old?
12  A      Thirty-nine.
13  Q      I can't do the math that quick.
14  A      Almost 40.
15  Q      You've got a big birthday.  And you are
16  originally from Talladega County I take it?
17  A      Yes, ma'am.  I was born in Citizens Hospital
18  in Talladega County, Talladega Hospital.  And then I
19  lived in Talladega for about six months, and then my
20  mother and daddy moved to Oxford and I lived there
21  ever since.
22  Q      And did you go to Oxford High School?
23  A      Yes, ma'am.

6

1  know, this is for this.  And we might have a
2  fundraising drive, you know, to get the people jaws of
3  life and stuff like that.  You know, we would take up
4  money for them.  And then I guess the guy that owned
5  the company, Mr. Connerly, he had a back-door deal
6  with -- if you gave a donation you got a free family
7  portrait, like kind of at Wal-Mart -- not Wal-Mart --
8  but like at a local Piggly Wiggly or something like
9  that.  And he had a deal with the photographer where
10  if you come in you bought -- if you bought a picture
11  or whatever, they get the first one free.  And then
12  any other package you got, Mr. Connerly got a
13  percentage off of that, and you got a percentage off
14  of that.  So anything you took up, donations, you got
15  a percentage off of anything that Mr. Connerly made
16  off the pictures we got a percent of.  So I worked
17  there for, I'd say, maybe two years, 18 months maybe.
18  We did a lot of work in Pell City, and stuff like that
19  around the river and stuff.  So he had that area.  And
20  then the reason I quit working there is because he
21  would get contracts everywhere, you know, and so he
22  had to go -- at the time we had that area, St. Clair
23  County.  And then the next -- he went up north, like

8

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1 North Alabama. And they would have to go up there and
2 do it. And then I just stayed at home because my
3 father and mother lived there, and we had like a farm.
4 And so I stayed and helped them. My daddy at the time
5 had got a little bit older. So I stayed and helped my
6 mother and father there.
7 Q     So you didn't want to travel up to the other
8 areas was basically it?
9 A     Right, right. I was homesick. When I first
10 left high school, I went to college at Alabama. And I
11 told them down there they had to drag me back -- you
12 know, on our station wagon they had to drag me back to
13 make me go back down there. Because I just -- I mean,
14 I just love it, you know, at home.
15 Q     You're a homebody, you want to stay close?
16 A     Oh, yes, ma'am, just family, you know,
17 anything like that. Where I grew up, you know, family
18 that's really all we really had. And so we just all
19 stuck together. And, you know, my daddy needed me
20 back at home at that time. And so I just came back
21 home. So that was probably in '91 I came back home
22 from college, and I stayed, you know, at home and
23 commuted. I don't know if you know how far that is

9

1 is, like from Oxford to Jack State is like 15 miles.
2 So I would commute back and forth, help with them.
3 And then after I graduated, I got this job. In fact,
4 he was like -- he was a cousin of mine. So you know
5 he was -- wasn't hard to get the job anyway.
6 Q     Right, understood.
7 A     And, you know, that's about the only job
8 that I had. In my junior year of college, I worked at
9 a Magic Chef. I don't know if you ever -- they made
10 microwaves. And so I worked there over the summer of
11 my -- my junior year of college I worked there over
12 the summer, and they closed down. But the reason -- I
13 knew they was going to close down because I worked
14 for -- I worked for six months and got two promotions,
15 and they was talking about, I'm moving you up, man. I
16 said, y'all can't last.
17 Q     Too good to be true?
18 A     Ain't no way y'all can last here. And
19 finally they did. And I got a scar on my arm right
20 there. I cut myself the last night I was there on a
21 microwave.
22 MR. KILBORN:
23     Let me see, what did you do?

10

1 MS. ROBINSON:
2     Statute's run, Vince.
3 A     I cut myself on a microwave, and the guy
4 finally said, oh, you need to go to the nurse, you
5 know, go to the nurse. And I just walked past the
6 nurse's office outside to my car and went up to the
7 house. But I was lucky that I didn't stay there
8 because they was trying to really get me to stay like,
9 oh, we can move you up, move you up. And then six
10 months later, they shut the whole factory down. So
11 even the guys there were saying, you don't need to
12 go -- go to college part-time and, you know, work for
13 us. You know, you've got a future here. I thought,
14 yeah, somebody wants me to work there. Y'all got to
15 be crazy. I knew they didn't have a chance.
16     So anyway, those two jobs I had, and then
17 probably '96 -- 1996 after that I had a cousin that at
18 the time, which at the time he was a bookie, and he
19 asked me if I wanted to start working for him, and I
20 did.
21 Q     Let's talk about that a minute because, you
22 know, I like sports and everything, but I don't bet on
23 sports. So I don't know much about what you're

11

1 talking about here.
2 MR. KILBORN:
3     You don't need to confess.
4 Q     But I didn't want to say -- I love sports,
5 but I don't bet on sports. So when you say he worked
6 for a bookie, what is this?
7 A     Well, a person that -- you know, my cousin
8 took bets on football games.
9 Q     And so I want to bet on Alabama, and you
10 want to bet on Auburn and we set a line --
11 A     You call us, right. And so he did that and
12 then --
13 Q     Now, is that legal or illegal?
14 A     Well, some people you would, it would be --
15 some people think it is. Some people think it isn't.
16 I pay every year for a tax stamp from the government
17 that -- well, it's a license.
18 Q     A license to do what?
19 A     To take wagers on sporting events. So to me
20 it is.
21 Q     So you started doing that originally for
22 somebody else in '96, and now you're still doing that?
23 A     Yes, ma'am. Well, he got -- right around

12

3 (Pages 9 to 12)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  '99 maybe, '98 he went through a divorce and stuff
2  like that and just decided -- his father passed away
3  and then he just said, I'm quitting.  So then I've
4  kept on since then.
5  Q      And what is the name of the business again;
6  does it have a name?
7  A      No, ma'am.
8  Q      And you pay taxes on the money you make?
9  A      Yes, ma'am.
10 Q      And the deal is you're the house, and so if
11 the line gets beat or whatever, that's how you make
12 money?
13 A      Yes, ma'am.
14 Q      Do you report the income that you make that
15 way on your income tax?
16 A      Yes, ma'am.
17 Q      I mean, do you make -- can you --
18 A      You know, people say that all the time, like
19 you make a bunch of money.  But I'm probably -- I
20 guess I'm the most unlucky bookie in the world because
21 I don't make near as much as what people think.  I
22 probably -- you know, of course it fluctuates every
23 year.  I mean, I've had years that I work for free

13

1  I keep my records, but my accountant does
2  turn them in.  Like I will take the records to him and
3  show him what I did this month, and he'll fill out the
4  paperwork and send it in for me.
5  Q      What accounting firm do you use?
6  A      Lovvorn & Associates.
7  Q      Lovvorn?
8  A      Lovvorn, L-O-V-V-O-R-N.
9  Q      And where is that located?
10 A      It's in Anniston.
11 Q      Now, I saw you kind of looking up there and
12 laughing with Bubba.  Are you and Bubba friends; have
13 y'all known each other before this lawsuit; did y'all
14 know each other?
15 A      Oh, yes, ma'am.
16 Q      How did y'all known know each other?
17 A      Bubba was the attorney for us in -- I had at
18 one time in 2007 and 2008 was -- had like, I don't
19 know what you would call it, a company that was a
20 partner in a bingo establishment, and Bubba was the
21 lawyer for that.
22 Q      Aside from him being your lawyer before, did
23 y'all have a friendship before then; did you know him

15

1  because I end up losing money.  And years I've made
2  money.  So I can't really say this is what I make
3  every year.  You know, I haven't got a job like that.
4  It just really depends on, you know, my situation.
5  Q      Right.  Do you know what volume of like bets
6  you handle every year; do you keep records that way?
7  A      Yes, ma'am.  But, you know, I write maybe
8  between 8 and 12,000 worth of bets a month.
9  Q      And whether you make money or lose money on
10 that just depends on who wins the game and by how
11 much?
12 A      Right.  And I have to pay taxes on how much
13 I write, not how much -- you understand what I'm
14 saying?
15 Q      Yes.
16 A      Like it's a fee how much you write, not how
17 much you make.
18 Q      Right.  So you can take in $12,000 and
19 actually lose money, and you're paying taxes based on
20 12,000?
21 A      Right, yes.
22 Q      I understand.  Do you have an accountant
23 like keep the books for you, or do you do it yourself?

14

1  some way through school?
2  A      No, ma'am.
3  Q      Was that suit up in Tuscaloosa County?
4  A      No, ma'am.
5  Q      Now, we know from the questions that I was
6  asking your wife about this morning that you've been
7  married before and --
8  A      Yes, ma'am.
9  Q      -- have these two children that y'all are
10 raising?
11 A      Yes, ma'am.
12 Q      And when were you married the first time?
13 A      I was married from 2002 until -- I filed
14 paperwork for divorce at the end of 2005, but you
15 know, it takes a while so the first part of 2006, I
16 guess.  Say from at least March of -- I filed for
17 divorce say August 2005, and then we went through --
18 We never had to go to any kind of court or anything
19 like that.  In fact, my lawyer and her lawyer in the
20 divorce were the same lawyer.  We had the same lawyer.
21 So we just went and sat down and, you know, hashed
22 everything out.  And the reason it took so long is
23 when we first turned in like the divorce signed, I got

16

4 (Pages 13 to 16)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1 both the kids full custody of both our children at the
2 time -- excuse me, at the time we had a five year old
3 and a two year old.
4 **Q       And this is Jasey and Jenna?**
5 A       Jasey and Jenna. I got, you know, just
6 signed over full custody of them. So when we turned
7 the paperwork in to the judge, I didn't ask for
8 anything from my ex-wife, no support, no kind of
9 anything. I just wanted my children. We was in a
10 situation where my wife got -- we had a beauty shop.
11 She owned a beauty shop in Hollis Crossroads, and
12 that's a bad area for drugs and stuff. And my wife
13 got on drugs. And, you know, that's something I
14 couldn't have around my children. So, you know, she
15 knew she was on drugs. I knew -- it wasn't the type
16 of thing where she was trying to fight it. Look, I
17 know I am okay. She knew she was messed up. She knew
18 I wasn't. And so I said, you know, we're getting this
19 divorce and, you know, I'm going to take these kids.
20 And, you know, we're not going to have to go through
21 any kind of court system for it. So she said, you
22 know, you're right. I cannot, you know -- I can't
23 help you with these kids.

17

1 **Q       Right.**
2 A       So, you know, we went through that. And so
3 we turned the paperwork in. Excuse me. We turned the
4 paperwork in, and the court come back and said since
5 you didn't ask for any kind of child support, there's
6 got to be in the law -- there's got to be -- you know,
7 she's got to pay you child support. Of course, then
8 she -- I can't pay you child support. So then we had
9 like -- not a court order or mediation or anything.
10 We just said -- we went to my lawyer's office and I
11 told her, I said, listen, I'm never asking you for
12 this money. Never. But if this is the only way we
13 can get this signed, you've got to sign it. So then
14 she signed it, and then we had to go through a
15 parenting class and stuff. So that's what took that
16 amount of time. But really the marriage was over.
17 Well, the marriage was over January 2005. But for my
18 children, I tried everything I could to keep our
19 family together at the time, you know. And that
20 didn't work. And then I did everything I could to
21 keep my children safe from that time. So 2006 was
22 when the divorce was final, and I was, you know,
23 single again.

18

1 **Q       And you and April are raising these little
2 girls?**
3 A       Yes, ma'am.
4 **Q       Does your ex-wife have anything to do with
5 the little girls or y'all are basically --**
6 A       Well, my ex-wife for a long time was here
7 and there, in and out, you know. And one thing we --
8 me and April -- had decided a long time ago was that
9 we was never going to keep our children from seeing
10 their mother. Okay. We never did. So any time she
11 ever wanted to see them, she would see them. We let
12 her see them. If it was either just coming to our
13 house and seeing them or, you know, we'd let them go.
14 My mother would sometimes go with them, where they
15 were at, and meet her and stuff. So we went through
16 that for years, you know, a couple, three years maybe.
17 And she got put in jail in November of 2010 for a
18 year, and she just got out like November of this year.
19 She had a year sentence. So she just got out November
20 of this year. And since then, since she got out, she
21 started back working, and the kids have gone with her
22 some, the older children have.
23 **Q       Your mother and father still live in the**

19

1 same area where you live?
2 A       My mother does, and my father he's passed
3 away.
4 **Q       I'm sorry to hear that. Do you have
5 brothers and sisters that live up there in the
6 Talladega area or Oxford?**
7 A       No full brothers and sisters, no, ma'am.
8 **Q       Do you have half siblings or step siblings?
9 The reason I'm asking -- your lawyers would tell
10 you -- if we go try this case in front of a jury, I
11 don't want your half brother on the jury without
12 knowing who that is. That's why I'm asking.**
13 A       Let me say this --
14 MR. KILBORN:
15       Good luck.
16 A       Here we go. My father was married seven
17 times where we are from. I don't know how many
18 brothers and sisters I really honestly have. The only
19 two that I have ever had any kind of contact with --
20 I've got an older brother that's a half brother to me
21 that lives in town. And I had a sister that -- my
22 sister Lisa that when I was in school -- when I was in
23 college passed away.

20

5 (Pages 17 to 20)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  Q       I'm sorry.
2  A       She lived with us.  She lived with my mother
3  and daddy.  She didn't always live with us.  She lived
4  with us -- she had -- she was 16 when I was born, and
5  she lived with us for a little bit.  And my father
6  when I was six months old got put in jail for -- he
7  got put in jail for bootlegging when I was six months
8  old.  And my sister at the time lived with him, and
9  she moved in with her mother in Kentucky.  And when
10  she was probably about 20, she had a car wreck, very
11  bad car wreck, and she had -- she was pretty, Lisa
12  was.  And she had this wreck, and it messed her face
13  up, and she just started drinking and was an
14  alcoholic.  And when I was 15 or 16 years old, her
15  mother had killed herself in Kentucky, and she wanted
16  to move back down here with us and she did.  And she
17  lived with us.  And they told her -- the daughters
18  told her she had sorosis, and she had to quit drinking
19  or die.  And she couldn't quit drinking.  So as far as
20  living is just my one brother I know.  My father,
21  there's no telling how many kids he had, in wedlock,
22  out of wedlock, whatever.  Where we're from, my father
23  is probably the most notorious person anywhere we're
                                                          21

1  from, from Talladega County to Tallapoosa, Georgia.
2  You know, I grew up with that my -- I was born when my
3  daddy was 44 years old.  He'd been in and out of
4  prison.  He had been in and out of bar fights.  He had
5  been in and out of everything you could get into is
6  what he did.  You know, my mother worked three jobs.
7  My whole life my mother worked three jobs.  She
8  taught.  She worked at a deli after school.  And she
9  kept children and cleaned house whenever she could.
10  And my daddy laid out all night and did God knows
11  what.
12  Q       What was your father's name?
13  A       His name was James Buddy Barnett.  And my
14  whole life -- that's just how I was raised.  And you
15  know, my mother and all -- I'll say this, my mother
16  never said a word about it, ever because she knew the
17  life she had chose to live.  And so, you know, my
18  whole life I was just -- I guess just everybody from
19  where we live -- you cannot go to where we live and
20  ask five people about him and get -- you might get
21  three or four different stories, you know.
22  Q       Right, right.
23  A       And that's just how -- like I said, he was
                                                          22

1  on trial when I was born.  They stopped the trial for
2  me to be born, you know.  And that's the truth.  They
3  stopped the trial two or three times for me to -- my
4  mother would have false labor, go to the hospital.
5  They had to stop the trial.  And Buddy you've got to
6  go to trial.  And he did, like I said, when I was six
7  months old they finally convicted him, and he did
8  his -- he did 12 months.  But now when I was, you
9  know, before that if you looked my father up, I mean
10  that's -- I mean he was in prison, you know, state
11  prison, federal prison, anywhere he could be, you
12  know.  I guess trouble just found him or he found it,
13  you know.  And I don't know.  He wanted all of us --
14  you know, he wanted me to be -- he had this vision in
15  his head that I would be something like -- he wanted
16  me to go to law school.  And I went to Alabama.  He
17  got me a job in -- somehow got me a job in the Alabama
18  Law Library.  That was my job.
19  MR. KILBORN:
20        Law library?
21  A       Right.  I worked -- my year down there I
22  worked in the law library.
23  Q       We were all long since out of there before
                                                          23

1  then.
2  A       Oh, yeah, in '91.
3  Q       We were gone.
4  A       And I tell you, and this is the truth about
5  why I didn't become a lawyer.  This is the truth.
6  There was a guy in there that I went to Oxford High
7  School.  Okay.  There was a guy in there -- he was
8  from another school but back then you had Courtland
9  High School.  I don't know if y'all remember that.
10  Courtland was like this powerhouse in football, right.
11  And I had worked at this law library.  Oh, my daddy
12  was, hey, you work at this law library you're going to
13  be something that -- he thought he was -- he was a
14  jailhouse lawyer, you know.  I was going to be a real
15  one.  So this guy from Courtland or from that area
16  told me -- Oxford was playing Courtland.  We just won
17  like two state championships.  Oxford was playing
18  Courtland this year.  Courtland is going to kill
19  Oxford.  I didn't have no money.  I said, you crazy,
20  you know.  Courtland is going to kill them.  I said
21  I'll tell you what I'll do.  I'll bet you $100 against
22  -- I'll quit this job if Courtland beats Oxford.  He
23  said, Courtland beat the hell out of them last night.
                                                          24

**JASON BARNETT**

25

```
1    MR. KILBORN:
2         You quit?
3    A    And so I quit.  He said, no, no you don't
4    got to quit.  I was just -- and I said no, I think I'm
5    through.
6    Q    That's a sign?
7    A    Yes, that's a sign.  So I ended up, you know
8    like I said, coming back home and doing what I do.
9    Q    Now, what is your half brother's name who
10   you said was a brother to you?
11   A    Dan Griffin.
12   Q    Dan Griffin?
13   A    Right.  I'm not sure he'll claim that.
14   Q    Okay.  And I'm not going to go look him up.
15   I'm just asking for his name.  Have you ever been
16   convicted of a crime?
17   A    No, ma'am.
18   Q    Have you ever been in bankruptcy before?
19   A    No, ma'am.
20   Q    Have you ever been part of a lawsuit?  Now,
21   we already talked about a gaming lawsuit.
22   A    No, I wasn't a part --
23   MR. GRIMSLEY:
```

26

```
1         That was a corporation.  It wasn't an
2    individual.
3    Q    Was that a corporation you had an ownership
4    interest in?
5    A    No, ma'am.
6    Q    You were an employee of a corporation, or
7    how were you involved?  Were you a witness?
8    A    No.  I never did none of that stuff.
9    Q    Well, how was it you were involved in the
10   lawsuit?
11   MR. GRIMSLEY:
12        He was good friends with a client of mine.
13   MS. ROBINSON:
14        I see.  You didn't represent him in that?
15   MR. GRIMSLEY:
16        That's correct.
17   A    No, ma'am.
18   Q    Now, your wife said that one of the things
19   you did was that you passed out parlay cards.  I was
20   going to get you to explain that to me?
21   A    That's just a sheet, like parlay, you pick
22   them up.
23   Q    Is it like the sheet with the lines?
```

27

```
1    A    Yeah.
2    Q    With the lines on it?
3    A    Yeah, exactly.
4    Q    And so I can decide who I want to bet on
5    based what the line is?
6    A    Right, correct.
7    Q    And you don't make those up; you get them
8    like from Las Vegas or whatever, the lines on the ball
9    games?
10   A    Oh, yes, ma'am.  I don't make that up.
11   Q    What was the name of the wife you were
12   married to between '02 and '05?
13   A    Her name was Susan Ervin, E-R-V-I-N.
14   Q    Ervin was her maiden name?
15   A    Yes, ma'am.
16   Q    Have you been married to anyone other than
17   Susan and April?
18   A    No, ma'am.
19   Q    We've talked kind of around the issue of
20   your credit.  I mean, have you ever applied for credit
21   or have credit in your own name; do you have a credit
22   history?
23   A    I've got the worst credit probably of
```

28

```
1    anybody you know, ever.
2    Q    And what has been the problem with your
3    credit?  You borrowed money you hadn't paid back or
4    what?
5    A    Well, the majority of it is just been --
6    honest to you, when I was younger my father got as
7    many credit cards he could in my name.  And I would
8    come home, and he would say, here you go, sign this.
9    And I knew better than not to sign it.  You know, and
10   go -- hey, take this down there to the bank.  Here's a
11   credit card, take this down there and get you a cash
12   advance on it.  And I knew better than not to.  And I
13   did.  And, you know, them bills would come in, and he
14   would pay them sometimes.  And sometimes he'd say, are
15   you going to pay these bills?  And sometimes he didn't
16   care who paid them.  And then at the end of that --
17   you know, my credit got so bad, I mean there -- there
18   was no turning back.  You know, when you get your
19   credit ruined like my wife says now, the credit -- if
20   your credit is ruined, you've got no chance of having
21   you know -- you have no chance of having anything, you
22   know.
23   Q    Have you ever been in bankruptcy?
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

JASON BARNETT

1   A    No, ma'am.
2   Q    When you were married to Susan, did you ever
3   borrow money to buy a car or to buy a house or
4   anything like that?
5   A    No, ma'am.
6   Q    And you haven't -- currently you don't have
7   any kind of lines of credit to borrow money for a car
8   or anything like that?
9   A    No, ma'am.
10  Q    I'm going to kind of try not to go back --
11  A    Let me say something about -- you talk about
12  a line of credit.  Are you talking about with a bank
13  or just like --
14  Q    With anybody who loans you money?
15  A    Not loan money like -- the house that I
16  bought when I was married to Susan, okay, which I
17  ended up selling when we made the down payment on this
18  house, I knew a guy that, you know, was a teacher of
19  mine in high school, coached me in high school.  He
20  had a house that was paid for.  He had moved off and
21  he had no -- he owned it outright.  And so I couldn't
22  get any kind of credit anywhere, so I went to him and
23  just asked him could he just let me like rent to own

                                                    29

1   it.
2   Q    Right.  Like a vendor's lien kind of thing?
3   A    Right.  And we didn't draw up any kind of --
4   I mean, he knew I was going to pay him.  So I just
5   paid that.  And then when it got time to go -- and
6   when I had paid a lot of it, and then when I wanted to
7   move, I found another friend of mine that wanted a
8   house.  And so he got a loan on the house, but he --
9   when he got a loan on the house he could go through
10  that.  So he got a loan on the house and he paid off
11  the house.  And then, you know, what I had paid they
12  gave me back.
13  Q    And that's where the money came from.  You
14  were here when April was explaining about how y'all
15  came up with the 10 percent?
16  A    Right.
17  Q    And that was your contribution, was from the
18  house?
19  A    Right.
20  Q    So when the house was bought in May of
21  2007 -- and we've already looked at the documents
22  here, the mortgage and all that stuff; it's Exhibit 1.
23  A    Okay.

                                                    30

1   Q    And so the house was taken just in April's
2   name; y'all were not married at that time?
3   A    Right.
4   Q    And after the house sale was closed, then
5   did you and your girls go ahead and move into the
6   house on Karian?
7   A    Whenever we moved in, yes, ma'am.  That was
8   our plan -- we planned to do that.  In fact, I think
9   that we had started looking for a house, I guess, in
10  like April or -- March or April?
11  Q    She can't help you.
12  A    I'm sorry.
13  Q    That's okay.
14  A    I don't remember.  Yes, ma'am, we moved in.
15  Q    And that was just always the plan; that
16  y'all would move in; y'all were going to start a life
17  together?
18  A    Yes, ma'am.
19  Q    And then y'all got married a year -- a
20  little bit less than a year later?
21  A    Yes, ma'am.
22  Q    Am I getting those dates right?
23  A    Exactly right.  Moved in, lived together for

                                                    31

1   a year, got married.  Lived together for another year,
2   had a baby.
3   Q    And that's Davis?
4   A    Yes, ma'am.
5   Q    Now, I wanted to talk about the
6   conversations you had with Chase because your wife
7   said you were one of the people who was doing a lot of
8   that?
9   A    Oh, yeah.  Exactly.
10  Q    Let me just ask you this.  You heard what
11  your wife had to say about the fire, and y'all were at
12  the Gulf and how awful that was when y'all were out of
13  town and the house burned down?
14  A    Right.
15  Q    I want to give you a chance to add anything
16  you want to to that.  But I mean, do you disagree with
17  anything she said about how that happened and what
18  caused the fire?
19  A    No -- well, she had the date, you know,
20  wrong when she said it was a Sunday.
21  Q    Right.  But --
22  A    I know what she meant on that -- I can't say
23  what she meant.  The fire was --

                                                    32

                                    8  (Pages 29 to 32)

**JASON BARNETT**

| | |
|---|---|
| 1 | Q      Sunday night? |
| 2 | A      Sunday night at 1:30, 2:00 or whatever in |
| 3 | the morning. |
| 4 | Q      And when y'all found out about it, it was |
| 5 | Monday? |
| 6 | A      Monday morning, yes, ma'am. So I guess they |
| 7 | classify the date of loss was, you know, the 14th |
| 8 | because it was -- well, June -- |
| 9 | Q      I think that's what she said, June 14th? |
| 10 | A      But we got the call that morning of |
| 11 | June 14th. |
| 12 | Q      Okay. |
| 13 | A      And then, you know, like she said, we came |
| 14 | back from the beach. You know, she's calling people. |
| 15 | I'm calling people. We got our little boy with us. |
| 16 | We left the two; we didn't tell them about it. And |
| 17 | we're coming back and, you know, we're talking to my |
| 18 | friends; we're talking to my mother. You know, go by |
| 19 | there and see. Hey maybe it's not as bad as everybody |
| 20 | says; go by there and see. Hey, can you go by there |
| 21 | and see. Call you on the phone. Everything's gone. |
| 22 | You've got nothing left. No, really. No. No, home |
| 23 | don't want to -- you know, this is bad. Come home |

33

| | |
|---|---|
| 1 | like -- I think it's like 3/10 of a mile because I |
| 2 | used to try to run down there and back, try to see if |
| 3 | I could -- I'd measure it in my car and run down to |
| 4 | the bottom and run back. Hopefully I'll get in shape, |
| 5 | but it never worked. So it's 3/10's of a mile; I know |
| 6 | that for sure -- it's close anyway. So, you know, |
| 7 | there's cars on both sides all the way down. You |
| 8 | could see like still smoke billowing up. You can't |
| 9 | see our house until -- you have to pass everybody's |
| 10 | house and then it's back up, you know, in the |
| 11 | cul-de-sac. So we pull up in there. There they go. |
| 12 | There's our church people. Our preacher's there. The |
| 13 | first person we see is our preacher and our preacher's |
| 14 | wife. And then, you know, of course you've got all |
| 15 | kind of, you know, the fire department people is there |
| 16 | wanting to talk to you. The police department there |
| 17 | wanting to talk to you, and then Mr. Woodard's there. |
| 18 | You know, and we go through everything with them. And |
| 19 | he tells us then, hey, listen. You know, you're safe. |
| 20 | That's the main thing about everything. You're safe |
| 21 | and you're covered. You know, here's some money to go |
| 22 | get you a hotel room, get you a house. Everything's |
| 23 | fine. So, you know, it was -- you see like in your -- |

35

| | |
|---|---|
| 1 | from there. Took us, I guess, five or six hours. I |
| 2 | can't even remember really coming home. But you know, |
| 3 | just me and her back and forth, hey, this is going to |
| 4 | be okay. We talked to the insurance agent. I |
| 5 | called -- our insurance agent was Steve Camp. |
| 6 | Q      He's the one that actually sold the |
| 7 | policy -- |
| 8 | A      Right. |
| 9 | Q      And then Sam's the guy who's the adjuster? |
| 10 | A      Right. So we called him. And he said, all |
| 11 | right, Jason -- because he's my cousin too so -- all |
| 12 | right. Everything's going to be fine. I'm going to |
| 13 | get -- there's going to be somebody call you within |
| 14 | 15, 20 minutes, and we're going to get this took care |
| 15 | of. Okay, great. Thank you. Sam Woodard called me. |
| 16 | So he called. Mr. Barnett, I'm the adjuster who's |
| 17 | been assigned to your claim. Tell me what you know |
| 18 | now; where you're at, whatever. So I told him. He |
| 19 | said, I'll be at your house when you get there. Okay. |
| 20 | So we come in our neighborhood. We live down a -- we |
| 21 | live at the end of a cul-de-sac. So, you know, you |
| 22 | come in our neighborhood, it's like the second left. |
| 23 | You take a left, and there's cars all the way back |

34

| | |
|---|---|
| 1 | I don't -- you look in there -- you've seen the |
| 2 | pictures -- everything is gone. You know, we have |
| 3 | what we took to the beach. You know, and we had our |
| 4 | kids, like April said, and we had our health still. |
| 5 | And that's all we had, but what we also had, though, I |
| 6 | guess is a bunch of friends that we didn't realize, I |
| 7 | guess, before that it happened, how many friends we |
| 8 | really had. You know, we had people, you know, |
| 9 | getting in touch with us that we probably had never -- |
| 10 | you know, how you do that facebook and you got all |
| 11 | these facebook friends, but you don't know any of |
| 12 | them. We probably had all of those people, you know, |
| 13 | get in touch with us and ask us, you know, any way |
| 14 | they could help and that kind of stuff. So, you know, |
| 15 | we just started that day, you know -- we had to start |
| 16 | our life over so. |
| 17 | Q      And your wife already told me about, you |
| 18 | know, State Farm rented a house for y'all? |
| 19 | A      Yes, ma'am. |
| 20 | Q      And y'all gathered up -- y'all were busy |
| 21 | gathering up lots of information. You were getting |
| 22 | estimates on rebuilding the house; you were getting |
| 23 | the payoff's, I guess, for the two -- |

36

```
                                    9  (Pages 33 to 36)
```

**JASON BARNETT**

1   A    Well, the first thing we had to do was we
2   had to get -- the very first thing they wanted us to
3   do was to contact our mortgage company and let them
4   know what had happened.  And we did.  And they would
5   send us -- we would call and you could talk, you know,
6   call Chase and they would say, well, you got to get to
7   -- let me send you to the Lost Draft Department --
8   send you to the Lost Draft Department.  Let me send
9   you, you know, to the -- everywhere.  What about this
10  one?  Well, and the thing about it is, here's what you
11  do -- you call and they say, okay -- I wish they had
12  just some kind of thing where they would know who you
13  were because you would call them, and they would say,
14  okay, this is so and so from so and so department.
15  Well, how can I help you?  Well, our loan number is
16  00 -- you know, whatever it was.  Let me tell you what
17  happened.  You know, we just had a house fire.  We
18  lost everything we owned.  You know, we're trying to
19  get -- you know, let y'all know, keep -- oh, y'all had
20  a house fire.  Hold on.  Hold on.  Talk to the wrong
21  person.  You know, you've got to talk to this
22  department, and they send you to this department.
23  Hello.  Can I help you?  Yes.  Well, can you please
                                                    37

1   give me your name and Social Security number.  All the
2   way back through, you know.  Every time, all the way
3   back through.  So what we did, the first thing we had
4   to do after we, you know, informed both mortgage
5   companies, we've had a total -- we had a loss; we are
6   covered.  And this will be -- we're covered, you know,
7   this is what we got to do.  Okay.  So then State Farm
8   got with them.  You know, that first thing they did,
9   they didn't worry about, hey we've got to pay this off
10  immediately or, hey, we're going to do that.  First
11  thing of course they did they had, you know, an
12  investigator.  They had to come out because of the
13  amount of the loss was.  They had to hire a guy.  I
14  think he come from Georgia.  He was a real nice guy.
15  And he come from Georgia and stayed out there for like
16  two days.  You know, his wife sat in car the whole
17  time.  That was the craziest thing.  Like he come out,
18  right.  Seriously.  He had an Escalade.  And his
19  wife -- he's got to have either the dumbest wife or
20  the best wife ever.  She sat in a car in our
21  driveway -- we'd go out and ask her -- you know,
22  because we was there.  We wanted to know because they
23  was digging through stuff.  We tried to hope that they
                                                    38

1   would just find anything we could save.  So we asked
2   him, can we be here while -- because they went through
3   like shovels, putting a little sifter thing.  And we
4   wanted like, hey, if you can find anything, anything
5   that we can save.
6   Q    You couldn't save anything?
7   A    No.  I think they saved, you know, my car.
8   They pulled my car out, and then they pulled out --
9   which we had -- we just got rid of them because we
10  didn't want our little girls to see them -- they
11  pulled out their bicycles.  But all the rubber was
12  burnt off the tires and, you know, the spokes -- it
13  was just like on the spokes I guess or whatever on the
14  rim and melted stuff.  So we threw them away because
15  we didn't want them to see, hey, this is what
16  happened, you know.  So we went out there with him,
17  and so they had to, of course, go through all that.
18  They didn't find anything.  And they had all kind of
19  people out there.  So at the end of that, then he said
20  okay, you know, we got to wait a couple of days on his
21  report.  You know, he don't come out right then and
22  say, this is what happened.  You know, so we got to
23  wait a couple of days on his report.  So we wait a
                                                    39

1   couple of days on his report.  Here it is everything,
2   you know, electrical fire, you know.
3   Q    I was just going to pull out the date of the
4   report was June 28th, 2010.
5   A    Yeah.
6   Q    And I won't mark it as an exhibit but it's
7   SF693.
8   A    Right.  So, you know, that's --
9   Q    It was like two weeks later?
10  A    Right.  That's the first thing that -- we
11  couldn't do anything until that.  So when that come
12  out and the guy said, okay, here's what we need to do
13  now.  What you need to do is you need to get some
14  estimates for debris removal.  Okay.  So we had to do
15  that.  So, you know, you can't just call somebody out
16  and say, hey, come out here and give me an estimate on
17  debris removal.  They say oh yeah, we'll be out
18  there, today's Tuesday, you know, next Monday.  You
19  know or today's Wednesday, I'll see you next week.
20  Oh, yeah, it ain't no problem.  I'll see you next
21  week.  So it took them that time, and they come out.
22  We had to get -- never can you just get one on
23  anything.  You know, you got to get two.  And they are
                                                    40

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  going to pay you, you know, but they want you to get
2  more than one of course, which I don't blame them for
3  that.  So we have to get two.  So we got two of them.
4  Turned them in to State Farm.  So then we turned them
5  in to State Farm, they have to look at them.
6  Q    So all that slows down the steps?
7  A    Everything is slowing down.  So then they
8  give you the check for that first.  Okay.  So when we
9  got the check for that, it was made out to April,
10 Chase and RBS or something like that, all three of
11 them.  So we had to go through, all right -- them
12 peoples got to sign the check and send it back to you.
13 You can't, you know -- and then use that check to pay
14 the people.  So they're not -- nobody's going to
15 really do work until you can pay them.  So we had to
16 send off the check to both people, and they sent it
17 back to us, I mean.
18 Q    Do you have any documents about that, like
19 where the letter pre you sent it, or the letter where
20 they sent it back showing like when that happened?
21 A    No, ma'am.  You know, I hear you ask that a
22 lot about, do you have documentation or do you
23 anything -- you know, who'd you talk to or -- you
                                                      41

1  know, here's the thing about that.  When we was doing
2  all this, we just been through this fire.  And to tell
3  you the truth about it all, everybody -- we thought
4  everybody had our interest because everybody that we
5  knew had our best interest at heart.
6  Q    Well, let me tell you -- I just want to tell
7  you, I'm not fussing at you when you don't have
8  documents.  Part of what we're doing is trying to
9  establish like the date that stuff happened.  So
10 that's one of the reasons I ask you about documents.
11 A    I know.  You know, we don't -- hindsight
12 now, every person we talked to, we would've wrote
13 their name down even if we couldn't spell it or
14 anything like that.  We'd wrote their name down, every
15 single person that we talked to, but we didn't.  Every
16 time we sent somebody a letter, we would have put it
17 in a file.  We would have done anything like that, but
18 we didn't because we thought, hey, look these people,
19 they're on our side.  Everybody else is on our side.
20 You know, it's like a thing where you don't realize
21 sometimes in life that people, I guess, is against you
22 because everybody up until that point -- we've been
23 lucky in our life.  We've been lucky that in our life
                                                      42

1  through this tragedy that everybody except for
2  Chase -- but at the time we didn't know this -- but
3  everybody has just been 100 percent -- 110 percent
4  behind us.  The fire fighters that come out and put
5  the fire out, the next day they come to the hotel with
6  boxes and boxes full of stuff that they had took up,
7  you know.  Our church, they come out.  You know, they
8  took up stuff, gift cards, anything -- you know,
9  every -- It's just overwhelming how much support we
10 had.  And at the time I guess we were so naive to
11 think, hey, everybody's helping us.  These people are
12 too.  And they weren't about that, you know.  So no,
13 we don't have documentation of it because we were
14 naive at the time, and we thought that -- which we've
15 learned now, you know, we've learned in our life
16 now -- Where we're from -- I don't know where you're
17 from.
18 Q    I'm from Clarke County.
19 A    See, you're from the country.  We're from
20 the country.  Okay.  You know, really my family's from
21 Munford, Alabama.  They got probably -- if there's 400
22 people there it's a miracle.  That's where my mother's
23 family is from.  And I ate breakfast there every day
                                                      43

1  when I was growing up.  You know, and I went there to
2  school 1st through 4th anyway -- I know that's a
3  tangent -- but where we're from, everybody takes care
4  of everybody.  You know, everybody looks out for if --
5  you know, if our neighbors are sick, we go help them,
6  you know.  If, you know, my wife -- I used to get onto
7  her all the time when we first got married because
8  she'd look in the paper like for obituaries because
9  people that she had worked -- like took care of at the
10 hospital might have passed away, and she would, you
11 know, get them flowers or a pie or something and go to
12 their house.  No matter how far it is, no matter how
13 long -- Oh, I used to be -- back in '05 this person
14 broke her hip; let me go take care of her; let me go
15 see about them.  And that's how -- where we're from --
16 how everybody does.  So I guess we just didn't see how
17 treacherous somebody can be.  How, you know, these
18 people -- I don't know.  Where's Chase even from, New
19 York City or something; is that where it's at?
20 Q    They have offices lots of different places.
21 A    Exactly.  But I mean, I'm sure wherever
22 that's coming from I got no idea -- I can't even --
23 Colorado, I guess, New York City, Colorado wherever
                                                      44

11 (Pages 41 to 44)

**JASON BARNETT**

1   these things come from, people was writing us calling
2   us on the phone, you know.
3       Like here's the worst story about the whole
4   thing, I guess, them people calling us on the phone.
5   We're at our house Thanksgiving. I mean, you know,
6   how big Thanksgiving is where I'm from, and I'm sure
7   probably Clarke County where you're from.
8   **Q**    So this is Thanksgiving after the fire where
9   **y'all are living in the rented house?**
10   A    Right, Thanksgiving. We've done paid them
11   off, got a ten day payoff, sent a check in. They
12   cashed it. Thanksgiving we're at our house. We got
13   our family there. Our phone rings. What's the thing
14   you think on Thanksgiving when your phone rings at
15   your house? Something's wrong; right? Hey, everybody
16   in our family's here. I mean, what's going on? You
17   know, is one of my friends died, or something happened
18   because I'm sure that everybody that calls you on
19   Thanksgiving is probably your family telling you, you
20   know -- but, hey all mine is here. Some person on the
21   phone, May I speak with April Barnett. I don't know
22   where they was from. Sounded like -- I don't know.
23   But you know how Indian people sound. I'm not racist
                         45

1   -- you know what I'm talking about, how Indian, not
2   Cherokee or American but like overseas Indians, you
3   know, like on that Slumdog Millionaire. You know how
4   they sound; right. I mean, everybody does. Like the
5   guy on Simpsons, you know, the oldest star on the
6   Simpson's, you know, that guy. Anyway, can I speak
7   with April Barnett. I think in fact, they probably
8   said April Burnett; April Burnett -- Can I speak with
9   April Burnett? Well, this is her husband, Jason. Oh,
10   okay, Mr. Barnett. I'm from Chase Finance. I'd just
11   like to talk to you about your account. Okay. So I
12   go out of the family room into my daughter's back
13   room. Look, what can I help you with? Well, you're
14   now default; you're three months, four months behind,
15   whatever he said; you're behind. And we just want to
16   know what you're going to do about it. Right. What
17   are you going to do about this? Well, how about
18   nothing. What do you mean, Mr. Barnett? You don't
19   want us to come foreclose on your house. We can work
20   out anything you want to work out. We're here to help
21   you. We're trying to work out something. But we need
22   you to at least catch up two months -- like you're
23   four months behind, but if you'll catch up two months,
                         46

1   you know, then we'll put you back on schedule, right,
2   on schedule. Well, I'm not doing that; I've already
3   paid you. So then I say, well, I paid you $301,000
4   already. Can you please look it up on there? I paid
5   you $301,000, right. They say, oh, so you paid -- so
6   when did you send in the $3,000. No, sir. I paid you
7   $301,000. I know I send country, so I try to keep
8   going, you know. I reiterate $301,000. So,
9   Mr. Barnett, I see here you said you've paid 3,000.
10   Now Mr. Barnett, if you'll pay three more thousand,
11   we'll get you back current. How do you want to pay
12   that today? I don't, you know. And this is probably
13   a 15 minute conversation. I'm just trying to get --
14   You know, here's my family in the other room. They're
15   eating turkey. I love turkey, you know. I love it.
16   My family cooks good. We've got good cooks in our
17   family. I want to go in there and eat. I'm having to
18   tell this guy -- I don't got no idea what -- if he
19   told me his name -- if he would have said an American
20   name, I'd have to tell him he was telling a story, but
21   I don't remember his name at all. So I ain't got that
22   documentation either. But I do know that finally I
23   told him, please let me get off this phone with you,
                         47

1   because really I don't get upset -- I try not to.
2   Like I know what my family's representation might
3   be -- and my mother tells me all the time. I'm glad
4   you're like the Camps. You know, my mother's a Camp.
5   That's that Camp in you. I'm glad you're like them
6   Camps. And April gets on me all the time, you need to
7   quit being like them Camps. So I said, Listen, please
8   let me get off here and enjoy my Thanksgiving with my
9   family, and we'll get this took -- you know, we can
10   get this took care of some other time. Well,
11   Mr. Barnett, you know, we're on a time schedule about
12   this. I couldn't understand what kind of time
13   schedule. You know, yeah, I guess you're on a time
14   schedule because you want to get some more money from
15   me before it gets around that I can go hire a lawyer,
16   I guess. I guess that's the time schedule you could
17   be on; that I'm going to beat you out of all I can
18   beat you out of until you stop me. That's a good time
19   schedule. But to say we're on a time schedule -- Now,
20   you're on a time schedule. You know, the clock's
21   ticking. I'm sure he didn't say it like that. That's
22   how I took it. The clock's ticking. Hey, get this
23   took care of or guess what, we're going to put your
                         48

12 (Pages 45 to 48)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  name in the paper; we're going to come up there and
2  get everything you got, you know.  And I'm saying what
3  about this money?  You say it -- they cashed the
4  check; what about that?  I don't know what you're
5  talking about.  Mr. Barnett, that $3,000 that you sent
6  in, we don't have that -- we don't have that anywhere
7  noted.  When did you send the $3,000 in?  Can you tell
8  me when you sent the $3,000, and when you're going to
9  send 3,000 more?  So, you know --
10  **Q      So you started out by saying the worst one**
11  **was probably when they called in the middle of**
12  **Thanksgiving and you told me that.  I mean, when you**
13  **had other conversations, was it sort of the similar**
14  **thing where you were saying, we already sent it in?**
15  A      Look, when we would have conversations with
16  them, it's like -- Have you ever seen that show
17  Punk'd; right?
18  **Q      I know what you're talking about, but I've**
19  **never seen it.**
20  A      Like they play tricks on people.  Like
21  they'll call you -- like set up a prank, and you'll
22  get real mad, you know, and jump out and all that.
23  You're Punk'd.  We checked our house for -- we checked
49

1  our house for cameras because you told them, told
2  them.  Oh, no.  Well okay, well, hold on.  Let me
3  transfer you.  Well, hey.  Yeah, I understand what
4  you're saying now.  Let me transfer you to somebody
5  else.  On hold.  You sit there on hold.  If you hang
6  up, you know you're going to go through all this again
7  soon.  You sit there on hold.  Hey, it might be
8  time -- we got to go get kids from school.  Let me
9  call somebody and get them to go get my kids because I
10  don't want to hang this phone up because when I hang
11  this phone up, I've got to come back later, and I've
12  got to go through all of it again.  Right.  So we're
13  telling this person, hey, sir, please, can you please
14  look in the -- I know y'all have got records.  I mean,
15  you're a large company.  I mean, y'all are one of the
16  biggest companies.  If you go to New York City,
17  everything in New York says Chase on it.  Y'all own
18  everything.  How in the world can y'all not, one
19  person, pull up our account and say oh, yeah, y'all
20  paid that; we cashed that check.  Sorry for calling
21  you; won't call you no more.  Nobody does it.
22  Mr. Barnett, Ms. Barnett, when they talked to her --
23  Ms. Barnett, can you please send us what you owe us?
50

1  You know, my wife called me from work, Jason, they
2  called me again.  Jason, they called me again.  Please
3  call them.  I can't answer my phone.  They're calling
4  me.  We got it programmed.  Hey, we got it programmed
5  in our phone.  It's Chase.  There they go, calling
6  again every time a 800 number comes up, you know.  And
7  I'll be honest with you, a lot of times they call, we
8  just let it ring.  You'd be in the bed, we got -- At
9  the time we had three children.  We got -- my 10 year
10  old -- or she's 11 now, thinks she's about 30.  She
11  told me like last year one time, I'm the only kid in
12  5th grade that goes to bed when it's still light
13  outside.  I mean, we go to bed, that's how we do.  I
14  mean, around our house we shut it down.  We take a
15  bath about 7:00, 7:30 after we eat.  We take a bath.
16  We get ready for bed.  Okay.  We get ready for bed.  I
17  don't know what these people in New York City are
18  doing, but we're going to bed or Colorado.  I guess
19  they're in a different time zone.  I guess they was
20  ahead maybe.  But we be in bed.  The phone would be
21  ringing.  You know, what we'd say, don't even get it.
22  Don't even get it.  Hey, you know who that is.  That's
23  Chase.  Don't even get it.  And you know what happens
51

1  as soon as they hung that one up, April's cell phone
2  would ring.  That's how we would know it was Chase
3  because we'd say okay, there's your cell phone.  Give
4  it 30 seconds.  There it comes again.  We didn't even
5  have -- we had no answering machine at this rental
6  house.  We didn't have an answering machine.  Heck, it
7  would have filled up if we did.  So then it would be
8  Chase calling again.  And, you know, we dodged a
9  bunch.  And I'm not really proud to say that, but it
10  got to a point where we just dodged it.  I mean,
11  because when you talk to them -- April worked, you
12  know, when she would be off of work, she would come
13  home.  She'd say, all right.  I'm going to come home
14  for my lunch break, and we'll call Chase.  You know,
15  I'm going to come home -- we used to be like, hey,
16  let's meet out at Logan's and eat on my lunch break.
17  Now, it's hey, I'm going to come home on my lunch
18  break.  Let's call Chase.  I'm like, come one; I mean,
19  let's go eat somewhere, you know, like that.  But
20  that's -- and I hate to say -- I mean, she's not here
21  now, so I can probably slip something in about her.
22  But she's like very, very over the top on making sure
23  her stuff -- that's what she says, my stuff's going to
52

13 (Pages 49 to 52)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  be right. I don't care about yours, but mine is going
2  to be right. And that's how -- because her mother did
3  bring her up -- you know, she talked about her mother
4  and daddy. She didn't tell you the story because
5  she's -- I know that a lot of times you don't want to
6  tell people stuff. But, you know, she grew up she
7  didn't have nothing. You know and that was -- they
8  had nothing. And that was -- her mother taught her.
9  Her mother got divorced from her daddy. You know, he
10  was abusive. And her mother taught her don't never be
11  dependent like that. You do your stuff. And you get
12  your stuff right. And that's the greatest thing you
13  can have -- you know, her mother would tell her.
14  That's the greatest thing you can have in this world
15  is credit, the greatest. If you ain't got that --
16  that's the greatest thing. The thing about it now --
17  and one of the reasons, you know, you asked her, well,
18  how did y'all meet or whatever. I known her my whole
19  life. I know her name. Her family is good people.
20  You know, her granddaddy was my little league football
21  coach. Coach Tommy is what they called him, Coach
22  Davis. He's still alive, her grand-daddy. When I was
23  ten years old, April was the mascot on our little

53

1  league football team. The Redskins, she was the
2  mascot. That's how long I've known her. They're good
3  people. And her mother taught her that. Hey, that's
4  the one -- look, we might not have -- we might not be
5  rich folks, you know, we're never going to be rich
6  folks. You know, we're not like these people. I'm
7  sure the guy that owns this Chase, whoever he is, I'm
8  sure -- I don't know if it's one person that owns it,
9  but I'm sure whoever it is that owns it or runs it or
10  whatever, he ain't got to worry about his credit; I
11  I'm pretty sure of that. This would've never go with
12  him. If his house burnt down -- if his house burnt
13  down, I would really like to see -- Well, he probably
14  don't got a mortgage with Chase because -- he's
15  probably really smart and don't have a mortgage with
16  Chase. But if he did, and his house burnt down, I
17  wouldn't know -- I guarantee this wouldn't be
18  happening to him. First off, he could probably talk
19  to somebody that he can understand because it's
20  probably right there in his office. And second, when
21  he gave them the money, I guarantee you, that they --
22  you know what I'm saying? You know what I'm saying.
23  **Q    She's concentrating.**

54

1  A    You know, that they cashed that check of
2  his. Do you know his name? You work for him.
3  **Q    No, I'm their lawyer. I'm not employed**
4  **by --**
5  A    So who hired -- they didn't hire --
6  **Q    They hired me.**
7  A    So the person that owns it, didn't hire you.
8  Okay. But there's somebody -- you know, there's
9  somebody that owns it. He, if he pays them, if he
10  had -- like I said, if he had a loan -- but if he paid
11  them they're going to -- I can guarantee you, that's
12  paid off. And he checks his credit, and it says paid
13  in full. Okay. He hadn't got to go --
14      Here's the thing. All right. I know like
15  you said and I know I'm in here, so I hear what you
16  say, of course. But you said, well, it's took care of
17  now. Right. It's took care of. Hey, what's the
18  problem? Right. I don't understand that. Okay.
19  Here's the problem. What I mean, we got people -- I
20  know people that's in the banking industry that's
21  friends of mine that I've known my whole life. Like I
22  said, we're from a small town. Okay. You go and talk
23  to them about this. Hey, let me tell you what's

55

1  happened. We're trying to rebuild this house, but
2  man, let me just tell you. We paid Chase off. We
3  paid them. But they didn't give -- they didn't credit
4  our account. Listed us as in default, put on our
5  credit, on April's credit, that they foreclosed on the
6  house. That's on their credit; that's a record. Put
7  on there, foreclosed. But hey, let me tell you, man,
8  that ain't really what happened. You know, we paid
9  them. That ain't what happened. We paid them off.
10  They cashed it. We got to go through the whole story,
11  house burnt down which everybody probably knows it
12  anyway. House burnt down, got the check from State
13  Farm. Sent it to Chase. They cashed it. But, you
14  know, it says they foreclosed on us, but they really
15  didn't. Every one of them says, no, they can't do
16  that. That's not -- you know, and they might say,
17  okay. You know how like if somebody tells you
18  something sometimes that you don't believe, you'll hit
19  them with the Oh, okay. Oh, yeah, okay. You've done
20  that, I'm sure, to a lot of people. You probably want
21  to do it to me. But you've done it to people. Right,
22  okay. Yeah, you're right. So you tell them that, and
23  they tell you, yeah, okay; I understand. Yeah, hey, I

56

14 (Pages 53 to 56)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1 understand. When you leave our office, the secretary
2 comes in there and talking about this guy here, he's a
3 feisty thing. He told the truth about stuff, but I
4 know that's a lie. Nobody does that. There's no
5 way -- there's no way a company as big as Chase out of
6 New York City, owns all of New York City -- and like
7 you said they got stuff everywhere, right. That's
8 just not New York City. They got it everywhere. I'm
9 sure they got something in Alabama; they got in touch
10 with you. They got stuff everywhere. No way in the
11 world that what they're telling -- there's no way what
12 Jason just told me is true. He's got to be a liar
13 because you can't do that. You can't take somebody's
14 payment, right, cash a check and not apply it. I
15 think that's a law. I'm not sure, but if it ain't, it
16 should be.
17 **Q     Well, that's what we're doing here. You**
18 **know, you're complaining about what got done --**
19 A     That is what got done.
20 **Q     I'm not answering questions. I'm finding**
21 **out from you what you're complaining about.**
22 A     Well, that's what I'm telling you. That's
23 what got done. You've read it, you know. I know how
                                                    57

1 people are. I know, you know. That's what happened.
2 So, you know, they did -- if you owe me $25 say, and
3 you say, how much do I owe you, Jason?  $25.  Here's
4 $25. Right. I see you two weeks from now.
5 Ms. Robinson, where's that $25 you owe me?  Well, I
6 paid you that $25. Well, I didn't know what to do
7 with that $25. Oh, you might have gave me $25, but
8 was that $25 to clear up what you owed me, or were you
9 just giving me $25 to hold on, you know, go down here
10 and buy me a snow cone or whatever, which this is a
11 little more than $25. This is $301,000 and more --
12 more than $301,000. Say, Ms. Robinson, you owe me
13 $301,000 and you gave me $301,000. That's a lot of
14 money to you -- I don't know about you. I didn't mean
15 to say that. That's a lot of money to me. Okay. You
16 give that to me, and I see you next week, and I say,
17 where's that money you owe me? Jason, I done paid you
18 that money. Okay. So I say, well, are you sure you
19 paid me that money? Yeah, I paid you. Okay. Okay.
20 I call you the next week, Ms. Robinson, where's that
21 money you owe me? Jason, I've done paid you that
22 money. When did you pay me that money? You sure you
23 didn't pay me $3,000? No, I paid you 300,000. When?
                                                    58

1 Are you sure? Okay. Then we got off the phone, and
2 you call me the next week, and the next week. And I
3 called you again, and you called me. Hey, now you
4 know I paid you that money, right? I don't know that.
5 Next week, hey, where's that money? That's how -- and
6 finally what would you think to yourself? These
7 people -- this guy here is an idiot, right? Why does
8 he keep calling me. Why does he keep calling me for
9 this $25 when I paid him four months -- say I called
10 you at least three times a week for, you know, three
11 or four months and said, hey, that money you owe me,
12 give it to me.
13 MR. MCDONALD:
14        Let's take a little break.
15        (WHEREUPON, THERE WAS A BRIEF RECESS
16        AT 4:25 - 4:40.)
17 BY MS. ROBINSON:
18 **Q     Now, before the break, Mr. Barnett, you were**
19 **telling me about, you know, the experiences you were**
20 **going through getting these calls from Chase, trying**
21 **to make sure the money got attributed so that it paid**
22 **off the loan?**
23 A     Yes, ma'am.
                                                    59

1 **Q     And I was going to ask you. It was my**
2 **understanding during this time after the fire when**
3 **y'all were living in the rental house that April was**
4 **working at a doctor's office. So I guess she was**
5 **going to work most days like during the day?**
6 A     Yes, ma'am.
7 **Q     And were you getting a lot of the calls or**
8 **taking care of a lot of the communication because you**
9 **were working from home?**
10 A     Like I said, they might call April's cell
11 phone or something, and she wouldn't answer it. And
12 then she would call me and say hey, you know, if they
13 call, you answer at the house or whatever. And then
14 they would usually call if I was -- you know, I don't
15 sit around the house all day.
16 **Q     Right.**
17 A     But it would just be stuff like that and,
18 you know, one of things that the reason I took a lot
19 of the, I guess, brunt of the phone calls -- I guess
20 is that in context right?
21 **Q     Yes.**
22 A     The brunt of the phone calls is because, you
23 know, we got, you know, a family. And then April, me
                                                    60

                                    15 (Pages 57 to 60)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1    and three kids at the time.  Okay.  If April -- first
2    of all, if she got on the phone with them, of course
3    like we've already established, each phone call would
4    take 45 minutes, you know, 30, 45, you know, just to
5    get to where you started who you needed to talk to.
6    Okay.  And then after those phone calls, you know, I'm
7    not trying to say anything bad about April because I
8    wouldn't, but after those phone calls April would
9    be -- I don't know if the correct word would be in
10   shambles or distraught.
11   Q     She was upset?
12   A     Right.
13   Q     You were trying to protect her?
14   A     Exactly.  And she would go and just go in
15   the bedroom, lay down and cry or go in the back -- you
16   know, you'd go in the back, she'd be washing clothes
17   or something.  You walk in there, and there's tears
18   everywhere.  And then one of your daughters comes to
19   you and say, why is mamma crying?  You and mamma
20   fighting?  Are you and mamma having an argument?  No,
21   me and mom's not having an argument.  And my little
22   boy, he's a mess.  But, you know, he wants to of
23   course know like -- just hug him.  But, you know,
61

1    you see like your wife in the other room squalling or
2    in the other room just sitting down on the bed or go
3    back to the back, because this is just so draining.  And
4    sitting there because this is just so draining.  And
5    it's draining -- like it's drained us in here now,
6    right.  This is a hard day.  We've been here forever.
7    But just think about we was there -- this happened to
8    us every day.  You know, this deposition is today.
9    Y'all are hearing this.  When this is over with, we're
10   going to leave here, and we're going to go somewhere
11   and, you know, everybody's going to -- you're going to
12   go to your family; we're going to go back to ours.
13   Okay.  But we went through it every day, sometimes
14   twice a day.  You know, this story you're asking us to
15   tell today, it's a long story.  I am sure Dennise here
16   she's -- it's a long story, right.  You heard it.
17   Now, just imagine hearing it every day, talking about
18   it every day for months.  Okay.  Explaining, not
19   just -- you know, it just doesn't go in a cacoon.  We
20   talked to these people on the phone.  That's it.
21   That's the only people that know about you, you know.
22   That's the only people that hear this story, you know.
23   People at banks, they got to hear it.  We got to tell
62

1    it to them, you know.  Our builder, hey, we have got
2    to tell the story to him.
3    Q     Let's go back to the builder because I
4    actually had a question about that to shift gears for
5    a minute.
6    A     Okay.
7    Q     Y'all had Chris build your house; he gave
8    you an estimate?
9    A     Correct.
10   Q     How did that work?  As he was going along,
11   would he submit like a draw request --
12   A     Yes, ma'am.
13   Q     -- to y'all or to State Farm or to both?
14   A     To us.  To us.  How the thing went is once
15   they got the payoff -- you know, we sent in for a
16   payoff.  Okay.  Which that's been established.  We
17   sent in for a payoff.  I guess, what is it,
18   August 24th we sent in for a payoff.
19   Q     Right.
20   A     And then we gave it to State Farm.
21   Q     And then they sent the check on August 31st?
22   A     Right.  Okay.  Once they sent a check in,
23   they sent both checks in, a check to y'all, Chase, and
63

1    a check -- I guess this is it, right?
2    Q     Yes, sir.
3    A     Right.  They sent it in.  And this was, I
4    guess, this is the loan number that was on it.
5    Q     We're looking at Defendant's Exhibit 4, yes,
6    sir.
7    A     This is the loan number, and this is where
8    they endorsed it, and they cashed it, right.  Well, we
9    had from RBS or CCO, they did the same thing.  So then
10   after that's done, there was -- we had equity left in
11   our house.
12   Q     How much equity did you have?
13   A     I want to say 185,000.
14   Q     Meaning that -- just to make sure you and I
15   are speaking the same language -- meaning that the
16   value of the house exceeded the amount of the
17   mortgages on it by how much?
18   A     185,000.
19   Q     185,000.
20   A     And I can explain how -- I know everybody
21   says, well how is it -- we've had people say that to
22   us -- well, how did you have to give so little for a
23   house that's worth that much, right.  The person that
64

16  (Pages 61 to 64)

### JASON BARNETT

1  owned the house that had it for sale -- he's a
2  builder. His name is Adrian Walley. We don't like
3  him too much. Anyway, he -- what he did he bought
4  this land up which is now our neighborhood, it's
5  called Winwood. So he bought all this land, right,
6  and then he built houses in that subdivision. Right.
7  So the first house he built was his, okay. So he
8  built his house in the subdivision. I don't know -- I
9  mean, it was a nice house because he was a builder; he
10 lived there. That's the house he built for him and
11 his wife. And then when he lived in that house, then
12 he built like all the houses in there. That's, I
13 guess, his home base or whatever, right. So he owed
14 nothing on the house. He built it his self, okay. So
15 when the neighborhood got finished which that's
16 probably -- I guess, now there's like three or four
17 lots that don't have a house on it or four or five
18 maybe -- or really two of them is around us. But he
19 never sold the lots around him because he don't want
20 nobody living there.
21 Q    Right.
22 A    Right. And everybody -- he filled the whole
23 neighborhood up. It's five side streets and then a
                                                        65

1  long street in. Okay -- or six side streets and a
2  long street in. And so he filled the whole
3  neighborhood up. He built every house in there. I
4  mean, it was like in, I guess, the covenant or
5  whatever. You've got -- he had to be a builder, and
6  he had to approve who built, right. So once he did
7  that, he bought some land in Jacksonville and is going
8  to do the same thing. And so he built him a house in
9  Jacksonville to start over, and he had this house.
10 And it was on the market for 400 and -- say when we
11 first seen it like $465,000, right. And it had been
12 on the market for a while too. So I don't know if
13 they had started out higher than that or not. Okay.
14 Been on the market, been on the market, and then they
15 had dropped it to, you know -- economy, it was like
16 400, and then we offered him 385.
17 Q    And they took it?
18 A    And he took it. So, you know, the thing
19 about it is the house was -- we got a real good deal
20 on it, like an exceptional deal. So, you know,
21 there's -- then the equity made up. That's how it was
22 as much as it was.
23 Q    So after you got the payoffs, the insurance
                                                        66

1  company sent the payoff money to Chase and to the
2  other mortgage company?
3  A    Yes, ma'am.
4  Q    Then they had equity, and you were about to
5  explain to me how it worked like when Chris was
6  building the house; he would submit a draw request?
7  A    Right. We had that money, and we went and
8  opened up a bank account where Chris banks at. I
9  believe his mother-in-law is like a secretary there or
10 something.
11 Q    So they just paid you your equity portion;
12 you just put it in the bank to pay Chris out of?
13 A    Right, yes, ma'am. So we got that and then,
14 I guess, they gave us that in September, right, that
15 first check. So we got that, end of August, put that
16 in the bank. So then we had to get blueprints drawn
17 up and stuff like that and approve them. And, of
18 course, April knocked out a bunch of it and started,
19 you know.
20      And the thing we did on the house, you had
21 to do our insurance thing, you know, you could either
22 get a certain amount if you wasn't going to build
23 back. And if you were going to build back in the same
                                                        67

1  house, there was a escalator like -- they call it
2  total replacement cost. So that would mean no matter
3  what it cost when you bought it, what it was worth
4  now, you know would be whatever so. Anyway --
5  Q    So that's what y'all chose, to build back,
6  and then the escalator clause came into it?
7  A    Yes, ma'am. And we didn't have to build
8  back the same house that was built. We just had to
9  build a house that was --
10 Q    Comparable?
11 A    Comparable, right. But on those estimates,
12 the estimates had to be for the same house. Do you
13 see what I mean? We had to turn in -- and here's the
14 thing about it, the guy didn't have no blueprints on
15 the house because he just built it his self. He never
16 had blueprints. In our city you don't have to, you
17 know --
18 Q    Building permit or whatever?
19 A    Right -- well, you had to get a permit, but
20 you don't have to like turn over the blueprints to the
21 city. So we had to draw it.
22 Q    Let me make sure I understand what you're
23 just saying. That they would pay you based on the
                                                        68

```
17 (Pages 65 to 68)
```

**JASON BARNETT**

1    cost to build the exact same house, but once they
2    approved the amount of money, you didn't have to
3    use it to build the exact same house?
4    A    You didn't have to build the exact same
5    house.
6    Q    I just wanted to make sure I understood.
7    A    Right.  So when we built the new house, when
8    we got it drawed up, we didn't want any -- in our old
9    house we had a full basement.  Okay.  A downstairs
10    which was the kitchen, living room, dining room, stuff
11    like that.  And then upstairs was all bedrooms.  The
12    people from the fire told us that they wasn't sure how
13    long the house had burned.  It could have burned ten
14    minutes or ten hours.  They didn't know how long that
15    that plug had took to catch the house on fire.  And
16    that they didn't know if we would have been able to
17    get us and our kids out if we would have been there.
18    So of course when we went to build back, we said we're
19    not having any bedrooms, you know, upstairs because we
20    don't want to have, you know -- Do you see what I'm
21    saying?
22    Q    I understand.
23    A    You don't want your kids --

69

1    Q    Right.
2    A    We're not sure we could have got out if we
3    would have been home.
4    Q    If everyone had been upstairs.  And so the
5    idea was that if the mamma and daddy are downstairs,
6    they would have more time to get up to get the kids
7    or --
8    A    Well, we don't got a upstairs.
9    Q    Oh, I see.
10    A    We are all -- we're one story and a full
11    basement.  Do you see what I mean?  Like we've got a
12    full -- I guess the other house we might have had what
13    they would call a half basement.
14    Q    So when your wife was telling me earlier
15    that there was one bedroom downstairs and three
16    bedrooms upstairs --
17    A    That's the basement.
18    Q    Okay, understood.
19    A    So everything upstairs and then the
20    basement.  So we've got a basement --
21    Q    You have a fully finished-out basement
22    that's --
23    A    That's not finished.

70

1    Q    But it's a living area; it's designed --
2    A    Oh, yeah.  It's got cut-in's for like a
3    kitchenette, like a kitchen thing.  Our daughter
4    that's 11, she thinks like, I guess she's going to
5    have an apartment.  It's got a garage like for her if
6    she ever starts driving which I'm not sure about that.
7    But it's got all that, and it's got like, really April
8    says one bedroom -- I call it two bedrooms, but my
9    kids call it a bedroom, and we're going to put a
10    theater room, right.
11    Q    Like a play room?
12    A    Right.  But it's got a closet in it.  So I
13    guess technically it would be called like a bedroom,
14    closet, bedroom, closet.  But anyway --
15    Q    But the main living area is all on one
16    floor?
17    A    All on one floor, yes, ma'am.
18    Q    Okay.  And so you have the equity money --
19    A    Right.
20    Q    -- in the bank?  And you were using that
21    first to pay Chris.  And then how did it work after
22    that money was gone; what were you using to pay Chris?
23    A    Well, what we did was, of course, we went

71

1    and we thought, well, we've got to go get a loan to
2    get the rest of this house built, right.  We got to
3    get a loan.  So when we first went, the first person I
4    went and talked to was Mike Simpson.
5    Q    At Farmers & Merchants?
6    A    At Farmers & Merchants.
7    Q    Let me just interrupt for one second.  You
8    went to talk to him, or the two of y'all went
9    together?
10    A    No, just me.  I went and talked to him.  And
11    you know, like I said, everybody in our town knows the
12    situation that our house had burnt down, and we
13    were -- it's not like, I guess -- well, you know,
14    where you're from, the same thing.  So everybody
15    knows.  So we went and talked to him.  He said, hey,
16    you know, first thing you need to make sure of is that
17    you've got a clear deed.  You can't, you know -- he
18    asked me, hey, you've got a clear deed to it?  It's
19    paid off you.  It's paid off.  You got a clear deed?
20    Well, no, we ain't got a clear deed.  I guess, they're
21    working on that or whatever.  Well, you need to make
22    sure you got a clear deed.
23    Q    So did you ever actually put in an

72

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

### JASON BARNETT

1  application with Mike, or you just went and talked to
2  him?
3  A       I just went and talked to him.  And he just
4  advised me that before anything could be done that I
5  had to have a clear deed on the house.  That thing
6  that you said in February thing.  So, in essence, I
7  couldn't do nothing until February if that -- you know
8  if that was true.  We would be in like home -- I guess
9  the home -- the insurance wasn't going to keep paying
10  until that far, right?
11  Q       Right.  So what did y'all decide to do?
12  A       So what we did was we just started using
13  that money, and we just hoped -- you know, because I
14  didn't know about houses built.  You don't have to
15  give it all to them at that time.  Like when he's
16  taking a draw, it might be 20,000 this month or 40,000
17  next month, you know.  So his whole thing was we've
18  got time -- or what are y'all doing?  He's like, What
19  are y'all doing?  We're trying to get a loan, but
20  we've got to wait on this deed, this clear deed.
21  Q       And just to be clear when you kind of
22  referred over here with your hand, you were pointing
23  to this stack of stuff that starts at SF 222, the

73

1  itemization of the contents?
2  A       I didn't point to that.
3  Q       Oh, I thought you were waving at that.
4  A       I just talk with my hands.
5  Q       Oh, I'm sorry.  Go ahead then.  I
6  misunderstood.
7  A       No, I get that.  So I'll try to put them
8  down here.
9  Q       That's okay.  I thought I was following you,
10  but I wasn't.  So I'm glad I clarified.
11  A       Okay.  So, you know, he would say we need
12  30,000 this month or we need, you know, 20,000 this
13  month.  And we would say, well how long -- we got
14  185,000.  How long is that going to last?  Well, that
15  will get you 'til maybe December.  You know what I'm
16  saying?  That gets you maybe to December, January
17  right in there.  And then by then everything is going
18  -- you know, any person in the world would think that.
19  Wasn't paying them off.  You know, the banker is
20  telling us, all we really got to wait on is to get the
21  deed.  Hey, get the deed cleared.  As soon as you get
22  that deed cleared, then you can go get financing,
23  right.  So this is in the first of September.  And the

74

1  guy says, well, you've got 'til -- that 185,000 that
2  you've got -- because we told him, this is what we
3  got.  We got 185,000.  Well, that $185,000 you got,
4  that will get you into January, right.  That's --
5  maybe December, early January, that's going to get you
6  to there, right.  You're good.  Okay.  So then what do
7  you think?  Well, great.  You know, let's go.  Because
8  I know that these people's got the money because they
9  cashed the check, you know.  I called my insurance man
10  and said -- I mean my adjuster -- hey, can you check
11  and they did -- because we check online.  You know,
12  we'd get online.  It would say, balance owed, you
13  know, so and so.  Well, okay.  Called Sam.  Hey, can
14  you check and see when they cashed that check?  Yeah,
15  they cashed it.  It's done cleared our bank.  Okay.
16  Okay.  So, you know, you just get the -- I guess to
17  trusting people again -- back to that trust.  Hey,
18  just being naive.  Go on and go -- yeah, go on and go.
19  We'll start, and when it's -- because there's no way
20  in the world that these people -- you know, we sent
21  this in.  The other one, that CCO, it cleared
22  September 23rd, right, September 23rd.  We got that.
23  They sent it back in the mail to us.  Your deed's

75

1  clear, September 23rd.  So I get that one
2  September 23rd, right.  CCO's a little bitty company I
3  would think.  This Chase is a huge company.  If CCO's
4  got enough manpower to get it cleared by
5  September 23rd, surely by October 15th at the latest I
6  would think in my mind Chase should have that cleared.
7  That's not unreasonable to think, I don't think.
8  That, you know, you sent the checks in the same day.
9  We checked back.  They was both cashed.  Right.  So if
10  one business -- they're in the same business.  Maybe
11  they should own all of New York.  Maybe they should
12  have everything up there because they did what they
13  said.  You know, we asked for a payoff, ten day
14  payoff.  Here it is.  Send you a check, cashed it.  I
15  guess -- I'm sure they don't send somebody from
16  wherever they're from down to Talladega Courthouse --
17  I guess they hire somebody by proxy -- I mean, they
18  might call somebody, get them to go down there and
19  file it, you know, that it's paid off.  Right.  So
20  they did that.  September 23rd, that's done.  A
21  reasonable person, I would think, would not think that
22  it would take -- I'm going to count them -- September
23  to October, October to November, November to December

76

19  (Pages 73 to 76)

**JASON BARNETT**

1  December to January, January to February, five extra
2  months than what a person that's in the same business
3  could do.  It took a person really five months to do
4  something what the other people took three weeks.
5  They're in the same business.  They do the same thing.
6  They write mortgages.  You know, they got paid off.
7  They cleared it September 23rd.  This one you showed
8  my wife I think February 9th; is that right?
9  Q    Yes, sir.
10  A      This one.  So reasonable to us we would
11  think, let's go ahead and start building a house with
12  this money we have, right.  And by October, end of
13  December like he said, we should be able to get a
14  loan.  We should be able to get a loan because we were
15  building a house that, you know, I don't know what it
16  appraised for, but it's appraised -- at least
17  $185,000, we've already put in it.  It would be more.
18  Do you see what I'm saying?  You won't have to
19  borrow -- I know 185,000 you ain't got to borrow.
20  That's what it's worth.
21  Q      Right.  That you wouldn't have to borrow as
22  big a portion of it because you already received a
23  cash settlement?

77

1  A      Right.
2  Q      No, I understand.
3  A      Of course we started.  Hey, let's start
4  building.  You know, September 23rd, that other thing
5  comes in from CCO -- or I'm not saying we got it
6  September 23rd.  It got --
7  Q      Recorded?
8  A      -- recorded September 23rd.  We probably got
9  it the 26th or in there, whenever they send it to you.
10  It's not February.  It's not in February when we got
11  if.  Okay.  So if we would have waited -- I want you
12  to understand, if we would have waited until Chase
13  done what they were supposed to do -- These other
14  people did.  If we would have waited -- First thing,
15  if we wouldn't have ever hired a lawyer, it probably
16  would have never got done, ever.  They would have
17  probably showed up at our house, the sheriff trying --
18  you see what I'm saying, if we didn't hire a lawyer,
19  that probably never gets done.  So I really can't say.
20  It took them five months -- it took them three moths
21  after we hired a lawyer or two months after we hired a
22  lawyer.  So if somebody hires a lawyer on me, I guess
23  sort of get to going.  So if you don't get to going,

78

1  they wouldn't have ever had that fire under them, how
2  long is it going to take?  I mean, really.  I know you
3  see that and everybody sees that.  How long is it
4  going to take without this -- say me and April never
5  went and talked to Mr. Rice, never -- we just kept on,
6  kept on, hoping and praying and believing that Chase
7  was going to do right; that they were going to do
8  right.  How long is that going to take?  It took 'til
9  February us -- just about, you know, us calling them
10  and our lawyer calling them and threatening and
11  threatening.  It took them 'til February to do it that
12  way.  Okay.  We can't -- there's no loan in the world
13  you can get if you got -- if you don't own the deed to
14  the property.
15  Q      Yes, sir.  And so that's my question.  So
16  how were you paying for the house after you ran out of
17  the 185?  I mean, I understand clearly what you're
18  complaining about.
19  A      So you understand they did wrong.
20  Q      I understand what you're complaining about.
21  I do.
22  A      I mean, I know you can't say you understand
23  they did wrong.  Okay, so --

79

1  MR. KILBORN:
2        So what's the question?
3  Q      The question is:  How did they keep paying
4  for the construction of the house after the $185,000
5  was gone?
6  A      We had some of our personal money that we
7  had, and then on these contents which I know you get
8  to them, we had to fill all them things, right.
9  Q      Right.  And I'm not going to ask you about
10  it in any kind of detail.  But are you now pointing at
11  this stack of documents?
12  A      Yes, ma'am.
13  Q      This stack of documents that I asked April
14  about, it starts at SF 222 is the contents list.
15  A      Right.
16  Q      And this is what you had to fill out to give
17  to State Farm so they would write you checks so you
18  could have money to replace the contents?
19  A      All right.  Okay.  Now, when you say replace
20  the contents, that check that they write, the first
21  check to replace the contents, that's not -- from what
22  I understand, that's not a check to replace the
23  contents.  That's a check for the value of what your

80

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1 contents that you've -- that's yours.
2 **Q      I understand.  It's your money.  Yeah, when**
3 **State Farm --**
4 A      You keep saying that's to replace the
5 contents.  That's your value of the contents.
6 **Q      Okay.  They're giving you a check to pay you**
7 **for the value of the contents you lost?**
8 A      Right.
9 **Q      I'm fine with that.**
10 A      Okay.  That check was $212,000.  So that
11 gives you -- add that up 407 -- I'm not good with
12 math.
13 **Q      I have to use a pen, 407.**
14 A      Okay, $407,000.  We end up paying on the
15 house 397,000 I think when we run out -- when we just
16 couldn't go any further.  The other $10,000 out of
17 that, you know, we spent on, you know, replacing some
18 of the stuff for our kids or stuff like that.  We
19 didn't, you know, that whole amount -- we spent like
20 I'm staying, we didn't have any money left over.  I
21 mean, in fact, we stopped.  The house is probably
22 going to cost us 475,000 if you -- or 500,000 if
23 everything would have got done.

81

1 **Q      Let me ask you this.  I know this isn't what**
2 **happened, and I'm not asking you -- I'm just saying a**
3 **hypothetical question.  If you could go out today and**
4 **borrow the money, if the deed was clear and there was**
5 **no negative credit, how much money would you want to**
6 **borrow to finish the house and replace the contents?**
7 **I mean, you said you were looking to get a mortgage.**
8 **You didn't know how much it was going to have to be,**
9 **but you knew you already were 185,000 to the good, how**
10 **much would you have wanted to have as a mortgage?**
11 A      When we got to -- when we filled out that
12 thing with LSI or -- is that it?
13 **Q      LSI.**
14 A      We asked for $200,000.
15 **Q      Do you remember the date that you contacted**
16 **them about borrowing money?  And this is Michael**
17 **Saltzman; right?**
18 A      Yes, ma'am.  I'm not sure.  It was early --
19 late January, early February.  You know, like I said
20 again, maybe we'll learn from this and keep better
21 records of our phone calls and such.
22 **Q      And April told us the story about Lowe's,**
23 **and what happened at Lowe's in March?**

82

1 A      Yes, ma'am.
2 **Q      Have y'all made any attempt to apply for**
3 **credit with anybody say, in the last three months?**
4 A      No, ma'am.  And a lot of it is just -- I
5 don't want to try to sound like -- it's just, you
6 know, I guess shame.  I don't know if that's a good
7 word, shame, like that you would get turned down, or
8 you'd have to explain the situation.  And then like I
9 said before, have people ridicule you or not believe,
10 you know, your word about it.  I mean, even though
11 Chase broke their word of how they were supposed to do
12 things, we are trying not to break -- you know, I
13 don't want people to think -- like we go in there and
14 tell them something that's not right, you know.  And I
15 know that you could say that, you know, people will
16 understand this or people -- it's no big deal that
17 people understand it.  But nobody we've talked to --
18 nobody we've told believes it.
19 **Q      Is LSI the only mortgage person you went to**
20 **where you actually got to the point of like making an**
21 **application?**
22 A      That we turned in an application, yes, ma'am.
23 **Q      And you've already told me about Mike**

83

1 **Simpson, did you also, you personally, talk to Wayne**
2 **Carden?**
3 A      Yes, ma'am.
4 **Q      And Mike Watts?**
5 A      Yes, ma'am.  The same things that we would
6 go in and tell them the story about -- You know, we
7 got to the point where we was just going to really try
8 to get a loan even the way it was because we wanted to
9 get that took care of.  And they would say, you know,
10 if you got a foreclosure on there, if it says
11 foreclosure on there, you can apply, that's fine, but,
12 you know, I don't know -- As long as that's on there
13 or as long as you don't have the deed, there's no
14 reason to.  Do you see what I'm saying?
15 **Q      Right.  And I just want to make sure I'm**
16 **clear.  Like you told me before with Mike Simpson,**
17 **what he said is you've got to get a clear deed?**
18 A      Right.
19 **Q      And then by the time you got to Saltzman,**
20 **you had the deed --**
21 A      Right.
22 **Q      -- but there was an issue with the credit**
23 **report?  So with Carden, did you already have the deed**

84

21 (Pages 81 to 84)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

# JASON BARNETT

| | |
|---|---|
| 1 by then? | 1 MR. KILBORN: |
| 2 A      Saltzman is the last person. | 2        Yeah, we need that. |
| 3 Q      And with Watts and Carden, they were in the | 3 MS. ROBINSON: |
| 4 same category as -- | 4        I mean, nobody has sent any discovery |
| 5 A      And Simpson. | 5 request.  So I mean, I don't know the answer.  I don't |
| 6 Q      So that was at a time when you had a clear | 6 want to have a discussion about it.  You can write me |
| 7 deed but that you -- | 7 a letter, or I can look into it.  We can work it out |
| 8 A      No. | 8 later. |
| 9 Q      You still did not have a clear deed? | 9 MR. KILBORN: |
| 10 A      We did not have a clear deed.  We were just | 10        I don't want to write a letter.  I just want |
| 11 waiting on a deed.  You know, we had a clear deed from | 11 the recordings. |
| 12 CCO.  And what we do right here, I'd take it in.  And | 12 BY MS. ROBINSON: |
| 13 I would show, like here's the deed from COO, you know, | 13 Q      I'm wanting to make sure that I hit these |
| 14 right.  Here's this one.  Well, what about the other | 14 points that I wanted to ask you about, and one of them |
| 15 one?  Well, they haven't done it yet.  Well, Why not? | 15 is the issue of -- I know that y'all were wanting to |
| 16 You hadn't paid them yet?  Yeah, we paid them already. | 16 start a family, and y'all had talked about starting a |
| 17 Well, why not, why haven't they?  And I don't know how | 17 family before you got married? |
| 18 to answer that. | 18 A      Yes, ma'am. |
| 19 Q      Well, I'm just trying to -- I am not trying | 19 Q      And I am sure that all three times that this |
| 20 to persuade you or convince you of anything.  I just | 20 happened, it was upsetting.  And I don't want to upset |
| 21 want to understand what you're telling me. | 21 you, and I sure don't want to upset April. |
| 22 A      Yes, ma'am. | 22 A      Yes, ma'am. |
| 23 Q      And is it correct that Saltzman is the only | 23 Q      But just you want to tell me about these |
| 85 | 87 |

| | |
|---|---|
| 1 one that you talked to after you had the deed? | 1 miscarriages that happened with her in February of '07 |
| 2 A      Yes, ma'am. | 2 and in May of '08 and then in December of '10? |
| 3 Q      And I think I know the answer to this | 3 A      Well, February '07 that was the first one? |
| 4 question, but I just want to make darn sure while I've | 4 Q      Yes, sir, that's what I understand from -- |
| 5 got you here.  You don't have any kind of notes or | 5 A      Okay, February of '07 she had been pregnant. |
| 6 recordings or calendars or anything of these | 6 That's when we first decided that -- we didn't live |
| 7 conversations? | 7 together then.  Okay.  And that's when we first |
| 8 A      You know, I don't but y'all should. | 8 decided that we were going to start looking for a |
| 9 Q      Well, I'm not answering the questions. | 9 house to move in together and then have a family.  So |
| 10 A      I mean, I don't have any.  But, you know, | 10 we -- she had a doctor in Birmingham, and we went over |
| 11 like every time you talk to them, they say, they're | 11 there that day.  And well, we went to the doctor, and |
| 12 recording -- everybody's got it -- just be advised | 12 we were far enough along that like that's the day you |
| 13 that these conversations will be recorded, I guess. | 13 go to see like the heartbeat, you know.  So we went to |
| 14 MR. KILBORN: | 14 see the heartbeat.  And they put you in that room, the |
| 15        Do y'all have any recordings? | 15 sonogram room and stuff like that.  How many children |
| 16 MS. ROBINSON: | 16 you have? |
| 17        I'm not testifying.  There have been no | 17 Q      I have two. |
| 18 discovery requests to -- | 18 A      You know, you got to do all that.  And April |
| 19 MR. KILBORN: | 19 didn't have any children at the time.  So they, you |
| 20        I'm just asking -- | 20 know, show the sonogram and stuff.  And I got to.  So |
| 21 MR. MCDONALD: | 21 I knew, you know, just about immediately something was |
| 22        They should be part and parcel of the | 22 wrong.  Because you could tell there was no movement, |
| 23 initial disclosures. | 23 you know, the little heart thing, or you couldn't hear |
| 86 | 88 |

```
                                    22 (Pages 85 to 88)
```

## JASON BARNETT

1  anything.  So we got out of there, out of that
2  sonogram office.  Instead of putting us in a room,
3  they put us in the doctor's room.  So the first
4  thing -- April then knew something was wrong.
5  **Q      Right.**
6  A      I tried to console her inside there.  The
7  doctor come in, of course, and you know, talked to us
8  that there was something that had went wrong; that
9  they didn't know what it was.  But that she would have
10 to have a --
11 **Q      D&C?**
12 A      D&C because she was so far along.  So you
13 know, here's the thing about April.  She is probably
14 the strongest person I know about stuff like that.
15 You know, back then she was so strong.  And I just
16 thought, you know, how she handled everything was
17 just, hey listen, it's God's will; we know that.  And
18 that's how we're going to go from this, you know.  I
19 said okay, that's great.  Okay.  We already told our
20 kids we was moving in together.  We was looking for a
21 house.  So we did that.  And then we went on about our
22 life, and she got pregnant again and we had -- she had
23 another miscarriage.  And then we just said, we are

89

1  going to find out what's going on, and we're going to
2  get it fixed.  Okay.  We are going to find out what's
3  causing these, and we are going to get it fixed.  So
4  she did some blood work, and they come back with they
5  thought, here's what we can do.  You know --
6  **Q      That's the sticky platelet thing where she**
7  **would take a baby aspirin?**
8  A      Right.  Here's what we can do, and
9  everything will be fine.  She started doing that,
10 never a problem.
11 **Q      So she got pregnant; she had Davis and**
12 **everything --**
13 A      Everything was fine.  Okay.  Never a
14 problem.  We decide we're going to have another child.
15 She started on her regimen again, you know started.
16 She got pregnant again.  Everything was going along
17 good except these phone calls every day.  She's lying
18 in the bed crying every day.  I know I've been
19 through -- I know that -- you know, I would tell her
20 April, it's going to be okay.  You know, we're going
21 to have a baby.  Everything is going to be okay, you
22 know.  And she would say, can they please just not
23 understand this -- please just leave me alone.  Let's

90

1  get this house built back, and let's go on about our
2  life.  Why do they keep doing this to us over and
3  over.  And, you know, she's in their crying.  You're
4  talking to her about -- you know, you're talking to
5  her about, you know, everything's going to be okay,
6  and then the phone's ringing in the other room.  And
7  it's, you know, somebody on the phone that could care
8  less about anything that's going on in your life about
9  what -- you know, what's happening with you.  All they
10 want to know is, where's their money.  And the sad
11 thing about it is, their money's already there.
12 Where's my money?  You already have it.  Where is my
13 money?  You need to send us in some money.  You
14 already have it.  When are you going to send us a
15 payment?  You already have it.  We don't have that
16 so -- you know, we don't have that.  We don't see that
17 anywhere.
18 **Q      The same kind of conversation you had been**
19 **telling us about earlier; you kept having the same**
20 **kind of conversations?**
21 A      See, I want you to understand that was every
22 day, okay, every day.  When you're pregnant -- I've
23 not been pregnant, but I've had four children.  I feel

91

1  like -- I tell everybody, every time April's pregnant,
2  I gain 20 pounds and she don't, you know.  But when
3  your wife is pregnant like that, it's my -- I felt
4  like a failure in my job as a husband.  Because my job
5  as a husband, I should have been able to protect her
6  from those phone calls and let her have peace of mind
7  to go out and, you know, let's have a child and us,
8  you know, have our life.  But I couldn't stop them.
9  You know, nobody could stop them.  I don't know who
10 could stop them.
11 **Q      Then they finally stopped, though; right, we**
12 **got that?**
13 A      They stopped, you know, after we had to do
14 all this -- You know, would they have stopped if we
15 wouldn't have done anything?  That should be the
16 question.  I know you -- you just gloss over it to me
17 that, okay -- that's like you saying, I punched you in
18 the mouth, but I'm going to stop.  I still got a
19 bloody lip, you know.  I'm going to punch you again.
20 **Q      Sir, I'm not trying to talk you in to seeing**
21 **my view of things.  I'm just trying to --**
22 A      I just want to try to express to you how it
23 really was.  I know maybe that's -- I'm sure that's

92

23 (Pages 89 to 92)

**JASON BARNETT**

1  your job, and you do a good job of it that you don't
2  show any kind of emotion like you don't -- it's like
3  you don't believe it.  And, you know, that's what we
4  get from everybody.  That doubt that you've got right
5  now that y'all didn't do anything wrong, that's what
6  we get from everybody.  You know, my wife -- we lost a
7  child.  Okay.  We lost our home.  And really -- I
8  guess the best thing we lost is our -- us just being
9  so naive; we lost that.  But I just don't -- I don't
10  know.  I don't mean to ramble on or anything like
11  that.  I know I am.  I know everyone's got somewhere
12  to go.  But everybody, like I said, can go somewhere
13  when this is over with.  We still got this.  I know
14  you can say, well, it's over with.  It was over with
15  in February the 9th to y'all; right.  April of 2011 we
16  get this letter.  I thought it was over with.  Okay.
17  **Q     Have you heard anything since then -- after**
18  **that?**
19  A     Why did we get that?  Hold on, yeah.  We get
20  this, April 2011.
21  MR. MCDONALD:
22       You're referring to --
23  A     November --

93

1  MR. KILBORN:
2       Wait.  Let's get this straight.
3  MS. ROBINSON:
4       It's Plaintiff's Exhibit 1.
5  MR. KILBORN:
6       You're referring to Plaintiff's Exhibit 1.
7  A     Yes, sir.  This package we get from y'all --
8  let me see if I can find a date on here.  They sent it
9  April 13th.  So we get it April 14th or 15th.  They
10  overnighted it.  That's important.  If I send
11  something overnight, right, that cost money.  You
12  know, if this was not important to them, and they
13  didn't think that this was something we should just
14  get right on top of, that we owed them this money
15  still, just mail it to us, right.  This is overnight.
16  I know that Chase has got a bunch of money, and that
17  might not mean nothing to them, sending something
18  overnight.  But it means something to send something
19  overnight.  If somebody tells you you got to have
20  something, you know, like they need something, it's
21  important to send to, what do you tell them to do to
22  it?  At your law office, if you see somebody and they
23  say, well, I've got to send you these papers.  How do

94

1  you want me to send them to you?  First, you'd
2  probably say fax.  We ain't got a fax machine at our
3  house.  But if somebody didn't have a fax machine, you
4  would say overnight them, right.  Get them to me.
5  They'll be here tomorrow, overnight.  That's how they
6  sent it to me.  So they sent it to us on Wednesday the
7  13th, I guess.  Is the 13th a Wednesday?  You've got a
8  calendar?
9  **Q     You've got it.**
10  A     Yeah, Wednesday the 13th.  They wanted us to
11  get this on the 14th, right.  That's when they wanted
12  us to get it because they overnighted it to us the
13  14th.  Okay.  So you say, well, that's the last y'all
14  have had to deal with them.  Hey, we know we was wrong
15  before then, but hey, let's say -- first it was
16  February the 9th we're through with y'all.  But now
17  let's bump it up to April the 14th.  We're through
18  with y'all now on April the 14th.  Okay.  I get this
19  check from y'all, you know --
20  MS. ROBINSON:
21       Is this something new too?
22  MR. MCDONALD:
23       We just got it, Plaintiff's Exhibit 2.

95

1       (Whereupon, Plaintiff's Exhibit No. 2
2       was marked for identification.)
3  A     Right.  Here this check y'all got sent to
4  April that's November the 9th of 2011 with the loan
5  number on it.  Okay.  So we're still dealing with it.
6  For some reason, right, this ain't over with y'all.
7  And it won't be over after this case is over with
8  y'all.  Because the rest of our life, the rest -- the
9  people at Chase might not care.  Obviously they don't.
10  I want to think that you care because I know you're
11  probably a nice person.  You're from Clarke County,
12  and you're country just like us.  I want to think you
13  care, but guess what, five years from now when we go
14  to get our little girl a car, right, or we go to do
15  something like that -- Lord, I guess we'll get her a
16  car when she's 16 -- but when we go to get that five
17  years from now, people is going ask you about this
18  Chase case with Barnett, and you're going to have to
19  go back and look it up, or you might not even remember
20  it, right.  But five years from now, we got to bring
21  this up.  So, you know, you keep saying you are
22  through with Chase, February the 9th, 2011.  Guess
23  what?  We're never through with it.  This is never

96

**JASON BARNETT**

1    ever going to be resolved with.  We always have to
2    bring this up, always.
3    **Q      Well, so what do you see as the solution?**
4    A     You know, I don't know.  That's why we're
5    doing this.  What do I see as the solution?  I don't
6    know the solution.
7    **Q      Do you understand that -- and I don't want
8    you to think that I don't care because I care, but I'm
9    also here doing my job.  I'm dealing with your
10   allegations.**
11   A     I know you're doing your job.  I know.  I
12   know.
13   **Q      But do you understand that there are ways
14   that the Chases of the world can go back and ask that
15   credit information, credit reporting, be changed so
16   that if there was a mistake made and a report was made
17   in error, it can be changed so that people don't have
18   to deal with it down the line?**
19   A     Why should they have to do that?
20   **Q      Do you know that that can be done?**
21   A     I don't know that can be done because we
22   haven't had it done for us.
23   **Q      Well, have you checked -- have you checked**
                                                    97

1    **your credit report in the last 60 days or applied for
2    credit?**
3    A     No, ma'am.  But are we through with them --
4    why is that -- do you know why they sent us that
5    check?
6    **Q      I mean, I've never heard of it before just
7    now.**
8    A     Well, you see, they're not through with us.
9    MR. KILBORN:
10           They got a lawyer and a lawsuit, great
11   lawyer, oldest law firm in Alabama and still they
12   can't figure out how to do the right thing.  And
13   they're so idiotic, they're even sending him money
14   back.
15   **Q      Well, I want to make sure I give you time to
16   say your peace, you know.  And you've told me about
17   how upset you were with these phone calls and the
18   repetitive phone calls and everything.  Have I given
19   you a chance to tell me all the stuff that you're
20   upset about that Chase did in connection with the
21   payoff of the mortgage?**
22   A     I mean, have I -- I could -- honestly I
23   could probably talk for two days if you want me to
                                                    98

1    about how this is wrong y'all have done.  I mean, I
2    don't understand.  I know you said you don't want to
3    cut me short or whatever, and now you're opening me up
4    to say -- well, say what you want to say.  Y'all are
5    ladies.  I really can't say what I'd like to say, you
6    know.  My mamma and daddy raised me better than to say
7    what I'd really like to say.  And like I'm sure you
8    can -- I just wish one day, I just wish one day -- not
9    wish it on somebody forever because I wouldn't want
10   that on anybody -- but just one day that whoever is in
11   charge of this company -- I know it's not you -- so
12   I'm not upset at you.  I promise you, I'm not upset at
13   you.
14   **Q      You wouldn't be the first one if you were
15   but --**
16   A     I'm not that type -- I don't want you to
17   think because I know you're not evil.  Okay.  I know
18   that.  You're a good person, I can tell.  These people
19   are evil.  What they have done is evil.  They tried
20   and are still trying -- not tried.  Who says that --
21   Ms. Robinson, I sign this check -- if my wife signs
22   this check and deposits it, what does that mean?
23   What's it mean?  Can they come take what we got?  Is
                                                    99

1    this a check to turn over -- they're giving us this
2    for our house?  I know it's not, but who knows what
3    they're liable to do.
4    **Q      Let me try and come at it a different way.
5    You're telling me, and I've asked you for it, so I'm
6    not fussing about it.  You've been telling me your
7    opinion about what happened and why it was wrong and
8    all of that.  I'm asking you more for facts, things
9    that occurred, things that people said to you, things
10   that people sent you in the mail to try to make sure I
11   understand all the little facts that go into figuring
12   out who's right and wrong?**
13   A     You know, everything can't be just boiled
14   down into -- you know that.
15   **Q      Right.**
16   A     You know, everything can't just boil -- you
17   just can't break stuff down into this, this, this,
18   this, this, you know, and this happened.  It's
19   everything.  This is everything.  This is not, hey,
20   who did you talk to today; who did you talk to.
21   That's not the point.  The point of this is, the point
22   of this case to me, is that these people -- these
23   evil people from New York City or wherever they're
                                                    100

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1  from -- this one says Columbus, Ohio. They're
2  everywhere I guess. These evil people conspired
3  against me and my wife who even though we have
4  education -- one of them's from Auburn and one is from
5  Jack State. That ain't saying too much, right. Jack
6  State means just show up. That's what I did. And my
7  wife -- I'm not saying that about hers. Anyway we
8  hadn't got much -- I don't know nothing about this --
9  you ask me what should happen? How am I supposed to
10  -- I don't know nothing about this stuff. I know that
11  what happened was we paid them their money. We are --
12  Where did they hold our money; do you know? They held
13  it. They put it somewhere. You just -- maybe Chase
14  is so big they can lose $300,000, right. Maybe, I
15  guess, the guy, Rosheebee in India, got it in his bank
16  account somewhere -- I don't know how to spell that
17  either; I'm sorry -- but where's it at; where's our
18  money at that we paid them? I love you to death.
19  **Q      That's how you tell somebody is really from**
20  **the country if they say that.**
21  A      I know you want to say okay, and I know that
22  my wife probably wants to go home. I know you don't
23  now. I know the rest of us all want to go home. I do
                                                                101

1  too. I got four kids at home. We called during the
2  break. One of them's mad; one of them's crying. One
3  of them's being -- we need to be home too. Guess
4  what, I've got my mother at the house over there. I
5  got my mother-in-law at the house. We got four kids
6  we're trying to take care of. We down here. We drive
7  down here to Mobile six hours away from our kids and
8  our family. And we'll be gone last night and tonight,
9  right. Because y'all, the people you work -- not you
10  -- the people you work for, that's hired you to defend
11  their actions, right -- and you're doing a good job --
12  defend their actions, you know, because we've got to
13  say this over and over what y'all did.
14  **Q      Let me make you understand. I was**
15  **coming to Birmingham so y'all wouldn't have to drive**
16  **six hours.**
17  A      That's fine. I understand. Look, look --
18  **Q      And your lawyers requested, and that was**
19  **fine with me.**
20  A      Birmingham, we're still not at our house.
21  Okay. Do you understand what I'm saying? I didn't
22  mean to have that -- to me like on April's letter that
23  come from her doctor when they said the fire, right.
                                                                102

1  To me when we say the fire, because of the fire,
2  right. That's this whole thing. Do you see what I'm
3  saying? That's this case. This Chase stealing our
4  money. That's stealing. That's keeping your money
5  and not -- that's holding our money. Okay. Go ahead.
6  I'm sorry.
7  **Q      Let me ask you this question. Do you have**
8  **any evidence, like proof or something that somebody**
9  **told you, that Chase did anything to you out of evil**
10  **intent to hurt you versus out of making a mistake or**
11  **one hand not knowing what the other did?**
12  A      Okay. Let me just say this, obviously
13  they've got to be competent, right. Okay. I would
14  think that these people are competent. Why would they
15  not be. They're successful. Did they take one of
16  those bailouts. You know? They did. Okay. Maybe
17  they're not as successful. But they -- they're
18  competent. Okay. They did -- so you're trying to --
19  Let me say this. If this is not something they're
20  trying -- they're either the most incompetent people
21  ever which they couldn't be because they couldn't have
22  this business. Okay. They couldn't have this
23  business and be that way. I mean, if you run a store
                                                                103

1  and you're the worst store person in your town, you're
2  going to shut it down; you won't have a store. But if
3  you're flourishing -- Chase is flourishing. How are
4  they flourishing? Barney Fife or whoever, Andy and
5  them, they ain't up there running this place. These
6  are people that know what they're doing. So it's
7  either this, either don't -- they've got maybe 20
8  what-you-call-it's, departments, right. Either every
9  person in every department they have doesn't know
10  anything about anything. Right. They don't know
11  anything in any department, their department heads;
12  their people that work for them; their people that
13  work for them here; their people that works in Ohio
14  and New York, Colorado, India, Calcutta, wherever
15  they're working at, everybody there's got to be
16  incompetent for this not to be -- this not to be a
17  conspiracy against us.
18  **Q      Well, let me ask you this question. I want**
19  **you to explain to me what would be in that for Chase**
20  **because they were owed $301,000, whatever it was, on**
21  **August 24th.**
22  A      Okay.
23  **Q      And then these months went by, and they used**
                                                                104

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**

**JASON BARNETT**

1   that money to count the debt paid in full on
2   January 27th.  Isn't that the letter that we saw that
3   they wrote back to Mr. Rice?
4   A    Okay.
5   Q    So what was in it for Chase by not paying
6   off the loan for the same amount of money four months
7   later?
8   A    Are you really asking me to say why somebody
9   tried to steal from you?
10  Q    What would be in it for them?  They didn't
11  make any money off of it.
12  A    Well, what's in it for somebody out here
13  running around?  I don't know why you break the law.
14  I mean, I don't what's in it for you.  I guess -- I
15  don't know.  Here's the thing, I can't tell you why
16  they did.  I know what they did.  I don't know -- I
17  guess somebody could have put a gun to every person's
18  head that we called and made them do it.  Like what's
19  in it for them?  What about they got $301,000 for
20  nothing.  They used that money for five months and
21  didn't apply it.  Okay.  What's in it for them?
22  That's just such a -- ma'am, that to me right there
23  out of every question you've asked me, that doesn't

105

1   make any sense.
2   Q    Well, I understand --
3   A    What's in it for them?  Why?  Why?
4   Q    If there was some way that they got more
5   money from somebody by screwing around for the four
6   months before they issued the satisfaction, there
7   would be some motivation for them to do it, but why
8   would they do it if they're going to get the same
9   amount of money, either early or late, why wouldn't
10  they want the money early?
11  A    Well, they asked for $8,000 extra.
12  Q    Yeah, but they didn't get it.
13  A    There but okay -- wait a minute.  But why
14  would they do it, though?  Do you understand?  You
15  just said that.  Why would they do it?  That don't
16  mean that -- okay, we didn't give it to them, right.
17  But there's a reason why they would do it, hoping that
18  we were dumb enough to give it to them, I guess,
19  $8,000.  Hoping we were dumb enough to sign over this
20  deed to them.  Hoping -- you know, that's what's in it
21  for them.  $8,000 is a bunch of money to me.  That's
22  in it for them.  So that's like saying I got a gun on
23  you.  Give me all your money.  I'm not giving you my

106

1   money.  Okay.  That's good.  What's in it for me?
2   There wasn't nothing in it for me anyway.  See, that's
3   what you're saying.
4   Q    I understand what you're saying.  I'm just
5   going back to my previous question.  Do you have any
6   evidence --
7   A    All this, all this is evidence.
8   Q    That they did it intentionally out of evil
9   intent to hurt you?
10  A    What else would they do it for?
11  Q    Okay.
12  MR. KILBORN:
13      Can we take a bathroom break?
14  MS. ROBINSON:
15      Sure.
16      (WHEREUPON, THERE WAS A BRIEF RECESS.)
17  BY MS. ROBINSON:
18  Q    Let me ask you just a couple of other
19  questions, Mr. Barnett.
20  A    All right.
21  Q    You heard me asking April questions about
22  she said that she had sent a fax up to Chase directing
23  them to use the money to pay off the loan, and I asked

107

1   if she had a copy.  And I'm not fussing about the copy
2   thing.  But do you know if there's a copy of that?
3   A    I don't think so.
4   Q    Do you have a date on when that might have
5   happened?  I think she said like three weeks before
6   y'all went to see Mr. Rice?
7   A    You know, she did it twice.  So I don't
8   know.  One of them would have been, you know, a
9   certain day and then, you know, three or four days
10  later would have been another one.  You know, I've got
11  no idea what the actual date was or to tell you the
12  truth the actual even month.
13  Q    Right, how far -- and I was kind of --
14  A    Because we were just -- I want to be short,
15  but we were just -- everything was just -- kept on
16  coming.
17  Q    I had asked her if she ever talked to
18  anybody from Fannie Mae.  Did you ever talk to anybody
19  from Fannie Mae?
20  A    You know, the first time we ever had any
21  inclination that Fannie Mae had anything to ever do
22  with this was that letter that said, you know, that we
23  had had requested from Fannie Mae to accept the

108

27 (Pages 105 to 108)

**JASON BARNETT**

| | |
|---|---|
| 1 | payment.  And we had no idea why we would ask Fannie |
| 2 | Mae -- we hadn't asked Fannie Mae that.  And we had no |
| 3 | idea why they would say that.  But, you know I guess, |
| 4 | ma'am, saying that Chase really didn't -- I guess, I |
| 5 | don't know why.  They were just trying to get the |
| 6 | money for it, I guess. |
| 7 | Q        Are y'all enjoying your house? |
| 8 | A        Oh, yes, ma'am. |
| 9 | Q        I mean, is it comfortable for y'all? |
| 10 | A        Yes, ma'am. |
| 11 | MS. ROBINSON: |
| 12 | I don't think I have anything else.  I thank |
| 13 | you for your patience. |
| 14 | THE WITNESS: |
| 15 | Thank you. |
| 16 | * * * * * * * * * * * * * * * * * |
| 17 | CROSS EXAMINATION |
| 18 | BY MR. KILBORN: |
| 19 | Q        Jason, this nice lady asked you about what's |
| 20 | in it for Chase.  Do you remember that question? |
| 21 | A        Yes, sir. |
| 22 | Q        Could you tell us what you think is in it |
| 23 | for Chase? |

109

| | |
|---|---|
| 1 | us the other $8,000, we're not only going to keep the |
| 2 | $301,000, now we're going to get your land? |
| 3 | A        Yes, sir.  Yes, sir.  That's exactly what |
| 4 | they did. |
| 5 | MR. KILBORN: |
| 6 | That's all I have. |
| 7 | MS. ROBINSON: |
| 8 | Thank you, sir. |
| 9 | THE WITNESS: |
| 10 | Thank you. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

111

| | |
|---|---|
| 1 | A        Well, you know, like I said at first in it |
| 2 | for Chase, they wanted $8,000 extra from us.  And then |
| 3 | when we couldn't pay the $8,000 or didn't pay the |
| 4 | $8,000 or, you know, they should have known we |
| 5 | couldn't pay the $8,000, you know, then they wanted |
| 6 | our land, and they wanted our house.  And what we had |
| 7 | started -- we had started building already.  And |
| 8 | that's what they wanted.  I mean, they sent us a |
| 9 | letter saying, you know, we know -- First they wanted |
| 10 | the $8,000.  And then they sent us a letter later |
| 11 | saying we know that you can't -- you probably can't |
| 12 | pay the $8,000, or you can't pay what you owe us.  So |
| 13 | for that, you know, sign over your land, and we are |
| 14 | going to be straight.  Everything will be took care |
| 15 | of.  You'll be okay if you sign this document, deed |
| 16 | your land to Chase.  Everything will be okay.  And, |
| 17 | you know, I don't think everything would have been |
| 18 | okay if we'd done that.  In fact, I think everything |
| 19 | would have been worse. |
| 20 | Q        So what you're saying is they had the |
| 21 | $301,000, and they wanted another $8,000? |
| 22 | A        Yes, sir. |
| 23 | Q        And then they said, well, if you don't pay |

110

| | |
|---|---|
| 1 | STATE OF ALABAMA   ) |
| 2 | COUNTY OF BALDWIN ) |
| 3 | |
| 4 | C E R T I F I C A T E |
| 5 | |
| 6 | I, DENNISE S. WOLSTENHOLME, Certified |
| 7 | Shorthand Reporter and Notary Public, do hereby |
| 8 | certify that the above and foregoing deposition was |
| 9 | taken down by me in machine shorthand and the |
| 10 | questions and answers thereto were reduced to |
| 11 | typewriting under my personal supervision, and that |
| 12 | the foregoing represents a true and correct transcript |
| 13 | of the proceeding given by said witness upon said |
| 14 | deposition. |
| 15 | I further certify that I am neither of counsel |
| 16 | nor of kin to the parties to the action, nor am I in |
| 17 | anywise interested in the result of said cause. |
| 18 | |
| 19 | |
| 20 | _____ |
| | DENNISE S. WOLSTENHOLME, CCR |
| | Court Reporter |
| 21 | Notary Public |
| | ACCR-61 |
| 22 | |
| 23 | |

112

28 (Pages 109 to 112)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652 (251) 694-0950 (888) 557-2969**