Case 1:12-cv-01745-VEH   Document 61-3   Filed 03/22/13   Page 1 of 14

FILED
2013 Mar-22 PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

APRIL BARNETT

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF ALABAMA
 3                  EASTERN DIVISION
 4
 5   CIVIL ACTION NO.: 1:12-CV-01745-VEH
 6
 7   APRIL K. BARNETT,
 8        Plaintiff,
 9          vs.
10   JP MORGAN CHASE BANK NATIONAL
11   ASSOCIATION, FORMERLY CHASE HOME
12   LOAN SERVICING, LLC,
13         Defendants.
14
15        DEPOSITION OF APRIL BARNETT
16
17        S T I P U L A T I O N S
18        IT IS STIPULATED AND AGREED by and between the
19   parties, through their respective counsel, that the
20   deposition of APRIL BARNETT may be taken before Kathleen
21   Cavazos, Commissioner, at the law offices of Cabaniss,
22   Johnston, Gardner, Dumas & O'Neal, 63 North Royal Street,
23   Suite 700, Mobile, Alabama 36602, on the 1st day of
24   February 2013.
25        IT IS FURTHER STIPULATED AND AGREED that the
```
                                                          1

```
 1   signature to and the reading of the deposition by the
 2   witness is waived, the deposition to have the same force
 3   and effect as if full compliance had been had with all
 4   laws and rules of Court relating to the taking of
 5   depositions.
 6        IT IS FURTHER STIPULATED AND AGREED that it
 7   shall not be necessary for any objections to be made by
 8   counsel to any questions except as to form or leading
 9   questions, and that counsel for the parties may make
10   objections and assign grounds at the time of the trial,
11   or at the time said deposition is offered in evidence, or
12   prior thereto.
13        IT IS FURTHER STIPULATED AND AGREED that the
14   notice of filing of the deposition by the Commissioner is
15   waived.
```
                                                          2

```
 1              EXAMINATION INDEX
 2
 2   APRIL BARNETT:                      PAGE
 3
 3     BY MS. ROBINSON . . . . . . . . .   5
 4     BY MR. KILBORN . . . . . . . . . .  44
 4     BY MS. ROBINSON . . . . . . . . .  50
 5
 5
 6               EXHIBIT INDEX
 7   EXHIBIT:
 7
 8   18  DOCUMENTS FROM FIFTH THIRD BANK          12
 8
 9   19  DOCUMENTS FROM FORD MOTOR CREDIT         18
```
                                                          3

```
 1              A P P E A R A N C E S
 2
 3        KILBORN, ROEBUCK & MCDONALD, by Vincent F.
 4   Kilborn, III, Esq., and David A. McDonald, Esq., 1810 Old
 5   Government Street, Mobile, Alabama 36606, appearing on
 6   behalf of the Plaintiff.
 7
 8        D. W. GRIMSLEY, JR., ESQ., P.C., by D.W.
 9   Grimsley, Jr., Esq., 21 South Section Street, Fairhope,
10   Alabama 36532, appearing on behalf of the Plaintiff.
11
12        CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL, by
13   Sandy G. Robinson, Esq., 63 South Royal Street, Suite
14   700, Mobile, Alabama 36602, appearing on behalf of the
15   Defendants.
16
17        CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL, by
18   Michael E. Turner, Esq., 2001 Park Place North, Suite
19   700, Birmingham, Alabama 35203, appearing on behalf of
20   the Defendants.
21
22        ALSO PRESENT:  Jason Barnett
```
                                                          4

1 (Pages 1 to 4)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

APRIL BARNETT

| | |
|---|---|
| 1  I, Kathleen Cavazos, RPR, CCR, a Court Reporter<br>2 of Mobile, Alabama, and Notary Public for the State of<br>3 Alabama at Large, acting as Commissioner, certify that on<br>4 this date, as provided by the Federal Rules of Civil<br>5 Procedure and the foregoing stipulation of counsel, there<br>6 came before me at 63 North Royal Street, Suite 700,<br>7 Mobile, Alabama 36602, beginning at 1:30 p.m., APRIL<br>8 BARNETT, witness in the above cause, for oral<br>9 examination, whereupon the following proceedings were<br>10 had:<br>11         APRIL BARNETT,<br>12    the witness, having previously been sworn by the<br>13 Court Reporter, was examined and testified as follows:<br>14         THE COURT REPORTER: Do we have the usual<br>15 stipulations?<br>16         MS. ROBINSON: That's fine.<br>17             EXAMINATION<br>18 BY MS. ROBINSON:<br>19    Q. Ms. Barnett, as you know, my name is Sandy<br>20 Robinson. You and I have met before. I took your<br>21 deposition back in December of 2011.<br>22         Have you read back through your deposition?<br>23    A. I have.<br>24    Q. And did you find anything in there that you<br>25 disagreed with or that you thought was incorrect?<br>5 | 1    Q. Okay. Jason's trying to help you. Jason wants<br>2 me to take his deposition again, but I don't have time.<br>3         MR. KILBORN: He does.<br>4         MR. BARNETT: I said, can't I testify today,<br>5 Mr. Kilborn?<br>6         MS. ROBINSON: I'm going to send Michael into<br>7 another room to take Jason's deposition.<br>8         MR. BARNETT: I apologize.<br>9    A. I'm sorry. 2012.<br>10    Q. Okay. So not quite a year after I took your<br>11 deposition, you changed jobs?<br>12    A. Yes.<br>13    Q. In between -- Like from December of 2011 to<br>14 October 2012, did anything change about your job duties<br>15 or your rate of pay or anything at Anniston Neurological?<br>16    A. No.<br>17    Q. Why did you leave that job?<br>18    A. I got a job with better hours.<br>19    Q. And where did you go from there?<br>20    A. Oxford City Schools.<br>21    Q. Oxford City Schools?<br>22    A. Yes.<br>23    Q. And what are you doing for them?<br>24    A. I'm a school nurse.<br>25    Q. And do you have one particular school you go to<br>7 |
| 1    A. No.<br>2    Q. Just like, after thinking about it, you thought<br>3 you misspoke, or do you think everything was correct?<br>4    A. No. It should be correct.<br>5    Q. And as your lawyers have told you, I'm sure, the<br>6 purpose of the deposition today is just for me to follow<br>7 up on things that I didn't ask you about before or things<br>8 that may have happened since that deposition, so I'm<br>9 going to try to confine my questions to that sort of<br>10 thing.<br>11    A. Okay.<br>12    Q. When I talked to you back in December of 2011, I<br>13 think you were working for the Anniston Neurological<br>14 Associates?<br>15    A. Correct.<br>16    Q. Is that still your employment or have you<br>17 changed positions?<br>18    A. I have changed jobs.<br>19    Q. If you would, just starting with the Anniston<br>20 Neurological, move forward in time and tell me when you<br>21 changed jobs and what else you've done.<br>22    A. I left Anniston Neurologic Associates October<br>23 5th, 2011.<br>24         MR. BARNETT: 2012.<br>25    A. I'm sorry. '12 -- 2012. I'm so sorry.<br>6 | 1 or --<br>2    A. Yes, Oxford Elementary School.<br>3    Q. And do you have children there at that school?<br>4    A. I do, one.<br>5    Q. Who goes to school there?<br>6    A. Jenna. She's a fourth grader.<br>7    Q. And what are your hours there at Oxford<br>8 Elementary School?<br>9    A. 7:15 to 3:15, not limited to.<br>10    Q. Just school days?<br>11    A. Yes.<br>12    Q. And so you go every day that the children are in<br>13 school? You go there the same --<br>14    A. Yes.<br>15    Q. If you would, please, let me finish my question<br>16 because she's writing it down. And how are you paid? Is<br>17 that an hourly position?<br>18    A. No, salary.<br>19    Q. And what is the salary?<br>20    A. This is a funny question. I'm not actually on a<br>21 salary now because I came in in the middle of the year,<br>22 so I won't be doing it. I think it is on a daily pay<br>23 rate at the moment.<br>24    Q. Do you know what that is?<br>25    A. I think it's 101 a day.<br>8 |

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

**Page 9**

1  Q. So when did you start doing that job?
2  A. October 15th, 2012.
3  Q. So you've just been there for three, four
4  months?
5  A. Yes, ma'am.
6  Q. And do you plan to stay in that position?
7  A. Yes.
8  Q. Have you had any other jobs in between the
9  Anniston Neurologic and the Oxford City Schools?
10 A. No.
11 Q. And what county is Oxford City Schools?
12 Calhoun?
13 A. Calhoun.
14 Q. I wanted to ask you -- Well, let me ask you this
15 question first. Have you reviewed any depositions that
16 have been given in the case by anyone other than
17 yourself? Did you read anyone else's deposition
18 transcript?
19 A. I did.
20 Q. Who else's did you look at?
21 A. Lanier Jeffrey.
22 Q. Anybody else?
23 A. No, ma'am.
24 Q. Did you review any documents that have been
25 produced in the case by Chase or by other people?

**Page 10**

1  A. I looked over some.
2  Q. Do you remember what you looked at?
3  A. Not a hundred percent sure.
4  Q. Tell me what you can remember.
5  A. I do remember an e-mail kind of going back and
6  forth between Ms. Lanier -- no. I get her name so
7  confused.
8  Q. I know. Her first name is Lanier. It seems
9  backward.
10 A. -- Ms. Jeffrey and Fannie Mae, a representative
11 from Fannie Mae.
12 Q. Asking how much --
13 A. How to do, yes.
14 Q. Do you remember any other documents you've
15 reviewed that were produced by Chase or came from any
16 place else in the case?
17 A. Let me think. No.
18 Q. Did you read anybody else's deposition?
19 A. Just mine and my husband's and hers.
20 Q. Okay. Now, you may recall that in your
21 deposition, I had asked you if you had ever spoken to
22 Lanier Jeffrey, and you said no at that time when I asked
23 you back in 2011. After reading her deposition, do you
24 recall having spoken with her when she talked about how
25 she called you?

**Page 11**

1  A. No. I couldn't --
2  Q. You just don't remember?
3  A. No.
4  Q. Was there anything that you read in her
5  deposition that you disagreed with, that you thought she
6  had misstated about the facts?
7  A. Yeah.
8  Q. Tell me about that.
9  A. One phone call where she said she called me and
10 she said -- I think her words were basically I was
11 begging her to accept what my insurance company had
12 already given, that I didn't have any more money to give
13 her or Chase. That's a lie. I mean, she may have took I
14 said I wasn't going to give her anything else as begging,
15 but that wasn't begging to me.
16 Q. So you disagreed with the way she characterized
17 that?
18 A. Yes.
19 Q. Anything else you can recall that you disagree
20 with?
21 A. Not right off the top of my head, no.
22 Q. Did you review any of the documents that were
23 obtained by subpoena from Ford Motor Credit in the case?
24 A. No.
25 Q. Or how about the documents received by subpoena

**Page 12**

1  from Fifth Third Bank?
2  A. No.
3  Q. Let me show you -- I'm going to mark -- Do y'all
4  want to number the exhibits consecutively or -- Off the
5  record.
6      (Off-the-record discussion.)
7  Q. We're just going to mark this Defendant's 18.
8      (Whereupon, Exhibit 18 was marked for
9  identification and attached hereto.)
10 Q. And these are documents we obtained by subpoena
11 from Fifth Third Bank, and we provided a copy to your
12 lawyer. I'm sorry I don't have a copy. Do you mind if I
13 walk around and look over your shoulder?
14 A. Oh, no.
15 Q. I'll put it here and tell you what my question
16 is. Let me find the page you signed.
17     MR. KILBORN: I want her to be able to look at
18 it, too, see if she recognizes it or anything.
19 A. Okay.
20 Q. Is that your signature on that document?
21 A. It is.
22 Q. And can you tell us what that is?
23 A. It looks like an application statement.
24 Q. It's an application for financing for a vehicle?
25 A. Okay.

**Page 13**

1   Q. I mean, I'm asking you.
2   A. It looks so.
3   Q. And is it dated?
4   A. It is.
5   Q. What is the date, please?
6   A. 1/16/2009.
7   Q. Okay. And what does it say there for the
8   current employer name?
9   A. Barnett Consulting.
10  Q. What is Barnett Consulting?
11  A. I really don't know how to classify it. It is
12  something that I helped my husband with. It's a company
13  he has.
14  Q. Okay.
15  A. I'm not sure you classify it as a company, but
16  it's something he has.
17  Q. Has it been like incorporated or formed as an
18  LLC like officially with lawyer documents?
19  A. I'm not sure.
20  Q. Or is it just like a doing-business-as kind of
21  name for y'all?
22  A. I can't be a hundred percent sure. I don't
23  know.
24  Q. What is the business of Barnett Consulting?
25  A. What do I do of it?

**Page 14**

1   Q. Well, we can start there. What do you do for
2   it?
3   A. Okay. Just like secretarial work.
4   Q. What does the business do? Does it sell a
5   product or provide a service?
6   A. I'm not a hundred percent sure exactly what it
7   does.
8   Q. Tell me what you do as a secretary.
9   A. I run errands, go to the bank, do deposits,
10  answer phone calls, things of that nature.
11  Q. Do you write letters?
12  A. No.
13  Q. Do you keep the books?
14  A. No.
15  Q. Are you given a paycheck?
16  A. Yes.
17  Q. And how frequently are you paid?
18  A. Sometimes monthly.
19  Q. And who does Barnett Consulting bank with? Is
20  there a bank account with that name?
21  A. Yes.
22  Q. Who do y'all bank with?
23  A. Noble Bank.
24  Q. And so do you get like a W-2 from Barnett
25  Consulting at the end of the year showing your income

**Page 15**

1   from that job?
2   A. One time or another I did, yes.
3   Q. Okay. Well, normally, the W-2 is issued for
4   every year that you work there. So if you were working
5   there in 2009, did you get a W-2 for the work you did in
6   2009?
7   A. I assume I did, if they're supposed to give me
8   one.
9   Q. Were you still working there in 2010?
10  A. I'm not a hundred percent sure.
11  Q. Okay. How long did you work there?
12  A. I kind of still do things. Whether I'm on a
13  payroll, I don't know if you classify it as that or not.
14  I don't have a date that I was terminated or I resigned
15  or anything like that.
16  Q. Was that a full-time or part-time position?
17  A. Part-time.
18  Q. And so, I don't remember now exactly from your
19  prior deposition, but in 2009 you were also working as a
20  nurse someplace; were you not?
21  A. 2009?
22  Q. Yes, ma'am.
23  A. Yes.
24  Q. So this would be something you would help your
25  husband with after hours or on the weekend?

**Page 16**

1   A. Yes. Correct.
2   Q. And what does it say your gross monthly salary
3   is for that job?
4   A. 5,000.
5   Q. Okay. Let's look at that because there's
6   another page that's not dated. Does that say 5,000 or
7   15,000?
8   A. That looks like it says 15,000, but right here,
9   which is the same page -- what it is is a line, looks
10  like to me. I mean, there's no way I put down 15,000. I
11  mean, why would I need credit if I made 15,000 a month?
12  Q. So is that a correct amount, that in January
13  2009 you were making $5,000 a month with Barnett
14  Consulting?
15  A. If I put that down.
16  Q. And we would be able to find documents showing
17  where you were paid that and where --
18  A. I'm not sure. I don't have any documents saying
19  that.
20  Q. Did y'all pay -- Did you declare that on your
21  taxes?
22  A. I couldn't be a hundred percent sure.
23  Q. I think you told me -- I can't remember now
24  whether you or your husband told me the Lovelorn
25  accountant --

## APRIL BARNETT

**Page 17**

1  A. Lovvorn.
2  Q. Lovvorn. I pronounced it wrong. That's
3  L-O-V-V-O-R-N; is that right?
4  A. L-O-V-V-O-R-N, correct.
5  Q. And they did your taxes?
6  A. Yes.
7  Q. Were they doing the taxes back in 2009?
8  A. Yes.
9  Q. And you told me before that you didn't have any
10 of the tax returns for the years before the fire because
11 of the fire?
12 A. Correct.
13 Q. And we had asked for those again through
14 discovery that your lawyer had said y'all were going to
15 be providing me with, but have you gone to Lovvorn to try
16 to get your old tax records?
17 A. Yes. I think my husband did.
18 Q. And have you given those to your lawyer?
19 A. The ones we were able to get, yes.
20 Q. And did y'all obtain the financing there on that
21 application from -- is that the one from --
22 A. Ford Credit. We did.
23 Q. And what was the vehicle y'all were buying?
24 A. Let me see about this one because we got -- An
25 Expedition, I think, Ford Expedition. Yes.

**Page 18**

1  (Whereupon, Exhibit 19 was marked for
2  identification and attached hereto.)
3  Q. Let me show you what I've marked as Exhibit 19,
4  and these are also documents we obtained by subpoena from
5  Ford Motor Credit, and I'm going to show you basically a
6  similar page, it's an application, and ask you if you
7  recognize that.
8  A. Okay.
9  Q. And what is the date of that, please?
10 A. June 12 of 2009 -- or is that January?
11 Q. I think it's June.
12 A. I can't tell if that's closed up or not.
13 Q. And what does it say there about your
14 employment?
15 A. Barnett Consulting.
16 Q. And, again, this is the same position you
17 described to me as being a part-time secretary for your
18 husband?
19 A. Sure.
20 Q. And what does it say there about the income?
21 A. That says 15,000.
22 Q. And is that gross monthly? I mean, the form
23 says gross monthly, and you filled in 15,000?
24 A. It appears that way.
25 Q. Did you fill it out that way?

**Page 19**

1  A. To be honest with you, I don't think this
2  particular part is my handwriting, but this is my
3  signature, yes.
4  Q. Well, is that true that you were being paid
5  $15,000 a month from Barnett Consulting?
6  A. I don't remember that far back about it. I
7  can't tell you for sure.
8  Q. So you're telling me that you worked there as a
9  secretary and you were, like, making bank deposits, but
10 you don't know what the business was?
11 A. Correct.
12 Q. You told me in your first deposition that you
13 didn't know exactly what your husband did, but it had
14 something to do with selling parlay sheets?
15 A. Handing them out, not selling.
16 Q. I'm sorry. Handing them out. You said that.
17 Did Barnett Consulting have something to do with parlay
18 sheets?
19 A. Not to my knowledge. I didn't never deal with
20 that.
21 Q. Was it operated out of your house?
22 A. Not my actual house but a spot near my house.
23 Q. And was there an address -- You're saying it was
24 a separate building?
25 A. Yes.

**Page 20**

1  Q. Did it have a separate address or was it an
2  outbuilding?
3  A. It was a P.O. box. It was the same --
4  Everything came to the P.O. box.
5  Q. Do y'all still have that P.O. box?
6  A. I'm not sure.
7  Q. Do you not still pick up the mail?
8  A. Do I? Sometime I do. Sometimes I don't.
9  Q. So do you still have the P.O. box?
10 A. We have a P.O. box, but I'm not sure if it's the
11 same one or not.
12 Q. Where is the P.O. box located that you have now?
13 A. In Mumford.
14 Q. Mumford?
15 A. Uh-huh.
16 Q. What's the P.O. box number?
17 A. I'm not a hundred percent sure, 3-something.
18 I'm not a hundred percent sure.
19 Q. When you were working for your husband as, you
20 know, like a part-time secretary for Barnett -- or
21 working with him, maybe not for him, did you and he ever
22 talk about the business, or did he ever say, I need you
23 to go do this or that?
24 A. I mean, generally speaking or a certain task or
25 what are you asking me?

APRIL BARNETT

```
 1     Q.  Well, I'm just having a hard time understanding
 2  how you could work for somebody as a part-time secretary
 3  but you didn't know what the business was.  I mean, did
 4  you have inventory that came in?
 5     A.  No.
 6     Q.  Was he going and advising people on things and
 7  y'all were charging for his time?
 8     A.  I'm not a hundred percent sure what he was
 9  doing.  I just know what I was doing.
10     Q.  Was the money you were depositing cash or
11  checks?
12     A.  At any given time or every month or every week
13  or what?
14     Q.  Well, just give me an example.
15     A.  Sometimes it could be -- Mostly cash, I would
16  say.
17     Q.  And did you ever ask him where the money came
18  from or what people were giving y'all money for?
19     A.  No.
20     Q.  You never were curious why people were giving
21  y'all money?
22     A.  No.
23     Q.  Did you keep up with bank balances, for example,
24  if you paid expenses and kept up with how much money was
25  in the bank?
                                                          21
```

```
 1     A.  No, not really.
 2     Q.  Did you reconcile the bank statements?
 3     A.  No.  We don't get bank statements, that I know
 4  of.
 5     Q.  Did you pay bills?
 6     A.  No.
 7     Q.  Who wrote your paycheck?
 8     A.  I didn't get a check.
 9     Q.  How did you get paid?
10     A.  Cash.
11     Q.  Okay, $15,000 a month?
12     A.  At what time?  I mean, I'm not sure.  It's
13  different at times.
14     Q.  In June of 2009.
15     A.  You know, if you don't have a good month, you
16  might not get paid that much every month.  It's, you
17  know, whatever according to him.
18     Q.  And he would determine how much you were able to
19  get paid depending on what kind of month?
20     A.  Sure.
21     Q.  And so in June of 2009, you signed a statement
22  saying you were paid $15,000 a month?
23     A.  Okay.
24     Q.  Was that true?
25     A.  I mean, I can't -- I don't remember back that
                                                          22
```

```
 1  far.
 2     Q.  How much are you paid by Barnett Consulting a
 3  month now?
 4     A.  I'm not really paid by them at the moment.
 5     Q.  When was the last time you were paid by them?
 6     A.  I'm not really sure about that.
 7     Q.  Within the last --
 8     A.  I can't tell you for sure.
 9     Q.  Have you done any work since you took the job as
10  a school nurse at the school?
11     A.  I do little odds and ends things.  I don't do as
12  much as I used to, no.
13     Q.  Do you still get paid for the odds and ends?
14     A.  It's more like I married into it, you know.  I
15  just help out when I can.
16     Q.  And you don't --
17     A.  But mostly not.
18     Q.  And mostly not get paid now or --
19     A.  Yeah, mostly not get paid.
20     Q.  Do y'all still have the tax lien that was
21  recorded on your property; do you know?
22     A.  We do.  We do.
23     Q.  When I took your deposition before, you told me
24  you had a monthly payment plan for that.
25     A.  I do.
                                                          23
```

```
 1     Q.  And are y'all still making the monthly payments?
 2     A.  Yes, ma'am.
 3     Q.  How much are the monthly payments on the tax
 4  lien?
 5     A.  I pay them 200 a month.
 6     Q.  And is there a particular time it's all going to
 7  be paid off and canceled, or do you know?
 8     A.  It probably would have been paid off a long time
 9  ago, but, you know, something happened with my credit and
10  I'm not able to borrow any money in order to pay that
11  off.  I think that's what Chase did to me is why not.
12     Q.  My question is whether there's a set time that
13  that amount of the tax lien is due to be paid off,
14  whether there's an agreement where they say, If you pay
15  $200 a month until January 2015, then we'll cancel the
16  lien.
17     A.  I'm not aware of that.  I just know that I have
18  to pay $200 a month until it's satisfied.
19     Q.  Is there a written agreement with the IRS that
20  sets out the repayment plan?
21     A.  I'm not sure about a written agreement.  I know
22  every month when I get the bill, it's got an itemized
23  thing on there of what is still owed.
24     Q.  So they just send you a bill.  Do you know what
25  the balance is, if it has it itemized?
                                                          24
```

6 (Pages 21 to 24)

**Page 25**

1   A.  I don't remember the last one, no.  I just know
2   it's due every month.  I rip out that piece of paper,
3   write it and put it in the mail.
4       Q.  How long have y'all been paying the $200 a month
5   on the lien?
6       A.  I'm not a hundred percent sure.  I know at least
7   over a year or more.
8       Q.  Do you know what tax year that lien arose from,
9   like what year the IRS said that more taxes were owed?
10      A.  Maybe the 2008.  I'm not a hundred percent sure.
11      Q.  Have you seen a credit report on your own credit
12  since December of 2011?  You know, when I took your
13  deposition before, I asked you about that, and you had
14  not seen any credit report.  I think at that time, you
15  told me you hadn't seen any credit reports that were
16  dated any time after like August 2011.  Have you seen a
17  current credit report for yourself?
18      A.  The last one I think I remember seeing is the
19  one I got from LSI.
20      Q.  And that was back in February 2011, right?
21      A.  Correct.
22      Q.  Have you -- I know that there are ways you can
23  get your own credit report online.  Have you pulled your
24  own credit report or looked at one?
25      A.  I have not myself, no.

**Page 26**

1       Q.  Has anyone done that for you?
2       A.  Not that I'm aware of.
3       Q.  And you have not seen any credit report after
4   that LSI credit report in February of 2011?
5       A.  Not that I recall, no.
6       Q.  Have your lawyers shown you any of the credit
7   reports after that date that have been obtained by
8   subpoena in this case?
9         MR. MCDONALD:  We're not going to share what
10  she's talked to us about.
11        MS. ROBINSON:  Okay.  I'll just ask her.
12      Q.  Have you seen the credit reports that were
13  produced by subpoena in this case?
14      A.  Not that I remember.
15      Q.  Do you know what your credit report currently
16  says about the Chase loan?
17      A.  No.
18      Q.  Have you applied for any credit since December
19  of 2011 when I took your deposition?
20      A.  Let me think.  No.
21      Q.  I want to ask you.  When I took your deposition,
22  you were describing for me your house, the one that you
23  rebuilt, and you were talking about what aspects of it
24  had not been completed in terms of the construction.  And
25  I just reread your deposition the other night, so I hope

**Page 27**

1   I don't misstate it, but I think you told me downstairs
2   there's one bedroom and a bathroom that were not
3   completed?
4       A.  Correct.
5       Q.  Have y'all completed the work on those rooms
6   now?
7       A.  No.
8       Q.  Have you purchased any furniture for your house
9   since December 2011?
10      A.  Any furniture?  No.
11      Q.  So we went through -- When I took your
12  deposition before, I kind of had you take me room by
13  room, and at that time you said you didn't have any
14  furniture in the den other than a TV.  Is that still the
15  case?
16      A.  I said I just had a TV in there?
17      Q.  Yes, ma'am.
18      A.  I don't recall saying nothing else was in there
19  at the time.
20      Q.  What's in there now?  I could have
21  misunderstood.
22      A.  I mean, there's just a couch and a recliner,
23  and -- I thought I said that in there.  I thought I did.
24      Q.  I guess my question may not have been very good
25  on that issue.  Let me ask you another one.  You said you

**Page 28**

1   had a little study that was not furnished.  Is that still
2   unfurnished?
3       A.  Correct.
4       Q.  And in the kitchen, you had the table from your
5   parents that they had had for 30 years.  Is that still
6   there?
7       A.  Still there.
8       Q.  And I think you told me before that all the
9   bedrooms were furnished in your house in December of
10  2011.
11      A.  2011.  It's been so long.  Just a minute.  I
12  know at least a couple of them were.
13      Q.  If you told me back then that they were
14  furnished, do you think that was right or wrong?
15      A.  If I said they were, then I guess they were.  I
16  probably remembered more then than I do now.
17      Q.  Right, since that was closer to the time?
18      A.  Sure.
19      Q.  You said that there was like a separate building
20  that y'all had the Barnett Consulting business in.  Was
21  that there at the time the house burned down?
22      A.  Yes.
23      Q.  And it survived the fire because it was
24  something separate?
25      A.  Yes, adjacent to the house.

**Page 29**

1  Q. Do y'all keep records in there? You know, there
2  are there locked cabinets with file folders and stuff in
3  there, or is there just a desk and telephone?
4  A. Yes, and a TV.
5  Q. Is it big enough for two people to work in or
6  just one at a time?
7  A. Two people could work in it at a time, if
8  needed.
9  Q. After the fire in June of 2010 -- Let me back up
10 one step. Before the fire at your house at Karian Court,
11 did you have an outside mailbox by the driveway, or was
12 the mailbox on the house?
13 A. No, at the end of the driveway.
14 Q. And did the mailbox stay there after the fire,
15 or was the mailbox knocked down or something?
16 A. No, it was there. Yes, it was there.
17 Q. Did you have your mail forwarded by the post
18 office from that address?
19 A. Yes, I did.
20 Q. Where did you have it forwarded to?
21 A. Eight Stacy Court.
22 Q. Have you ever lived at 622 Leighton Avenue?
23 A. I have not lived there. That was my place of
24 employment.
25 Q. And that was Anniston Neurologic?

**Page 30**

1  A. Yes, ma'am.
2  Q. And what were the dates that you worked there?
3  I know you told me through October 25th, 2012.
4  A. I think I started there the end of May, first of
5  June of 2007.
6  Q. And why were you using -- Well, did you use that
7  address at least during one or two conversations with
8  Chase where you asked them to send things to that
9  address?
10 A. Yes. I'm pretty sure I did.
11 Q. Why did you want things sent to that address?
12 A. Well, I think that started where the debris
13 removal check needed to be FedExed, and I think it needed
14 a signature, so I got them to send it there because I
15 knew somebody would be there because my husband isn't
16 home all the time. So to make sure we got it, I told
17 them to send it there. And I think at that time, I
18 probably told them to use that as an address because I
19 knew somebody would be there, and the Karian Court was
20 forwarded. So at all times, anything from them, I should
21 have got.
22 Q. So the Karian Court was forwarded to Stacy
23 Court?
24 A. Yes.
25 Q. And then you gave that one address because you

**Page 31**

1  thought there was a FedEx that had to have a signature
2  for it?
3  A. Correct.
4  Q. Was it your intention to change your address
5  forever and always in the Chase records to the Leighton
6  Avenue address?
7  A. Did I ever tell them to do that?
8  Q. Right.
9  A. I'm pretty sure I did at one time, I mean, to
10 make sure that I would get FedExes. Is that what you're
11 saying?
12 Q. Right. That's what I'm trying to understand. I
13 thought you said, like, for this FedEx that somebody had
14 to sign for, you told them to send it there because
15 somebody would be there at the place of business and
16 somebody may not be at home at Stacy Court, correct?
17 A. Right, for the FedEx.
18 Q. But did you say, This is my new and permanent
19 address, and I want you to change your records to send
20 all of my mail always to 622 Leighton Avenue?
21 A. I never told them to send all my mail there, no.
22 Q. It was just for the FedEx with the check in it?
23 A. I'm not a hundred percent sure, but I think I
24 did tell them at one time to maybe use that address if
25 anything important needed to come to me, yes.

**Page 32**

1  Q. Okay. Did you ever give them the Stacy Court
2  address?
3  A. I'm not a hundred percent sure about that. I'm
4  not.
5  Q. And y'all lived there, I think you told me in
6  your earlier deposition, from July of 2010 to March
7  2011.
8  A. Correct.
9  Q. Did you ever receive mail at the Karian Court
10 mailbox during the time you were living at Stacy Court?
11 A. None that I'm aware of.
12 Q. And as far as you can remember, you did not give
13 that Stacy Court address to Chase?
14 A. I'm not a hundred percent sure because any time
15 you would call, they would ask you your address, which
16 dealing with the fire was that residence at the time, so
17 that's the one they always referred to.
18 Q. The property address?
19 A. The property address, correct. So I'm not a
20 hundred percent sure if I told them that but -- which it
21 doesn't matter because if they still sent stuff to Karian
22 Court, it should have been forwarded through the mail to
23 Stacy Court or get it at 622.
24 Q. Have you reviewed the expert reports that have
25 been prepared in the case, reports of expert witnesses?

**Page 33**

1  A. I've talked with some expert witnesses, but I'm
2  not for sure if I've reviewed exactly what they had
3  brought up.
4  Q. Did you talk to Evan Hendricks?
5  A. I did.
6  Q. What was y'all's conversation? What did he ask
7  you about, and what did you tell him?
8  A. He was just asking me basic questions, you know,
9  name, Social, all that kind of stuff to be able to, I
10 guess, pull my credit and check on that.
11 Q. Is it your understanding he pulled a credit
12 report for you?
13 A. I believe so, yes.
14 Q. And did you ever review it?
15 A. No.
16 Q. Did you ask him if you could review it?
17 A. Did I ask him at that time?
18 Q. Yes.
19 A. No.
20 Q. Did you ever ask him what it said?
21 A. Because it was on the phone, you know.
22 Q. Did you ever ask him what it showed?
23 A. I did not personally ask him, no.
24 Q. I mean, do you know if Jason asked him?
25 A. I don't.

**Page 34**

1  Q. Did you have any conversation with him about
2  this federal tax lien, that you recall?
3  A. I'm pretty sure I did.
4  Q. What did you tell him about why that was on your
5  property? Do you remember?
6  A. He probably asked me about how that come about,
7  and I told him that that didn't get brought up on me
8  until June of 2011. Okay? So in my mind, if I hadn't
9  got in this mess with Chase and they ruined my credit,
10 then I probably wouldn't have that tax lien brought
11 against me because I was making my monthly payment of
12 $200 a month. But, you know, when y'all messed up my
13 credit and ruined my credit, it's got foreclosure written
14 on there or typed on there, however you want to put it,
15 and that probably -- the IRS, I don't know if they audit
16 people every once in a while, check people's credit to
17 make sure they're not getting ruled over by this and that
18 person, and, you know, they go and they see a foreclosure
19 on mine, they're thinking, well, you know, somebody's
20 fixing to get all their stuff, why aren't we going to get
21 our money. So they put a tax lien on me due to what
22 Chase done to me. Before then, they never bothered me.
23 Q. I understand what you're saying. Has anybody
24 over told you that, or is that just what you figured out?
25 A. Well, it don't take a rocket scientist to figure

**Page 35**

1  that out.
2  Q. So that's something you figured out, not
3  something somebody told you?
4  A. Sure.
5  Q. But you were aware that there had been a tax
6  lien filed in an adjacent county against Jason on his own
7  the previous year. You knew there was another tax lien
8  but it wasn't in Calhoun County, right?
9  A. Okay.
10 Q. And that was before anything happened with your
11 house fire. So if the reason for the tax lien is because
12 of something Chase did --
13 A. But that don't have anything to do with me. His
14 name is not on the mortgage. Mine is.
15 Q. Right. But y'all filed joint tax returns,
16 right?
17 A. Not -- At one point in time, yes.
18 Q. Well, the last year, I guess, you filed a tax
19 return for is 2011. Did y'all file jointly in 2011?
20 A. I'm pretty sure we did.
21 Q. I'm trying to remember. Were y'all married in
22 '07 or '08?
23 A. Eight.
24 Q. Did you file joint tax returns the year you got
25 married?

**Page 36**

1  A. I think we did, yes.
2  Q. And have you every year since then?
3  A. Yes.
4  Q. So '08, '09, '10, '11, you filed jointly?
5  A. Correct.
6  Q. And if there was a --
7  A. To the best of my knowledge, correct.
8  Q. And if there was a tax lien for some tax year
9  before '08, you would not have filed jointly with Jason
10 before y'all were married?
11 A. Repeat that.
12 Q. If there was a tax lien for some tax year before
13 2008, you would not have filed jointly with Jason because
14 it was before you were married?
15 A. Put that in different terms for me.
16 Q. I'm sorry. I'm not trying to make it
17 confusing. You married in 2008. So after you were
18 married, you were filing jointly?
19 A. Correct.
20 Q. Before you were married, did you ever file
21 jointly?
22 A. No.
23 Q. So if there was some problem with his tax return
24 before you were married, you were not joint on that tax
25 return?

**Page 37**

 1  A. Correct.
 2  Q. Okay.
 3  MR. KILBORN: Are you saying that you're telling
 4  her that there's a tax lien in the joint account in her
 5  name?
 6  MS. ROBINSON: No.
 7  Q. During the period from like July 2010 to March
 8  2011 when you were living in the rental house at Stacy
 9  Court, did you change your mailing address with any of
10  your credit card companies or anything like that to give
11  them the Stacy Court?
12  A. I don't remember.
13  Q. You don't remember one way or the other?
14  A. No.
15  Q. Do you remember if your forwarding order with
16  the post office was still in effect at the time y'all
17  moved back into the house at Karian Court, or did you
18  have to go undo the forwarding order?
19  A. I think we just forwarded it from Stacy Court to
20  Karian Court.
21  Q. Forwarded it back around?
22  A. Yes, to Karian Court.
23  Q. So you think there was some mail that was coming
24  like from -- I'm using as an example a credit card
25  company. You changed the address, so they were mailing

**Page 38**

 1  that to Stacy Court?
 2  A. I don't remember if I called and changed it or
 3  not.
 4  Q. Since I'm not taking Jason's deposition today,
 5  and we've been kind of joking about that, but I'm going
 6  to ask you. As far as you know, has he changed in any
 7  way what he does for a living since I took his deposition
 8  in December of 2011?
 9  A. No.
10  Q. So whatever he was doing then as he explained to
11  me, he's still doing now, as far as you know?
12  A. Yes.
13  Q. You had told me in your prior deposition about
14  trying to get a washer and dryer for your house, and your
15  mother ended up getting that for you at Lowe's. Do you
16  remember what the total amount was of the cost of the
17  washer and dryer?
18  A. I do not.
19  Q. Has that been paid off now?
20  A. No.
21  Q. Are you still paying that bill?
22  A. Yes.
23  Q. Have you ever contacted any credit reporting
24  agency to dispute any aspect of your credit reports?
25  A. No.

**Page 39**

 1  Q. You've never like contacted Equifax or Trans
 2  Union to say, I dispute this entry that says there's a
 3  foreclosure on my account, that's not true, I want you to
 4  take it off?
 5  A. No, I haven't. I mean, do you think they would
 6  believe me if I did that? I mean, I didn't put it on
 7  there. And then I have to go through this whole spill
 8  about how it got on there, which wasn't my fault. Do you
 9  think they would believe me and take that off my credit?
10  I believe not.
11  Q. Is Dr. Tessen still your doctor? Is that the
12  right name, Tessen?
13  A. Tessen.
14  Q. Is that still your doctor?
15  A. She has currently took a leave. I don't know
16  what you call it. She's not at that office right now.
17  Q. Is that still the office where you go for your
18  check-up?
19  A. I haven't been back for my check-up. I did my
20  six-week, but I haven't been back for my yearly. So I
21  haven't chose another doctor yet.
22  Q. Okay. So we have Evie, we were talking about
23  about her today, who's about 16 months old. Have you
24  been pregnant since she was born?
25  A. No.

**Page 40**

 1  Q. Is your health good? Are you having any health
 2  problems?
 3  A. No.
 4  Q. No health problems?
 5  A. No.
 6  Q. Is that -- I may have already asked this, and if
 7  so, I apologize, but you still go to that doctor's office
 8  even though Dr. Tessen is on sabbatical or whatever?
 9  A. Probably so.
10  Q. I have asked you this question before, but I
11  want to ask again. Have you been to see any mental
12  health counselors, psychologists, psychiatrists,
13  counseled with your pastor over --
14  A. No, just my husband. He gets the brunt of all
15  of it.
16  Q. Are you -- Do you claim that you're still having
17  any emotional problems as a result of what you told me
18  about in December of 2011 with Chase?
19  A. I mean, I have stress about it. I mean, having
20  to do this. I should be living in my new home with my
21  new family -- my new baby and the rest of my children and
22  just going on with my life. But then, I'm still having
23  to deal with all this. This is three years later.
24  Q. And you're pointing at the documents and my
25  notebook. You're talking about the lawsuit, having to

1  deal with the lawsuit?
2    A.  Correct.
3    Q.  Is there anything else you're having to deal
4  with other than having the lawsuit, having to come
5  testify and produce documents and that sort of thing?
6    A.  No.
7    Q.  I can't remember if you were in the room when I
8  asked your husband in December.  I said, Are you happy in
9  your new house, are y'all happy with your family.  Are
10 you happy in your new house with your family?
11   A.  Well, I mean, I've got my family.  I'm happy
12 with that, you know.
13   Q.  Do y'all have any plans to finish the
14 construction on that one last bedroom and bath?
15   A.  Do we have any plans to?  Yeah, we have had
16 plans for the last three years or two years to do that.
17   Q.  Do you have an estimate on how much it would
18 cost to finish it out?  I think you told me the plumbing
19 was stubbed in and --
20   A.  I don't have an exact amount, no.
21   Q.  Do you have an approximate amount?
22   A.  No.
23   Q.  Do you know if it would be more or less than
24 $20,000?
25   A.  I don't know.

41

1    Q.  I had asked you in your prior deposition about
2  people who might have knowledge about your case, and you
3  had given me a list of names way back when, including
4  your mother and best friend and all that.  Is there
5  anybody else you would add to that list, people you
6  didn't know about at the time who know something about
7  the claims you're making against Chase?
8    A.  No.
9    Q.  Do you know what tax returns you were able to
10 obtain from Lovvorn that you've given to your lawyers?
11   A.  I'm not exactly sure of the years.
12   Q.  Do you know if there were any liens at the
13 property on Karian Court other than the tax lien?
14   A.  Not that I'm aware of.
15   Q.  Did you ever have anybody call Chase on your
16 behalf, or did you make all the calls personally?
17   A.  No, my husband made some of them.
18   Q.  Other than you and your husband, nobody ever
19 called?
20   A.  No.
21   Q.  Did your mother ever call?
22   A.  No.  They don't want my mama to call.
23   Q.  You've got to tell me why.  You can't say that
24 without me asking why not.
25   A.  Because she's the devil in disguise.  They'd

42

1  probably just give her whatever just to get her to shut
2  up.
3    Q.  Okay.  Let's just take a short break.
4      (Whereupon, an off-the-record break was taken,
5  after which the following occurred:)
6  BY MS. ROBINSON:
7    Q.  I just have a couple of other questions,
8  Ms. Barnett.  I had asked you earlier about talking to
9  any expert, and you said you talked to some experts.  Did
10 you talk to anybody other than Mr. Hendricks?
11   A.  No.
12   Q.  I wanted to make sure I understand about what
13 you were saying about the tax lien and payments on it.
14 The $25,000 tax lien was filed in Talladega County in
15 July of 2011.  Are you saying that you were making
16 monthly payments to the IRS before that?
17   A.  Yes.
18   Q.  When did you start making payments?
19   A.  I think I said -- I know at least over a year,
20 but I'm not exactly sure how long.
21   Q.  A year would have been July 2010.  That would
22 have been right after the fire.  Do you remember if you
23 were already making payments when the fire happened?
24   A.  I can't be a hundred percent sure.  I really
25 don't know if I was.

43

1    Q.  Okay.  And you said you didn't know anything
2  about this $43,000 tax lien that's filed just against
3  Jason in Calhoun County?
4    A.  That wasn't any of my business, don't have my
5  name on it.
6    Q.  Do you know whether the $200-a-month monthly
7  payment is for that lien or the one filed in Talladega
8  County?
9    A.  I'm not real sure.
10   Q.  So do you know if you're actually in the process
11 of paying off the Talladega County lien or not?
12   A.  I'm not sure.
13   Q.  If you started paying the $200 a month before
14 they recorded the tax lien in July 2011 and at that time
15 the outstanding amount was roughly 25,000 dollars, do you
16 know how much the total tax claimed was before you
17 started making the $200-a-month payment?
18   A.  No.  I couldn't be sure, no.
19   Q.  I don't have anything else.  Thanks.
20           EXAMINATION
21 BY MR. KILBORN:
22   Q.  Maybe I'm not hearing what you're saying, but I
23 wanted to clarify that Calhoun County thing that
24 Ms. Robinson just asked you about.
25      You got married in what year?

44

11 (Pages 41 to 44)

**Page 45**

1  A. 2008.
2  Q. Okay. And when you got married to Jason, Jason
3  owed the IRS some taxes; is that right?
4  A. Correct.
5  Q. And that wasn't your taxes?
6  A. No.
7  Q. But he was paying the IRS?
8  A. Correct. I assume he was.
9  Q. Okay. And then y'all got married in '08, and
10 then you started helping Jason pay the tax debt?
11 A. Correct.
12 Q. And there was an agreement with the IRS, and you
13 were paying the tax debt without any problems from the
14 IRS or liens being filed?
15 A. Correct.
16 Q. And the only lien that was filed against you was
17 in June of 2011 by the IRS?
18 A. Correct.
19 Q. And your intent and Jason's intent, for
20 instance, when you were going to borrow the money from
21 LSI, was to use the money to basically pay off the IRS,
22 and since that loan didn't go through because of Chase's
23 black marks on your credit, that never came to pass?
24 A. Correct.
25 Q. That's what you're saying?

**Page 46**

1  A. Yes, sir.
2  Q. That's what you're telling this nice lady over
3  here?
4  A. Yes.
5  Q. All right. And on the address thing
6  Ms. Robinson asked you about, the address of the burn
7  location was 101 Karian Court, Oxford, Alabama?
8  A. Correct.
9  Q. And then when the fire occurred, you told the
10 post office to forward your mail?
11 A. Correct.
12 Q. From that address to the Stacy Court address?
13 A. Correct.
14 Q. And then the 612 (sic) Leighton Avenue,
15 Anniston, Alabama address, which is here on this Chase
16 note, Plaintiff's Exhibit 30, that address right there,
17 that's your place of work?
18 A. Correct.
19 Q. And then, let's see, you got a letter from Chase
20 with a $23,000 check in it at that address?
21 A. Yes.
22 Q. About July 2nd, 2010?
23 A. Correct.
24 Q. And then if you look above that, on July 6th,
25 2010, the Leighton Avenue address is also mentioned in

**Page 47**

1  connection with that?
2  A. Correct.
3  Q. And Chase is noted. And also on July 12, 2010
4  it's mentioned there?
5  A. Correct.
6  Q. So after the fire, you would either be getting
7  your mail at Stacy Court, which is the forwarded address
8  to the post office, or Leighton Avenue?
9  A. Correct.
10 Q. And is it your testimony that with that in
11 place, you had assured yourself that no matter where
12 Chase sent something, you'd get it, correct?
13 A. Yes.
14 Q. And she asked you about -- I'm not sure how
15 Ms. Robinson phrased it, but she asked you about
16 something to do with mental anguish. Do you remember
17 that?
18 A. I do.
19 Q. Okay. Do you still have worries about the fact
20 that your credit has been ruined today?
21 A. Yes, I do.
22    MS. ROBINSON: Object to the form.
23 Q. And do you worry about the fact that if you went
24 and applied for credit, you'd probably get turned down?
25    MS. ROBINSON: Object to the form.

**Page 48**

1  A. Sure.
2  Q. And do you worry about the fact that you
3  probably will have problems with your credit for the rest
4  of your life, really?
5  A. Correct.
6  Q. And before Chase put the black marks like
7  foreclosure and the delinquencies on there, did you enjoy
8  good credit?
9  A. I did, took pride in it.
10 Q. You say you took pride in it. Did you think you
11 earned good credit?
12 A. Sure, I did.
13 Q. How did you earn it?
14 A. Working hard all my life.
15 Q. Do you work hard?
16 A. I do.
17 Q. And are you and Jason still paying on his old
18 tax debt?
19 A. I believe so.
20 Q. Ms. Robinson asked you about your accountant.
21 Now, I don't think she mentioned the name of the
22 accountant. Who is the accountant you use?
23 A. Prior to being married, her name is Hilda Bonds.
24 Q. Hilda Bond?
25 A. Uh-huh.

**Page 49**

1  Q. And what happened to Hilda Bond?
2  A. She died.
3  Q. She died?
4     MS. ROBINSON: Are you saying Bonds, B-O-N-D-S?
5  A. Yes.
6     MS. ROBINSON: Thank you.
7  Q. So do you know what happened to Hilda Bonds'
8  records or her business?
9  A. I don't.
10 Q. And your records that you had, your tax records
11 that you had, they were burned up in the fire, anything
12 you had prior to June 14th, 2010?
13 A. Correct.
14 Q. That would include anything to do with '07, '08,
15 '09 tax returns and whatever you had gathered up prior to
16 June 2010?
17 A. That's correct.
18 Q. So that's lost forever?
19 A. Yes, sir.
20 Q. And without the tax return, do you know if you
21 and Jason filed jointly in the year you were married,
22 2008?
23 A. I think we did in 2008.
24 Q. You think you did?
25 A. Yes.

**Page 50**

1  Q. You don't have that return?
2  A. No.
3  Q. Whatever that return would show, that would be
4  correct?
5  A. Yes, sir.
6  Q. That's all.
7         EXAMINATION
8  BY MS. ROBINSON:
9  Q. I want to go back to this issue for just a
10 minute about the tax liens again. Your lawyer just asked
11 you -- I want to make sure I understand what you were
12 saying about paying off the tax lien.
13        When I took your deposition before, you told me
14 that you were trying to get $200,000 from LSI.
15 A. Correct.
16 Q. And you told me then that you were going to use
17 that to finish building the house and furnish the house;
18 is that right?
19 A. With some of it, yes.
20 Q. What else were you going to do with that money?
21 A. I was going to pay the IRS off.
22 Q. And what is your understanding of what amounts
23 were owed to the IRS jointly?
24 A. I'm not a hundred percent sure of the amount,
25 the dollar amount.

**Page 51**

1  Q. Let me just show you. This is part of a
2  document that your lawyers provided to me, and it's
3  numbered Barnett versus Chase, Plaintiff 27. This is
4  part of a credit report that your lawyers gave me that
5  they got by subpoena.
6  A. Okay.
7  Q. And it shows in Calhoun County, individual in
8  January '09, 43,369, and then in Talladega County --
9  That's the county where your house is located, right?
10 A. Correct.
11 Q. Joint, July 2011, 25,956.
12 A. Okay.
13 Q. Now, you agree with me, this looks like two
14 different things because one of them is individual and
15 one is joint?
16 A. Correct.
17 Q. So that's a total of like $70,000?
18 A. Okay.
19 Q. So were y'all going to use $70,000 of the
20 200,000 you were trying to borrow from LSI to pay off
21 those tax obligations?
22 A. Whatever I owed to the IRS, I would have paid
23 them to get that off my property.
24 Q. What about whatever Jason owed, that 45,000?
25    MR. BARNETT: Good luck.

**Page 52**

1  A. Well, let's see. Sure. I would have done that
2  as well.
3  Q. So that's what -- You were going to clear up the
4  federal tax liens and then finish the construction of the
5  house and additional furnishings, right?
6  A. Correct.
7  Q. Y'all didn't keep any of your personal records
8  like tax returns in the outbuilding where you had Barnett
9  Consulting?
10 A. No. I didn't let him keep up with much.
11 Q. Okay. I mean, have y'all -- I want to make sure
12 I understand because David just handed us something over
13 here which says this is the only tax document you could
14 get.
15 A. Okay.
16 Q. Have you gone to Lovvorn and said, Do you have a
17 copy of my old tax return?
18 A. I have not personally, no.
19    MS. ROBINSON: Are y'all going to do that? I
20 mean, we don't have to discuss this on the record, but I
21 think y'all --
22    MR. MCDONALD: I'll tell you what my
23 understanding was. My understanding was that she went,
24 and she can tell you about going to where she had her
25 taxes prepared, and that lady passed away, and that after

APRIL BARNETT

```
 1  that, they didn't file a joint.  So that's my
 2  understanding.  I'll see what other stuff they've got.
 3       MS. ROBINSON:  She told me in her first
 4  deposition, and she just confirmed, that Lovvorn filed
 5  their taxes for them.  So I'm wanting to know if -- We
 6  might could argue about this, but I think you're required
 7  to go get documents that are accessible to you, like if
 8  y'all went to her accountant and said give us the tax
 9  returns, they would have to give them to you.  In the
10  alternative, we would have to ask y'all to sign a release
11  so we can go to the IRS and get them.  So y'all can talk
12  about that.
13       MR. MCDONALD:  Okay.
14  Q.  I don't have anything else.  Thank you.
15       FURTHER, THE DEPONENT SAYETH NOT.
```

53

```
 1            C E R T I F I C A T E
 2
 3  STATE OF ALABAMA    )
 4  COUNTY OF MOBILE    )
 5
 6       I hereby certify that the above and foregoing
 7  deposition was taken down by me in stenotype and
 8  transcribed by means of computer-aided transcription, and
 9  that the foregoing is a true and correct transcript of
10  the testimony given by said witness upon said hearing.
11       I further certify that I am neither of counsel
12  nor of kin to any of the parties, nor am I in anywise
13  interested in the result of said cause.
14       I further certify that I am duly licensed by the
15  Alabama Board of Court Reporting as a Certified Court
16  Reporter as evidenced by the ACCR number following my
17  name found below.
18
19
20       Kathleen F. Cavazos
21       KATHLEEN F. CAVAZOS, NPR, ACCR302
22       NOTARY PUBLIC
23       MY COMMISSION EXPIRES:  1/9/16
24
25
```

54

14 (Pages 53 to 54)