**PETER KATSIKAS**

---

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
2               EASTERN DIVISION
3
4    APRIL K. BARNETT,        *
                              *
5         Plaintiff,   *
                              *
6    vs.           * CIVIL ACTION NUMBER:
                   * 1:12-CV-01745-VEH
7    JP MORGAN CHASE BANK,    *
     NATIONAL ASSOCIATION,    *
8    formerly CHASE HOME LOAN *
     SERVICING, LLC,          *
9                  *
          Defendant.   *
10
11
12
13
14
15
16
17
18
19       The deposition of PETER KATSIKAS was taken
20   before Patsy C. Poteat, CCR, as Commissioner, on
21   January 31, 2013, by the Plaintiff, commencing at
22   9:40 a.m., at the law offices of Kilborn, Roebuck &
23   McDonald, located at 1810 Old Government Street,
24   Mobile, Alabama.
25
```

---

**Page 2**

```
1           A P P E A R A N C E S
2
3    For the Plaintiff:
4        VINCENT F. KILBORN, III, ESQUIRE
                and
5        DAVID A.  McDONALD, ESQUIRE
         KILBORN, ROEBUCK & McDONALD
6        Post Office Box 66710
         Mobile, Alabama  36606
7
         DARRELL W. GRIMSLEY, JR., ESQUIRE
8        ATTORNEY AT LAW
         21 South Section Street
9        Fairhope, Alabama  36532
10
     For the Defendant:
11
         SANDY G. ROBINSON, ESQUIRE
12       CABANISS, JOHNSTON, GARDNER,
            DUMAS & O'NEAL, LLP
13       Riverview Plaza
         63 South Royal Street, Suite 700
14       Mobile, Alabama  36602
         (P.131)
15
         MICHAEL E. TURNER, ESQUIRE
16       CABANISS, JOHNSTON, GARDNER,
            DUMAS & O'NEAL, LLP
17       2001 Park Place North, Suite 700
         Birmingham, Alabama  35203
18
19   Also Present:   Iris James
20
21
22
23
24       PATSY C. POTEAT, CCR
         COURT REPORTER
25
```

---

**Page 3**

```
1               I N D E X
2
3    EXAMINATION                       PAGE
4
     MR. KILBORN:   . . . . . . . . .   7
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1               I N D E X
2
3    EXHIBITS                    PAGE
4
     Plaintiff's Exhibit Number 18  . . . . .   6
5      (30(b)(6) Notice of Deposition)
6    Plaintiff's Exhibit Number 21  . . . . .  139
       (Letter, 8/27/10 Chase 341 and 344)
7
     Plaintiff's Exhibit Number 22  . . . . . . 122
8      (Letter, 8/27/10, Chase 349)
9    Plaintiff's Exhibit Number 22-A . . . . .  116
       (Acceleration Warning, 8/27/10, Chase 342 and 343)
10
     Plaintiff's Exhibit Number 26  . . . . .  128
11     (State Farm Production)
12   Plaintiff's Exhibit Number 27 . . . . .  164
       (Letter, 8/4/10, Chase 335 through 337)
13
     Plaintiff's Exhibit Number 28  . . . . .  167
14     (Letter, 8/11/10, Chase 339 and 340)
15   Plaintiff's Exhibit Number 29  . . . . .  168
       (Letter, 10/27/10, Chase 379)
16
     Plaintiff's Exhibit Number 30  . . . . .  170
17     (Chase 465 Claims History, Chase 765)
18   Plaintiff's Exhibit Number 31  . . . . .  182
       (Letter, 7/2/10, Chase 684)
19
     Plaintiff's Exhibit Number 32  . . . . .  186
20     (Chase 767)
21   Plaintiff's Exhibit Number 33  . . . . .
       (
22
     Plaintiff's Exhibit Number 34  . . . . .  243
23     (Letter, 8/30/10)
24
25
```

---

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

**Page 5**

```
 1          S T I P U L A T I O N
 2
 3          It is stipulated and agreed by and between
 4    counsel that the deposition on oral examination of
 5    the witness, PETER KATSIKAS, may be taken before
 6    Patsy C. Poteat, CCR, Commissioner Notary Public for
 7    the State at Large, and that the said deposition
 8    shall be taken in accordance with, and when so taken
 9    may be used in accordance with the provisions of the
10    applicable sections of the Federal Rules of Civil
11    Procedure.
12          It is further stipulated that all notices
13    provided for by said applicable sections of the
14    Federal Rules of Civil Procedure are waived, as is
15    the signing and certification of said Patsy C.
16    Poteat, and all other requirements and technicalities
17    of every sort regarding the taking and filing of the
18    deposition, except as hereinafter set out:
19          All objections save as to the form of
20    questions asked are reserved until the time of trial,
21    in accordance with the applicable provisions of the
22    said Federal Rules of Civil Procedure.
23          Further, that the original of this transcript
24    will be delivered to Vincent F. Kilborn, III,
25    Esquire.
```

**Page 7**

```
 1    THE COURT REPORTER:
 2          Usual stipulations?
 3    MR. TURNER:
 4          Yes, that's fine with me.
 5
 6          PETER KATSIKAS,
 7    the witness, after having first been duly
 8    sworn to tell the truth, the whole truth, and nothing
 9    but the truth, was examined and testified as follows:
10
11          EXAMINATION
12
13    BY MR. KILBORN:
14    Q    Could you tell us your full name?
15    A    Peter Katsikas.
16    Q    How do you spell that?
17    A    K-A-T-S-I-K-A-S.
18    Q    Where do you live?
19    A    In Ponte Vedra, Florida.
20    Q    Where is Ponte Vedra?
21    A    Just south of Jacksonville, Florida.  Between
22          Jacksonville and Saint Augustine.
23    Q    All right.  And where do you work?
24    A    JP Morgan and Chase Bank, NA.
25    Q    Is there an office in the town where you live?
```

**Page 6**

```
 1
 2          It is further stipulated and agreed that the
 3    witness hereto does waive the right to read and sign
 4    said deposition as provided for by said Federal Rules
 5    of Civil Procedure.
 6
 7
 8
 9                * * * * * *
10
11
12
13
14          I, Patsy C. Poteat, CCR, Commissioner and
15    Court Reporter, certify that on this date, as
16    provided by the Federal Rules of Civil Procedure and
17    the foregoing stipulation of counsel, there came
18    before me at Mobile, Alabama, on the 31st day of
19    January, 2013, commencing at 9:40 a.m., PETER
20    KATSIKAS, witness in the above cause, for oral
21    examination, whereupon the following proceedings were
22    had:
23
24          (Plaintiff's Exhibit Number 18 was
25           marked for identification.)
```

**Page 8**

```
 1    A    There's offices in Jacksonville of Chase.
 2    Q    Right.  And how long have you worked for
 3          Chase?
 4    A    JP Morgan Chase Bank, NA, since May of 2011.
 5    Q    And do you have a job title?
 6    A    Yes.  Home lending research officer.
 7    Q    And tell me in layman's terms what are your
 8          job duties?
 9    A    Basically I work with the servicing default,
10          default risk.  Basically my job is to review
11          Chase's books and records in preparation for
12          either testimony or handle mediations.
13    Q    Mediations?
14    A    Correct.
15    Q    And what's the name of your department that
16          you're in?
17    A    What's the name of it?  It's just Servicing
18          Default -- I mean, department.
19    Q    Servicing Default Department?
20    A    Yeah.
21    Q    And how many people are employed in that
22          department?
23    A    Where I work -- They are scattered throughout
24          the United States.  The last -- There are
25          probably around 20, somewhere around there.
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

| | | |
|---|---|---|
| 1 | Q | Okay. And do you have a supervisor or |
| 2 | | manager? |
| 3 | A | Yes. |
| 4 | Q | And how would that be? |
| 5 | A | Currently, it's Cassie Freeman. |
| 6 | Q | Does she also live near Jacksonville? |
| 7 | A | No. She's out of Westerville, Ohio. |
| 8 | | MR. TURNER: |
| 9 | | I'm sorry, did you say Western or -- |
| 10 | A | Wester -- W-E-S-T-E-R-V-I-L-L-E. |
| 11 | Q | Okay. Is that near Columbus? |
| 12 | A | Yeah. It's right outside there. |
| 13 | Q | Okay. So she works in the Chase offices near |
| 14 | | Columbus or in Columbus? |
| 15 | A | Yes. Correct. |
| 16 | Q | And what is her title? |
| 17 | A | She's assistant vice president, operations |
| 18 | | unit manager. Operations unit manager. |
| 19 | Q | Operations unit manager? |
| 20 | A | Yeah. |
| 21 | Q | Does she have a boss? |
| 22 | A | Her boss? |
| 23 | Q | Right. |
| 24 | A | Yes. |
| 25 | Q | And who is that? |

9

| | | |
|---|---|---|
| 1 | A | Bruce Marshak. |
| 2 | Q | Marshak, M-A-R -- |
| 3 | A | S-H-A-K. |
| 4 | Q | Okay. And what is his title? |
| 5 | A | I want to say senior vice president, but I |
| 6 | | don't know for sure his title. |
| 7 | Q | Who would be the top person in charge of the |
| 8 | | Servicing Default Department that you're in? |
| 9 | A | The Risk Research part of that. Bruce kind of |
| 10 | | manages that. |
| 11 | Q | Okay. Let's get that full name, because I |
| 12 | | shorthanded it? |
| 13 | A | Yeah, Bruce Marshak. |
| 14 | Q | No, I mean the department. Research? |
| 15 | A | Yeah, it's basically -- It's Risk Research. |
| 16 | Q | Risk Research? |
| 17 | A | I mean -- |
| 18 | Q | And Servicing Default Department? |
| 19 | A | Well, that's part of the duties, as far as the |
| 20 | | servicing. |
| 21 | Q | What's the name of the department, Risk |
| 22 | | Research? |
| 23 | A | Well, it's risk -- Well, part of the duties is |
| 24 | | Risk Research -- I don't know how you would |
| 25 | | classify it or -- There's Bruce. Because he |

10

| | | |
|---|---|---|
| 1 | | handles like other managers of different |
| 2 | | departments, as well, as far as that -- |
| 3 | | basically, as far as -- I guess Risk |
| 4 | | Management, as far as -- Risk Research. |
| 5 | Q | So what is the exact name of the department |
| 6 | | you're in? |
| 7 | A | Mine is Witness and Mediation Support. |
| 8 | Q | Witness and Mediation Support? |
| 9 | A | Correct. |
| 10 | Q | Department? |
| 11 | A | Right. |
| 12 | Q | Okay. And so Bruce Marshak would be in charge |
| 13 | | of the Witness and Research Support |
| 14 | | Department, but other departments, as well? |
| 15 | A | No, Cassie Freeman runs that. Bruce has had |
| 16 | | -- is in charge of that. You know, basically |
| 17 | | that's the hierarchy. I mean, he's at the |
| 18 | | top, then you have that, and then you have the |
| 19 | | litigation analyst. |
| 20 | Q | Okay. |
| 21 | A | That he manages -- or under that particular |
| 22 | | umbrella. |
| 23 | Q | So your primary job is research and documents |
| 24 | | and records and testifying either in |
| 25 | | deposition or at trial? |

11

| | | |
|---|---|---|
| 1 | A | Yes. And attending mediations. |
| 2 | Q | And mediations? |
| 3 | A | Correct. |
| 4 | Q | Okay. Where did you get your expertise in |
| 5 | | being a witness? |
| 6 | | MR. TURNER: |
| 7 | | Object to the form. |
| 8 | A | What do you mean by "expertise"? |
| 9 | Q | Well, do you have any expertise in being a |
| 10 | | witness? |
| 11 | A | No. I have -- I worked at -- I've been with |
| 12 | | Chase, you know, through its affiliates, for a |
| 13 | | number of years and worked on the systems. |
| 14 | | And also I worked at -- Washington Mutual Bank |
| 15 | | was part of Chase -- Chase acquired back in |
| 16 | | 2008. So I basically, you know, have been in |
| 17 | | the mortgage industry for a number of years. |
| 18 | | And I also worked with the company for a |
| 19 | | number of years. |
| 20 | Q | Where did you get your expertise and/or |
| 21 | | experience in testifying, either in trial, |
| 22 | | deposition, or mediation? |
| 23 | A | What do you mean expertise? |
| 24 | Q | Well, do you have any expertise in those |
| 25 | | areas? |

12

3  (Pages 9 to 12)

PETER KATSIKAS

**Page 13**

1 A   I don't understand -- I mean, I've been -- I
2 review -- I mean, I've been -- I was
3 originator and worked in the Service and
4 Default, you know, for most of my career.
5 Q   I understand that.  But part of your job is
6 testifying?
7 A   Correct.
8 Q   Okay.  Where did you get your expertise or
9 experience or both in doing that?
10 A   Other than just traveling to the trials or
11 depositions, that's my expertise.  I mean, if
12 that's what you're asking.
13 Q   Okay.  And how many trials or depositions or
14 mediations have you testified in by deposition
15 or live testimony?
16 MR. TURNER:
17 Why don't we -- It might be easier to
18 break that down.  That's three
19 different things.  But he can answer
20 it if he can.
21 A   As far as depositions?
22 Q   Yeah.
23 A   If I have to give a rough estimate, probably
24 about 75 times.
25 Q   Okay.

**Page 14**

1 A   Probably.  I mean, I don't really --
2 Q   75 times?
3 A   Approximately.
4 Q   And then how about live testimony in front of
5 a mediator or a court?
6 A   Well, the mediator, there's really no, I
7 guess, testimony really.  I mean mediations.
8 But as far as like trials, I mean, there's --
9 If you're including individual lawsuits,
10 like foreclosure trials -- you know, because
11 it -- For example, Florida is what's called a
12 judicial state foreclosure.  Which, you know,
13 they have to put up a witness to testify for
14 the foreclosure.  If you include that, I would
15 say over my career, probably, for individual
16 lawsuits, maybe 450 times or something around
17 there.  That's just a rough guess.
18 Q   Okay.  So the total of what I would call live
19 testimony and depositions would be somewhere
20 around, say, 575 times?
21 MR. TURNER:
22 Object to the form.
23 A   I don't know exactly.  But that's approximate.
24 Q   Okay.
25 A   I mean, just giving a rough estimate.

**Page 15**

1 Q   And that would be in various types of
2 proceedings, such as trials, such as
3 depositions, such as other types of judicial
4 proceedings?
5 A   Correct.
6 Q   Okay.  Sometimes there's a judge there,
7 sometimes there's a jury there, sometimes
8 there's just lawyers there?
9 A   Correct.
10 Q   Okay.  So testifying in this deposition is not
11 unfamiliar to you at all, is it?
12 A   I reviewed these documents, yeah.  So, I mean,
13 it's not -- You know, it's unfamiliar for me
14 to do that, yeah.
15 Q   Sitting here with a lawyer asking you
16 questions in a deposition, that's something
17 you do on a regular basis?
18 A   I mean, I attend mediations, as well.  But I
19 do attend the depositions and trials, yes.
20 Q   And testify?
21 A   And testify, correct.
22 Q   Yeah.  How many times do you think you -- over
23 your testifying career, do you think you've
24 sworn to tell the truth, the whole truth, and
25 nothing but the truth and raised your right

**Page 16**

1 hand?
2 A   Same amount of times I've had to provide
3 testimony.
4 Q   Somewhere around 525 times?
5 A   Whatever that -- Roughly whatever that was
6 between the depositions and the trials.
7 Q   Okay.  And do you know why you're here today?
8 A   Yes.  To speak on the Notice of Deposition.
9 There was a Notice of Deposition sent to our
10 counsel.
11 Q   Okay.  And I've marked this as Plaintiff's
12 Exhibit 18.  Would that be the Notice of
13 Deposition?
14 A   (Witness examines document.)  Yes, it looks
15 like it, except for I think the date on that
16 was -- Maybe you had originally like the 18th
17 or 19th, if I can remember correctly.
18 MR. TURNER:
19 This is the amended.
20 A   Yeah.  But as far as the topics, it looks the
21 same as that you sent over.
22 Q   And have you testified previously as a Chase
23 representative similar to what's called for in
24 Exhibit 18?
25 A   What do you mean by similar?

4 (Pages 13 to 16)

PETER KATSIKAS

1  Q    Well, to testify on certain topics that are in
2       a Notice of Deposition?
3  A    Yeah.  I mean, they set a deposition and they
4       would -- obviously those topics, yes.
5  Q    And you reviewed Plaintiff's Exhibit 18?
6  A    Yes.
7  Q    And there are designated 21 topics.  Are you
8       the designated Chase representative for each
9       one of those 21 topics?
10 A    Yes.
11     MR. TURNER:
12         And, of course, we've asserted some
13         objections.  But he is here for those
14         topics.
15     MR. McDONALD:
16         You're not tendering any other
17         30(b)(6) other than him?
18     MR. TURNER:
19         He's here.  Yes.  Correct.  Peter is
20         our 30(b)(6).  He is our corporate
21         rep today.
22 BY MR. KILBORN:
23 Q    And attached to the Notice of Deposition,
24      Plaintiff's Exhibit 18, there was a notice to
25      produce documents.  Have you produced the
                                                      17

1      documents referred to?
2     MR. TURNER:
3         Those documents have been produced
4         already, Vince.  We responded to
5         that.
6     MR. KILBORN:
7         I want to ask him.
8  A    As far as I know, everything has been produced
9       here.
10 BY MR. KILBORN:
11 Q    Okay.  Have you done a search, an inquiry as
12      to what documents would be covered by that
13      Rule 34 -- excuse me, Rule 30(b)(2) request on
14      Page 6 of Plaintiff's Exhibit 18?
15 A    Did I do anything in addition to that?  Is
16      that what you're asking me?
17 Q    No.  Did you make an inquiry or search for
18      documents as called for in that Notice?
19 A    No, I didn't.
20 Q    So as far as you know, there could be
21      thousands of documents or no documents --
22     MR. TURNER:
23         Object to the form.
24 Q    -- called for by that Notice?
25 A    I mean, as far as I -- I mean, anything's
                                                      18

1      possible.  But as far as I know everything has
2      been produced.
3  Q    Well, how do you know it's been produced?
4  A    I mean, there's over like 3,000 pages of -- I
5       mean --
6  Q    Produced by Chase?
7  A    Correct.
8  Q    Have you looked at those 3,000 pages?
9  A    Yes, I have.
10 Q    Each one of them?
11 A    Each one of them.
12 Q    Okay.  Have you looked at April Barnett's
13      mortgage with JP Morgan Chase?
14 A    Yes.
15 Q    Have you read it?
16 A    Yes.
17 Q    The entire thing?
18 A    I glanced over it, yes.
19 Q    Well, have you read it or just glanced at it?
20 A    Well, there are certain parts I read through
21      that were pertaining that I thought was
22      necessary more than others.
23 Q    Was April Barnett ever in default on that
24      mortgage?
25 A    She was at default -- She was due for July and
                                                      19

1      August payment of 2010.
2  Q    Was April Barnett ever in default on that
3       mortgage?
4  A    Default.  It looks like she was in default,
5       yeah, because she missed the July and August
6       2010 payment.
7  Q    So she was in default?
8  A    Right.
9  Q    Okay.  And how long was she in default?
10 A    Well, as far as for those -- Those payments
11      were missed for July and August.
12 Q    How long was she in default?
13 A    The two months.
14 Q    July and August?
15 A    Right.
16 Q    All right.  How about September, October, and
17      November, December?
18 A    September -- Did you say, September,
19      October, --
20 Q    September, October, November, December, and
21      January -- of 2010 and January 2011.
22 A    Well, it was fixed in January of 2011.
23 Q    Was she in default September, October,
24      November, December 2010?
25 A    Once we fixed everything in January, that --
                                                      20

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

```
 1      that was -- that didn't make her in default.
 2   Q    You're saying retroactively fixed it?
 3   A    Correct.
 4   Q    But I'm talking about during the months of
 5      September, October, November, December 2010
 6      was April Barnett in default?
 7   A    I don't know.
 8   Q    Did Chase report to any credit reporting
 9      agency that she was, in fact, in default
10      during those months, September through
11      December 2010?
12   A    I've got to see it.  Do you have a credit
13      report you can show me?  Maybe I can --
14   Q    I'm just asking you as the Chase
15      representative.
16   A    Right.  I'd have to see the credit report to
17      make that determination on that time frame
18      that you're asking about.
19   Q    Well, based on all the three thousand plus
20      documents that you reviewed that Chase
21      produced, was she in default during those
22      months, September through December 2010?
23   A    Well, July -- Like I said, July and August,
24      there was definitely no payments made on
25      there.  As far as the other one, it was, like
                                                21
```

```
 1      you said, retroactively fixed in January of
 2      2011.
 3   Q    Well, give me a "yes" or "no" answer.  Was she
 4      in default from September to December 2010?
 5   A    From what dates?
 6   Q    September to December 2010.
 7   A    I really don't know how to answer that
 8      question.
 9   Q    Okay.  Based on all the records that you
10      reviewed in preparation for your deposition,
11      was she in default?
12   A    For July and August she was, 2010.
13   Q    Am I not speaking English?
14          MR. TURNER:
15             You didn't put a time frame in that,
16          Vince.  Are you talking about
17             September to December of 2010?
18   Q    Listen carefully.  September to December 2010,
19      based on everything you reviewed, based on
20      your knowledge gained in testifying 525
21      something times, my question to you is:  Was
22      she in default from September to December
23      2010?
24   A    Like I say, I don't know how to answer that.
25   Q    What would you need to know?
                                                22
```

```
 1   A    Well, like I said, it was retroactively fixed
 2      in January 2011.
 3   Q    I got that part.  But before it was
 4      retroactively fixed, September to December
 5      2010, that's what I'm asking you about.
 6   A    Right.  So it's -- So before retroactively it
 7      was fixed, it shows it was in default.
 8   Q    Okay.  And was that default reported to any
 9      credit reporting agency?
10   A    Like I said, I would have to see a Credit
11      Bureau report.
12   Q    According to the records you have reviewed for
13      purposes of this deposition, did Chase report
14      a default in that home loan to any credit
15      reporting agency?
16   A    I mean, there was 3,000 documents.  You'd have
17      to show me a document to show -- to see.  I
18      mean, we can go over it.
19   Q    Just based on your memory?
20   A    I don't recall.  I would have to have a
21      document in front of me to --
22   Q    When's the last time you reviewed all of
23      Chase's documents?
24   A    Yesterday.
25   Q    Okay.  So you don't recall in the last 24
                                                23
```

```
 1      hours what you read?
 2   A    I read over 3,000 documents over the last
 3      week.
 4   Q    Okay.  You don't recall if Chase ever reported
 5      a default to any credit reporting agency?
 6   A    Not off the top of my head.  I would have to
 7      see a document.
 8   Q    Right.  And you did see documents, didn't you?
 9   A    I did see documents.
10   Q    And your lawyer showed you the documents,
11      didn't he?
12   A    Correct.
13   Q    Okay.  And would it be a -- would it -- Strike
14      that.
15          Did Chase falsely report anything to any
16      credit reporting agency about April Barnett or
17      her home loan with Chase?
18   A    You're talking what time frame?
19   Q    At any time?
20   A    Yeah, they reported it.
21          MR. TURNER:
22             The question is:  Did they falsely
23          report anything?
24   A    Oh, falsely report anything?
25   Q    Did Chase falsely report any information to
                                                24
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|
| 1 | any credit reporting agency? |
| 2 | A   Not to my knowledge. |
| 3 | Q   Okay.  So everything, as far as you know, that |
| 4 | Chase reported to any credit reporting agency |
| 5 | about April Barnett was true and accurate? |
| 6 | A   As far as I know, yes. |
| 7 | Q   Okay.  Based on your review of all the Chase |
| 8 | documents and records in preparation for your |
| 9 | deposition and based on your testifying |
| 10 | abilities, was April Barnett ever delinquent |
| 11 | on her home loan with Chase? |
| 12 | A   Was she delinquent?  Yes. |
| 13 | Q   Okay.  Tell me what you know about that. |
| 14 | A   Well, July and August of 2010 there was no |
| 15 | payments made. |
| 16 | Q   Okay.  Anything else? |
| 17 | A   Because the last payment was in June.  And |
| 18 | then there was a check that came to Chase from |
| 19 | the insurance proceeds on our records around |
| 20 | September 3, 2010, for three hundred and one |
| 21 | thousand and change. |
| 22 | Q   All right.  And how much was April Barnett |
| 23 | delinquent? |
| 24 | A   When?  At what time? |
| 25 | Q   At any time. |

25

| | |
|---|---|
| 1 | A   Well, obviously, she was delinquent for July |
| 2 | and August of 2010. |
| 3 | Q   Okay.  How much? |
| 4 | A   What was the amount due? |
| 5 | Q   Correct. |
| 6 | A   I don't recall the exact payoff or what it |
| 7 | was. |
| 8 | Q   Well, say, within $10,000, how much? |
| 9 | A   I don't know.  I mean, whatever roughly two |
| 10 | payments were, if there was any additional |
| 11 | fees or corporate advances on that account. |
| 12 | Q   Well, within $10,000, give me a rough figure. |
| 13 | A   I don't know.  I don't know off the top of my |
| 14 | head.  I don't want to guess or speculate. |
| 15 | Q   Well, based on all the records that you |
| 16 | reviewed in preparation for your deposition, |
| 17 | how much was she delinquent? |
| 18 | MR. TURNER: |
| 19 | At any time, again, or are we talking |
| 20 | a specific time frame? |
| 21 | Q   At any time. |
| 22 | A   How much was she delinquent at any time?  I |
| 23 | mean, that's kind of -- Well, there's per diem |
| 24 | interest every day.  So I don't -- I don't |
| 25 | know the answer to that question. |

26

| | |
|---|---|
| 1 | Q   How much? |
| 2 | A   I don't know. |
| 3 | Q   In addition to per diem interest, what other |
| 4 | late charges did she owe? |
| 5 | A   I mean, was there -- I mean, I don't know with |
| 6 | specific times without payoffs and all, I |
| 7 | can't sit here and guess and tell you. |
| 8 | Q   At any time? |
| 9 | A   I don't know.  I mean, I would have to show |
| 10 | something to show what it was. |
| 11 | Q   And since you say she was delinquent for July |
| 12 | and August 2010, how much was she delinquent |
| 13 | for July? |
| 14 | A   Well, she was due for the July payment. |
| 15 | Q   How much? |
| 16 | A   I don't know the payment off the top of my |
| 17 | head. |
| 18 | Q   Was she delinquent for the August payment? |
| 19 | A   Yes. |
| 20 | Q   How much? |
| 21 | A   I don't have that in front me.  If you have a |
| 22 | document you want to show me on there, we can |
| 23 | make it easier.  I don't know. |
| 24 | Q   Just based on all your review? |
| 25 | A   I don't know.  And I don't want to guess and I |

27

| | |
|---|---|
| 1 | don't want to speculate. |
| 2 | Q   Well, based on your review of all the Chase |
| 3 | documents in preparation for your deposition. |
| 4 | A   It would have been two payments, whatever the |
| 5 | payments would be at that time, plus any |
| 6 | additional -- |
| 7 | Q   How much, in your best judgment, based on your |
| 8 | review of the documents? |
| 9 | A   Can you tell me what the -- I mean, if you |
| 10 | have a -- Do you have a document? |
| 11 | MR. TURNER: |
| 12 | He's just asking you, sitting here |
| 13 | without looking at documents, what |
| 14 | your memory is of August 2010? |
| 15 | A   I don't know.  I mean, whatever the -- I don't |
| 16 | know what the exact payment was.  So I can't |
| 17 | really speculate or guess. |
| 18 | Q   Well, what did you learn when you reviewed all |
| 19 | those 3,000 plus documents yesterday? |
| 20 | MR. TURNER: |
| 21 | Object to the form. |
| 22 | A   I mean, what do you mean what I learned? |
| 23 | Q   Well, tell me one thing that you learned about |
| 24 | April Barnett or this Notice of Deposition. |
| 25 | |

28

7 (Pages 25 to 28)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1              MR. TURNER:
 2          Object to the form.  Go ahead.
 3    A    The loan was paid off in January of 2011, and
 4         was satisfied.
 5    Q    All right.  How much?
 6    A    How much was paid?
 7    Q    Um-hum.
 8    A    The three oh one six oh eight and change,
 9         whatever it was.
10    Q    Okay.  Tell me one other fact that you learned
11         based on your review of Chase's documents
12         yesterday.
13    A    What other fact that --
14    Q    Yeah.
15    A    Well, the loan was satisfied and it was taken
16         care of.
17    Q    That's it?
18              MR. TURNER:
19          Object to the form.
20    A    I mean, I don't know what you're asking me.
21    Q    What did you learn about April Barnett's loan
22         other than what you told me?
23    A    Well, the house burned down.
24    Q    Okay.  That's good.  Anything else?
25    A    She got an insurance check.
                                                      29
```

```
 1    Q    Okay.  That's good.  What else?
 2    A    Well, she may have got a few -- at least a few
 3         insurance checks for the demolition of it.
 4         Whatever remainder was on the house and then
 5         also the payoff on the loan.
 6    Q    All right.  Anything else?
 7    A    (No response.)
 8    Q    When was the July --
 9              MR. TURNER:
10          Did you finish answering?
11              THE WITNESS:
12          Yeah.
13    BY MR. KILBORN:
14    Q    When was the July 2010 payment due to Chase?
15    A    On July 1, 2010.
16    Q    And you learned that from reading what?
17    A    Pay history.
18    Q    Pay history.  Okay.  When was the August 2010
19         payment due?
20    A    August 1, 2010.
21    Q    And when should the $301,608 been applied to
22         pay off April Barnett's loan with Chase?
23    A    On or before September 3, 2010.
24    Q    Was it?
25    A    Was it applied what?  At that -- On September
                                                      30
```

```
 1         3, was it applied to her account and paid off?
 2    Q    Correct.
 3    A    No.
 4    Q    All right.  Whose job was it to do that?
 5    A    According to the records, it looks like
 6         Robbert Saxon -- or Saxton or Saxon.
 7    Q    Okay.  And he failed?
 8    A    Correct.
 9    Q    Okay.  And for how long did he fail?
10              MR. TURNER:
11          Object to the form.
12    A    Well, there was a form that Ms. Barnett needed
13         to sign, an authorization.  I guess her
14         intention was to pay off the entire loan.
15         According to the records and Lanier's
16         deposition, it looks like -- In the records,
17         it looks like she picked it up roughly around
18         November -- somewhere around November of 2010
19         or end of October, somewhere in that time
20         frame.
21    Q    She picked up what?
22    A    She picked up the phone and called Ms. Barnett
23         and told her.
24    Q    Who was that?
25    A    Lanier.
                                                      31
```

```
 1    Q    All right.  What about Mr. Saxton, how long
 2         did he fail to do his job?
 3              MR. TURNER:
 4          Object to the form.
 5    A    I don't know what you mean by "failed."  But,
 6         I mean, he missed.  He sent out a letter, the
 7         authorization.  But apparently it went to the
 8         house, which was burned down.
 9    Q    And what are Chase's guidelines on sending
10         mail to homes that are burnt to the ground?
11    A    I mean, there's no guidelines on it.  I mean,
12         whatever the last known address is.
13    Q    Well, what did you determine that should have
14         been done instead of sending the notice to the
15         burned down house?
16              MR. TURNER:
17          Object to the form.
18    A    Mr. Saxton should have -- if he hasn't
19         received it, maybe followed up on it with
20         Ms. Barnett for that letter of authorization.
21    Q    Did Chase have Ms. Barnett's telephone number?
22    A    We have phone numbers.  They may have been
23         changed, I don't know, throughout -- there
24         was -- I saw there was calling in where she
25         was changing it throughout the process.  But
                                                      32
```

8 (Pages 29 to 32)

PETER KATSIKAS

```
 1    which phone number, I don't know.  Which one
 2    they gave her -- or him to Mr. Saxton.
 3  Q    Well, had you been Mr. Saxton and you had
 4    gotten the full payoff amount of the home loan
 5    and mortgage, what would you have done?
 6  A    What I would --
 7        MR. TURNER:
 8            Object to the form.  Go ahead.
 9  A    I would pick up the phone and probably call
10    her.
11  Q    That's --
12  A    Find out -- you know, since it came back, if
13    there's any other address.
14  Q    And you would have simply called her on the
15    phone; correct?
16  A    Right.
17  Q    Okay.  And then you would have asked her what?
18  A    Well, I would ask her that -- this form came
19    back undeliverable, can you provide another
20    address where I can mail it to you where
21    you're at or where you're going to be at to
22    receive this particular letter.
23  Q    Right.  Was that done?
24  A    At that time, between September and end of
25    October, it doesn't look like it, no.
                                              33
```

```
 1  Q    Based on your review of the Notice of
 2    Deposition and your research in this case,
 3    have you determined that Chase has done
 4    anything wrong at all?
 5  A    I mean, I don't think they really did anything
 6    wrong.  Once we found out what the issue was,
 7    you know, we try to resolve it.  Chase tried
 8    to resolve it.
 9  Q    So the answer is Chase, as far as you know,
10    admits to no wrong at all?
11        MR. TURNER:
12            Object to the form.
13  A    I mean, like I said, wherever he found an
14    issue, you know, we tried to fix the issue.
15  Q    All right.  And is it based on what you know,
16    Chase -- JP Morgan Chase Bank did not
17    inaccurately or falsely report anything about
18    April Barnett's credit that was adverse to
19    anybody?
20        MR. TURNER:
21            Object to the form.  I don't know
22            what you mean by "adverse to
23            anybody."  He can answer it if he
24            can.
25  Q    I will rephrase that.  Did JP Morgan Chase
                                              34
```

```
 1    report any false or inaccurate information to
 2    anybody?
 3  A    We don't report false information.  I mean --
 4  Q    Right.  So is it your testimony Chase did not
 5    report any false information?
 6  A    I mean, it's -- You know, we report false
 7    information.  However if there was an issue
 8    after research of it, then they would fix it.
 9    Whatever -- If it was an issue of it.  If
10    that's what you're asking me.
11  Q    I'm asking this specific question:  Did Chase,
12    based on your information and review, ever
13    report any false information about April
14    Barnett?
15  A    I don't know what you mean by "false
16    information."  I mean --
17  Q    Did Chase, to your knowledge and review, ever
18    report any inaccurate information about April
19    Barnett to anybody?
20  A    Are you talking about a credit report or
21    something?  I mean, what are you specifically
22    asking?
23  Q    Any type information about April Barnett.
24    Credit information or any other information.
25  A    Without looking at documents, I don't know.  I
                                              35
```

```
 1    would have to look at it.
 2  Q    Well, when you looked at the documents in
 3    preparation for your deposition, did you try
 4    to determine if Chase reported any false or
 5    inaccurate information about April Barnett,
 6    particularly her credit, to anybody?
 7  A    No.
 8  Q    All right.  Is it of any concern to you or
 9    Chase that April Barnett's credit reputation
10    might have been tarnished in any way by Chase?
11        MR. TURNER:
12            Object to the form.
13  A    Say that question again.
14  Q    Is it of any concern to you or Chase that
15    information Chase reported might have
16    tarnished April Barnett's credit reputation?
17        MR. TURNER:
18            Object to the form.  Go ahead.
19  A    I mean, it depends on what it was, you know,
20    reported on her.  I mean, if it was -- If it
21    was, you know, untrue, then it was eventually
22    fixed.  Or whatever was on there, that once we
23    got it fixed -- once we got it all satisfied
24    and fixed in January of 2011.
25  Q    You said "if it's untrue."  Did Chase report
                                              36
```

9 (Pages 33 to 36)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

1    untrue information?
2  A   I don't think it was untrue.  At the time of
3    there, as far as the delinquency showing --
4    our system was showing a delinquency, it would
5    report it as delinquent on there.  And so it's
6    been fully satisfied.
7  Q   So Chase did report untrue information, didn't
8    it?
9        MR. TURNER:
10         Object to the form.
11  A   I mean, I don't want to say it's untrue,
12    because -- It went back and got fixed, the
13    credit.
14  Q   Well, --
15  A   From what I understand.
16        MR. TURNER:
17          I think y'all might be talking
18          about -- thinking of two different --
19          You may be ships passing in the dark
20          here on these questions.  He's -- I
21          think he's asking you at the time
22          these reports were made was the
23          information untrue?
24  A   Is that what you're asking me?
25  Q   I'll phrase it.  You say Chase fixed
                                                    37

1    something?
2  A   Yeah, it looks like -- The credit was fixed.
3  Q   Credit was fixed.  Okay.
4  A   After it was satisfied, the mortgage, after
5    January 2011.
6  Q   How was April Barnett's credit fixed?
7  A   Well, it was -- As far as what I saw her
8    credit report, on there it showed "paid and
9    satisfied."
10  Q   Okay.  And what did it show before it was
11    fixed?
12  A   I don't recall.  I would have to see the
13    credit report.
14  Q   What was fixed?
15  A   To show -- What was fixed would show that she
16    wasn't late.
17  Q   All right.  Well, before that got fixed, did
18    it show she was late?
19  A   At least for the July and August payment.
20  Q   And before it was fixed, it showed she was
21    delinquent, didn't it?
22  A   Right.
23  Q   And before it was fixed, it showed she was in
24    default, didn't it?
25  A   Correct.
                                                    38

1  Q   And before it was fixed, it showed that she
2    was in the process of being foreclosed on,
3    didn't it?
4  A   I don't know.  I'd have to see that credit
5    report that you're talking about.
6  Q   Well, Chase sent out a warning, a notice of
7    foreclosure, didn't it?
8  A   Acceleration warning.
9  Q   Yeah.  It said notice of foreclosure, didn't
10    it?
11        MR. TURNER:
12          Object to the form.
13  A   I would have to see the document again to read
14    it.
15  Q   Well, you saw it yesterday, didn't you?
16  A   Right.  I didn't memorize 3,000 documents.
17  Q   No.  You at least saw that one, didn't you?
18  A   I did see that one.
19  Q   Okay.  And you called it an acceleration, I
20    think, didn't you?
21  A   Correct.
22  Q   And it was an acceleration, which said in
23    there that basically you're in default and
24    you're going to be foreclosed on?
25
                                                    39

1        MR. TURNER:
2          Object to the form.
3  A   Well, there's other language in it other than
4    that.
5  Q   Sure.  Yeah.  I mean, there's other language.
6    But it said that, didn't it?
7        MR. TURNER:
8          Object to the form.
9  A   I would have to see the document and go over
10    it.
11  Q   And you saw that document, what, yesterday?
12  A   No.  Over the last few days.
13  Q   Last few days?  Okay.  But you'd have to see
14    it again?
15        MR. TURNER:
16          If you're asking him to quote it
17          verbatim, why don't you just pull it
18          out?  I mean, --
19        MR. KILBORN:
20          I'm not asking him to quote it
21          verbatim.  I said --
22  BY MR. KILBORN:
23  Q   Do you have to see it again?
24  A   If you're going to ask me more questions about
25    it.
                                                    40

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

1  Q   Okay.  Have you brought any documents with you
2      here today?
3  A   No.
4  Q   Where are all the documents that you reviewed?
5  A   Well, I reviewed -- there's about -- over
6      3,000 documents that was produced by Chase.  I
7      reviewed Ms. Barnett's deposition, Lanier's
8      deposition, Jennifer Sanclemente's deposition.
9      I listened to two calls, met with counsel, the
10     discovery requests, there was a hearing with
11     the judge, Vickie Landis' deposition.  And
12     that's all I can think of right now.
13 Q   Okay.  Have you ever heard of a credit
14     reputation?
15 A   Credit reputation?
16 Q   Um-hum.
17 A   I don't know what you're talking about, credit
18     reputation.
19 Q   For instance, do you have -- Do you have a
20     credit reputation?
21 A   Do I have -- I don't know what you're
22     referring to.
23 Q   Okay.  Are you aware that people like to have
24     good credit?
25 A   Yes.

                                                    41

1  Q   Are you aware that people like to have good
2      credit reputations?
3  A   A reputation of credit, yeah.
4  Q   Okay.  Why do they want that?
5  A   To get credit.
6  Q   Okay.  You think that's important?
7  A   Sure it is.
8  Q   All right.  And do you think a credit
9      reputation could be damaged?
10 A   Sure.
11 Q   How would you damage your credit reputation?
12 A   By not paying your bills.
13 Q   Well, how would a creditor damage your credit
14     reputation?
15 A   How would a creditor -- I don't understand.
16 Q   All right.  Can you think of anything that
17     could be reported on somebody's credit record
18     that would damage their reputation?
19 A   Reporting a damaged credit?  I don't know what
20     you're asking me, sir.
21 Q   Okay.  Do you know what a credit score is?
22 A   I do.
23 Q   What is a credit score?
24 A   A credit score is to -- It's a range of
25     numbers that the major bureaus, as an example

                                                    42

1      of Equifax and Experian and Transunion, rate a
2      credit consumer based on their credit history,
3      past history.
4  Q   All right.  And who with Chase is in charge of
5      making sure that it doesn't report inaccurate
6      or false information that adversely affects
7      somebody's credit reputation?
8  A   I don't know.
9  Q   Does Chase have anybody?
10 A   Specifically, I don't know.
11 Q   To your knowledge, does Chase have any
12     guidelines or rules and regulations or
13     procedures that speak to making sure false or
14     inaccurate credit information is not put on
15     somebody's record so that it damages their
16     credit reputation?
17 A   Well, if it -- I mean, there's -- you know,
18     through all the -- You know, it triggers
19     reports to the bureaus once a month, you know,
20     if the payment has been paid or not been made.
21 Q   So who's in charge of that?
22 A   I'm not sure.
23 Q   Have you reviewed Evan Hendricks'  deposition?
24 A   Say that name again.
25 Q   Evan Hendricks.

                                                    43

1  A   I don't think so.
2  Q   Do you know who Evan Hendricks is?
3  A   No.
4  Q   Do you believe you've reviewed all depositions
5      taken in the case?
6  A   No.  Just the ones that I told you about
7      earlier.
8  Q   Did you review, in preparation for this
9      deposition, some documents regarding April
10     Barnett's credit received from LSI Mortgage?
11 A   No.
12 Q   Do you know what LSI is?
13 A   No.
14 Q   Have you ever seen April Barnett's credit
15     report?
16 A   I've seen credit reports of April Barnett,
17     yes.
18 Q   Okay.  And who produced those or created
19     those?
20 A   You mean, what -- I saw an Experian and
21     Equifax on Ms. Barnett.
22 Q   Okay.  And are you familiar with how to read a
23     credit report?
24 A   Yes.
25 Q   And what does a creditor look for in a credit

                                                    44

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | | |
|---|---|---|
| 1 | | report? |
| 2 | A | They look at everything. |
| 3 | Q | Obviously. What do they look for |
| 4 | | particularly? |
| 5 | A | Late pays, inquiries, judgments, tax liens. |
| 6 | Q | Okay. Let me write that down. Late pay. |
| 7 | | That's delinquency; right? |
| 8 | A | Tax liens, judgments, late pays, inquiries, |
| 9 | | comments, addresses, employers. That's part |
| 10 | | of it. |
| 11 | Q | What are the more serious black marks on |
| 12 | | somebody's credit in a credit report? |
| 13 | A | Bankruptcies, foreclosures. |
| 14 | Q | One would be bankruptcy? |
| 15 | A | Correct. |
| 16 | Q | Okay. Two would be foreclosure? |
| 17 | A | Um-hum. |
| 18 | | THE COURT REPORTER: |
| 19 | | You need to say "yes" or "no," |
| 20 | | please. |
| 21 | | THE WITNESS: |
| 22 | | Yes. I'm sorry. |
| 23 | | THE COURT REPORTER: |
| 24 | | Thank you. |
| 25 | | |

45

| | | |
|---|---|---|
| 1 | | BY MR. KILBORN: |
| 2 | Q | Any more? |
| 3 | A | The most serious one, tax liens. |
| 4 | Q | Tax liens? |
| 5 | A | Judgments. |
| 6 | Q | Okay. |
| 7 | A | Those are the major ones. |
| 8 | Q | And do you know what's called a "serious |
| 9 | | delinquency"? |
| 10 | A | When it's past due. |
| 11 | Q | Okay. Have you ever seen a credit report on |
| 12 | | April Barnett that says serious delinquency"? |
| 13 | A | I can't recall off the top of my head. |
| 14 | Q | Okay. Have you ever seen a credit report on |
| 15 | | April Barnett that says foreclosure? |
| 16 | A | I don't recall. I'd have to see the document. |
| 17 | Q | Have you ever seen a credit report on April |
| 18 | | Barnett that says 4X90? |
| 19 | A | I would have to see the credit report. |
| 20 | Q | Do you know what 4X90 is? |
| 21 | A | Four 90 day lates. |
| 22 | Q | What does that mean? |
| 23 | A | It means it's late 90 days four times. |
| 24 | Q | Okay. Is that a serious black mark on a |
| 25 | | credit? |

46

| | | |
|---|---|---|
| 1 | A | It is. |
| 2 | Q | All right. Do you know why it's a serious |
| 3 | | black mark? |
| 4 | A | Because it's delinquent. |
| 5 | Q | In a serious way? |
| 6 | A | In a serious way, correct. |
| 7 | Q | Do you know why foreclosure is a serious black |
| 8 | | mark on a credit report? |
| 9 | A | Why it's serious? Because the debt has not |
| 10 | | been satisfied. Payments are missed. |
| 11 | Q | You said, I think, you'd been in this |
| 12 | | business -- I think you said, what, about |
| 13 | | eight or nine years? |
| 14 | A | No. Longer than that. |
| 15 | Q | Longer than that. Give me a little bit of |
| 16 | | your work history. I think you came to work |
| 17 | | for Chase in 2011? |
| 18 | A | JP Morgan Chase Bank, NA. |
| 19 | Q | Right. Before that? |
| 20 | A | Chase Home Finance, LLC. |
| 21 | Q | Chase Home Finance? |
| 22 | A | LLC. |
| 23 | Q | Okay. What did you do there? |
| 24 | A | What time frame? |
| 25 | Q | Well, just give me a little history of what |

47

| | | |
|---|---|---|
| 1 | | you did there. |
| 2 | | MR. TURNER: |
| 3 | | Why don't you tell him -- Start with |
| 4 | | the beginning. |
| 5 | A | Okay. September 26, 2008, up until around May |
| 6 | | of 2011 it was Chase Home Finance, LLC. What |
| 7 | | I did there was I was a -- I had a dual role. |
| 8 | | Was an assistant sales manager, senior loan |
| 9 | | consultant. And then after that, I was a -- I |
| 10 | | guess I'd call a "modification counselor." |
| 11 | | They changed it in between. It was the same |
| 12 | | duties. Was Loss Mitt Specialist 2 -- |
| 13 | | THE COURT REPORTER: |
| 14 | | I'm sorry, say that again. |
| 15 | A | Loss Mitt, M-I-T-T, Mitigation Specialist 2 or |
| 16 | | modification counselor. And then after that, |
| 17 | | I was -- the same duties I was since May of |
| 18 | | 2010 to the present. The same duties in my |
| 19 | | position. |
| 20 | Q | And prior to working in Chase or Chase |
| 21 | | affiliated company, where did you work? |
| 22 | A | Washington Mutual Bank, FA. |
| 23 | Q | What did you do there? |
| 24 | A | I was assistant sales manager, senior loan |
| 25 | | consultant. It was a dual role. |

48

12  (Pages 45 to 48)

PETER KATSIKAS

| | | |
|---|---|---|
| 1 | Q | What were you selling? |
| 2 | A | I was originating first, second mortgage loans |
| 3 | | through a national call center in |
| 4 | | Jacksonville. |
| 5 | Q | How would you do that? You would just call |
| 6 | | people and ask them if they want a loan? |
| 7 | A | Most of it was inbound or some outbound for |
| 8 | | current customers and some external customers. |
| 9 | Q | Okay. And you worked in a call center. |
| 10 | | What's a call center? |
| 11 | A | Well, a call center is made up where there's |
| 12 | | cubicles and there's -- where the inbound |
| 13 | | calls are coming in or you're making outbound |
| 14 | | calls to customers. |
| 15 | Q | So mostly customers or a potential customer |
| 16 | | would call the call center? |
| 17 | A | Correct. |
| 18 | Q | And you'd determine if they qualified for a |
| 19 | | loan? |
| 20 | A | Correct. |
| 21 | Q | And would you ask for a loan application? |
| 22 | A | A loan application or income asset |
| 23 | | information. |
| 24 | Q | Okay. |
| 25 | A | And see what, you know, products that they |

49

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. If April Barnett applied for a loan |
| 3 | | today with some lender and one of the |
| 4 | | questions was, have you ever been in default |
| 5 | | on a loan, what would she answer? Yes or no? |
| 6 | | MR. TURNER: |
| 7 | | Wait a minute. You're asking what |
| 8 | | would she answer or what should she |
| 9 | | answer? |
| 10 | Q | What would be the correct answer? |
| 11 | | MR. TURNER: |
| 12 | | Object to the form. Go ahead if you |
| 13 | | can answer it. |
| 14 | A | I don't know. I'm not Ms. Barnett. |
| 15 | Q | Well, what would be the correct answer if she |
| 16 | | was asked today, have you ever been in default |
| 17 | | on a loan? |
| 18 | A | Well, she's got to tell the truth on there. I |
| 19 | | mean -- So, I mean -- |
| 20 | Q | So what? |
| 21 | A | I would say yes, because she missed July and |
| 22 | | August's payment with default. |
| 23 | Q | And if she said yes -- Most loan applications |
| 24 | | say: If yes, please explain. |
| 25 | A | I don't know if the Form 1003, the Uniform |

51

| | | |
|---|---|---|
| 1 | | would be qualified for and -- |
| 2 | Q | And why is a loan application important? |
| 3 | A | Why is it important? Well, it gives the whole |
| 4 | | blueprint of the borrower of what they said is |
| 5 | | needed in order to process the application. |
| 6 | Q | And you're looking for whether or not the |
| 7 | | buyer qualifies financially for the loan? |
| 8 | A | Correct. |
| 9 | Q | And are you looking for, on that loan |
| 10 | | application, if there's ever been any |
| 11 | | foreclosures? |
| 12 | A | Well, that would be on the credit report. |
| 13 | Q | But does the application ask for that? |
| 14 | A | It does. |
| 15 | Q | Does it ask if the borrowers have been in |
| 16 | | default? |
| 17 | A | It's on the declarations. I think it's on |
| 18 | | Page 3. But I would have to see. I would |
| 19 | | have to look at it again. |
| 20 | Q | All right. And the purpose of questions on |
| 21 | | applications is to get the borrower's own |
| 22 | | statement about the borrower's credit history; |
| 23 | | isn't that correct? |
| 24 | A | Some of it, yes. |
| 25 | Q | All right. Ask about lawsuits, doesn't it? |

50

| | | |
|---|---|---|
| 1 | | Residential Loan Application has that |
| 2 | | particular -- It doesn't have that little |
| 3 | | explanation box on there. |
| 4 | Q | Okay. Well, suppose the question was have you |
| 5 | | ever been in foreclosure, what would the |
| 6 | | correct answer be? |
| 7 | | MR. TURNER: |
| 8 | | Object to the form. Go ahead. |
| 9 | A | I don't know. |
| 10 | Q | Well, has she ever been in foreclosure? |
| 11 | A | Well, there is foreclosure proceedings |
| 12 | | started, but it stopped. |
| 13 | Q | Okay. Foreclosure proceedings were started; |
| 14 | | is that what you said? |
| 15 | A | Yeah. |
| 16 | Q | Okay. And tell me how far they went. |
| 17 | A | It doesn't look very far. |
| 18 | Q | How far? |
| 19 | A | It appears to be within a couple of weeks. |
| 20 | Q | Well, what were the steps that were taken? |
| 21 | A | Well, they sent out the acceleration notice |
| 22 | | and shows the amount to cure the default. |
| 23 | Q | Okay. What else? |
| 24 | A | Well, then it gets referred to local counsel. |
| 25 | | And whatever the attorneys do there. |

52

13 (Pages 49 to 52)

PETER KATSIKAS

| | | |
|---|---|---|
1   Q   Okay.  The Alabama counsel since the property
2         is in Alabama?
3   A   Correct.
4   Q   All right.  Who was the local counsel?
5   A   Who was the local --
6         MR. TURNER:
7              I'm going to let him answer that
8              question, as we're going to object to
9              privilege for anything else about it.
10             But if he knows the name of the
11             counsel, he can tell you without
12             waiving our privilege objection.
13  A   I want to say -- Was it Stephens Millirons or
14        something to that effect.  If I remember
15        correctly.
16  Q   I don't know.
17  A   Millirons Stephens or Stephens Mil --
18        Something like that.  Something to that
19        effect.  I don't know the exact.
20  Q   Millirons Stephens or --
21  A   Yeah.  Either Stephens -- like Stephens
22        Millirons or Millirons Stephens or something
23        to that effect.
24  Q   Is that the name of a firm or a person?
25  A   No, no.  The firm.

53

1   Q   Okay.  Where are they?
2   A   I don't know.  Somewhere in Alabama, I assume.
3   Q   Okay.  And did they send a bill?
4   A   There was a small fee.  I think there was like
5         about 180 bucks or something to that effect.
6   Q   And what was that for?
7   A   A deal with some kind of foreclosure expense.
8         I'm not sure exactly.
9   Q   Was it like attorney's fee?
10  A   I don't recall.  It's on the pay history.  I
11        honestly don't know.
12  Q   How do you know it was $180?
13  A   Because that's what it shows in some of those
14        notes on there.  There was attorney's fees, as
15        well.
16  Q   All right.  Let's see.  I think we've got
17        those notes.  Let's look at Columbus Exhibit 1
18        -- Plaintiff's Exhibit 1.  Let's see.  I think
19        you said you reviewed the Lanier Jeffrey's
20        deposition?
21  A   Yeah.
22  Q   Okay.  Take a look at Plaintiff's Exhibit 1,
23        Lanier Jeffrey's, Chase 2452.  Is that what
24        you're talking about?
25  A   Yes.

54

1   Q   Okay.  It says:  Please pay off the loan
2         effective 9/7/10, and charge the shortage of
3         $2,672.67 ($2,492.67 plus $180 FCL ATTY fees).
4   A   Correct.
5   Q   Okay.  And "FCL" means foreclosure?
6   A   Correct.
7   Q   And "ATTY" means attorney fees?
8   A   Yes.
9   Q   Okay.  And where would that bill be?
10  A   Well, I don't know about the -- the bill is
11        requested -- It's requested through LPS, but
12        the charge would be on -- would come up on the
13        pay history on there, in the accounting
14        history of the loan.
15  Q   What was requested through LPS?
16  A   I don't remember.
17  Q   Well, where -- Is there a real lawyer who
18        really did $180 worth of work, or is that just
19        a bogus number?
20        MR. TURNER:
21             Object to the form.
22  A   I don't know what it was for.  It was
23        something to do with the foreclosure attorney
24        fees that was billed.
25  Q   Well, here's my question.  As a Chase

55

1         representative who's reviewed all the
2         documents that Chase produced in this case, is
3         that a bogus $180 foreclosure attorney fees,
4         or was work really done by a real, live
5         attorney?
6   A   Not to my knowledge.  It's a bogus fee.
7         Whatever they bill us and it gets corporate
8         advanced to them.
9   Q   So you think there's $180 worth of work done
10        and billed?
11  A   That's my belief, yes.
12  Q   Okay.  And you think there really is a bill
13        for $180?
14  A   That's what it shows on there, correct.
15  Q   Well, I know what it shows.  I'm saying I
16        don't think it -- I think it's a fake, bogus
17        bill.  I don't think that exists, and I don't
18        think there's a lawyer that sent that bill.
19        That's what I think.  And my question is:  Am
20        I wrong, or is there a real lawyer who did
21        real work and that is a real bill?
22        MR. TURNER:
23             Object to the form.
24  A   I believe it's a real bill.
25  Q   Okay.  So there's some real lawyer licensed in

56

14 (Pages 53 to 56)

PETER KATSIKAS

| 1 | Alabama who actually did $180 worth of legal |
| 2 | work on a foreclosure? |
| 3 | A   I have no personal knowledge.  But according |
| 4 | to our records, that's what it shows. |
| 5 | Q   And had the foreclosure been completed, Chase |
| 6 | would have charged April Barnett for all the |
| 7 | attorney's fees involved in the foreclosure, |
| 8 | including that $180, wouldn't it? |
| 9 | A   Correct. |
| 10 | Q   Okay.  That's because Chase's mortgage says |
| 11 | you're responsible for attorney's fees? |
| 12 | A   Correct. |
| 13 | Q   Okay.  Now, what did this attorney do that he |
| 14 | charged money for? |
| 15 | MR. TURNER: |
| 16 | Don't answer the question.  I |
| 17 | instruct you not to answer. |
| 18 | Privileged. |
| 19 | Q   Did he do anything? |
| 20 | MR. TURNER: |
| 21 | Same instruction. |
| 22 | Q   Did Chase pay that bill? |
| 23 | A   On the pay history, it shows corporate |
| 24 | advanced. |
| 25 | Q   What does that mean? |

57

| 1 | A   It means Chase wrote a check. |
| 2 | Q   Okay.  So there is a check to an attorney? |
| 3 | A   Either a wire or a check.  I'm not sure which |
| 4 | one. |
| 5 | Q   All right.  While we've got that in front of |
| 6 | you, turn to -- Turn the page to Plaintiff's |
| 7 | Exhibit 2 to Lanier Jeffrey's deposition.  It |
| 8 | says:  Chase Home Finance, LLC, default payoff |
| 9 | quote. |
| 10 | Do you see that? |
| 11 | A   Yes. |
| 12 | Q   Under it says quote good through date -- |
| 13 | What's the date? |
| 14 | A   9/7/2010. |
| 15 | Q   Okay.  And what was the date that Chase got |
| 16 | the full payoff amount from State Farm? |
| 17 | A   When it first reached Chase, it was September |
| 18 | 3, 2010. |
| 19 | Q   And that's four days before the date that the |
| 20 | quote was good through, isn't it? |
| 21 | A   Four calendar days, yes. |
| 22 | Q   So we know, based on this document, Chase said |
| 23 | that if we have this amount of money by |
| 24 | September 7, 2010, the loan is completely paid |
| 25 | off and satisfied, don't we? |

58

| 1 | A   That's what the charges are, yes. |
| 2 | Q   Okay.  And Chase did, in fact, receive that |
| 3 | exact amount of money, didn't it? |
| 4 | A   301 they received from State Farm -- 301,608, |
| 5 | or whatever it was. |
| 6 | Q   Okay.  Well, it received exactly the correct |
| 7 | amount, didn't it? |
| 8 | A   For September 3, yes. |
| 9 | Q   Okay.  And on this Plaintiff's Exhibit 2, it's |
| 10 | got a charge of -- a fax fee, $30.  What is |
| 11 | that for? |
| 12 | A   Fax fee. |
| 13 | Q   Yeah.  What's that for? |
| 14 | A   I don't know.  It's fax fee. |
| 15 | Q   Chase charges $30 for fax fees? |
| 16 | A   That's what it shows, yes. |
| 17 | Q   Okay.  And what was the fax? |
| 18 | A   I'm not sure. |
| 19 | Q   It says corporate advances.  That means Chase |
| 20 | paid the money, didn't it? |
| 21 | A   Correct. |
| 22 | Q   Okay.  It says fax fee $30.  So Chase paid |
| 23 | somebody $30 for fax? |
| 24 | A   That's the fee it shows on here. |
| 25 | Q   All right.  How about recording fee, $15.50. |

59

| 1 | What is that for? |
| 2 | A   To record it.  Just a recording fee. |
| 3 | Q   Record what? |
| 4 | A   Satisfaction, is my understanding. |
| 5 | Q   Of the mortgage? |
| 6 | A   Correct. |
| 7 | Q   Okay.  So Chase already researched how much it |
| 8 | would take to record the satisfaction? |
| 9 | A   I mean, that's coming from Chase Default |
| 10 | Payoff Department. |
| 11 | Q   So what? |
| 12 | A   That's what they're saying -- That's what they |
| 13 | say the payoff is for 9/7/2010. |
| 14 | Q   All right.  And is this information on here |
| 15 | correct? |
| 16 | A   That's what it's showing. |
| 17 | Q   I know what it's showing.  Is it correct? |
| 18 | A   To the best of my knowledge, yes. |
| 19 | Q   While you've got that in front of you, look at |
| 20 | Plaintiff's Exhibit 4 to Lanier Jeffrey's |
| 21 | deposition.  What is this document here? |
| 22 | A   What is this document? |
| 23 | Q   Um-hum. |
| 24 | A   It looks like notes. |
| 25 | Q   And who made these notes? |

60

15 (Pages 57 to 60)

## PETER KATSIKAS

| | | |
|---|---|---|
| 1 | A | It doesn't show who. |
| 2 | Q | **Do you know who?** |
| 3 | A | No. |
| 4 | Q | **Did you read Lanier Jeffrey's deposition?** |
| 5 | A | I did. |
| 6 | Q | **All right.  Did she make these notes?** |
| 7 | A | It looks like she made some notes on here. |
| 8 | Q | **Who made the other notes?** |
| 9 | A | I'm not sure.  Or if there was somebody else |
| 10 | | working the other notes. |
| 11 | Q | **Yeah.  Look at the first notes, September 13,** |
| 12 | | **2010.  Can you read that?** |
| 13 | A | Sure.  (Reading:)  Received -- "RCVD" means |
| 14 | | received -- Claim Check Number 109897934 IAO |
| 15 | | -- which is in the amount of -- $301,608.58 |
| 16 | | payable to Chase, sent to restricted escrow |
| 17 | | with effective date 9/7/2010.  Sent letter |
| 18 | | of -- LOA is letter of authorization -- |
| 19 | | request via FedEx 793908010871 with return |
| 20 | | FedEx 793908016939. |
| 21 | Q | **And does it show that that fax -- that that** |
| 22 | | **FedEx came back?** |
| 23 | A | I believe so, yes. |
| 24 | Q | **Okay.** |
| 25 | A | That may have been Mr. Saxton, it looks like. |

61

| | | |
|---|---|---|
| 1 | Q | **The next note, November 5, 2010, what does** |
| 2 | | **that say?** |
| 3 | A | (Reading:)  Reviewing R. Saxton files, |
| 4 | | received return mail.  Her address not in |
| 5 | | service.  Contacting borrower for letter of |
| 6 | | authorization and also contacting Fannie Mae |
| 7 | | for approval to accept funds to pay off loan. |
| 8 | Q | **All right.  And how long did it take Chase to** |
| 9 | | **do that, contact the borrower?** |
| 10 | A | Well, Lanier picked up the phone, looks like, |
| 11 | | right then, on November 5, 2010. |
| 12 | Q | **So it took Lanier from September 13 -- Excuse** |
| 13 | | **me.  It took Saxton from September 13 to** |
| 14 | | **November the 5th?** |
| 15 | A | I believe -- No.  Robbert Saxton, he left the |
| 16 | | end of October of 2010. |
| 17 | Q | **So whose job was it when he left to pick up** |
| 18 | | **the phone?** |
| 19 | A | Lanier Jeffrey. |
| 20 | Q | **So Lanier Jeffrey, when did she -- When was** |
| 21 | | **she supposed to pick up the phone and call the** |
| 22 | | **borrower?** |
| 23 | A | Well, I guess after she -- It looks like after |
| 24 | | she left -- I'm sorry, after he left, |
| 25 | | Mr. Saxton.  According to these notes, the |

62

| | | |
|---|---|---|
| 1 | | next entry down says:  Reviewing R. Saxton's |
| 2 | | file.  Received return mailer realized that. |
| 3 | | And then she contacted the borrower for the |
| 4 | | letter of authorization and also contacted |
| 5 | | Fannie Mae for approval to accept funds to pay |
| 6 | | off the loan. |
| 7 | Q | **And while the full payoff was sitting in** |
| 8 | | **Chase's bank account and before November 5,** |
| 9 | | **2010, what was the Chase Collection Department** |
| 10 | | **doing?** |
| 11 | A | Okay.  The money went into a restricted escrow |
| 12 | | account, to answer that question.  What was |
| 13 | | the other question? |
| 14 | | MR. TURNER: |
| 15 | | What was the Collection Department |
| 16 | | doing? |
| 17 | Q | **What was the Chase Collection Department** |
| 18 | | **doing?** |
| 19 | A | Oh, they were calling Ms. Barnett, last known |
| 20 | | numbers that was on file. |
| 21 | Q | **What were they telling her?** |
| 22 | A | There was only -- it's looks like -- According |
| 23 | | to the records, it looks like a handful of |
| 24 | | calls.  It looks like they were auto dialers |
| 25 | | that there were no contact made on there. |

63

| | | |
|---|---|---|
| 1 | | There was calls, but there was no -- No one |
| 2 | | answered the phone or anything like that. |
| 3 | Q | **Okay.  Auto dialer was dialing?** |
| 4 | A | On some of them, yes.  It looks like, yes. |
| 5 | Q | **Okay.  And what was the Collection Department** |
| 6 | | **trying to -- What kind of action were they** |
| 7 | | **looking for Ms. Barnett to take?** |
| 8 | A | Sometimes either promise to pay or see if |
| 9 | | there's Loss Mitigation alternatives. |
| 10 | Q | **All right.  Well, was Chase trying to collect** |
| 11 | | **a delinquency at that time?** |
| 12 | A | What time frame? |
| 13 | Q | **Before November 5, 2010.** |
| 14 | A | Yes.  There was collectors calling, yes.  That |
| 15 | | was the purpose for it. |
| 16 | Q | **Collectors calls.  And the purpose is to what?** |
| 17 | A | To collect the debt. |
| 18 | Q | **Okay.  And what are the things that Chase** |
| 19 | | **Collection Department does to collect debt?** |
| 20 | A | Well, we get reason for default and, you know, |
| 21 | | if they're having trouble.  If they're having |
| 22 | | trouble, you know, we try to, you know, work |
| 23 | | out some kind of Loss Mitt -- you know, Loss |
| 24 | | Mitigation efforts in order to avoid |
| 25 | | foreclosure. |

64

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

### PETER KATSIKAS

| | |
|---|---|
| 1 | Q So Chase was communicating with April Barnett |
| 2 | during that time? |
| 3 | A Well, there's different departments. |
| 4 | Q Right. How many different departments were |
| 5 | working on April Barnett's file? |
| 6 | MR. TURNER: |
| 7 | Same time frame? |
| 8 | Q Same time frame. |
| 9 | A Well, you've got the Collections and then |
| 10 | you've got the Loss Draft department. There's |
| 11 | a couple of calls from Ms. Barnett to Chase. |
| 12 | I believe she went to the Customer Service and |
| 13 | talked to them a little bit. |
| 14 | Q That's the Customer Service Department? |
| 15 | A Correct. |
| 16 | Q Okay. How many other departments? |
| 17 | A How many other departments? I would have to |
| 18 | go through the notes. |
| 19 | Q Huh? |
| 20 | A I would have to go through the notes and we |
| 21 | can determine. |
| 22 | Q Based on what you went through as of |
| 23 | yesterday, how many departments were actively |
| 24 | working April Barnett's file before November |
| 25 | 5, 2010? |

65

| | |
|---|---|
| 1 | A Until November -- Okay, what time frame are |
| 2 | you saying? |
| 3 | Q Before November 5, 2010. |
| 4 | A Oh, before? The Collections -- to my |
| 5 | knowledge, you know, without looking at |
| 6 | anything, from my memory is the Collections |
| 7 | department and also the Loss Draft. |
| 8 | Q How about the Insurance Processing Department? |
| 9 | A They were done prior. Because it was for the |
| 10 | demolition of the -- whatever existing |
| 11 | structure that was there that had to be |
| 12 | demolished. |
| 13 | Q What do you call that department? |
| 14 | A HIPC, which is basically Assurant. |
| 15 | Q HIPC? What does that stand for? |
| 16 | A Hazard Insurance Processing Center, I believe. |
| 17 | Q Hazard insurance. All right. And what do |
| 18 | they do? |
| 19 | A Well, they have what's called Assurant. To my |
| 20 | knowledge, my understanding of it is they |
| 21 | have -- employees have Assurant. They kind |
| 22 | of, you know -- kind of like a -- They babysit |
| 23 | the process, as far as, you know, if there's |
| 24 | draws, so they can see -- Most people want to |
| 25 | rebuild a house after a total loss or a |

66

| | |
|---|---|
| 1 | partial loss. So, you know, they'll babysit |
| 2 | -- like the contractors, you know, come in and |
| 3 | taking draws and so forth. Some of the |
| 4 | responsibilities is my understanding. |
| 5 | Q So, let's see, you've got the Collection |
| 6 | Department; correct? |
| 7 | A Correct. |
| 8 | Q You've got HIPC; correct? |
| 9 | A Right. |
| 10 | Q Okay. You've got Loss Draft Department? |
| 11 | A Yes. |
| 12 | Q All right. How about the Property |
| 13 | Preservation and Inspection Department? |
| 14 | A Yeah. Them, too. |
| 15 | Q What do they do? |
| 16 | A Once the loans goes into default, they have -- |
| 17 | we have subcontracting -- a vendor, I should |
| 18 | say, that goes out and make monthly |
| 19 | inspections to make sure the house is secure, |
| 20 | to make sure it's no code violations, or if |
| 21 | it's abandoned, or whatever the case maybe. |
| 22 | Like if there's grass needs to be cut, they |
| 23 | will let us know if it needs to be cut. Make |
| 24 | sure there aren't any code violations. |
| 25 | Q How was Chase coordinating or managing all |

67

| | |
|---|---|
| 1 | these different departments? |
| 2 | A Well, each department has their own -- you |
| 3 | know, manages their expertise, so to say. |
| 4 | Q All right. Well, how were they coordinating |
| 5 | what each department was doing? |
| 6 | A Well, the system that's used -- The servicing |
| 7 | system, the main one that's used is called |
| 8 | MSP. And MSP, you know, they'll show notes of |
| 9 | what's transpiring. |
| 10 | Q I understand. Who was coordinating or |
| 11 | supervising or managing all these departments |
| 12 | between the time the house burned down, June |
| 13 | 14, 2010, and November 5, 2010? |
| 14 | A You mean who managed -- |
| 15 | MR. TURNER: |
| 16 | Object to the form. Go ahead. |
| 17 | A You are asking me who manages all the |
| 18 | departments? |
| 19 | Q Who, yeah. |
| 20 | A I don't know. |
| 21 | Q Did anybody? |
| 22 | A Well, each department is separate. I mean -- |
| 23 | Q I understand. Each department is separate. |
| 24 | And how are they separate? |
| 25 | A Well, for instance, you've got, you know, Loss |

68

```
                                    17 (Pages 65 to 68)
```

PETER KATSIKAS

| | |
|---|---|
| 1      Mitt -- Loss Mitigation, for instance. You | 1   A   Correct. |

1    Mitt -- Loss Mitigation, for instance.  You
2    know, they work on, you know, collecting
3    documentation.  You know, work it out.  Either
4    a short sale, as an example, or a modification
5    with the borrower, collector, see if they can
6    collect, you know, the debt.  Do like a
7    promise to pay or even refer over to Loss
8    Mitigation if they're having trouble
9    financially.  The borrower is -- You know,
10   you've got your Loss Draft Department for loss
11   drafts.  You've got Customer Service.  You
12   know, for instance, like a billing -- you
13   know, inquiry or something to that effect.
14   You know, there's -- There's Tax Department.
15   That's -- Chase is a large, you know, company.
16   So they don't have just one person working on
17   one specific thing.  So there's different
18   departments there.
19 Q    So, let's see --
20 A    We've got Property --
21 Q    Go ahead.
22 A    -- yeah, your Property Preservation
23   Department, you know, who does inspections.
24   And if there's work that needs to be done on
25   the house and, you know, will have to

69

1    obviously approve it to have it done to make
2    sure the secured -- the property is secured
3    and everything.
4  Q    So we've mentioned so far that you know of
5    your own personal knowledge between the date
6    the house burned down, November 5, 2010, the
7    date on Lanier Jeffrey, Plaintiff's Exhibit 4,
8    that we have the Collection Department, the
9    HIPC Department, the Property Preservation
10   and Inspection Department, the Loss Draft
11   Department, the Loss Mitt Department, the
12   Customer Service Department, all those are
13   working the file, aren't they?
14 A    Well, I didn't see any documents mailed or
15   financials mailed in from Ms. Barnett to apply
16   for any kind of Loss Mitt activity.
17 Q    Well, was Loss Mitt Department involved or
18   not?
19 A    They may have sent a solicitation or
20   solicitations.
21 Q    Well, they did, didn't they?
22 A    Solicitations, right.
23 Q    Right.  So we do know the Loss Mitt Department
24   was involved because they sent a solicitation,
25   didn't they?

70

1  A    Correct.
2  Q    Okay.  So that's -- What, we've got six
3    departments so far; right?
4  A    Yes.
5  Q    Okay.  Now, was there anyone who was
6    coordinating or supervising, managing the
7    activities of these six departments?
8        MR. TURNER:
9            Object to the form.
10 A    I don't know.
11 Q    You can't name them?
12 A    No.
13 Q    All right.  And then we have the activity with
14   the local attorney, don't we?
15       MR. TURNER:
16           Object to the form.  Still in the
17           same time frame?
18 Q    Same time frame.
19       MR. TURNER:
20           Same objection.
21 A    Yes.
22 Q    Okay.  So that's six departments plus a local
23   attorney?
24 A    Yes.
25 Q    Who was having something to do with

71

1    foreclosure?
2  A    Yeah.  I don't know what, but yes.
3  Q    But yes.  Okay.  Now, who was -- Who was
4    managing or supervising or coordinating the
5    local lawyer plus the other six departments
6    during that time frame?
7        MR. TURNER:
8            Object to the form.
9  A    I don't know who the lawyer was -- sorry --
10   the person managing it.
11 Q    You notice in the Rule 30(b)(6) Notice of
12   Deposition, Exhibit 18, that I listed about 22
13   departments that had something to do with
14   April Barnett's loan.  You noticed that?
15       MR. TURNER:
16           He's talking about 2.
17 A    2.
18 Q    Number 2 there; do you see that?
19 A    Okay.
20 Q    Customer Service department, Hazard Claims
21   Loss Department, Payoff Department, Loss Draft
22   Department, Escrow Administration Loan
23   Department, Collection Department, Property
24   Preservation and Inspection Department,
25   Insurance Department, Research Department,

72

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1    Foreclosure Department, Default Payoff
 2    Department, Short Sales Department, Bankruptcy
 3    Department, Loss Mitigation Department, Home
 4    Listing Research Department, Real Estate
 5    Office Department, Umbrella Department, Tax
 6    Department, IT Department, Risk Management
 7    Department, Sworn Document Department, and
 8    Homeowner Loan Assistance Department.
 9         Can you tell me anything about how all
10    these departments were being coordinated or
11    supervised or managed?
12  A   Well --
13         MR. TURNER:
14             Object to the form.  Go ahead.
15  A   Some of the employees that was already
16    produced here, I guess their personal records
17    or whatever that you requested.  If you have
18    questions about that.
19  Q   No, my question is -- And the designated Item
20    2:  The manner, means, and methods Chase
21    coordinated the various departments within
22    Chase which had any involvement with Barnett's
23    home loan during the relevant time period --
24    which is defined -- including any of these
25    departments, or all of them.
                                              73
```

```
 1         Now, as a Chase representative, tell me
 2    the manner, means, and methods by which Chase
 3    coordinated or supervised or managed these
 4    various departments so that one hand knew what
 5    the other one was doing.
 6         MR. TURNER:
 7             Object to the form.  Go ahead.
 8  A   Well, as far as that goes, I mean, they -- You
 9    know, there's departmental goals for whatever
10    the department is and what their job functions
11    are and what their expectations are.  You
12    know, there's beginning of the year of what's
13    expected, there's a midyear review, there's an
14    end of the year review for each and every
15    department there.  And there is also ongoing
16    training that are conducted, Continuing
17    Education, you know, done within these
18    departments, as well.
19  Q   So you've got a year-end review?
20  A   What's that?
21  Q   A year --
22  A   Yeah, a year-end review, correct.  Midyear.
23  Q   So the year-end would have been the year ended
24    December 2010?
25  A   Yeah.  I mean, whatever year you're looking
                                              74
```

```
 1    for.  I mean, they do it every year.
 2  Q   This was going on during 2010?
 3  A   Correct.
 4  Q   So the review that you're talking about which
 5    answers Item Number 2 on the Notice of
 6    Deposition is the review that happens at the
 7    close of that year?
 8  A   Yes.
 9  Q   All right.  Which would be --
10  A   For each individual employee.
11  Q   Would be after December 31, 2010?
12  A   Right.
13  Q   Okay.  And was that done in this case?
14         MR. TURNER:
15             For who?
16  Q   Well, I'm talking about April Barnett's loan.
17         MR. TURNER:
18             Object to the form.
19  A   I mean, there's people that was -- There was
20    employees that was produced on there that we
21    produced to you as far as their personal
22    personnel history and all that.
23  Q   I'm not talking about litigation.  I'm talking
24    about was there a review December 31, 2010, or
25    shortly thereafter that reviewed anything to
                                              75
```

```
 1    do with April Barnett's loan or anything to do
 2    with how any of these departments are
 3    supervised or managed?
 4         MR. TURNER:
 5             Object to the form.
 6  A   Those are done through the employees you're
 7    talking about.
 8  Q   So it's an employee review?
 9  A   Correct.
10  Q   Not a department review?
11  A   Department review?  Right.  There's employees
12    that are -- Yeah, that get reviews throughout
13    the year.
14  Q   So that's your answer to Number 2 in the
15    Notice of Deposition, employee reviews at the
16    end of the year?
17         MR. TURNER:
18             Object to the form.
19  A   Well, as far as that goes, I mean, there's
20    certain departments -- there's -- Some of
21    those departments, I don't even know what it
22    is.  Like, for instance, real estate -- It's
23    actually real estate own, not real estate
24    office department.
25         Umbrella department, I'm not sure what
                                              76
```

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

PETER KATSIKAS

| | |
|---|---|
| 1 | that is. But these departmental have specific |
| 2 | goals that need to be reached on there. |
| 3 | There's supervisors, there's teams that they |
| 4 | individually -- you know, the teams that would |
| 5 | individually work their specific department or |
| 6 | job duties on a daily basis. |
| 7 **Q** | **That's a team within a certain department?** |
| 8 A | Correct. There may be a couple of teams, |
| 9 | there may be one team. |
| 10 **Q** | **Okay. Well, is there a team that manages,** |
| 11 | **supervises, or coordinates all the departments** |
| 12 | **that had to do with April Barnett's loan?** |
| 13 A | Is there one person? |
| 14 | MR. TURNER: |
| 15 | He asked if there is a team. |
| 16 **Q** | **One person or a team?** |
| 17 A | A team. That coordinate everything or just |
| 18 | one -- there's -- Certain departments have |
| 19 | certain roles to it. If that's what you're |
| 20 | asking. |
| 21 **Q** | **I understand that certain department have** |
| 22 | **certain roles. But I'm talking about the** |
| 23 | **coordination and --** |
| 24 | MR. TURNER: |
| 25 | I think he's asking is there one team |

77

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Object to the form. |
| 3 A | Well, I mean, the mortgage department, you |
| 4 | know, is -- The mortgage department would go |
| 5 | all the way up the food chain. Someone who |
| 6 | manages the entire -- Yes, there's somebody |
| 7 | that manages the entire mortgage department. |
| 8 | But they have branched out through departments |
| 9 | and teams and employees and separate people. |
| 10 | I mean -- |
| 11 **Q** | **Well, how does that person manage all the** |
| 12 | **departments?** |
| 13 A | I don't know how they manage all the |
| 14 | departments. I mean, you're talking |
| 15 | probably -- if I had to guess, probably 55,000 |
| 16 | mortgage workers on there. |
| 17 **Q** | **Well, who manages the 55,000 mortgage workers?** |
| 18 A | I'm not sure, off the top of my head. |
| 19 **Q** | **Well, how many departments does Chase have in** |
| 20 | **which these 55,000 mortgage workers work?** |
| 21 A | What was that question again? |
| 22 **Q** | **How many departments does Chase have in which** |
| 23 | **these 55,000 mortgage workers work?** |
| 24 A | I mean, these are some of them that I can see |
| 25 | off the top of my head. I don't know. |

79

| | |
|---|---|
| 1 | that coordinates all these |
| 2 | departments? |
| 3 A | Not to my knowledge. |
| 4 **Q** | **Is there one person that coordinates all of** |
| 5 | **the departments?** |
| 6 A | One person that coordinates all departments. |
| 7 | I mean, maybe high up the food chain, you |
| 8 | know, as far as the head of the mortgage |
| 9 | division a part of -- that's head of the |
| 10 | mortgage division. If that's what you're |
| 11 | asking me. Yes. |
| 12 **Q** | **Well, how high up the food chain would be the** |
| 13 | **head of the mortgage division?** |
| 14 A | I'm not sure exactly. |
| 15 **Q** | **Who is that?** |
| 16 A | I don't know, off the top of my head. |
| 17 **Q** | **What's that person's title?** |
| 18 A | I don't know that, either, off the top of my |
| 19 | head. |
| 20 **Q** | **Your understanding is that that person would** |
| 21 | **have overall management or supervisory duties** |
| 22 | **with regard to all the departments within** |
| 23 | **Chase listed here in Item Number 2 in the** |
| 24 | **Notice?** |
| 25 | |

78

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | You're referring to the ones in the |
| 3 | deposition notice? |
| 4 A | There's Customer Service. |
| 5 **Q** | **2-A through V.** |
| 6 A | I don't know what -- |
| 7 | MR. TURNER: |
| 8 | 2-A through -- not just B. Did you |
| 9 | say 2-A through -- Oh, you said V. |
| 10 | Excuse me, Vince. |
| 11 | MR. KILBORN: |
| 12 | 2-A through V. |
| 13 | MR. TURNER: |
| 14 | I heard you say "B." |
| 15 A | 2-A through V. I don't know what the Umbrella |
| 16 | Department -- Never heard of Umbrella |
| 17 | Department before in my life. |
| 18 BY MR. KILBORN: |
| 19 **Q** | **All right. Are there any departments that are** |
| 20 | **not listed here?** |
| 21 | MR. TURNER: |
| 22 | Within the mortgage division or |
| 23 | department? |
| 24 | MR. KILBORN: |
| 25 | Right. |

80

## PETER KATSIKAS

```
1    A    Well, the Mortgage Division there would be
2         obviously originations.  But that's not --
3    BY MR. KILBORN:
4    Q    Well, for instance -- Let's break it down a
5         little bit.  You've got the -- We know the
6         Collection Department and the Property
7         Preservation and Inspections Department --
8    A    Right.
9    Q    -- were active with regard to April Barnett's
10        loan at the same time, don't we?
11   A    Right.
12   Q    Okay.  And how was Chase making sure
13        Collections knew what Property Preservation
14        and Inspections was doing and vice versa?
15   A    They could see it on the notes, the history of
16        the notes of the MSP.
17   Q    Okay.  Any other way?
18   A    I mean, there's other programs, as far as.
19        You know, each individual department may have
20        their own internal software system that they
21        use specifically to their job duties.
22   Q    So basically the MSP is what is used?
23   A    That's the main general one.
24   Q    All right.  How about just simply talking to
25        each other?
                                              81
```

```
1    A    They can do that.
2    Q    Did they in this case?
3    A    Phone or -- yeah, I mean, there's some -- I
4         heard of one transfer phone call from, I
5         believe -- I don't know which of those.  It
6         may be from Customer Service over to Loss
7         Mitt.  One of the phone calls that was on
8         there that I heard.
9    Q    Okay.  And you're talking about a recorded
10        phone call?
11   A    Correct.
12   Q    Did you listen to it?
13   A    Yes.
14   Q    Okay.  And in that recorded phone call, Chase
15        tells April Barnett and the Chase employee is
16        Maricor, M-A-R-I-C-O-R, Carolino (phonetic).
17        She says April Barnett says the house burned
18        in June.  I paid the June payment.  Talked to
19        y'all and told y'all you know the insurance is
20        going to pay it all.  Y'all said that would be
21        fine, you know.  Didn't she?
22             MR. TURNER:
23             Object to the form.  Lack of
24          foundation.
25   Q    She said that, didn't she?
                                              82
```

```
1              MR. TURNER:
2              Same objection.
3    A    I would have to listen to the call.
4    Q    Well, you did listen to it, didn't you?
5    A    Right.  But I don't know if it was verbatim,
6         from what you just told me.
7    Q    Well, isn't it true that April Barnett told
8         Chase that the house burned down and the
9         insurance was going to pay it all off?
10   A    There was --
11             MR. TURNER:
12             Same objection.  Go ahead.
13   A    There was something to that effect.
14   Q    Okay.  And why wasn't that good enough for
15        Chase?
16             MR. TURNER:
17             Object to the form.
18   A    Why wasn't it good for Chase?  I don't
19        understand what you're asking me.
20   Q    Okay.  Chase quoted the exact payoff, April
21        Barnett paid it, Chase got it in a timely
22        fashion.  Why wasn't that good enough for
23        Chase to stop collection activity?
24   A    Well, we needed the borrower's authorization
25        from the borrower.
                                              83
```

```
1    Q    All right.  Well, you read it where -- You
2         read it in the notes, didn't you, of the
3         conversation?
4    A    What conversation?
5              MR. TURNER:
6              What's the question?
7    A    I don't understand what you --
8              MR. TURNER:
9              The question is did he read that?
10             MR. KILBORN:
11             Yeah.
12   BY MR. KILBORN:
13   Q    So what did April Barnett, how did she fail,
14        what didn't she do that she was supposed to
15        do?
16   A    Well, there was a borrower authorization was
17        for what to do with the money, and along with
18        the check.
19   Q    Okay.  She failed to give an authorization to
20        do what?
21   A    No, she didn't fail.  She sent it in within a
22        couple of days after Lanier picked up the
23        phone after November 5, 2010.  She sent it to
24        us.
25   Q    Well, that was November 5.  What did April
                                              84
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1        Barnett fail to do before November 5?
 2    A   Well, she didn't make July or August's
 3        payment.
 4    Q   Is that all she failed to do?
 5    A   That's what I could see.
 6    Q   Okay.  And do you think that gave the
 7        Collection Department the right to try to
 8        collect money?
 9    A   If it's triggering the payment is not made,
10        then the collection calls will start.
11    Q   And they did, didn't they?
12    A   They did.
13    Q   And is it Chase's position that the Collection
14        Department have every right to try to collect
15        the money to make the phone calls to April
16        Barnett and her husband and to send letters
17        out to her and to refer her to foreclosure?
18        MR. TURNER:
19            Object to the form.
20    A   Well, those -- Once it's -- payments are
21        missed, the collection calls are going to
22        start again, like I say.
23    Q   So you don't see anything abusive or harassing
24        about any of Chase's collection calls?
25    A   There was -- As far as from the notes, there
                                                        85
```

```
 1        was only a handful.  It looks like we even
 2        made contact with her for the collection
 3        calls.  The rest of them were just auto
 4        dialers, no contact made.
 5    Q   Well, you read her deposition, didn't you?
 6    A   I read her deposition.  I also reviewed
 7        Chase's notes, books and records.
 8    Q   Well, are you saying April Barnett didn't tell
 9        the truth?
10    A   I don't know what she said or what not.  I
11        don't know -- I don't know April Barnett.  But
12        I'm just showing what is on Chase's books and
13        records.
14    Q   I understand.  But you read her deposition?
15    A   Correct.
16    Q   Okay.  So you know what she testified to?
17    A   Correct.
18    Q   Okay.  And did she lie in her deposition?
19        MR. TURNER:
20            Object to the form.
21    A   I'm not calling her a liar.  I'm just saying
22        it's what our records show.
23    Q   You're saying she just didn't tell the truth,
24        according to Chase's records?
25
                                                        86
```

```
 1        MR. TURNER:
 2            Object to the form.
 3    A   I didn't say that, sir.  I said I don't know
 4        her.  I read her deposition.  And I looked at
 5        Chase's books and records.  I don't know who
 6        called her or if there was somebody else that
 7        was calling her, you know, from some other
 8        matter or whatever the case would be or
 9        whatever is going on in her life.  But as far
10        as Chase's phone records, there's a handful
11        that we actually -- on collection calls that
12        we just made contact with her.  The rest were
13        just no contact.  And it shows it on there.
14    Q   What about the phone call on Thanksgiving Day?
15        MR. TURNER:
16            What about it?  What's the question?
17    Q   Was there a phone call made on Thanksgiving
18        Day?
19    A   I didn't see one.
20    Q   Okay.
21    A   Do you have the phone records on there?
22    Q   You saw where there's testimony that there was
23        a phone call on Thanksgiving Day?
24    A   I didn't -- I don't remember seeing that.
25    Q   You don't remember that testimony?
                                                        87
```

```
 1    A   Whose testimony was it?
 2    Q   Well, you tell me.
 3        MR. TURNER:
 4            Wait a minute.  Wait a minute.  Just
 5        ask him -- Vince; if -- Just ask the
 6        questions.  The testimony is what it
 7        is.  He's trying to --
 8        MR. KILBORN:
 9            Well, he read it.
10        MR. TURNER:
11            Just ask the question.
12        MR. KILBORN:
13            He read it.
14        MR. TURNER:
15            Look, just ask the question.  You're
16        asking him was there a call made on
17        Thanksgiving Day?  That was the
18        question?
19        MR. KILBORN:
20            Yeah.
21        MR. TURNER:
22            And what's the answer?
23    BY MR. KILBORN:
24    Q   The testimony was -- it was by Jason and/or
25        April, that there was a phone call made on
                                                        88
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1     Thanksgiving Day to collect money. Wasn't
 2     there?
 3   A   I didn't read Jason's deposition. Her
 4     husband.
 5   Q   Why not?
 6   A   I read hers.
 7   Q   Why didn't you read Jason's?
 8   A   I didn't have time to. I read -- Since I
 9     already had been reading over 3,000 pages.
10   Q   So you didn't have time to read Jason
11     Barnett's deposition?
12   A   I read up to -- I read everything, as far as
13     there's -- I didn't read Jason's, no.
14   Q   Okay. So you don't know what he testified to?
15   A   No. I didn't see that one.
16   Q   Okay. You're just testifying as to what
17     Chase's notes say?
18   A   Those are the books and records of Chase, yes.
19   Q   And so you have no personal knowledge what
20     really went on, do you?
21   A   I wasn't there. No, no personal knowledge.
22   Q   Right. So you never talked to the Barnetts,
23     have you?
24   A   No.
25   Q   Okay. Does Chase make any apology to April
                                                    89
```

```
 1     Barnett or her husband, Jason Barnett, about
 2     anything that happened in this case?
 3       MR. TURNER:
 4         Object to the form. Don't answer
 5         that.
 6         Just ask your question, Vince.
 7   Q   You don't -- You don't know of any apologies
 8     Chase has?
 9       MR. TURNER:
10         That's not a proper question for a
11         deposition, Vince. We can deal with
12         that outside of the deposition.
13   Q   Did Chase do anything at all wrong, to your
14     knowledge?
15       MR. TURNER:
16         Object to the form.
17   A   I don't think they did anything wrong, but
18     they could have been a little bit better, as
19     far as following up on that letter of
20     authorization sent out to Ms. Barnett.
21   Q   As far as you know, does Chase have any
22     procedures or rules or guidelines designed to
23     protect the borrower's reputation?
24       MR. TURNER:
25         Object to the form. Reputation?
                                                    90
```

```
 1       MR. KILBORN:
 2         Yeah.
 3       MR. TURNER:
 4         You mean credit reputation?
 5       MR. KILBORN:
 6         Yeah.
 7       MR. TURNER:
 8         Same objection. Object to the form.
 9         Go ahead.
10   A   I'm not sure.
11   BY MR. KILBORN:
12   Q   You don't know of any?
13   A   I don't know either way.
14   Q   If you knew of any, you'd tell me, wouldn't
15     you?
16   A   Right.
17   Q   You can't think of any?
18   A   I can't think of any.
19   Q   Okay. Have you -- In all the documents that
20     you've read that Chase created, was there ever
21     any mention about April Barnett's credit
22     reputation?
23       MR. TURNER:
24         I don't understand, Vince. Are you
25         asking as a mention of that term
                                                    91
```

```
 1     "credit reputation" or just her -- I
 2     guess I don't understand what you
 3     mean by that term.
 4       MR. KILBORN:
 5         My question stands.
 6       MR. TURNER:
 7         All right. Well, I object to the
 8         form. If he can understand the
 9         question, he can answer it.
10   A   I don't understand what you're asking me.
11   BY MR. KILBORN:
12   Q   Is there ever any mention in any of the Chase
13     documents that you've read about April
14     Barnett's credit reputation?
15       MR. TURNER:
16         Object to the form.
17   A   I can't recall. Unless you have something I
18     could see.
19       MR. TURNER:
20         Let's take a break, please.
21         (A short break was taken.)
22   BY MR. KILBORN:
23   Q   How many years were you with Washington
24     Mutual?
25   A   How many years?
                                                    92
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|

1   Q  Right.

2   A  I started with them around April '02 until

3      September 25, 2008.  So six and a half

4      roughly.

5   Q  Six and a half years?

6   A  Yes.  Sounds right.

7   Q  Okay.  Were you there when the federal

8      government took over the bank?

9   A  FDIC?  Yes.

10  Q  Right.  And do you know why they took over

11     Washington Mutual?

12  A  It's a failed institution.

13  Q  Right.  It sort of caused the beginning of the

14     crash of the banking industry, wasn't it?

15        MR. TURNER:

16           Object to the form.  Lack of

17           foundation.

18  A  I mean, there was banks that went under, yes.

19  Q  Yeah.  Well, there was a whole series of banks

20     that went under?

21  A  Yes.

22  Q  Washington Mutual was one of them?

23  A  Correct.

24  Q  And what was the reason that WAMU went under?

25        MR. TURNER:

93

1      That's an if-you-know question.

2   A  I don't know.

3   Q  What was the reason that the federal

4     regulators, FDIC, said they were taking it

5     over?

6   A  I don't know.

7   Q  FDIC said it, didn't they?

8   A  Well, yes.  The FDIC came in there and closed

9     it down.

10  Q  Right.  And they said they were closing it

11     down because of what?

12        MR. TURNER:

13           Object to the form.

14  A  All I know is failed institution, and that was

15     it.

16  Q  Okay.  So you worked for this failed

17     institution for six and a half years?

18  A  I worked for Washington Mutual Bank, FA, for,

19     yeah, six and a half years.

20  Q  Okay.  And then ultimately, the holding --

21     Washington Mutual holding company, they filed

22     Chapter 11, didn't they?

23        MR. TURNER:

24           Object to the form.

25  A  I'm not sure what they -- which part of it or

94

1      what they did.

2   Q  Okay.  And after the FDIC took over Washington

3     Mutual, then Chase bought the assets, didn't

4     they?

5   A  As far as I know, yes.

6   Q  All right.  The mortgage loans?

7   A  The assets of Washington Mutual.

8   Q  Well, it was a home loan bank, wasn't it?

9   A  No, they were savings.

10  Q  It was the biggest home mortgage company in

11     the country at the time, wasn't it?

12  A  It was one of them.

13  Q  Right.  And your job, among other things, was

14     to make home loans?

15  A  Correct.

16  Q  And how many home loans did you actually make

17     during your six and a half years?

18  A  I don't know, off the top of my head.

19  Q  Give me just an estimate.

20  A  An estimate?  How many individual loans?  It's

21     a lot, but I'm not sure exactly how many were

22     at the call center.

23  Q  Just some general range.  You know, 10, a

24     hundred, a thousand.  Just some general

25     number.

95

1        MR. TURNER:

2           If you can answer the question, you

3           can answer.

4   A  Maybe over a thousand.  But I don't know

5     exactly.  I can't remember exactly what I did

6     every year.

7   Q  I understand.

8   A  But I did well.

9   Q  And you -- when you made -- You just got paid

10     a salary, or did you get bonuses when you made

11     a loan?

12  A  When I originated loans?

13  Q  Right.

14  A  It was salary and commission.

15  Q  And you get commission when you originate a

16     loan?

17  A  Yes.

18  Q  And that's an incentive, I suppose, to

19     originate loans?

20  A  Correct.  Sales.

21  Q  Right.  Sales.  And I think you told me your

22     title was something to do with sales, wasn't

23     it?

24  A  Assistant manager.  It was a dual role.

25     Assistant manager and sales manager and senior

96

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

1  loan consultant.
2  Q    Right.  And one of the reasons that Washington
3       Mutual was taken over by FDIC was it had made
4       an awful lot of bad home loans?
5       MR. TURNER:
6            Object to the form.
7  Q    Isn't that true?
8       MR. TURNER:
9            Object to the form.
10 A   There are accusations of it.
11 Q    Right.  And then after Chase took over the
12       assets of Washington Mutual -- Strike that.
13            What was the reason that you left
14       Washington Mutual?  Was it because the FDIC
15       came in and you just didn't think it was a
16       good place to work, or did you stay until
17       Chase bought the assets?
18 A   I stayed until the next.  We left five o'clock
19      on September 25, 2008.  I remember it.  And we
20      left there.  We heard rumors and news or
21      whatever.  And the next day, we answered the
22      phones:  Welcome to Washington Mutual, now
23      part of Chase.  That was the end of it.
24      Business as usual.
25 Q    So that's how the phone was answered?

97

1  A   Correct.
2  Q    And that's how you answered the phone?
3  A   That is correct.
4  Q    So basically the employees of Washington
5       Mutual then became employees of Chase,
6       including yourself?
7  A   Correct.
8  Q    All right.  And then as employees of Chase,
9       after Chase took over Washington Mutual, was
10      one of your jobs and one of the Chase
11      employees -- now Chase employees' jobs was to
12      help work through the problems with the
13      various Washington Mutual loans?
14      MR. TURNER:
15           Object to the form.
16 A   I don't know anything about problems.  I was
17      still -- we were still -- I was still
18      originating loans and -- like we were doing
19      the day before.
20 Q    Okay.  Well, how about the problem loans,
21      foreclosures?
22 A   Well, I did six -- there was six months --
23      Let's see.  September -- from September -- We
24      originated loans from September until about --
25      I don't know.  I think it was around the end

98

1  of June of '09, that there was too many, you
2  know.  Because Chase had their own basically
3  refinance purchase department call centers.
4  And then Washington Mutual has -- had theirs,
5  obviously.  So at that time, instead of laying
6  us off, we were fortunate to keep our job.
7  President Obama came out with the Home
8  Affordable -- the "HAMP" program, which stands
9  for Home Affordable Modification Program.  And
10 we were trained on -- for Loss Mitt --
11 underwriting Loss Mitigation default loans.
12 Q    After September 25, 2008, did you spend any of
13      your time working with loans that had gone
14      into default or foreclosure that Washington
15      Mutual had made, that Chase now owned?
16 A   Say that again.  What time frame?
17 Q    Yeah.  After the announcement or the collapse
18      September 25, 2008, --
19 A   Right.
20 Q    -- did you spend time helping the new owner,
21      Chase, with working through loans in default
22      or foreclosure that WAMU had made?
23 A   Not until end of June, first part of July of
24      '09.
25 Q    That's when you started?

99

1  A   Correct.
2  Q    Okay.  Helping with bad loans, basically?
3       MR. TURNER:
4            Object to the form.
5  A   Bad loans.  Just people who were default that
6      needed help.
7  Q    Right.
8  A   Were having financial problems that they
9      needed to try to Refi or short sale or
10     something to that effect for modifications.
11 Q    Were the ones that -- The loans that you were
12      working with, were these both loans that
13      Washington Mutual had originated and that
14      Chase originated?
15 A   Chase and WAMU, yes.  And I think a little bit
16     of EMC mortgage, as well.
17 Q    What, EMC?
18 A   EMC, yeah.
19 Q    Okay.  So did your workload increase because
20      you now were working with Chase loans, as well
21      as Washington Mutual loans?
22 A   I'm sorry.  What was that question?
23 Q    Did your workload increase because you were
24      working with a lot more borrowers?
25 A   I mean, once I went to the Loss Mitt part, are

100

25  (Pages 97 to 100)

PETER KATSIKAS

| | |
|---|---|
| 1 | you asking me? |
| 2 | Q   Yeah.  After June of '09? |
| 3 | A   Yes, it increased.  Yes. |
| 4 | Q   Okay.  Did the number of customers or |
| 5 | borrowers that the other employees of |
| 6 | Washington Mutual -- previous employees of |
| 7 | Washington Mutual, did their workload increase |
| 8 | because they had more borrowers to handle or |
| 9 | loans to work with? |
| 10 | MR. TURNER: |
| 11 | Object to the form.  Lack of |
| 12 | foundation. |
| 13 | A   Well, some had -- you know, may have gotten |
| 14 | laid off with the merger.  You know, some |
| 15 | moved to different departments.  Some people |
| 16 | left; some people stayed.  You know, whatever |
| 17 | the case may be.  Not everybody -- It was a |
| 18 | different shift.  You know, we were doing -- |
| 19 | Me, personally, you know, going from |
| 20 | originations, going to -- you know, work with |
| 21 | default borrowers, underwriting their loans. |
| 22 | And Chase had documentation for that. |
| 23 | Q   Well, generally speaking, would you say that |
| 24 | the old Washington Mutual workers, such as |
| 25 | yourself, workload increased once Chase bought |
| | 101 |

| | |
|---|---|
| 1 | Washington Mutual and you had both Washington |
| 2 | Mutual borrowers plus Chase borrowers plus, I |
| 3 | think you said, EMC borrowers? |
| 4 | MR. TURNER: |
| 5 | Object to the form.  Lack of |
| 6 | foundation. |
| 7 | A   Well, if it's -- I mean, it's different.  I |
| 8 | mean, because -- Well, it's a different line |
| 9 | of work.  Same mortgage industry, but |
| 10 | different -- I don't know if it would be |
| 11 | increased.  Because, you know, we were busy, |
| 12 | you know, the days originating loans.  Yes, we |
| 13 | were busy, you know, in my department that I |
| 14 | worked at the time for underwriting, you know, |
| 15 | default loans, as well.  So I wouldn't say -- |
| 16 | I mean, I don't know what you -- It was busy |
| 17 | ever since I've been working there -- or |
| 18 | started with Washington Mutual and/or Chase |
| 19 | Bank -- JP Morgan Chase Bank. |
| 20 | Q   In reviewing the documents that you've |
| 21 | reviewed in preparation for your deposition |
| 22 | here today, did you see where April Barnett |
| 23 | had a home loan turned down because of certain |
| 24 | things that Chase had put on her credit |
| 25 | record? |
| | 102 |

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Object to the form.  Go ahead. |
| 3 | A   The only thing I saw on that was, I guess, |
| 4 | from her testimony, that she said -- I don't |
| 5 | think -- I didn't see any documentations or |
| 6 | any loans that she applied for or anything |
| 7 | like that.  Just based on her testimony. |
| 8 | Q   Okay.  So, sitting here today, as a Chase |
| 9 | representative, you don't know whether or not |
| 10 | April Barnett actually ever applied for a home |
| 11 | loan? |
| 12 | MR. TURNER: |
| 13 | Object to the form. |
| 14 | A   I mean, whatever her deposition said.  I mean, |
| 15 | that's what she says she did, so I guess |
| 16 | that's what happened. |
| 17 | Q   I don't understand.  I know what her |
| 18 | deposition said.  I'm talking about based on |
| 19 | the documents that have been produced in |
| 20 | discovery in this case that you've reviewed, |
| 21 | did April Barnett ever apply for a home loan |
| 22 | after the fire? |
| 23 | MR. TURNER: |
| 24 | Object to the form. |
| 25 | A   It was just at her deposition.  I didn't see |
| | 103 |

| | |
|---|---|
| 1 | the documentation that she submitted over to |
| 2 | whoever -- if she did -- if she did or did |
| 3 | not, you know, apply for a loan.  I didn't see |
| 4 | any of those documents, no. |
| 5 | Q   Okay.  And you say in your deposition you read |
| 6 | something? |
| 7 | A   Yeah.  She said something like that, yeah. |
| 8 | And then she applied for a credit card or |
| 9 | something like that. |
| 10 | Q   I think my question was home loan. |
| 11 | A   Home loan, yeah.  I don't -- I saw it in a |
| 12 | deposition, but I didn't see any documentation |
| 13 | in regards to that. |
| 14 | Q   Okay.  So, sitting here today as a Chase |
| 15 | representative, you don't know whether or not |
| 16 | she applied for a home loan or not after the |
| 17 | fire? |
| 18 | MR. TURNER: |
| 19 | Object to the form. |
| 20 | A   Other than what she said. |
| 21 | Q   In her deposition? |
| 22 | A   Correct. |
| 23 | Q   And in her deposition, she said she was turned |
| 24 | down for a credit card, I think, didn't she? |
| 25 | A   Yes. |
| | 104 |

26 (Pages 101 to 104)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

### PETER KATSIKAS

| | |
|---|---|
| 1 | Q  And why did she say she was turned down for a |
| 2 | credit card? |
| 3 | A  I believe she was looking to buy a washer and |
| 4 | dryer at Lowe's. |
| 5 | Q  Right.  And what did Chase put on her credit |
| 6 | record that caused her to not get a Lowe's |
| 7 | credit card? |
| 8 | MR. TURNER: |
| 9 | Object to the form.  Lack of |
| 10 | foundation. |
| 11 | A  I would have to see that credit report again. |
| 12 | Q  Well, based on -- |
| 13 | A  The time frame that you're talking about. |
| 14 | Q  I'm talking about between the time of the fire |
| 15 | and the date this lawsuit was filed, did Chase |
| 16 | put anything on April Barnett's credit record |
| 17 | that caused her to get turned down for a |
| 18 | credit card? |
| 19 | MR. TURNER: |
| 20 | You're asking him to tell you why |
| 21 | Lowe's turned her down for a credit |
| 22 | card? |
| 23 | Q  Based on what he knows. |
| 24 | MR. TURNER: |
| 25 | Same objection.  Object to the form. |

105

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Same objection as before.  If you can |
| 3 | answer, you can answer. |
| 4 | A  I don't know. |
| 5 | Q  Okay.  And your "I don't know" is based in |
| 6 | addition to everything you've seen and read on |
| 7 | all your years in the banking business; is |
| 8 | that correct? |
| 9 | MR. TURNER: |
| 10 | Same objections. |
| 11 | A  I don't know. |
| 12 | Q  You don't know.  Okay.  Have you ever turned |
| 13 | down anybody for a home loan? |
| 14 | A  Yes. |
| 15 | Q  Okay.  Have you ever turned down for a home |
| 16 | loan because of bad credit? |
| 17 | A  Yes. |
| 18 | Q  And have you ever turned down for a home loan |
| 19 | because of anything stated on the application |
| 20 | for a home loan? |
| 21 | A  If anything was stated -- What do you mean by |
| 22 | "stated on -- |
| 23 | Q  On the application.  Answers. |
| 24 | A  Well, it goes for full underwriting, not just |
| 25 | on one. |

107

| | |
|---|---|
| 1 | Lack of foundation.  Go ahead.  You |
| 2 | can answer it. |
| 3 | Q  You can answer it. |
| 4 | A  I don't know. |
| 5 | Q  Is it Chase's position that April Barnett has |
| 6 | suffered no damage because of Chase's actions? |
| 7 | MR. TURNER: |
| 8 | Object to the form.  He's not |
| 9 | testifying here as a lawyer or as an |
| 10 | expert witness. |
| 11 | MR. KILBORN: |
| 12 | I understand. |
| 13 | MR. TURNER: |
| 14 | So he can answer if he knows.  If he |
| 15 | has an answer from his personal |
| 16 | knowledge.  But he's not testifying |
| 17 | as a corporate rep on that subject. |
| 18 | We've objected to that. |
| 19 | A  I don't know. |
| 20 | BY MR. KILBORN: |
| 21 | Q  Excuse me? |
| 22 | A  I don't know. |
| 23 | Q  All right.  Based on everything you've seen |
| 24 | and read, in your opinion, has April Barnett's |
| 25 | credit reputation been damaged by Chase? |

106

| | |
|---|---|
| 1 | Q  But as far as you know. |
| 2 | A  I don't think I understand what you're asking |
| 3 | me. |
| 4 | MR. TURNER: |
| 5 | I think he asked if -- Well, it's his |
| 6 | question. |
| 7 | Q  Okay.  How many times have you personally |
| 8 | turned down somebody for a home loan even when |
| 9 | you were working for Washington Mutual or any |
| 10 | other company? |
| 11 | MR. TURNER: |
| 12 | I don't think this has anything to do |
| 13 | with the corporate representative |
| 14 | Notice, so I don't think we need to |
| 15 | get into this.  And I instruct him |
| 16 | not to answer questions outside the |
| 17 | scope of the corporate rep deposition |
| 18 | Notice. |
| 19 | MR. KILBORN: |
| 20 | Well, it goes to his knowledge.  It |
| 21 | goes to his knowledge of the subject |
| 22 | matter in the Notice. |
| 23 | MR. TURNER: |
| 24 | I don't think it does.  We can agree |
| 25 | or disagree about that.  But his |

108

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|
| 1 | history at Washington Mutual -- You |
| 2 | can ask him what he did.  But getting |
| 3 | into the specifics of him turning |
| 4 | down other folks for mortgage loans |
| 5 | based upon their credit history, that |
| 6 | doesn't have anything to do with this |
| 7 | case or his position here as a |
| 8 | corporate representative. |
| 9 | MR. KILBORN: |
| 10 | Foundation for his knowledge and |
| 11 | experience to testify on the subjects |
| 12 | in the Notice as a Chase |
| 13 | representative.  I'm entitled to go |
| 14 | into -- |
| 15 | MR. TURNER: |
| 16 | There's no subjects in the Notice |
| 17 | about asking -- that we put him up |
| 18 | for him to testify about credit |
| 19 | reputation. |
| 20 | MR. KILBORN: |
| 21 | But his knowledge and experience on |
| 22 | the subject is fair game.  And the |
| 23 | subject is credit and credit |
| 24 | reputation.  I'm entitled to know how |
| 25 | knowledgeable he is on that subject, |

109

| | |
|---|---|
| 1 | thousand, even? |
| 2 | A   It's going -- I mean, it's probably a lot.  I |
| 3 | mean -- |
| 4 | Q   I mean, what's a lot? |
| 5 | A   I don't know.  I mean -- I don't know. |
| 6 | Anywhere up to a thousand.  I mean, I did -- I |
| 7 | don't know.  I'd say between 500 and a |
| 8 | thousand maybe.  Or it's probably more than |
| 9 | that.  I don't know.  That's my best |
| 10 | guesstimate, off the top of my head. |
| 11 | Q   Okay.  All right.  And based on your knowledge |
| 12 | and experience, credit is extremely important |
| 13 | to a lender, isn't it? |
| 14 | A   Yes. |
| 15 | Q   Okay.  It's extremely important to Chase, it's |
| 16 | extremely important to Washington Mutual, and |
| 17 | it's extremely important to every other bank? |
| 18 | MR. TURNER: |
| 19 | Object to the form.  Lack of |
| 20 | foundation. |
| 21 | Q   Is that correct? |
| 22 | A   Yes. |
| 23 | Q   Okay.  And if you're a bank, it's important to |
| 24 | be careful that you don't damage somebody's |
| 25 | credit reputation, isn't it? |

111

| | |
|---|---|
| 1 | Michael. |
| 2 | MR. TURNER: |
| 3 | You've asked him.  We spent 30 |
| 4 | minutes on this subject. |
| 5 | MR. KILBORN: |
| 6 | Well, I'm asking him, since he now |
| 7 | says he's turned down home loans |
| 8 | himself, how many times. |
| 9 | MR. TURNER: |
| 10 | Well, he can give an answer based on |
| 11 | his personal knowledge.  He's not |
| 12 | testifying here as a corporate rep on |
| 13 | that subject.  It's outside the |
| 14 | deposition. |
| 15 | BY MR. KILBORN: |
| 16 | Q   All right.  How many times? |
| 17 | A   I don't know. |
| 18 | Q   Well, one or ten or a thousand?  Some order of |
| 19 | magnitude. |
| 20 | A   I don't -- I don't have an answer.  I don't |
| 21 | know.  I've worked in a call center.  There's |
| 22 | calls -- lots of calls coming in and out.  So |
| 23 | I can't say how many applications I took or |
| 24 | couldn't really give a good answer to that. |
| 25 | Q   So you don't know within, say, a hundred or a |

110

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Same objection. |
| 3 | A   Say that again.  I'm sorry. |
| 4 | Q   If you're a bank, it's important that you |
| 5 | don't damage somebody's credit reputation, |
| 6 | isn't it? |
| 7 | MR. TURNER: |
| 8 | Same objection.  You can answer. |
| 9 | A   Right. |
| 10 | Q   Excuse me? |
| 11 | A   Right. |
| 12 | Q   Okay.  It's also important if you're a bank, |
| 13 | to make sure you manage your employees and |
| 14 | your departments within the bank to make sure |
| 15 | that you know credit is unduly damaged or |
| 16 | damaged by false reporting; isn't that |
| 17 | important? |
| 18 | MR. TURNER: |
| 19 | Object to the form. |
| 20 | A   Yes. |
| 21 | Q   All right.  And part of that obligation is to |
| 22 | make sure that only accurate information is |
| 23 | given to credit reporting agencies; isn't that |
| 24 | true? |
| 25 | A   Yes. |

112

28  (Pages 109 to 112)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

### PETER KATSIKAS

1  Q   Okay.  And in April Barnett's case, who was in
2    charge of making sure that only accurate
3    information was given to credit reporting
4    agencies?
5  A  I'm not sure.
6  Q   All right.  Well, give me the name of the
7    person who was in charge.
8  A  I don't know.
9  Q   Well, give me the name of the department that
10    was in charge.
11  A  I don't know, off the top of my head.
12  Q   Give me the name of the team leader that was
13    in charge.
14  A  Still talking about credit reporting; correct?
15  Q   Correct.
16  A  I don't know.
17  Q   Well, what about the person at the top of the
18    mortgage -- the Chase mortgage business that
19    you mentioned a while ago, wouldn't you be in
20    overall charge of making sure that inaccurate
21    information isn't put on somebody's credit
22    record by Chase?
23        MR. TURNER:
24          Object to the form.  Go ahead.
25  A  A certain department -- Wherever the

113

1    department that is handling for credit
2    reporting would be responsible to do that.
3    They are a specialized department to do that.
4  Q   What's the name of that department?
5  A  I don't know, off the top of my head.
6  Q   You do know there is a department?
7  A  I don't know if it's actually a department or
8    something like IT that sends over to the
9    credit bureaus.  I don't know either way.  I
10    don't want to speculate or guess.
11  Q   Well, give me your best description of what
12    this is.  That's in charge of making sure that
13    only accurate information is given to credit
14    reporting agencies.
15        MR. TURNER:
16          Did you ask for a description, Vince?
17          I'm sorry.
18        MR. KILBORN:
19          Yeah, the best description he can
20          give of it.
21  BY MR. KILBORN:
22  Q   You used the word IP (sic)?
23  A  IT.
24        MR. TURNER:
25          I think he said "IT."

114

1  Q   IT.  Excuse me.  That's in Notice of
2    Deposition Item 2-S.  I said IT Department.
3    You said it's not a department, it's just a --
4  A  IT is a department.  It's a tech or tech
5    support.
6  Q   Okay.  So you're talking about something
7    different?
8  A  Yeah, I don't know if there is some part
9    where, you know, it's -- how -- I know it gets
10    reported to the credit bureaus whenever --
11    from the system.  Exactly the mechanics of
12    that, I'm not sure how it actually goes.  But
13    somehow it goes -- Depending on what our
14    servicing system says on there.  If it's
15    delinquent or not delinquent.  And it goes --
16    you know, it's paid as agreed.  I'm not sure
17    exactly the mechanics of it.
18  Q   Now, what is this?  Is this a person?
19  A  I'm not sure if it's actually a person or it's
20    something done electronically to the credit
21    bureaus.  Because there's Equifax -- The major
22    ones are Equifax, Experian, and Transunion.
23  Q   Right.  So my question is:  What does Chase
24    have in place -- What did Chase have in place
25    in 2010 to ensure that only accurate

115

1    information goes a credit reporting agency?
2  A  Well, there are only -- I don't know the
3    exact -- I don't know.
4  Q   Okay.  So you can't answer that.  You can't
5    tell me the name of a person or a team or a
6    department that did that?
7  A  Correct.
8
9      (Plaintiff's Exhibit Number 22-A was
10      marked for identification.)
11
12  Q   Let's see.  I want to show you what I'll mark
13    as Plaintiff's Exhibit 22-A.  And ask you if
14    that's one of the documents that you reviewed
15    in preparation for your deposition?
16        MR. TURNER:
17          For the record, it's Chase 342, 343.
18  A  It looks like it -- appears to be, yes.
19  Q   And what is this?
20  A  Acceleration warning.
21  Q   So is acceleration warning notice of intent to
22    foreclose?
23  A  That's what it says at the top, yes.
24  Q   Dated August 27, 2010?
25  A  Correct.

116

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

1  Q  It was sent from the Chase Collections
2     Department?
3  A  Correct.
4  Q  And item Number 1, it says:  You're in default
5     because you failed to pay the required monthly
6     installments, commencing with the payment date
7     July 1, 2010, doesn't it?
8  A  Yes.
9  Q  Okay.  And Chase reported that default to a
10    credit reporting agency, didn't it?
11 A  I believe so.  But I would have to confirm
12    that on the credit report.
13 Q  And then second, it says:  As of August 27,
14    2010, total monthly payments, including
15    principal, interest, and escrow, if
16    applicable, late fees and NSF fees and other
17    fees and advances due under the terms of your
18    loan documents in the total amount of
19    $4,577.67 are past due.
20       It says that, doesn't it?
21 A  Yes.
22 Q  Okay.  Then underneath that, it shows late
23    fees of $287.43, doesn't it?
24 A  Yes.
25 Q  All right.  And Chase reported that to a

117

1     credit reporting agency, didn't it?
2        MR. TURNER:
3        "That" being the late fees?
4        MR. KILBORN:
5        No.
6        MR. TURNER:
7        Or that information?  I'm just
8        confused what you're asking.
9        MR. KILBORN:
10       That information.
11 BY MR. KILBORN:
12 Q  She was past due?
13 A  I believe so.  Past due.  But I would have to
14    see the credit report to confirm that.
15 Q  Credit report says four times 90.  That means
16    four times more than 90 days past due, doesn't
17    it?
18 A  Four times -- Four 90 days past due.
19 Q  4X90?
20 A  Right.
21 Q  Okay.  Chase reported that to a credit
22    reporting agency, didn't it?
23       MR. TURNER:
24       Object to the form.
25 A  I don't know.  I would have to see the credit

118

1     report.
2  Q  Well, you did review a credit report, didn't
3     you?
4  A  I looked at credit reports on there, yes.
5  Q  Okay.  For purposes of testifying?
6  A  Yes.
7  Q  Okay.  Well, either one of these items, 1 and
8     2, on Exhibit 22 A, the default and the past
9     due, is that on the credit report?
10       MR. TURNER:
11       That he reviewed?
12       MR. KILBORN:
13       Yes.
14 A  I saw -- I saw the credit report after it was
15    straightened out.
16 BY MR. KILBORN:
17 Q  How about before?
18 A  I didn't -- I don't believe I've seen it, off
19    the top of my head.
20 Q  Okay.  So the one that was straightened out,
21    what was straightened out was the report of a
22    default and a report of a past due, wasn't it?
23       MR. TURNER:
24       Object to the form.
25 A  It just showed it was paid and satisfied or

119

1     something to that effect.  I would have to see
2     that to read the language on it.
3  Q  Well, let's see.  It says:  Notice of Intent
4     to Foreclose.
5        Chase reported a foreclosure, didn't it?
6  A  I don't know if you have -- I mean, unless you
7     have a credit report that you could show me
8     from that time frame.
9  Q  All right.  So you'd never seen a credit
10    report until after Chase says it was fixed?
11 A  To the best of my recollection.
12 Q  Okay.  So sitting here today you have no
13    knowledge of what Chase reported to April
14    Barnett's credit before Chase straightened it
15    out?
16 A  I can't recall.
17 Q  Well, if you do have that knowledge, tell me
18    what it is.
19 A  I mean, if it's Bate stamped with Chase on it,
20    and if shows on there, then I reviewed it.
21    But if it wasn't, I have no -- I mean, I don't
22    remember seeing it.  The only thing I remember
23    seeing that was -- It was the corrected
24    version of the Credit Bureau.
25 Q  What did it look like before it was corrected?

120

30 (Pages 117 to 120)

### PETER KATSIKAS

| | | |
|---|---|---|
| 1 | A | Like I said, I would have to see that Credit |
| 2 | | Bureau if I did or not. |
| 3 | Q | **You don't know?** |
| 4 | A | I can't recall one way or another. |
| 5 | Q | **Well, wouldn't it be important to know what** |
| 6 | | **was straightened out or corrected?** |
| 7 | A | Well, it shows it's been fixed. |
| 8 | Q | **Well, you know Chase is in a lawsuit --** |
| 9 | A | Correct. |
| 10 | Q | **-- that alleges incorrect information was put** |
| 11 | | **on April Barnett's credit, don't you?** |
| 12 | A | Those are the allegations, yes. |
| 13 | Q | **Okay. Well, since you're testifying on behalf** |
| 14 | | **of Chase, wouldn't it be important to know if** |
| 15 | | **that was true or not?** |
| 16 | | MR. TURNER: |
| 17 | | Object to the form. |
| 18 | A | I mean, I have no personal knowledge. I just |
| 19 | | reviewed the -- reviewed Chase's business |
| 20 | | records. But, like I said, if you have |
| 21 | | something on it that you would like to show me |
| 22 | | and ask questions on it. |
| 23 | Q | **Based on Chase's business records that you've** |
| 24 | | **reviewed, what was reported incorrectly?** |
| 25 | | 121 |

| | | |
|---|---|---|
| 1 | | MR. TURNER: |
| 2 | | Object to the form. |
| 3 | A | Again, I would have to see the credit report |
| 4 | | for that time frame that you're talking about. |
| 5 | Q | **What was straightened out?** |
| 6 | A | Well, it's showing that it's been paid and |
| 7 | | satisfied and there's no late pays on there. |
| 8 | Q | **You don't know why it was straightened out?** |
| 9 | A | Exact reason, I don't know. |
| 10 | Q | **Now, let's see -- what I want to mark as** |
| 11 | | **Plaintiff's Exhibit 22 --** |
| 12 | | |
| 13 | | (Plaintiff's Exhibit Number 22 was |
| 14 | | marked for identification.) |
| 15 | | |
| 16 | Q | **Looking at Exhibit 222. That's Chase 349.** |
| 17 | | **That's the August 27, 2010 letter, the same** |
| 18 | | **date as Exhibit 22-A from the Property** |
| 19 | | **Preservation and Inspection Department;** |
| 20 | | **correct?** |
| 21 | A | I'm still reading it. It just a moment. |
| 22 | | Yeah. |
| 23 | Q | **Okay. And what address is it sent to?** |
| 24 | A | 101 Karian Court, Oxford, Alabama 36203. |
| 25 | Q | **Okay. And that address is the same address** |
| | | 122 |

| | | |
|---|---|---|
| 1 | | that Exhibit 22-A was sent, isn't it? |
| 2 | A | (Witness examines document.) Correct. |
| 3 | Q | **Okay. And we know that that address had** |
| 4 | | **burned down, don't we?** |
| 5 | A | Right. |
| 6 | Q | **And we know that at that time Chase knew it** |
| 7 | | **had burned down, don't we?** |
| 8 | A | Yeah, Chase knew it was burned down. |
| 9 | Q | **All right. Then why was Chase communicating** |
| 10 | | **with the borrower, April Barnett, sending** |
| 11 | | **letters to a burned down house?** |
| 12 | A | I didn't see a property address request in |
| 13 | | writing to Chase in her files that we |
| 14 | | produced. |
| 15 | Q | **What, now?** |
| 16 | A | I said I didn't see a request in writing where |
| 17 | | the property address was changed to the |
| 18 | | mailing address -- the mailing address was |
| 19 | | changed. |
| 20 | Q | **That wasn't my question. My question --** |
| 21 | | MR. TURNER: |
| 22 | | He just answered your question. |
| 23 | Q | **It wasn't my question. Why was Chase** |
| 24 | | **communicating with the borrower important** |
| 25 | | **information to an address that Chase knew had** |
| | | 123 |

| | | |
|---|---|---|
| 1 | | burned down? |
| 2 | | MR. TURNER: |
| 3 | | Object to the form. |
| 4 | A | That same answer I just gave you. This is the |
| 5 | | last known address on here. |
| 6 | Q | **Well, Chase knew she wouldn't get the letter,** |
| 7 | | **didn't it?** |
| 8 | | MR. TURNER: |
| 9 | | Object to the form. |
| 10 | A | I mean, we don't know that unless she sends |
| 11 | | something in writing. |
| 12 | Q | **Say that again.** |
| 13 | A | Unless she sends something in writing to |
| 14 | | change it. And that's according to the |
| 15 | | mortgage provision says -- I mean -- |
| 16 | Q | **Well, Chase was out there -- was out there on** |
| 17 | | **the property and saw it was -- the dwelling** |
| 18 | | **was burned, wasn't it?** |
| 19 | | MR. TURNER: |
| 20 | | Object to the form. Lack of |
| 21 | | foundation. |
| 22 | A | The property inspectors were out there. |
| 23 | Q | **Well, that's Chase employees, isn't it?** |
| 24 | A | That's a vendor. |
| 25 | Q | **A vendor. Okay. So Chase hires vendors to** |
| | | 124 |

31 (Pages 121 to 124)

PETER KATSIKAS

| | |
|---|---|
| 1 | inspect property? |
| 2 | A   Correct. |
| 3 | Q   And the vendors report back to Chase what they |
| 4 | find, don't they? |
| 5 | A   Right. |
| 6 | Q   And Chase had a vendor go out and inspect this |
| 7 | burned house, didn't it? |
| 8 | A   Correct. |
| 9 | Q   And the vendor determined that the property |
| 10 | was vacant, didn't the vendor? |
| 11 | A   Well, that and State Farm, too. |
| 12 | Q   I'm not asking you about State Farm.  Chase |
| 13 | determined from the vendor that the property |
| 14 | was vacant, didn't it? |
| 15 | A   Well, them and State Farm. |
| 16 | Q   Did I ask you about State Farm? |
| 17 |        MR. TURNER: |
| 18 |        Don't argue with him.  Just answer |
| 19 |        his question. |
| 20 | Q   I've got lots of time.  All I want to ask you |
| 21 | about is Chase and its vendor.  If you want to |
| 22 | talk about State Farm, go ahead. |
| 23 |        MR. TURNER: |
| 24 |        All right.  Let's just ask questions |
| 25 |        and he'll answer. |

125

| | |
|---|---|
| 1 | A   Chase. |
| 2 | Q   Chase's Property Preservation and Inspection |
| 3 | Department wrote it, didn't it? |
| 4 | A   Property -- Yeah, correct. |
| 5 | Q   Okay.  And it says:  We were recently notified |
| 6 | that the referenced property is vacant. |
| 7 |        Did you read that?  Did I read that |
| 8 | correct? |
| 9 | A   Yep, that's what the document says. |
| 10 | Q   And what does "vacant" mean? |
| 11 | A   It means there's nobody living there. |
| 12 | Q   Nobody living there.  So we know that the |
| 13 | vendor reported this to Chase, don't we? |
| 14 | A   That's who signed the letter. |
| 15 | Q   Well, it say:  We were originally notified |
| 16 | that the referenced property is vacant. |
| 17 |        Who notified Chase? |
| 18 | A   Well, like I said, I saw in the file that |
| 19 | State Farm notified Chase, as well.  Then we |
| 20 | have also inspectors on there.  I'm not sure |
| 21 | which one actually did.  That references this |
| 22 | letter, maybe both.  I don't know. |
| 23 | Q   So we do know that either Chase or a Chase |
| 24 | vendor went to the property, don't we? |
| 25 | A   It would have been a Chase vendor. |

127

| | |
|---|---|
| 1 |        MR. KILBORN: |
| 2 |        Well, he's testified -- |
| 3 |        MR. TURNER: |
| 4 |        We're not going to argue.  Just ask |
| 5 |        the questions, Vince. |
| 6 |        MR. KILBORN: |
| 7 |        400 times? |
| 8 |        MR. TURNER: |
| 9 |        Just ask your questions, Vince. |
| 10 |        MR. KILBORN: |
| 11 |        He's being too cute.  And I want -- |
| 12 |        MR. TURNER: |
| 13 |        And nobody is being cute here.  You |
| 14 |        just ask the questions and he'll |
| 15 |        answer. |
| 16 | BY MR. KILBORN: |
| 17 | Q   Isn't it true that Chase sent an inspector to |
| 18 | the property that had burned down, the |
| 19 | inspector determined it was vacant, that was |
| 20 | reported back to Chase; isn't that true? |
| 21 | A   Yes. |
| 22 | Q   All right.  Then Chase wrote this letter, |
| 23 | Exhibit 22, didn't it? |
| 24 | A   This letter was written to the borrower. |
| 25 | Q   On whose letterhead? |

126

| | |
|---|---|
| 1 | Q   Okay.  And we know that the property burned |
| 2 | down, don't we? |
| 3 | A   Correct. |
| 4 | Q   Okay.  And you've seen pictures of the house, |
| 5 | haven't you? |
| 6 | A   I've seen VPO's of the original appraisal and |
| 7 | then copies of -- I guess it was getting |
| 8 | rebuilt, maybe just -- because it was like |
| 9 | distorted pictures of it.  But I don't know if |
| 10 | it was rebuilt or -- getting rebuilt or the |
| 11 | structure was -- It was a bad copy of the |
| 12 | pictures. |
| 13 | Q   Let's see.  I want to mark this Plaintiff's |
| 14 | Exhibit 26. |
| 15 | |
| 16 |        (Plaintiff's Exhibit Number 26 was |
| 17 |        marked for identification.) |
| 18 | |
| 19 | Q   This is State Farm production pursuant to |
| 20 | subpoena.  You've seen that, haven't you? |
| 21 | A   Let me double-check.  (Witness examines |
| 22 | document.) |
| 23 |        MR. TURNER: |
| 24 |        These are State Farm records? |
| 25 | A   Yeah.  I've seen -- this looks -- The first |

128

32 (Pages 125 to 128)

### PETER KATSIKAS

```
 1      page looks familiar, State Farm 690, 691 looks
 2      familiar.  I don't think I've ever seen 692.
 3   Q   You see all the photographs State Farm took of
 4      the burned-down house?
 5   A   Yeah.  I never seen these before, from 693,
 6      until -- Let's go through these real quick.
 7   Q   All right.
 8   A   -- through 728.
 9   Q   All right.  This is on 101 Karian Court; is
10      that correct?
11   A   That's wat that document says.
12   Q   See on 101 on State Farm -- SF-1700?
13   A   Correct.
14   Q   Is there some other 101 address other than
15      Karian Court that you know about?
16      MR. TURNER:
17         Another address that has 101 on it?
18      MR. KILBORN:
19         Right.
20   A   I don't know.
21   BY MR. KILBORN:
22   Q   Okay.
23   A   I don't know if that's -- I've never been out
24      to the house, so I can't tell you.
25   Q   You don't know if that's the house or not?
                                                    129
```

```
 1   A   I don't -- Like I said, I've never seen that
 2      before.
 3   Q   You do know whether or not this is the house
 4      or not?  Look at all these pictures.
 5   A   I understand it's devastating, but I've never
 6      seen it before.
 7   Q   Yeah.  Does it look like a burned-down house
 8      to you?
 9   A   It does.
10   Q   All right.  Do you dispute that that's 101
11      Karian Court?
12      MR. TURNER:
13         He's never seen these pictures
14         before, Vince.  He's already said
15         that.
16   Q   Do you dispute it?
17   A   I don't know either way.  Never been out
18      there, never seen them.  So I can't really
19      tell.  I've never been out to this property
20      before in my life.  So --
21   Q   So you wouldn't know what 101 Karian Court
22      looked like now or then?
23      MR. TURNER:
24         Object to the form.
25   A   No.  No.
                                                    130
```

```
 1   Q   Okay.  In the second paragraph of Exhibit 22,
 2      it says:  If your statement is not received by
 3      this date, we are required to secure the
 4      property to prevent damage and protect your
 5      interest, as well as ours, on the property.
 6      Our actions may include such measures as
 7      changing the locks and winterizing the
 8      property, if necessary.  Additionally, if the
 9      property is vacant, you may wish to contact
10      your insurance company to be sure your policy
11      covers this condition.
12         (Ms. Robinson enters deposition.)
13   Q   Did you read that?
14   A   Yes.
15   Q   Okay.  What's the Chase Property Preservation
16      and Inspection Department trying to
17      communicate to April Barnett?
18   A   This is basically a generic letter that goes
19      out when it's vacant.  Not all houses are
20      burned down once they're abandoned.  They're
21      just letting them know that, you know, if you
22      abandon the property just to protect the
23      interest of the property, you know, you may
24      have to change the locks and board it up, you
25      know, to prevent it from being vandalized or
                                                    131
```

```
 1      anything.
 2   Q   What's a generic letter?
 3   A   Well, it's just vacancy letters, you know, is
 4      a generic letter sent out to the borrower.
 5   Q   Is it supposed to be accurate?
 6   A   I mean, yes, it's supposed to be accurate,
 7      yes.
 8   Q   So when it says:  We were recently notified
 9      the referenced property is vacant, the
10      property is supposed to be vacant?
11   A   Say that again.  I'm sorry.
12   Q   The property is supposed to be vacant since
13      that's what it says?
14   A   Right.
15   Q   Okay.  Now, explain to the jury that's going
16      to hear this case how Chase would change the
17      locks on this particular house.
18      MR. TURNER:
19         Object to the form.
20   A   Well, I would say they wouldn't change the
21      locks to this property.
22   Q   Why was changing the locks mentioned?
23   A   I don't know why.
24   Q   Excuse me?
25   A   I don't know why.  I mean, it's a generic form
                                                    132
```

33 (Pages 129 to 132)

**PETER KATSIKAS**

| | |
|---|---|
1 that goes out that said property is vacant.
2 Not all houses are burned down.  Just a
3 vacancy letter.
4 Q  Well, obviously, the writer of the letter
5 didn't know what he was talking about, did he?
6 MR. TURNER:
7 Object to the form.  Lack of
8 foundation.
9 A  I don't know.
10 Q  Well, would you write such a letter?
11 MR. TURNER:
12 Same objections.
13 A  It's just saying that it's vacant.  I mean,
14 someone outside that never visited the
15 property that's coming from -- say that the
16 house is vacant.  One way or another, that
17 letter has been generated saying -- letting
18 them know that the house -- that the property
19 is vacant.  It just says they're going to
20 change the locks on it and winterize.  It's a
21 standard form.
22 Q  Then it says winterize the property.  Do you
23 see that?
24 A  Yes.
25 Q  What does winterize the property mean?

133

1 A  Making sure like the pipes don't freeze and
2 common in northern areas.
3 Q  Okay.  And why was that -- Why was that
4 winterizing the property put in this letter to
5 April Barnett?
6 A  Like I said, it's a standard letter that goes
7 out on there.  I mean, there's also, you know,
8 winterizing -- We send letters out like that.
9 It's just a generic form.  You know, sometimes
10 to people in Florida, as well, in regards to
11 that.  It just means make sure to secure the
12 property according to the mortgage, once it
13 becomes vacant, according to the terms of the
14 mortgage.  We just have to make sure we secure
15 the interest for the investor.
16 Q  And even though it's a generic letter, it's
17 supposed to have some relationship with
18 reality, isn't it?
19 MR. TURNER:
20 Object to the form.
21 A  Oh, yes.
22 Q  It is; is that correct?
23 A  Yes.
24 Q  Okay.  And does this letter have any
25 relationship with the reality?

134

1 MR. TURNER:
2 Object to the form.  Lack of
3 foundation.  If you understand what
4 he's asking, you can answer.
5 A  It just says it's vacant.
6 Q  But does the rest of the letter have any
7 relationship with reality?
8 MR. TURNER:
9 Same objections.
10 A  It doesn't say anything about reality on
11 there.
12 Q  I know that.  But what relationship does this
13 letter have with the reality of the situation,
14 which was that the house basically was burned
15 down?
16 MR. TURNER:
17 Object to the form.
18 A  It says the property is vacant.  If you have
19 any questions regarding this matter, there's
20 an 800 number to call.
21 Q  And if you call this 800 number, what do you
22 get?
23 A  Property Preservation specialist.
24 Q  Okay.  And who would that be?
25 A  That's what it says.  I mean, you would talk

135

1 to somebody in the Property Preservation in
2 regards to the vacancy over there.
3 Q  And the truth of the matter is that this
4 letter was written to April Barnett at a known
5 nonexistent address, wasn't it?
6 MR. TURNER:
7 Object to the form.  Lack of
8 foundation.
9 A  That was sent to the last known address.
10 Q  But the last known address was known to not
11 exist, wasn't it?
12 MR. TURNER:
13 Lack of foundation.  Object to the
14 form.
15 A  We don't have -- I mean, I don't see there was
16 any -- like something in writing sent by April
17 for proof of change of address.
18 Q  All right.  Well, if you knew that the house
19 had burned down and you didn't have change of
20 address from April Barnett, why would you send
21 a letter to the location anyway?
22 MR. TURNER:
23 Same objections.  Asked and answered.
24 A  It's sending to the address.  Unless I would
25 have -- You know, April would probably forward

136

34 (Pages 133 to 136)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

1  her mailing address somewhere else to wherever
2  she was living.
3  Q   What do you base that on?
4  A   That's my assumption.  I don't know.
5  Q   Okay.  So if the postal service could figure
6      out where she was, that would be Chase's
7      reason to send to 101 Karian Court, Oxford,
8      Alabama?
9          MR. TURNER:
10         Object to the form.
11 Q   In hopes that the post office would find her?
12         MR. TURNER:
13         Object to the form.  Asked and
14         answered.  Lack of foundation.
15 A   I mean, I don't know.
16 Q   Well, did you see a phone call from Chase to
17     April Barnett saying where should we mail this
18     letter, Exhibit 22 or Exhibit 22-A?
19 A   I don't believe so.
20 Q   Why didn't Chase do that?
21 A   I don't know.
22 Q   You think it's reasonable to do that?
23         MR. TURNER:
24         Object to the form.
25 A   Like I said, the only address that's on file

137

1  is last known address.  I mean, unless someone
2  -- I mean, I don't know.  We can't just make
3  up an address.  This is the address that was
4  -- that we have and we're going to.
5  Q   Do you remember the question?
6          MR. TURNER:
7          Don't argue with him, Vince.  Just
8          ask the questions, please.
9  Q   I asked about why wouldn't you call to find
10     out what the address is, knowing that the
11     address on the letter was burned down?
12 A   I don't know.
13         MR. TURNER:
14         Same objections.  Asked and answered.
15 A   I don't know why they wouldn't call.
16 Q   Well, would you call if you were writing this
17     letter, Exhibit 22 --
18         MR. TURNER:
19         Object to the form.
20 Q   -- knowing that the address didn't exist?
21 A   I would send it to last known address.
22         MR. TURNER:
23         Object to the form.  Lack of
24         foundation.
25 Q   So you wouldn't call, would you?

138

1  A   I would send it to the last known address.
2  Q   That's not my question.  You would not call,
3      would you?
4  A   Probably not, no.
5  Q   So let me look -- Let me see here.  Let's look
6      at -- Let's look at Exhibit 21.
7
8          (Plaintiff's Exhibit Number 21 was
9          marked for identification.)
10
11 Q   Take a look at Plaintiff's Exhibit 21.  Have
12     you seen that before?
13         MR. TURNER:
14         This is 341 and 344 of Chase's
15         production?
16         MR. KILBORN:
17         Yeah.  They were out of sequence in
18         the production.
19 A   I believe so, yes.
20 Q   Okay.  Is this an important letter, also?
21 A   It's just a solicitation for workout
22     regarding the missed payments.
23 Q   Is it an important letter?
24 A   It's an important letter, yes.
25 Q   Okay.  And it was sent to the same burned-down

139

1  address that Exhibits 22 and 22-A were sent
2  to; right?
3  A   It was sent to 101 Karian Court, Oxford,
4      Alabama, 36203.
5  Q   That's the same letter the other two were sent
6      to; correct?
7  A   Yes.
8  Q   On the same date?
9  A   It looks like it, yes.
10 Q   All right.  So we've got three Chase letters
11     sent to the same burned-down address on the
12     same day, and all of these letters are
13     important in one way or the other, aren't
14     they?
15 A   Right.
16 Q   And is this -- Is the first two letters I
17     showed you, 22 and 22-A, are they just generic
18     letters?
19         MR. TURNER:
20         I think he's already testified to 22.
21         You're asking -- But you can answer
22         it again.
23 A   The 22-A is not a generic letter, because it
24     shows the month that her -- the default.  And
25     then the 21 is a generic letter that goes out,

140

35 (Pages 137 to 140)

PETER KATSIKAS

1    yes.  Give us a call in order to see if we
2    could assist the borrower in some kind of
3    workout, the Loss Mitigation efforts.
4  Q   So, let's see, this August 27, 2010, letter,
5    Exhibit 21, that's -- you call that a generic
6    letter?
7  A   I would -- You know, I would classify it as a
8    generic letter, yes.
9  Q   From the Collection Department?
10  A   Loss Mitigation.  Well, it says Collection,
11    but, yes, Collection/Loss Mitigation.
12  Q   Well, it says Collection Department, doesn't
13    it?
14  A   I understood that.
15  Q   Okay.  And what does the Collection Department
16    do?
17  A   Well, I mean, that's part of the Loss Mitt
18    part, you know, Collections, to see if they
19    could -- Like I said, either do like a promise
20    to pay or a payment plan or forbearance or
21    some kind of modification or a short sale or
22    something to that effect.  Deed in lieu or --
23  Q   And it says, up at the top of the letter:
24    Your house is your home.
25    Is that correct?
                                               141

1  A   It does.
2  Q   Do you know what that means?
3  A   It says that your house is your home.  You
4    want to keep it that way.
5  Q   What does that mean?
6  A   In other words, we don't want to foreclose on
7    it.
8  Q   And then it says:  You're going through tough
9    times.  We can help.
10    What does that mean?
11  A   Since the loan has missed payments, it's
12    assuming that you're having financial trouble,
13    give us a call.  It goes on to say you may be
14    eligible for a loan workout.
15  Q   Well, April Barnett wasn't having financial
16    trouble, was she?
17    MR. TURNER:
18    Object to the form.
19  A   I don't know.
20  Q   Well, what financial trouble was she having?
21    MR. TURNER:
22    He just said he didn't know.
23  A   I don't know.
24  Q   You don't know whether she was or not, do you?
25  A   No.
                                               142

1  Q   You don't know whether she was going through
2    tough times or not, do you?
3  A   No.
4  Q   Chase didn't know whether she was going
5    through tough times or not, did it?
6  A   Correct.
7  Q   Why, then, did Chase write you are going
8    through tough times when it didn't know?
9  A   Because the July and August payment hasn't
10    been made.  Of 2010.
11  Q   That's tough times?
12  A   That's -- I mean, it hasn't -- payment hasn't
13    been made.
14  Q   And that's what Chase calls tough times?
15  A   It's their generic letter on there that gets
16    sent out, correct.
17  Q   It says:  In fact, we believe your home loan
18    may be eligible for a loan workout.
19    What does that mean?
20  A   Modification, forbearance.
21  Q   Why did Chase write to April Barnett that her
22    home might be eligible for a loan workout?
23  A   Because at that point she was due for August
24    and July of 2010.
25  Q   But she wasn't due for a loan workout, was
                                               143

1    she?
2    MR. TURNER:
3    Object to the form.
4  A   It says you may be eligible.  It doesn't
5    guarantee she was eligible for a loan workout.
6  Q   A loan workout was completely irrelevant to
7    the situation, wasn't it?  The house had
8    burned, State Farm was sending the check for
9    the right amount to pay it off.  Why does that
10    mean that she would be interested in a loan
11    workout?
12    MR. TURNER:
13    Object to the form.
14  A   Well, I mean, again, she hasn't -- At that
15    particular time she hasn't made July or
16    August's payment.
17  Q   I know that.  But she's going to pay the whole
18    thing off through her insurance company, State
19    Farm.  Why would she be interested in
20    anybody's wildest imagination of a loan
21    workout?
22    MR. TURNER:
23    Object to the form.
24  A   I don't know what her thinking would be.  I
25    don't know.
                                               144

PETER KATSIKAS

1  Q   What would Chase's thinking be --
2         MR. TURNER:
3             Object to the form.
4  Q   -- to think she would be interested in a loan
5      workout?
6  A   Because she missed a July and August payment
7      for 2010.
8  Q   She was also going to pay off the loan, too.
9      Chase knew that, didn't it?
10        MR. TURNER:
11            Object to the form.
12 A   We didn't know that.
13 Q   Excuse me?
14 A   We didn't know that.
15 Q   Chase didn't know that.  Chase didn't know
16     State Farm was going to pay it off?
17        MR. TURNER:
18            Object to the form.
19 A   At that time, no.
20 Q   Really?  What do you base that on?
21 A   There is no check in August 27, 2010.  At that
22     point time when this thing gets mailed out,
23     there was no check received from Chase.
24 Q   But Chase had been told that State Farm was
25     going to pay off in full, and Chase had given

145

1  Q   Okay.  Well, somebody in Chase knew April
2      Barnett's correct address, didn't they?
3         MR. TURNER:
4             What time are you asking, Vince?
5             Object to the form.
6  A   I don't know.  I would have to look at the
7      notes.
8  Q   Did Chase ever get a correct address on April
9      Barnett?
10        MR. TURNER:
11            Object to the form.
12 A   In writing?
13 Q   Writing, verbal, or whatever.
14        MR. TURNER:
15            Object to the form.
16 A   Well, there was some verbal in the notes.  But
17     as far as dates, unless you want to show me
18     the pay history -- or the notes of it, I could
19     point that out to you.
20 Q   So your sworn testimony on behalf of JP Morgan
21     Chase, that Chase did not know April Barnett's
22     correct address on or about August 27, 2010,
23     when it sent three letters out -- important
24     letters to the burned-down address?
25

147

1      the payoff amount and Chase knew the check was
2      in the mail, didn't it?
3         MR. TURNER:
4             Object to the form.  Lack of
5             foundation.
6  A   You know, we don't have any knowledge that the
7      check was in the mail.  People say they are
8      going to pay it off every day, and we don't
9      have -- you know, that doesn't excuse for
10     not -- for the payments not being made.
11 Q   Well, what about the debris check?
12 A   What do you mean debris check?
13 Q   Do you know anything about a debris check?
14 A   I don't know what that is.  I don't know what
15     you're asking me.
16 Q   Huh?  You don't know anything about a debris
17     check from State Farm?
18        MR. TURNER:
19            Object to the form.
20 A   I know there was a 23,000 to demolish the
21     house, the remainder of it.  23,000 and
22     change.  Is that what you're talking about?  I
23     don't know.
24 Q   No.
25 A   I don't think I'm aware of that.

146

1         MR. TURNER:
2             Object to the form.  Mischaracterizes
3             his testimony.
4  A   I mean, I would have to look at the notes on
5      there.
6  Q   Well, what note are you going to have to look
7      at?
8  A   The MSP notes, which you have.
9  Q   Okay.  You want to look at the MSP notes.
10     Well, let's just test your recollection.  So
11     you spent yesterday looking at all of Chase's
12     documents, didn't you?
13 A   Not just yesterday, but --
14 Q   Last week?
15 A   Last week.
16 Q   So you've been studying on all the records,
17     haven't you?
18 A   I've been looking at them, yes.
19 Q   And you knew you were going to testify under
20     oath?
21 A   Correct.
22 Q   In a federal lawsuit?
23 A   Correct.
24 Q   In front of a federal jury?
25

148

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Object to the form. |
| 3 | Q   Correct? |
| 4 | A   I don't know.  A jury -- I mean, I don't know. |
| 5 | Q   And you've testified before a jury before, |
| 6 | hadn't you? |
| 7 | A   Yes. |
| 8 | Q   How many times? |
| 9 | MR. TURNER: |
| 10 | He's already answered that. |
| 11 | MR. KILBORN: |
| 12 | No, he didn't. |
| 13 | MR. TURNER: |
| 14 | Yeah, he did. |
| 15 | MR. KILBORN: |
| 16 | I didn't ask about jury trials.  I |
| 17 | just said trials.  I'm talking about |
| 18 | jury trials. |
| 19 | MR. TURNER: |
| 20 | All right.  Well, answer the |
| 21 | question. |
| 22 | A   Yes. |
| 23 | BY MR. KILBORN: |
| 24 | Q   How many times? |
| 25 | A   Twice. |

149

| | |
|---|---|
| 1 | Q   And where? |
| 2 | A   Where?  Barnestable, Massachusetts.  And the |
| 3 | other one was somewhere in Texas -- outside of |
| 4 | Waco, Texas. |
| 5 | Q   Federal jury or state jury? |
| 6 | A   I think they were both state.  State. |
| 7 | Q   Okay.  So you've never testified before a |
| 8 | federal judge and a federal jury? |
| 9 | A   I have testified in front of a federal judge. |
| 10 | Federal jury, I don't believe so, no. |
| 11 | Q   Okay.  And those were wrongful foreclosure |
| 12 | cases in Texas and Massachusetts? |
| 13 | A   No. |
| 14 | Q   What were they? |
| 15 | A   The one in Massachusetts was -- I'm trying to |
| 16 | think.  It's been a while.  It had something |
| 17 | to do with -- alleged that someone -- Let's |
| 18 | say the father didn't sign the note and |
| 19 | mortgage.  Something to that effect.  With the |
| 20 | state.  And the other one was something to the |
| 21 | effect that there was some kind of -- same |
| 22 | thing as -- Well, if I can remember correctly, |
| 23 | something to that -- They alleged they didn't |
| 24 | sign the note and mortgage for some reason or |
| 25 | another.  I don't know.  It's been a while. |

150

| | |
|---|---|
| 1 | Something to that effect. |
| 2 | Q   And knowing that your testimony was going to |
| 3 | be important, you reviewed this MSP, didn't |
| 4 | you? |
| 5 | A   Yes. |
| 6 | Q   Okay.  And you reviewed the MSP, of course, to |
| 7 | find out if Chase really did know April |
| 8 | Barnett's correct address, didn't you? |
| 9 | MR. TURNER: |
| 10 | Object to the form. |
| 11 | A   Did we -- I don't -- There's stuff in MSP on |
| 12 | there, where she gave verbal. |
| 13 | Q   Verbal what? |
| 14 | A   Verbal addresses. |
| 15 | Q   What's a verbal address? |
| 16 | A   In other words, she told somebody on the phone |
| 17 | that someone documented in the notes that this |
| 18 | address for -- I mean, if you have it, we can |
| 19 | go over it.  It would be a lot easier. |
| 20 | Q   Don't be jumpy. |
| 21 | A   I'm not jumpy.  I just -- |
| 22 | MR. TURNER: |
| 23 | Just answer the question. |
| 24 | Q   I'm just asking you, isn't it true, despite |
| 25 | what you said up to right now, that Chase knew |

151

| | |
|---|---|
| 1 | April Barnett's correct mailing address on |
| 2 | August 27, 2010, when it sent three important |
| 3 | letters to her to the burned-down address? |
| 4 | MR. TURNER: |
| 5 | Object to the form. |
| 6 | A   Well, these were sent to the property address. |
| 7 | I'm not sure.  I mean, there was some -- I |
| 8 | don't know the exact dates when Chase got |
| 9 | those verbals without looking at the notes. |
| 10 | Q   Well, if Chase was verbally told and wrote in |
| 11 | its notes what the correct mailing address is, |
| 12 | why would it send important letters -- three |
| 13 | important letters to the wrong mailing |
| 14 | address? |
| 15 | A   I don't know who she talked to or which |
| 16 | department that was for that particular -- |
| 17 | Q   What department should she have talked to? |
| 18 | A   Well, what department is she calling to give |
| 19 | the address? |
| 20 | Q   I don't know.  What department should she have |
| 21 | called to give her correct mailing address? |
| 22 | A   Customer Service. |
| 23 | Q   Customer Service?  And only Customer Service? |
| 24 | A   Well, Customer Service, so they can update the |
| 25 | system. |

152

38 (Pages 149 to 152)

**PETER KATSIKAS**

**Page 153**

1  Q  How would she know that?
2  A  I don't know how she would know that.
3  Q  Okay.  And if Chase knew her correct mailing
4     address and sent three important letters to
5     the burned-down address, Chase deliberately
6     sent three important letters, knowing she
7     wouldn't get them, didn't it?
8        MR. TURNER:
9           Object to the form.  Lack of
10          foundation.
11 A  I don't believe so.
12 Q  Well, why would Chase send three important
13    letters regarding default, foreclosure, or
14    loan workout, obligations to winterize and
15    ensure -- why would it send three important
16    letters to a known bad address --
17       MR. TURNER:
18          Object to the form.
19 Q  -- that was burnt to the ground?
20       MR. TURNER:
21          Same objection.
22 A  I mean, I don't -- I don't know these -- I
23    didn't write these letters out.  These were
24    mailed out to the last known address according
25    to what was on file.  And they all went to the

**Page 154**

1     101 Karian Court, Oxford, Alabama.
2  Q  What would be the purpose of Chase writing
3     down in its notes the correct mailing address
4     if it was going to ignore that and send them
5     to the burned-down address anyway?
6        MR. TURNER:
7           Object to the form.
8  A  I don't know.
9  Q  Can you think of a reason?
10       MR. TURNER:
11          Object to the form.
12 A  Other than what the mortgage says in there.
13    It says any notices shall give the lender in
14    writing.
15 Q  And who was supervising a simple thing like
16    sending important letters to the correct
17    address?
18 A  Who the person was?
19 Q  Who?
20 A  Who the person was, you're asking?
21 Q  Yeah.
22 A  I don't know.
23 Q  Who was supervising that?
24 A  I don't know.
25 Q  Who was supervising or managing or

**Page 155**

1     coordinating Chase sending important letters
2     to the correct address?
3  A  I mean, their person that is sending it out,
4     you know, would look at the -- I don't know
5     what they did.  But they would -- Their duty
6     and responsibility was to look at the
7     address -- what the mailing address, and mail
8     it to that particular address.
9  Q  So who was managing that?
10 A  Who?  I don't know.
11 Q  Who was managing the person that was supposed
12    to be doing that?
13 A  I don't know.
14 Q  Who was coordinating Customer Service with
15    Preservation Inspection Department and the
16    Collection Department and the Loss Mitt
17    Department and the Loss Draft Department and
18    the Foreclosure Department and the lawyer in
19    Alabama, at that time?
20       MR. TURNER:
21          Object to the form.
22 A  I don't know.
23 Q  Was anybody?
24 A  There was supervisors that was supervising
25    their employees, yes.

**Page 156**

1  Q  Yeah.  Well, what was the name of that
2     supervisor?
3  A  I don't know.
4  Q  Did you check?
5  A  No.  Other than who Lanier's supervisor was at
6     that time.
7  Q  Well, Lanier wasn't even on the scene on
8     August 27, 2010, was she?
9  A  Correct.
10 Q  So who was in charge?
11       MR. TURNER:
12          Object to the form.
13 A  In charge -- I mean, I'm lost.
14 Q  Who was in charge of the simple task of
15    getting the correct address of the borrower to
16    mail her important letters when it was known
17    by Chase that the house was burned down and
18    nobody was living there and, in fact, Chase
19    said it was vacant?
20       MR. TURNER:
21          Object to the form.
22 A  Well, the borrower would have to give the
23    change of address.
24 Q  And the borrower did, didn't the borrower?
25 A  There's some point in time, I don't know what

39 (Pages 153 to 156)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|
| 1 | exact date, but they gave a verbal of where to |
| 2 | send whatever it is.  I would have to look at |
| 3 | the notes to -- |
| 4 | **Q   So what criticism does Chase have of that?** |
| 5 | MR. TURNER: |
| 6 | Object to the form. |
| 7 | A   What do you mean criticism? |
| 8 | **Q   Yeah.  You keep saying the borrower gave a --** |
| 9 | **verbally gave the correct address.  What in** |
| 10 | **the world is wrong with that?** |
| 11 | MR. TURNER: |
| 12 | Object to the form. |
| 13 | A   I don't know if it was just one thing just to |
| 14 | mail me I'm here temporary, or -- I mean, we |
| 15 | don't know that.  I mean, let's -- |
| 16 | **Q   Have you ever called up anybody you do** |
| 17 | **business with to say my address has changed?** |
| 18 | A   It's been a while.  I don't remember.  Yeah -- |
| 19 | I mean, yeah, I would say I have, yeah. |
| 20 | **Q   It's common activity, isn't it?** |
| 21 | A   Okay. |
| 22 | **Q   All right.  Isn't it?** |
| 23 | A   Yeah. |
| 24 | **Q   Okay.  Like when -- Did your address change** |
| 25 | **when FDIC took over WAMU and then Chase bought** |

157

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Object to the form. |
| 3 | A   I mean, according to the mortgage -- I mean, I |
| 4 | just read the mortgage saying on it -- It says |
| 5 | you have to give -- any notice shall give the |
| 6 | lender in writing. |
| 7 | **Q   Okay.  So April Barnett telling Chase over the** |
| 8 | **phone and Chase writing it down in its notes** |
| 9 | **isn't good enough; is that right?** |
| 10 | A   I mean -- I mean, it -- They may just say, |
| 11 | well, I'm here temporary.  I don't know.  I |
| 12 | mean, that's whatever she had the conversation |
| 13 | with that particular person at Chase. |
| 14 | **Q   Well, if it wasn't good enough, why did Chase** |
| 15 | **write it down in their notes?** |
| 16 | A   It was in their notes. |
| 17 | **Q   Huh?** |
| 18 | A   It was in the notes. |
| 19 | **Q   Yeah.  Well, why did they write that down?** |
| 20 | A   Because that's what Ms. Barnett told Chase, to |
| 21 | the representative. |
| 22 | **Q   Why would Chase be interested enough to write** |
| 23 | **it down since it wasn't giving it to them in** |
| 24 | **writing?** |
| 25 | A   I don't think I understand your question. |

159

| | |
|---|---|
| 1 | **them out in on September 25, 2008?  You were** |
| 2 | **now working for Chase?** |
| 3 | A   The physical location I was working at? |
| 4 | **Q   Did your address change?** |
| 5 | A   Where I was working at; is that what you're |
| 6 | asking? |
| 7 | **Q   Wherever you got your mail?** |
| 8 | A   No. |
| 9 | MR. TURNER: |
| 10 | Where he's working or where he lives |
| 11 | or what? |
| 12 | **Q   Business mail, personal mail, or anything.** |
| 13 | MR. TURNER: |
| 14 | Object to the form. |
| 15 | A   Wherever I lived, no, I don't have to change |
| 16 | address.  They had all that. |
| 17 | **Q   You never changed an address?** |
| 18 | A   I never moved. |
| 19 | **Q   Have you ever changed addresses in your life?** |
| 20 | A   Yes. |
| 21 | **Q   Okay.  Have you ever called up people you do** |
| 22 | **business with and say, hey, I'm at a new** |
| 23 | **address, here it is?** |
| 24 | A   Yeah. |
| 25 | **Q   Isn't that good enough?** |

158

| | |
|---|---|
| 1 | **Q   Well, if it has to be in writing like you just** |
| 2 | **said according to the mortgage which you've** |
| 3 | **read, --** |
| 4 | A   Right. |
| 5 | **Q   -- and she does it verbally and Chase writes** |
| 6 | **it down in its notes, why would Chase write it** |
| 7 | **down since it wasn't in writing?** |
| 8 | A   Well, they're notating the call of what |
| 9 | happened -- what the conversation was about. |
| 10 | **Q   Well, didn't Chase use this address after it** |
| 11 | **got the address as a mailing address for April** |
| 12 | **Barnett?** |
| 13 | A   I'm not sure which got mailed to any other |
| 14 | address -- or what got mailed exactly to the |
| 15 | other address that she gave, or we know this |
| 16 | was mailed to the property address. |
| 17 | **Q   Well, why would Chase sometimes mail it to the** |
| 18 | **101 Karian Court, the burned-down address, and** |
| 19 | **sometimes mail it to the address that's wrote** |
| 20 | **down in its notes?** |
| 21 | A   I don't know.  I mean, it has to be updated in |
| 22 | the system. |
| 23 | **Q   What would be the business reason to do that?** |
| 24 | A   They -- I mean, I don't know.  It was sent to |
| 25 | the property address.  I mean, they may be |

160

40 (Pages 157 to 160)

PETER KATSIKAS

1  staying there.  I mean, I don't know
2  everybody -- every situation is different,
3  obviously.  But I don't know.
4  Q  We're talking about this situation.
5  A  Oh, I understand that.
6  Q  Yeah.  How many letters have you ever written
7     to a homeowner at an address that you knew was
8     destroyed?
9  A  Personally?
10  Q  Yeah.
11  A  None.
12  Q  Would you ever do that?
13  A  If I have an address on file, that's the only
14     choice you have.
15  Q  So you'd do it?
16  A  I would send it.  And I assume the borrower at
17     that time would -- or the person would have
18     their mail forwarded to wherever.  If it
19     didn't reach there, you know, the post office
20     would deliver it over to the correct address.
21  Q  Yeah.  Well, you would still do that; right?
22  A  (No response.)
23  Q  That's a reasonable business --
24  A  Last known address.
25  Q  That's a reasonable business practice in

161

BY MR. KILBORN:
1
2  Q  You are guessing, you're not testifying on
3     what you know; isn't that true?
4        MR. TURNER:
5           What's the question -- What was the
6        question that you are saying he's
7        guessing about?
8  Q  You're guessing, aren't you?
9        MR. TURNER:
10           Object to the form.  I don't know
11        what question you're saying he's
12        guessing the answer.
13  Q  Has Chase corrected its policy on where to
14     send important mail?
15        MR. TURNER:
16           Object to the form.  Lack of
17        foundation.
18  A  I don't know.
19  Q  You don't know.
20        MR. TURNER:
21           I'm going to take a bathroom break.
22        I think it's time for a lunch break.
23        Because we've been at it over an
24        hour.
25

163

1     Chase, send letters to burned-down addresses?
2        MR. TURNER:
3           Object to the form.
4  A  No.  But, I mean, if we don't have another
5     address, I mean, where are we going to send it
6     to?
7  Q  How about the address that the borrower calls
8     you up and tells you the correct address,
9     wouldn't that be a good one?
10  A  If they put it on there, yes.
11  Q  Yeah.  So why wasn't that done?
12  A  I don't know.  Maybe because of the -- you
13     know, they didn't have it in writing.  I'm not
14     sure.
15  Q  You're guessing, aren't you?
16        MR. TURNER:
17           Object to the form.  Don't argue with
18        him.
19  A  I don't know.
20  Q  Aren't you?
21        MR. TURNER:
22           Don't argue with him, Vince, please.
23        MR. KILBORN:
24           I'm not arguing.
25

162

1        MR. KILBORN:
2           Yeah, go out there and get y'all's
3        mailing policy straight.  I want to
4        hear it when he comes back.
5        MR. TURNER:
6           All right, Vince, I'll get right on
7        it.
8           (A lunch break was taken.)
9  BY MR. KILBORN:
10  Q  Have you looked at any documents regarding
11     this case during the break to refresh your
12     memory or anything?
13  A  No.
14  Q  Other than your lawyers, you haven't talked to
15     anybody about the case during the break?
16  A  No.
17  Q  Let me show you -- Let me show you what I'll
18     mark as Plaintiff's Exhibit 27.
19
20        (Plaintiff's Exhibit Number 27 was
21        marked for identification.)
22
23        (Off the record.)
24        MR. TURNER:
25           Okay.  27 is 335 through 337?

164

41 (Pages 161 to 164)

PETER KATSIKAS

1      MR. KILBORN:
2         Right.
3      MR. TURNER:
4         Okay.
5  BY MR. KILBORN:
6  Q   Do you recognize that as the August 4, 2010,
7      letter from the Chase Collection Department to
8      April Barnett at 101 Karian Court, Oxford?
9  A   Yes.
10 Q   And it starts out:  Chase Home Finance, LLC,
11     is writing to inform you that your above
12     referenced account is currently in default due
13     to your failure to make the required monthly
14     payments.  This is a breach of your note and
15     mortgage, deed of trust, or other secured
16     instruments securing your loan.
17        And the second paragraph, it says -- I'm
18     going to paraphrase.  Basically it says you
19     owe $4,481.86 past due; is that right?
20 A   Correct.
21 Q   Then on the second page, it says:  While the
22     loan remains in default, the field
23     representative may visit the property to
24     conduct an inspection.  An inspection fee may
25     be assessed to the loan.

165

1         And then offers -- second to last
2      paragraph -- home ownership counseling
3      services.
4         Do you see that?
5  A   Correct.
6  Q   Okay.  And is it your testimony that the
7      reason this was mailed to 101 Karian Court,
8      Oxford, Alabama, is that April Barnett had not
9      informed Chase of her change of address?
10 A   According to the records, this shows that's
11     the last known property address.
12 Q   Okay.  So April Barnett didn't find out she
13     was in default on August 4, 2010, did she?
14     She didn't get this letter?
15 A   I don't know.  It looks like it was mailed to
16     the 101 Karian Court, Oxford, Alabama.
17 Q   What other way would she know that she was in
18     default from Chase, and that she owed
19     $4,481.86 past due?
20 A   The default letter.
21 Q   Is there any other way?
22 A   Phone calls.
23 Q   Did Chase call her and tell her she was past
24     due in that amount?
25 A   I would have to look at the call history on

166

1      there.
2  Q   You don't recollect?
3  A   Off the top of my head, no.
4      MR. KILBORN:
5         Okay.  Then Plaintiff's Exhibit 28,
6         that's 339 and 340.
7
8         (Plaintiff's Exhibit Number 28 was
9          marked for identification.)
10
11 Q   I'll show you Plaintiff's Exhibit 28.  This is
12     another letter coming from Chase.  This time
13     August 12, 2010.  Chase 339-340 from Chase
14     Homeowner Assistance Department saying:  Chase
15     may be able to help your mortgage -- may make
16     your mortgage more affordable if you are
17     having difficulty making your payments.  You
18     could be eligible to take advantage of the
19     Home Affordable Modification Program.
20        Do you recognize that as something Chase
21     sent to Ms. Barnett?
22 A   Yes.
23 Q   Let's see.  So we've got -- It looks like
24     we've got five letters between August 4 and
25     August 27 to her at 101 Karian Court, doesn't

167

1      it?
2  A   Correct.
3
4         (Plaintiff's Exhibit Number 29 was
5          marked for identification.)
6
7  Q   Okay.  And then we have, for instance, up --
8      Two months later, in Plaintiff's Exhibit 29,
9      October 27, 2010, Chase 379, we got another
10     letter there Chase Property Preservation and
11     Inspection Department to April Barnett, 101
12     Karian Court, again saying that Chase
13     recently -- We were recently notified the
14     referenced property is vacant.  That's the
15     same letter that we saw earlier on August 27,
16     isn't it?
17 A   Correct.
18 Q   Another generic letter, form letter?
19 A   Showing it's vacant.
20 Q   Right.  And, of course, when it says recently
21     notified that the home was vacant, that wasn't
22     correct.  Chase knew about that, we know at
23     least two months before; isn't that correct?
24 A   Yes.
25 Q   So it looks to me like the Property

168

42 (Pages 165 to 168)

PETER KATSIKAS

| | |
|---|---|
| 1 | **Preservation and Inspection Department was** |
| 2 | **just basically spitting out these generic** |
| 3 | **letters without reference to reality, doesn't** |
| 4 | **it?** |
| 5 | MR. TURNER: |
| 6 | Object to the form. |
| 7 | A   It was vacant.  That's what the vendors were |
| 8 | telling Chase. |
| 9 | **Q   Yeah.  But it certainly wasn't recent that** |
| 10 | **Chase knew about it, was it?** |
| 11 | A   I don't know how recent, but that's just -- |
| 12 | the letter was sent out. |
| 13 | **Q   So who at Chase was in charge of managing or** |
| 14 | **coordinating or supervising, you know, what** |
| 15 | **type of generic letters were getting spit out** |
| 16 | **by the Preservation Insurance (sic) and** |
| 17 | **Inspection Department here?** |
| 18 | A   I'm not sure. |
| 19 | **Q   Was anybody, to your knowledge?** |
| 20 | A   Not to my knowledge, no. |
| 21 | **Q   And other than the mortgage itself, which I** |
| 22 | **think you said earlier that you read, was** |
| 23 | **there any written procedure or instructions by** |
| 24 | **Chase to April Barnett concerning how she was** |
| 25 | **to notify Chase of a change of address?** |
| | 169 |

| | |
|---|---|
| 1 | MR. KILBORN: |
| 2 | Yeah, it's Bates Number 765. |
| 3 | BY MR. KILBORN: |
| 4 | **Q   And do you see on there a notation, July 2,** |
| 5 | **2010, at 2:28:49 p.m.?** |
| 6 | A   Okay. |
| 7 | **Q   And it says tracking number, batch number, and** |
| 8 | **gives a long number.  Mailing method, regular** |
| 9 | **mail; LOA approved, yes.  What does LOA mean?** |
| 10 | A   Letter of authorization. |
| 11 | **Q   Okay.  And what's a letter of authorization?** |
| 12 | A   Letter of authorization, to do what with the |
| 13 | funds. |
| 14 | **Q   To do what?** |
| 15 | A   To do whatever with the funds, is my |
| 16 | understanding. |
| 17 | **Q   Okay.** |
| 18 | A   Where to apply the funds on it. |
| 19 | **Q   Apply to pay off the loan?** |
| 20 | A   On this one -- No, this was for the demolition |
| 21 | of the existing structure. |
| 22 | **Q   Okay.  So letter of authorization, approved,** |
| 23 | **yes.  Homeowner's name and mailing address.** |
| 24 | **Would you read for us what it says for the** |
| 25 | **homeowner's name and address -- mailing** |
| | 171 |

| | |
|---|---|
| 1 | A   That was it, to my knowledge. |
| 2 | |
| 3 | (Plaintiff's Exhibit Number 30 was |
| 4 | marked for identification.) |
| 5 | |
| 6 | **Q   And now I want you to take a look at what I'm** |
| 7 | **going to mark as Plaintiff's Exhibit 30.  It's** |
| 8 | **a page out of the Chase 465 Claim History.  Do** |
| 9 | **you recognize that as something that you** |
| 10 | **reviewed?** |
| 11 | MR. TURNER: |
| 12 | Oh, I'm sorry.  I thought you handed |
| 13 | me my copy.  Did you mark it? |
| 14 | MS. ROBINSON: |
| 15 | Can you call out the Bates number for |
| 16 | the record? |
| 17 | MR. KILBORN: |
| 18 | It's Bates Number 765. |
| 19 | I think that is your copy. |
| 20 | A   I'm sorry, what was your question? |
| 21 | BY MR. KILBORN: |
| 22 | **Q   Did you review this series of notes?** |
| 23 | A   I believe so, yes.  It looks familiar. |
| 24 | MS. ROBINSON: |
| 25 | You said 765? |
| | 170 |

| | |
|---|---|
| 1 | **address?** |
| 2 | A   Sure.  April L. Kennedy, 622 Leighton Avenue, |
| 3 | Anniston, Alabama, 36207. |
| 4 | **Q   Okay.  And what does that mean?** |
| 5 | A   What do you mean?  It look like that's where |
| 6 | they mailed that letter to. |
| 7 | **Q   Okay.  First of all, it means Chase knew the** |
| 8 | **correct mailing address, doesn't it?** |
| 9 | MR. TURNER: |
| 10 | Object to the form. |
| 11 | **Q   As of July 2, 2010?** |
| 12 | A   It doesn't really say -- I mean, it just |
| 13 | says -- It appears that it shows that |
| 14 | homeowner's new mailing address.  So whatever |
| 15 | they were mailing to them, that's what -- |
| 16 | Whatever that particular thing that they were |
| 17 | mailing by regular mail, went to that address. |
| 18 | **Q   What do the words "homeowner's name and** |
| 19 | **mailing address" mean to you?** |
| 20 | A   Well, the homeowner would be April Kennedy, |
| 21 | and the mailing address to -- I don't know |
| 22 | that.  Just gives the address, 62 Latent |
| 23 | Avenue, Anniston, Alabama. |
| 24 | **Q   Okay.  Do you interpret that in any other way** |
| 25 | **other than that Chase had actual knowledge** |
| | 172 |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

1  that that was April Barnett's mailing address
2  as of that day?
3  A   I mean, I don't know.  It doesn't show like a
4  change of address or anything.  It just says
5  homeowner's name and mailing address.  It
6  gives April Kennedy, 622 Latent Avenue.
7  Q   All right.  So your interpretation of this is
8  it's not Chase's -- it doesn't demonstrate
9  Chase's knowledge of a changed address from a
10  burnt-out address to a new address; is that
11  what you're telling the jury?
12  A   I mean, it just -- just -- No, it just shows
13  what the -- whatever was in the regular mail
14  that they were sending to Ms. Kennedy, it
15  shows homeowner's name and mailing address.
16  It doesn't say anything about change of
17  address.
18  Q   Well, we know the address is burned down,
19  don't we?
20  A   Right.
21  Q   We know she was living somewhere else, don't
22  we?
23      MR. TURNER:
24      Object to the form.
25  A   I don't know.

173

1  they were in sort of a FEMA trailer out there
2  on the burned property?
3  A   I'm not saying that.  But I don't know.  I
4  have no personal knowledge.
5  Q   I mean, that's reasonable.  Do you think
6  that's possible, Chase might have thought
7  that?
8  A   I don't know.
9  Q   How many other FEMA trailers do you know in
10  this area up there in 2010?
11  A   I don't.
12  Q   Have you ever seen a FEMA trailer?
13  A   A FEMA trailer?
14  Q   Yeah.
15  A   Yeah.  It's a big white thing.
16  Q   All right.  Not much fun to live in, is it?
17  A   I'm sure it's not.
18  Q   Okay.  And did Chase ever use this mailing
19  address after July 2, 2010, to mail important
20  information to April Barnett, based on your
21  looking at the documents carefully yesterday?
22  A   It looks like July 6 and July 12.
23  Q   What happened then?
24  A   July 6, there was a check in the amount of
25  $23,795 mailed from SMBR to April L. Kennedy,

175

1  Q   So you think --
2  A   I have no personal knowledge.
3  Q   You think Chase could have thought that she
4  and Jason and their children were still living
5  in the burned-down house that you saw in the
6  pictures taken by State Farm?
7  A   (No response.)
8  Q   And I don't mind if you take a completely
9  ridiculous position.  As a matter of fact, I
10  prefer it if you do.
11      So my question is:  Are you telling me
12  that as of July 2, 2010, Chase had any
13  conceivable thought that there were people
14  living in that house?
15  A   Not in the house, no.
16  Q   Okay.  No in the house.  What, on top of the
17  house?
18  A   I don't know.  I didn't -- I mean --
19  Q   What, in a trailer?
20  A   I'm not -- My expertise.  But it doesn't --
21  Like, for instance, like Hurricane Katrina
22  came through or near around here, that they
23  put FEMA trailers on people's property.  I
24  don't know.
25  Q   Okay.  So it's possible Chase thought that

174

1  via regular mail, to 622 Leighton Avenue,
2  Anniston, Alabama, 36207, V. Williams, HIPC.
3  Q   So Chase used a mailing address on July --
4  What was the date?
5  A   The 6th.
6  Q   On July 6 to mail something to April Barnett?
7  A   That's what it shows here, correct.
8  Q   Okay.  And was that something that was mailed,
9  something important like money?
10  A   There was a check mailed to her.
11  Q   For how much?
12  A   $23,795.
13  Q   Okay.  Regular mail, wasn't it?
14  A   That's that it says, correct.
15  Q   Okay.  And then July the 12th, six days later,
16  Chase again mailed something important to
17  April Barnett at that new mailing address,
18  didn't they?
19  A   Correct.
20  Q   Okay.  Well, why didn't they mail it to 101
21  Karian Court where you think they might have
22  been a FEMA trailer there next to the
23  burned-out hulk of the house?
24  A   I didn't say there was a FEMA trailer there,
25  but --

176

44 (Pages 173 to 176)

## PETER KATSIKAS

1  Q   Well, there would -- Would they have been
2      living in a tent?
3  A   I've never been there.  I mean, I don't know.
4      I honestly don't know.  I've never been on the
5      property.
6  Q   You send inspectors out there to look at it.
7      What would they have been living in?
8  A   I'm not saying if it was or not -- if they did
9      or did not.
10 Q   Well, you said they might have been living
11     there, didn't you?
12 A   I mean, I heard of FEMA trailers being on
13     people's property for disasters.
14 Q   So your pitch in the prospect to the jury in
15     this case, that Chase might have actually done
16     the right thing by mailing information to 101
17     Karian Court, because they might have been
18     living out there, like in a FEMA trailer?  That's
19     what you're pitching to the jury, isn't it?
20         MR. TURNER:
21             Object to the form.
22 A   No.
23 Q   Why did you throw that out as a potential,
24     then?
25 A   Because your question was -- they wouldn't be

177

1      questions, please call.  We -- This is Exhibit
2      28.  We are here to help.  Right there on the
3      bottom of that letter.  Homeowners Assistance
4      Department.
5  A   Okay.
6  Q   Is that true?  Chase is here to help?
7  A   That's what it says on there.
8  Q   Okay.  And then they wrote:  Your house is
9      your home.
10         Right?
11 A   Correct.
12 Q   All right.  And if Chase thought -- If Chase
13     knew the house was burned down but thought
14     they were still living there and, therefore,
15     they might get these letters to 101 Karian
16     Court, why didn't Chase do something to help?
17 A   I'm not sure if I understand what you're
18     asking me.
19 Q   I know it's a big company with 55,000
20     employees.  But if you've got a borrower
21     living out there in a tent and that's your
22     mortgaged property, you don't think Chase
23     should have done anything except keep spitting
24     out generic letters to 101 Karian Court?
25

179

1      living in the -- The question had something to
2      the effect of, you know, they wouldn't be
3      living in the burned-down house.
4  Q   Right.
5  A   Give me an instance where, you know, you think
6      there's problems -- you know, there was
7      something that -- you know, they would be
8      living on the property.  And I gave you an
9      example of that.
10 Q   All right.  Well, Chase is writing a nice
11     letter, saying, you know, we're here for you.
12     Why wouldn't -- If Chase thought maybe they
13     were living out there in a trailer or a tent
14     or maybe under the trees, why wouldn't Chase
15     offer to help?
16 A   Why wouldn't Chase offer to help?  I don't
17     understand.
18 Q   Yeah.  Like, you know, maybe we'll give you
19     some blankets or something.  I mean, Chase was
20     there for them; right?  Homeowners Assistance
21     Program, Customer Service?
22 A   Right.  For the modification or Loss Mitt
23     activities.
24 Q   Right.  Right.  Chase is writing them nice
25     letters -- you know, by if you have any

178

1         MR. TURNER:
2             Object to the form.
3  A   Your question was they were living at the
4      property in a tent; is that what you said?
5  Q   Yeah.  You said, well, they might have been
6      living there.  That's why we would have sent
7      the letters there.  Had to be living in
8      something; right?
9         MR. TURNER:
10            Object to the form.
11 A   I mean, I didn't say that.  But it's the last
12     known address of their -- for those letters
13     that went out.
14 Q   Yeah.  Well, they had to be living in
15     something, though, didn't they?
16 A   They've got to live somewhere, right.
17 Q   They're not a bunch of back-packers, are they?
18 A   I don't know.
19 Q   Could be; right?
20 A   I don't know.
21 Q   And so we know now, Exhibit 30, Chase is
22     mailing money to the right new address;
23     correct?
24 A   Well, they mailed a check to 622 Leighton
25     Avenue.

180

45 (Pages 177 to 180)

PETER KATSIKAS

| | |
|---|---|

1  Q   Right. Money; correct?
2  A   They mailed money there.
3  Q   Okay. So Chase, one, knows the correct
4       mailing address, doesn't it?
5  A   That's a mailing address they had sent the
6       check to.
7  Q   Okay. It knows the correct mailing address,
8       doesn't it, sir?
9  A   (No response.)
10 Q   Your company typed in mailing address. I
11      didn't. See where it says "mailing address"?
12 A   (Witness examines document.) It's just an
13      address that they sent it to. It doesn't say
14      change of address.
15 Q   It says mailing address?
16 A   Right. Homeowner's name and mailing address.
17 Q   Mailing address. You see the mailing address?
18 A   Right.
19 Q   And then mailed important information, like
20      money, to the mailing address, didn't they?
21 A   The address that -- Yeah, it went to 622
22      Leighton Avenue.
23 Q   And it did it on July 6 and it did it on July
24      12, didn't it?
25

181

1      MR. TURNER:
2         Object to the form.
3  A   Yeah. They sent it to those two places --
4       those two dates.
5
6      (Plaintiff's Exhibit Number 31 was
7       marked for identification.)
8
9  Q   And let's see, lo and behold, we actually have
10      a copy of that letter, Chase 684, Plaintiff's
11      Exhibit 31 -- we've got a copy of that letter
12      that was mailed to that correct mailing
13      address, don't we?
14 A   On July 2, 2010, it says: I am writing to you
15      about your insurance claim check we recently
16      received for the repairs of your property.
17 Q   And, let's see. It looks like -- Where it
18      says we have endorsed and enclosed your claim
19      check on behalf of Chase. It says that,
20      doesn't it?
21 A   Correct.
22 Q   So looking at the facts that we now know that
23      you didn't remember this morning, don't we --
24      You and I agree that Chase did know the change
25      of address and did use the new address on

182

1      multiple occasions?
2  A   Well, they used it on --
3      MR. TURNER:
4         Object to the form. Go ahead.
5  A   -- July 2, 6, and 12.
6  Q   Okay. That's multiple times, isn't it?
7  A   Three times.
8  Q   Okay. And does Chase contend that that's not
9       the correct mailing address and that April
10      Barnett did not correctly inform Chase of the
11      new mailing address?
12 A   I mean, that's where these letters got
13      generated, went to the 622 Leighton Avenue.
14 Q   That's not my question. Does Chase still
15      contend, having presented you as their
16      representative with the evidence that they
17      knew the correct mailing address, the news
18      one, and sent three communications of
19      important material to the new address on three
20      separate occasions, does Chase still contend
21      that April Barnett did not correctly notify
22      Chase of her change of address?
23 A   Well, she --
24      MR. TURNER:
25         Object to the form. Go ahead.

183

1  A   She gave us, you know, these addresses. It
2       appears, based on these notes here, that they
3       gave -- She gave addresses of Leighton Avenue
4       for this month. And the only thing that was
5       changed for July, those three occasions, was
6       it went to Leighton Avenue versus the property
7       address of Karian Court.
8  Q   Yeah, I can read that. But my question is:
9       Does Chase still contend that April Barnett
10      did not give Chase a change of address?
11 A   I didn't see it in writing, no.
12 Q   Does Chase claim that April Barnett violated
13      her mortgage by not giving it to Chase in
14      writing, despite the fact that Chase had it
15      and used it on three separate occasions
16      involving important matters?
17 A   I'm not sure.
18      MR. TURNER:
19         Object to the form. Go ahead.
20 Q   You're not sure?
21 A   I'm not sure.
22 Q   All right. What would you have to know or who
23      would you have to talk to to get sure on that
24      point?
25 A   I'm sorry, what was the question?

184

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

185

1  Q   Yeah.  Who would you have to talk to or what
2      would you have to know, in addition to the
3      facts I've shown you here, to get straight on
4      what Chase's position is on that point?
5  A   Well, this is showing from a claim history the
6      notes based on that.  I mean, there's no -- It
7      doesn't show a change of address where -- or
8      form that you have that shows that, hey, this
9      is my new permanent mailing address for --
10     until further notice or something to that
11     effect.  I don't see anything.
12         Yes, she did give a verbal, it appears,
13     because of the checks were mailed back in
14     July.  But other than that, I'm not sure.
15 Q   So Chase's position is that April Barnett has
16     to put in writing in a letter this is my new
17     permanent address until further notice.  And
18     absent that, Chase can take the position and
19     does take the position that it had every right
20     to continue mailing things to April Barnett at
21     101 Karian Court?
22 A   The last known address that's on file, yes.
23 Q   That's what Chase still contends, sitting here
24     today?
25 A   Right.

186

1  Q   All right.  And do you -- Does Chase use that
2      policy or procedure, whatever it is, with all
3      of its borrowers?
4  A   As far as I know, yes.
5  Q   All right.  So Chase has never used anything
6      -- any other address unless that's what it
7      gets?
8  A   As far as I know, yes.
9  Q   All right.  Have you ever seen any letters
10     where that's written by a borrower?
11 A   Have I?
12 Q   Yeah.
13 A   I don't recall.
14 Q   And did Chase communicate with State Farm
15     about April Barnett?
16 A   I don't believe so.  Unless you have some kind
17     of document that shows.  But I don't think I
18     see anything back in the records where they
19     talked to State Farm directly.
20
21     (Plaintiff's Exhibit Number 32 was
22     marked for identification.)
23
24 Q   Plaintiff's Exhibit 32, Chase 767.  You
25     reviewed that also, did you not?

187

1  A   (Witness examines document.)  I think so, yes.
2  Q   Okay.  The date of July 1, 2010, which is
3      right before the note on the new mailing
4      address, what does that note mean?  July 10
5      (sic), 2010?
6  A   July 10?
7      MR. TURNER:
8          You mean July 1, the top one?
9  Q   Excuse me, July 1, 2010.
10 A   It just says SVHIPC, which is Hazard Insurance
11     Processing Center.  I'm not sure what "SV" is.
12 Q   All right.  Then June 28, 2010, what does that
13     note mean right there, the first entry?
14 A   Right below that July 1?
15 Q   Right.
16 A   It says June 28, 2010, 14:49:18, received call
17     from borrower, April Kennedy, call in
18     reference to report a new claim for something
19     COL fire on -- DOL is date of loss, 6/14/2010,
20     J. Rodgers, HIPC Department.
21 Q   Okay.  Can you interpret that for me?
22 A   Report a new claim for -- I'm not sure what
23     COL -- but fire on date of loss.
24 A   She's reporting a claim -- The borrower is
25     reporting a claim, which is April Kennedy,

188

1      that the call was taken by J. Rodgers in
2      Hazard Insurance Processing Center.
3  Q   Is she reporting that she's filing a claim
4      with her insurance company; is that what that
5      means?
6  A   Call in reference to report a new claim for --
7      It just says report a new claim for fire.
8      There's date of loss.  It just says call in
9      reference to report.
10 Q   You don't know what that means?
11 A   Just saying that we -- letting us know that
12     there's a claim for -- there's a fire -- The
13     date of loss was 6/14/2010.  And that's when
14     -- The date of loss would be the date of the
15     fire.
16 Q   All right.  Do you have any information that
17     Chase ever told April Barnett after she gave
18     them her new mailing address that she had to,
19     in addition to that, put it in writing that
20     the Leighton Avenue address was her new
21     permanent mailing address?
22 A   I don't -- I don't believe so.  Other than
23     what's on the mortgage.
24 Q   Then on June 28, 2010, underneath that,
25     there's a note that says:  I received an

PETER KATSIKAS

1    escalated call from borrower, April Kennedy,
2    calling in to report claim and advised that
3    she did not know what the total claim balance.
4    I provided her with my -- with the
5    www.mylossdraft.com website to download
6    documents and advised that we need the
7    adjusters report to that the funds for the
8    demolition portion.
9        You got any idea what that means?
10  A    She called in, April Kennedy did, and talked
11       to J. Rodgers, as well, saying call looks like
12       -- And J. Rodgers from the Hazard Insurance
13       Processing Center directed her to the
14       mylossdraft.com website to download documents.
15       And then that we need the adjuster's report to
16       that funds for demolition portion of that.
17  Q    Now, the word "escalated," that's a term of
18       art, isn't it?
19  A    (No response.)
20  Q    Escalated call?
21  A    Right.  It's a priority call, it looks like.
22  Q    And there are various escalated call types,
23       aren't there?
24  A    I don't know.  It just says escalated.  I'm
25       not sure.  "Escalated" just means --

189

1  Q    Chase has got procedures on escalated call
2       types, doesn't it?
3  A    Right.
4  Q    And what kind of escalated call type was this?
5  A    Well, looks like something was urgent, to let
6       us know that she's calling in to report a
7       claim.  She has suffered a fire loss on June
8       14, 2010.
9  Q    And when you get an urgent call from a buyer,
10      it's got a high priority, doesn't it?
11  A    Right.
12  Q    And even though you don't remember what kind
13      of escalated call type it is, it would be
14      certainly considered serious by Chase,
15      wouldn't it?
16  A    Right.  It's escalated.  Correct.
17  Q    And Chase would pay more attention to that
18      matter than other type calls, wouldn't it?
19  A    We all would take priority of it -- a little
20      bit more priority.
21  Q    And let's see.  Did you read this fax cover
22      sheet from Chase, dated August 24, 2010, as
23      Defendant's Exhibit 3?
24       MR. KILBORN:
25         Have you got the defendant's

190

1       exhibits?
2       MR. TURNER:
3         Is it in this right here?
4       MR. KILBORN:
5         That may be it.  It doesn't look like
6       it.  It should be the first series of
7       exhibits.
8       (Off the record.)
9       MR. TURNER:
10        Defendant's Exhibit 3, which is Chase
11      31.
12      THE WITNESS:
13        Okay.
14  BY MR. KILBORN:
15  Q    Did you review Defendant's Exhibit 3?  It's
16      August 24, 2010, the fax cover sheet.  And
17      then the attachment looks like a payoff quote
18      or payoff breakdown of the same date of the
19      $301,608.58?
20  A    Yes.
21  Q    Did you review that?
22  A    Yes.
23  Q    Okay.  And we know that Chase actually got a
24      check in that exact amount from State Farm.
25      And I'll just show you my -- Well, Defendant's

191

1       Exhibit 4, if you'll flip the page; correct?
2  A    Yes, the second page of that, of Exhibit 4.
3  Q    Right.  So what happened was on August 24,
4       2010, Chase gave State Farm the payoff for the
5       loan; correct?
6  A    (No response.)
7  Q    Exhibit 3?
8  A    Yes, 8/24.
9  Q    And then seven days later, exactly one week,
10      State Farm mailed to Chase the check in the
11      correct amount?
12  A    August 31, 2010.
13  Q    Right.  And then if you'll turn the page, it's
14      got a copy of the back -- The back of the
15      check, Chase endorsed that check and put it --
16      basically cashed it and put it in its bank,
17      didn't it?
18  A    Which was the restricted escrow account.
19  Q    Well, whatever.  Chase signed it on the back
20      and took the money, didn't it?
21  A    Correct.
22  Q    Okay.  So whose bank is that deposited in?
23  A    Which -- It went to Chase.
24  Q    Yeah, the check?
25  A    It went to a restricted escrow account, to

192

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

## PETER KATSIKAS

```
 1      Chase.
 2  Q   What bank?
 3  A   I don't know exactly.
 4  Q   Well, it says Chase Home Finance, LLC, doesn't
 5      it?  Look at the endorsement.
 6  A   Right.
 7  Q   Right?
 8  A   (Witness examines document.)  Yes.
 9  Q   So Chase got the $301,608.58 payoff of the
10      loan check on August 31, endorsed it and put
11      it -- endorsed it over to itself and got the
12      money, didn't it?
13          MR. TURNER:
14              Object to the form.
15  A   Well, September 3 Chase received it.  The
16      check is dated August 31.
17  Q   Okay.  Well, Chase did get the money, didn't
18      they?
19  A   Correct.
20  Q   Okay.  Now -- So within a week's time Chase
21      gave State Farm the payoff, State Farm sent
22      the check in the correct amount; is that
23      right?
24  A   Correct.
25  Q   Okay.  Now, during the interim, on August 27,
                                              193
```

```
 1      right in the middle of those two dates, how
 2      about explaining to me why Chase is sending
 3      letters, Exhibit 22-A, notifying April of a
 4      notice of intent to foreclose; Exhibit 21,
 5      offering loan workouts; and Exhibit 22, same
 6      date, stating that the property is vacant and
 7      talking about changing locks, winterizing the
 8      property and wants a written -- quote, written
 9      statement confirming that the property is
10      vacant but being maintained by the buyer.
11          Can you explain to me how that happened,
12      when what was really going on was the loan was
13      being paid off in a prompt and efficient and
14      judicious manner?
15          MR. TURNER:
16              Object to the form.
17  A   Well, the check didn't get to Chase until
18      September 3.  So this as August 27, 2010.
19  Q   Well, Chase knew it was going to get the
20      check, didn't it?
21          MR. TURNER:
22              Object to the form.
23  A   We don't know that.
24  Q   Don't know that.  And then also in the
25      middle -- in the middle of that, on
                                              194
```

```
 1      August 30 --
 2          MR. TURNER:
 3              Just for the record, we're looking at
 4          Exhibit 4.  That's PL-5 and 6.  Just
 5          so we know what we're talking about.
 6  Q   That is my copy of Plaintiff's Exhibit 33.
 7      Chase writes -- on August 30 writes -- Let's
 8      see.  Chase writes to State Farm, who's a
 9      person who has already quoted the payoff, and
10      says:  Re:  Unoccupied property.  I'm writing
11      to inform you of a recent inspection of the
12      property -- As required by the mortgagee
13      clause in the homeowner's insurance policy,
14      I'm notifying you this property appears to be
15      unoccupied.  Please make your own
16      determination of the occupancy status of the
17      property and inform us in writing within the
18      next 30 days if any change has occurred in the
19      policy coverage for the property.  Please
20      ensure that the mortgage clause reads -- And
21      then it's got Chase's name.
22          Why would Chase be sending such a
23      ridiculous letter to State Farm --
24          MR. TURNER:
25              Object to the form.
                                              195
```

```
 1  Q   -- when all they're doing is quoting a payoff
 2      and getting their money?
 3          MR. TURNER:
 4              Object to the form.
 5  A   (Witness examines document.)  It looks like --
 6      I mean, that document says what it says on
 7      there.  It says:  As required by the mortgagee
 8      clause of the homeowner's insurance policy.
 9      I'm notifying you that this property appears
10      to be unoccupied.
11  Q   Of course, we all know that, don't we?
12  A   Right.
13  Q   It doesn't take a letter from Chase to State
14      Farm to tell State Farm its insured property
15      is unoccupied, when State Farm has just
16      strucken (sic) the check to pay off the loan?
17  A   It says -- Yeah.  But it says -- I understand
18      what you're saying.  But it says as required
19      by the mortgagee clause.  So there's a
20      requirement to tell the insurance company that
21      it's -- to let them know it appears to be
22      unoccupied.
23  Q   So is this just some computer-generated letter
24      that it's going to get spit out regardless and
25      it's like a train wreck that you can't
                                              196
```

49 (Pages 193 to 196)

PETER KATSIKAS

| | |
|---|---|
| 1 | prevent? |
| 2 | MR. TURNER: |
| 3 | Object to the form. |
| 4 | A   I don't know if it's automated or someone else |
| 5 | does that. |
| 6 | Q   Is that a generic letter? |
| 7 | A   (Witness examines document.)  I'm not sure. |
| 8 | Q   It looks like it's written actually by a human |
| 9 | being, doesn't it? |
| 10 | A   I don't know. |
| 11 | Q   So what's the human being thinking? |
| 12 | A   Well -- |
| 13 | MR. TURNER: |
| 14 | Object to the form.  Go ahead. |
| 15 | A   It says there's a recent inspection at the 101 |
| 16 | Karin Court, and as required by the mortgagee |
| 17 | clause that -- in the homeowner's insurance |
| 18 | policy, that we have to let them know that |
| 19 | it's -- inform them, as well, State Farm, that |
| 20 | it's unoccupied. |
| 21 | Q   State Farm needed to know it was unoccupied, |
| 22 | even though they already photographed it being |
| 23 | burned down? |
| 24 | A   We're giving notice to -- as required. |
| 25 | Q   So I understand you are a long-term Chase |

197

| | |
|---|---|
| 1 | employee.  But you don't see anything |
| 2 | completely ridiculous about that? |
| 3 | MR. TURNER: |
| 4 | Object to the form. |
| 5 | A   No. |
| 6 | Q   You don't? |
| 7 | A   No. |
| 8 | Q   Well, what did April Barnett have to do to |
| 9 | stop the collection process at this time, |
| 10 | let's just say July/August 2010, that she |
| 11 | didn't do? |
| 12 | A   As to cure the default for the amounts due for |
| 13 | those two months per those letters. |
| 14 | Q   So she should have paid Chase the amount that |
| 15 | Chase has claimed she was deficient? |
| 16 | A   Correct. |
| 17 | Q   Which is -- |
| 18 | A   Four thousand and change. |
| 19 | Q   $4,577.67, Plaintiff's Exhibit 22-A? |
| 20 | A   Let me see.  It's for -- Well, August 27 shows |
| 21 | $4,577.67. |
| 22 | Q   Right.  That's what April Barnett should have |
| 23 | done, was to pay that amount of money to |
| 24 | Chase, in response to this letter? |
| 25 | A   Well, it says within 32 days of the day of |

198

| | |
|---|---|
| 1 | this notice to secure the default. |
| 2 | Q   Okay.  So she had 32 days to pay $4,577.67? |
| 3 | A   Correct.  That's what this letter is saying. |
| 4 | Q   Okay.  Well, she actually did better than |
| 5 | that.  She actually had her insurance company |
| 6 | pay the entire loan off, didn't she? |
| 7 | A   September 3, yes. |
| 8 | Q   All right.  So how could she still have an |
| 9 | obligation to pay the entire loan off, plus |
| 10 | pay $4,577.67? |
| 11 | MR. TURNER: |
| 12 | Object to the form.  You asked him |
| 13 | what's to stop the collection calls. |
| 14 | I think you're putting words in his |
| 15 | mouth. |
| 16 | MR. KILBORN: |
| 17 | I'm trying to find out simply what |
| 18 | Chase contends April Barnett should |
| 19 | have done that she didn't do. |
| 20 | MR. TURNER: |
| 21 | I object to the form.  Asked and |
| 22 | answered. |
| 23 | BY MR. KILBORN: |
| 24 | Q   Now, first of all, I want to ask you:  Does |
| 25 | Chase contend April should have sent in this |

199

| | |
|---|---|
| 1 | $4,577.67 demanded in Exhibit 22-A? |
| 2 | A   That letter says you have to -- says that the |
| 3 | 32 -- 32 days to cure the default. |
| 4 | Q   Did she comply with this letter or not? |
| 5 | A   She sent in $301,000 -- Well, State Farm sent |
| 6 | the $301,000. |
| 7 | Q   So she did comply with the letter -- in fact, |
| 8 | did better than that.  She overcomplied, |
| 9 | didn't she? |
| 10 | A   That should have paid it off on the 3rd. |
| 11 | Q   Right.  So since she paid the entire thing |
| 12 | off, one, she wasn't in default; correct? |
| 13 | MR. TURNER: |
| 14 | Object to the form. |
| 15 | A   Well, I mean, she was due for July and August. |
| 16 | She hasn't made July and August payment. |
| 17 | MR. TURNER: |
| 18 | I think the confusion is what time |
| 19 | are you asking, Vince.  Are you |
| 20 | asking when the check was -- the |
| 21 | check was received on September 3 or |
| 22 | the letter was sent on August 27? |
| 23 | Q   I'm saying:  What does Chase contend April |
| 24 | Barnett should have done that she didn't do? |
| 25 | |

200

50 (Pages 197 to 200)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

| | |
|---|---|
| 1       MR. TURNER: | 1   Q   Well, you haven't seen one, have you? |

1      MR. TURNER:
2          Object to the form.  Asked and
3          answered.
4   Q   And you said, well, she should have paid the
5       $4,577.67, demanded in Exhibit 22-A.  I said,
6       well, she did better than that.  She paid the
7       whole thing off.
8          So what else did April Barnett have to
9       do?
10  A   Needed a letter of authorization to instruct
11      Chase to pay off the entire loan.
12  Q   A letter of authorization.  Okay.  And so that
13      little note that we looked at a minute ago,
14      letter of authorization, LOA, on Exhibit 30,
15      July 2, 2010, LOA approved?  Yes.  That
16      doesn't mean anything, does it?
17  A   That's for -- My understanding is for the
18      demolition.
19  Q   Okay.  Well, where is the note about some
20      other letter of authorization that she needs
21      to get to Chase?
22  A   I don't see it in here.
23  Q   Where is the demand for another letter of
24      authorization?
25  A   I don't see it in there.
                                              201

1   Q   Well, you haven't seen one, have you?
2   A   I can't recall either way.
3   Q   Well, LOA means -- "L" means "letter," doesn't
4       it?
5   A   Yes.  That's my understanding, yes.
6   Q   And LOA approved means letter of authorization
7       approved, yes, doesn't it?
8   A   Yes.
9   Q   And the truth of the matter is, there was no
10      letter of authorization; isn't that true?
11  A   I don't know either way for that.  I can't
12      recall.
13  Q   Well, if Chase hadn't produced it in discovery
14      and you haven't seen it but it exists, doesn't
15      Chase owe the plaintiff the obligation -- owe
16      to turn that letter over?
17      MR. TURNER:
18          Object to the form.
19  A   Yeah.  But I don't know either way if that
20      does exist or it does not exist.
21  Q   And if it doesn't exist, what that means is
22      that it doesn't have to be a letter of
23      authorization, it can just be a verbal
24      authorization?
25
                                              203

1   Q   There's no note to that effect, is it?
2       MR. TURNER:
3          Are we looking at Exhibit 30; is that
4          what you're asking?
5   A   You talking about 30; right?
6   Q   Yeah.
7   A   Yes.
8   Q   In anything.  Forget Exhibit 30.  There's no
9       note, no record, no letter, no nothing, where
10      April is told you have to have a letter of
11      authorization, is there?
12      MR. TURNER:
13          Object to the form.
14  A   Not until in November of 2010 by Lanier.
15  Q   By Lanier?
16  A   Correct.
17  Q   Okay.  And then -- So Chase never did get the
18      letter of authorization?
19  A   No, they got it.
20  Q   Okay.  And where is the letter of
21      authorization that Chase is referring to in
22      Plaintiff's Exhibit 30?
23  A   Where is it?  I don't know.
24  Q   There isn't one, is it?
25  A   I don't believe -- I don't know.
                                              202

1      MR. TURNER:
2          Object to the form.
3   Q   Because if there's no letter of authorization
4       referred to on Plaintiff's Exhibit 30, July 2,
5       2010, Chase doesn't require letters of
6       authorization?
7      MR. TURNER:
8          Object to the form.
9   A   They require a letter of authorization.
10  Q   All right.  So where is it?
11  A   Of which one you're talking about, the
12      November?
13      MR. KILBORN:
14          Michael, I'm demanding right now that
15          letter of authorization.
16      MR. TURNER:
17          That's fine, Vince.  We've given you
18          the documents.  I'm not going to pour
19          through 3,000 pages looking for it
20          right now.  We can take it up after
21          the deposition.
22      MR. KILBORN:
23          I assure, you it doesn't exist.
24      MR. TURNER:
25          Okay.  Well, you can make your
                                              204

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1        statements.  Just ask your questions.
 2    BY MR. KILBORN:
 3    Q    You've looked through all three thousand plus
 4         documents, haven't you?
 5    A    Yes.
 6    Q    As of yesterday; correct?
 7    A    Yeah.  Last few days.
 8    Q    And you haven't seen any letter of
 9         authorization, have you?
10         MR. TURNER:
11             Object to the form.
12    A    I would have to go through there and show it.
13    Q    Well, just use your memory, since it's 24
14         hours old.  Do you recall seeing a letter of
15         authorization?
16    A    It's a lot of documents.
17    Q    Of course it is.  It's three thousand plus.
18         Do you recollect seeing such a letter?
19    A    I know I saw the form itself.  And as far as
20         -- There may have been a letter from April
21         Kennedy to Chase for demolition.  But I would
22         have to see the documents to refresh my
23         memory.
24    Q    And what does the letter of authorization have
25         to say?
                                                    205
```

```
 1    A    Basically what to do with the money.
 2    Q    Well, tell me as best you can recollect.
 3         Paraphrase that letter.
 4    A    You're talking about the letter that -- what,
 5         the form itself?
 6    Q    Either the letter of authorization you say
 7         April didn't give you to pay off the loan or
 8         the letter of authorization in -- referred to
 9         in Plaintiff's Exhibit 30.
10    A    I can't recall.
11    Q    Just paraphrase one of the other or both of
12         them.
13    A    I would have to see it.
14    Q    Well, it's important to Chase, though, isn't
15         it?
16    A    Yes.
17    Q    Okay.  So it has to be, one, a letter;
18         correct?
19    A    It's got to show -- yeah, the intent of what
20         needs to be done with the money.
21    Q    It has to be a letter; correct?
22    A    Right.
23    Q    Okay.  And if Chase doesn't require letters,
24         because there's no letter referred to in
25         Exhibit 30, what would you say about that?
                                                    206
```

```
 1        That sometimes it does and sometimes it
 2         doesn't?
 3         MR. TURNER:
 4             Object to the form.
 5    A    I don't know.
 6    Q    Don't know.  Well, what's Chase's policy?  Is
 7         it ironclad a hundred percent you've got to
 8         have a letter?
 9    A    Well, they need a letter of authorization.
10         Because, you know, when you rebuild -- or most
11         people rebuild the home, whether it be partial
12         or whole.  In this situation, it was unique
13         because it was, you know -- yeah, there was --
14         the entire loan was getting paid off.  But
15         part of that process, when we pay it off, it
16         was required by Chase that they need a letter
17         of authorization what to do with the money.
18    Q    And if there is no letter of authorization,
19         how would you explain that?
20    A    Well, if there's no -- We don't know.  It will
21         stay in the restricted escrow account.
22    Q    Well, if there's no letter of authorization
23         referred to on Plaintiff's Exhibit 30, how
24         would you explain that?
25    A    I don't know.
                                                    207
```

```
 1    Q    You can't think of an explanation?
 2    A    No.
 3    Q    Is the letter of authorization requirement in
 4         the mortgage that you read?
 5    A    I'd have to see it again, the mortgage.  Do
 6         you have --
 7    Q    Didn't you read it yesterday, last night?
 8    A    I didn't memorize it, no.
 9    Q    Did you read it?
10    A    I read through it.
11    Q    And you know the letter of authorization
12         defense was important, didn't you?
13    A    Like I said, I didn't memorize it, but I read
14         it.
15    Q    Yeah.
16    A    And if you want to show it to me, we can go
17         over it.
18    Q    Are there any of the people in the Loss Draft
19         Department supposed to be knowledgeable about
20         what the mortgage says about letters of
21         authorization?
22    A    Yes.
23    Q    Okay.  And did you determine that Mr. Robbert
24         Saxton knew that?
25    A    That he had -- Yeah, he should have had a duty
                                                    208
```

52 (Pages 205 to 208)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

1     to send it out to -- you know, once it came
2     back, to Ms. Barnett.
3  Q   So he had -- Mr. Saxton had a form letter of
4     authorization that he would send to the
5     homeowner --
6  A   Yeah, there's a form.
7  Q   -- and said fill this out --
8  A   Correct.
9  Q   -- and send it back?
10 A   Correct.
11 Q   Okay.  Have you ever seen that form?
12 A   Yes.
13 Q   And what address should Mr. Saxton have sent
14    the form to?
15 A   Last known mailing address on file.
16 Q   And that would have been 101 Karian Court?
17 A   That's where he sent -- That's where he
18    actually sent that particular letter of
19    authorization, yes.
20 Q   Okay.  Well, do you know whether he sent it or
21    not?
22 A   There was a return FedEx, as far as I can
23    remember.  There's a return -- it went -- it
24    came -- It went to the Karian Court and came
25    back to Chase.

                                              209

1  Q   Right.  And that's the old address we've been
2     talking about?
3  A   The Karian Court.
4  Q   Right.  I'm going to show you a copy of
5     Defendant's Exhibit -- excuse me -- yeah,
6     Defendant's Exhibit 14 to Mr. Evan Hendricks,
7     plaintiff expert's witness' deposition.  And
8     I'm going to show you my copy.  And take a
9     look at Bates Number LSI-16.  And take a look
10    at the credit information on there and see if
11    you can interpret that for me, what I've got
12    marked in yellow.
13        MR. TURNER:
14          You've got both entries.  Do you want
15        him just to do the one for Chase?  Is
16        that what you're asking?
17        MR. KILBORN:
18          Yeah, the one for Chase.
19        MR. TURNER:
20          You want him to just start -- Why
21        don't you read it and tell him what
22        you interpret that means; is that
23        what you're asking?
24        MR. KILBORN:
25          Right.

                                              210

1  A   It says:  Real Estate Mortgage 360 MON --
2     which is 360 months, which is a 30-year.  It
3     says:  Contact member for status.  Fannie Mae
4     account, real estate mortgage, foreclosure
5     2/11, paid.
6  Q   Foreclosure 2/11?
7  A   Or that's date reported, February '11.  It's
8     been paid.
9  Q   Foreclosure recorded?
10 A   No.  Foreclose -- It just says foreclosure
11    paid --
12 Q   Okay.  Foreclosure?
13 A   -- on February -- The reported date -- date
14    reported is February of 2011.
15 Q   Okay.  And what was reported on February 2011?
16 A   It shows the delinquencies and it shows it's
17    been paid and wasn't foreclosure.
18 Q   Okay.  I'm still not straight.
19        MR. TURNER:
20          Do you want to look at it so you can
21        ask him what you asking, so y'all can
22        talk about the same thing?
23 Q   LSI-16.  Okay.  It says:  Real estate mortgage
24    foreclosure, FRCL, 2/11 paid.
25        Now, that's on her credit.  And what does

                                              211

1     that mean?
2  A   Well, it was paid -- and as reported, it's
3     been paid -- paid in full.
4  Q   Well, does it mean there was a foreclosure and
5     then the foreclosure -- then the loan was paid
6     in full?
7  A   That's what this credit report shows.
8  Q   Okay.  And since it reports as a foreclosure,
9     that's a black mark on April Barnett's credit,
10    isn't it?
11 A   It's a -- I don't know a black mark, but a
12    negative mark, yes.
13 Q   All right.  But it's one of the -- one of the
14    big three black marks, like bankruptcy, isn't
15    it?
16        MR. TURNER:
17          Object to the form.  Go ahead.
18 A   I mean, it's a negative report, yes.
19 Q   Right.  And I think you listed it second,
20    under bankruptcy, didn't you?
21        MR. TURNER:
22          Object to the form.
23 Q   Is that correct?
24 A   I mean, you asked me what were the major ones.
25    And I told you that's the major ones.

                                              212

53 (Pages 209 to 212)

PETER KATSIKAS

| | |
|---|---|
| 1 | Q   Right.  And foreclosure is major, isn't it? |
| 2 | A   Foreclosure, bankruptcy, tax liens, judgments. |
| 3 | Q   Okay.  And Chase reported that foreclosure to |
| 4 | the credit agency, didn't it? |
| 5 | A   Correct. |
| 6 | Q   Okay.  And that was -- There was no |
| 7 | foreclosure, in fact, was there? |
| 8 | A   No. |
| 9 | Q   Okay.  So Chase falsely reported that there |
| 10 | was a foreclosure when there was not; isn't |
| 11 | that true? |
| 12 | MR. TURNER: |
| 13 | Object to the form. |
| 14 | A   Not falsely.  It was he corrected -- |
| 15 | eventually corrected. |
| 16 | Q   Well, they reported a foreclosure? |
| 17 | A   That's what it shows, but it was corrected. |
| 18 | Q   Right.  But there was no foreclosure? |
| 19 | A   Correct. |
| 20 | Q   So that was a false report, wasn't it? |
| 21 | MR. TURNER: |
| 22 | Object to the form. |
| 23 | A   That was -- Say that again. |
| 24 | Q   It was a false report; there was no |
| 25 | foreclosure? |

213

| | |
|---|---|
| 1 | it's in here.  Okay.  Since you've looked at |
| 2 | all the depositions, including Ms. Landis, and |
| 3 | the exhibits, I want to show you Plaintiff's |
| 4 | Exhibit 9 to Ms. Landis' deposition.  What is |
| 5 | this? |
| 6 | A   Products collections operating procedures. |
| 7 | Q   All right.  That's an official operating |
| 8 | procedure of Chase, isn't it? |
| 9 | A   For the last revision, July 5, 2010, that's |
| 10 | what it's showing. |
| 11 | Q   It's an official operating collection |
| 12 | procedure, isn't it? |
| 13 | A   Yes, sir. |
| 14 | Q   Okay.  You didn't know that existed until I |
| 15 | just showed it to you; correct? |
| 16 | MR. TURNER: |
| 17 | Object to the form. |
| 18 | A   I went through this.  Like I said, I didn't |
| 19 | memorize these 3,000 documents plus all the |
| 20 | depositions that was in there.  But I went |
| 21 | through this. |
| 22 | Q   Before I just showed it to you, did you know |
| 23 | that Chase had a written collection operating |
| 24 | procedure on the federal statute? |
| 25 | A   I mean, interpretation of the statute and all |

215

| | |
|---|---|
| 1 | MR. TURNER: |
| 2 | Object to the form. |
| 3 | A   The foreclosure did not happen, no. |
| 4 | Q   Right.  And that violates the federal -- the |
| 5 | federal statute -- the Federal Fair Credit |
| 6 | Reporting statute, doesn't it? |
| 7 | MR. TURNER: |
| 8 | Object to the form. |
| 9 | A   I'm not a lawyer.  I don't know. |
| 10 | Q   Well, doesn't Chase have guidelines setting |
| 11 | forth what that statute says? |
| 12 | A   That would be through Legal. |
| 13 | Q   I mean, Chase produced those in discovery, |
| 14 | didn't they, the guidelines?  Have you read |
| 15 | them? |
| 16 | A   For the fair debt collection? |
| 17 | Q   Yeah.  Federal statute. |
| 18 | A   Did we provide a statute?  I don't know. |
| 19 | MR. TURNER: |
| 20 | He's asking if we provided guidelines |
| 21 | about the statute. |
| 22 | A   Oh, I don't know.  I can't recall, off the top |
| 23 | of my head, without seeing it. |
| 24 | Q   All right.  Okay.  Let's see.  You've got |
| 25 | Plaintiff's Exhibit 9 in Landis.  Let's see if |

214

| | |
|---|---|
| 1 | that doesn't -- |
| 2 | Q   Yeah, it does.  It does on the page you just |
| 3 | flipped to, Chase 1954.  It's got a complete |
| 4 | explanation, doesn't it? |
| 5 | A   Correct.  But I don't see no statute on here. |
| 6 | Q   Well, you see Fair Debt Collection Practice |
| 7 | Act, FDCPA.  You don't know that's a |
| 8 | federal statute? |
| 9 | A   No, I know -- I know what the Fair Debt |
| 10 | Collection -- Yeah, I've seen it, but I'm not |
| 11 | a lawyer.  I can't interpret it for you, as |
| 12 | far as -- |
| 13 | Q   Well, you can read.  Does it -- |
| 14 | A   I can read it, yes. |
| 15 | Q   It's a Chase operating procedure, isn't it? |
| 16 | A   Yes. |
| 17 | Q   Is there anything about this you don't |
| 18 | understand? |
| 19 | A   Just the legal part of it. |
| 20 | Q   So you have to be a lawyer to understand this? |
| 21 | MR. TURNER: |
| 22 | Object to the form. |
| 23 | A   Well, as far as -- You're talking about |
| 24 | statutes, but as far as these bullet points on |
| 25 | here.  You know, for instance, leave multiple |

216

54 (Pages 213 to 216)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

1    messages on the same day on the same telephone
2    number; speak to a borrower the second time on
3    the same day; use false, deceptive, misleading
4    representation or means of connection with the
5    collection of a debt; use abusive, foul,
6    derogatory language; at any time engage and
7    conduct to harass, oppress, or abuse any
8    person in connection with the collection of a
9    debt and communicate with the borrower in a
10   prohibitive manner at unusual time or place or
11   communicate with third parties concerning debt
12   without obtaining prior consent from the
13   borrower; and hanging up on a borrower.
14  Q   **You understand all that?**
15  A   Yes.
16  Q   **Do you understand that that law requires that**
17     **a bank like Chase only report accurate**
18     **information?**
19        MR. TURNER:
20          Object to the form. To the extent it
21          calls for a legal conclusion. He can
22          answer it if he understands it.
23  A   I'm not a lawyer. I have no legal training.
24  Q   **So is there anything that you know of that**
25     **requires Chase to accurately report**

217

1     **information to a credit agency?**
2  A   Well, it has to be reported accurately to the
3    credit agency. What the credit agency does --
4    I mean, it's kind of beyond the creditor's
5    control.
6  Q   **Okay. And what requires that?**
7  A   What requires to accurately report the fair
8    credit -- to report accurately on the credit
9    report?
10  Q   **Um-hum. What requires that? Is that some law**
11     **or rule or just Chase policy, or what?**
12  A   No, there's a law and rule on it. I don't
13    know that -- I can't interpret a law for you.
14    It's not my expertise, obviously.
15  Q   **Well, you have to be an expert to know that**
16     **you're supposed to tell the truth about**
17     **somebody's credit?**
18  A   Right. I mean, you don't have to be an
19    expert, no.
20  Q   **Okay. Well, does Chase -- Is Chase required**
21     **to tell the truth to a credit agency?**
22  A   Yes.
23  Q   **And Chase did not tell the truth to the credit**
24     **agency, right there on Plaintiff's Exhibit --**
25     **Excuse me, it's Hendricks Exhibit 14, Bates**

218

1    **Number LSI-16, did it?**
2        MR. TURNER:
3          Object to the form.
4  A   Like I said, whatever they reported -- that
5    Chase reported to the bureaus, whatever the
6    credit bureau decides to do, that's -- you
7    know, the credit bureau ultimately makes
8    that -- puts that on their report there.
9  Q   **Who told -- Who told the credit agency**
10     **foreclosure?**
11  A   I don't know. I mean, I don't know if they
12    put it on there or Chase instructed. I don't
13    know that -- the answer to that question.
14  Q   **So you don't think they put it on there**
15     **independent of Chase, do you?**
16  A   I don't know. Because with the credit -- Like
17    I said, if we submit data over to the credit
18    bureau report, we have no control. Just like,
19    you know, when you pull a couple of credit
20    reports you're going to get generally two
21    different credit scores.
22  Q   **Does Chase have a contract with this credit**
23     **agency?**
24  A   Do we have a contract?
25  Q   **Yeah.**

219

1  A   I don't know what you mean by contract.
2  Q   **Some kind of a contract -- reporting contract.**
3  A   I don't know.
4  Q   **Have you ever heard of Creditco?**
5  A   Creditco?
6  Q   **Yeah. Creditco. (Showing.) Credit reporting**
7     **agency?**
8  A   This is LSI. This is not Chase.
9  Q   **Yeah.**
10  A   These are -- Creditco -- It look like a
11    third-party vendor who pulls like a tri merge
12    or -- which would be, you know, pulling two or
13    three credit bureaus on the same borrowers.
14  Q   **So if foreclosure got on April Barnett's**
15     **credit report in some way, shape, or fashion,**
16     **you don't know how it got on there?**
17  A   Your question was -- Say that again. I'm
18    sorry.
19  Q   **If April Barnett's credit report that you're**
20     **looking at had foreclosure on it, your**
21     **testimony on behalf of Chase is you don't know**
22     **how it got on there?**
23  A   Like I said, it could be either -- I don't
24    know what was reported besides the late pays
25    to the credit bureaus. Whatever the credit

220

55 (Pages 217 to 220)

PETER KATSIKAS

```
 1      bureaus -- What they put on their credit on
 2      there is beyond Chase's control, is what I'm
 3      saying.
 4   Q    Well, who reported -- Who reported to this
 5      credit agency where it says:  Lates 4X90 right
 6      above that?  Who reported that to Creditco?
 7   A    (Witness examines document.)  Well, as far as
 8      that shows, it was due for starting on October
 9      2010, November 2010, 12 December of 2010, and
10      January of 2011.  That's the four times 90.
11      It shows four -- I'm sorry, four 30-day lates
12      on this.  Four times 90.  So it would have
13      been Chase on there.  Because the -- It did
14      not get satisfied around the end of January of
15      2011.  That's why it's showing on there.
16   Q    So Chase reported she was more than 90 days
17      late on what date first?
18   A    This one shows October 2010.
19   Q    All right.  So the first time Chase reported
20      to Creditco she was more than 90 days late was
21      October 1, 2010?
22   A    Correct.
23   Q    And the second time they reported was November
24      1, 2010?
25   A    Yes.
                                              221
```

```
 1      October 1, November 1, December 1,  and
 2      January 1 that she was more than 90 days late
 3      on that exact loan that was paid off?
 4   A    Like I said, it didn't get satisfied until
 5      January of 2011.
 6   Q    That's not my question.  That's what you're
 7      telling me, Chase could still legitimately
 8      report those more than 90 days lates on four
 9      times?
10   A    Until it's satisfied.
11   Q    Even though Chase had the money?
12   A    It was in restricted escrow account because
13      they didn't have the letter of authorization
14      what to do with the money.
15   Q    It was in Chase's bank account, though, wasn't
16      it?
17   A    It was in a restricted escrow account.
18   Q    In Chase Bank?
19   A    As far as -- Yeah, Chase Bank.
20   Q    And Chase could write checks on that bank
21      account, couldn't they?
22        MR. TURNER:
23          Object to the form.  Foundation.
24   A    I don't know.
25   Q    You don't know if Chase could write a check on
                                              223
```

```
 1   Q    And the third time they reported it was
 2      December 1, 2010?
 3   A    Right.
 4   Q    And the fourth time they reported it was
 5      January 1, 2010?
 6   A    2011.
 7   Q    Excuse me.  '11?
 8   A    Yes.
 9   Q    And each of those reports was false, wasn't
10      it?
11        MR. TURNER:
12          Object to the form.
13   A    Well, they -- They weren't false, they were --
14      until, like I said, when the loan got
15      satisfied in January.  And then after that, it
16      went back and fixed the credit afterwards.
17   Q    Well, when Chase reported it, it was false,
18      wasn't it?
19   A    I don't think it was false.  Because the money
20      never got -- because we never -- the money
21      never got -- the money never got -- satisfied
22      the loan until January 2011.
23   Q    So even though Chase had the entire payoff
24      amounts since September 3, it could still, in
25      your opinion, report to a credit agency
                                              222
```

```
 1      its own bank account?
 2   A    Chase could write a check on the bank.
 3   Q    Sure.  It could have just written that money
 4      out, couldn't it -- written a check on that
 5      account?
 6   A    No.  Because we have a record of it that
 7      shows.
 8   Q    Could April Barnett have gotten that money
 9      back from Chase?
10   A    Could they have gotten it back?
11   Q    Yeah, could April have gotten the money back?
12   A    I don't know.
13   Q    Don't know?  Why couldn't she just ask for the
14      money and y'all would give it to her?
15   A    Because with a house, because there's a
16      security -- If you've got a mortgage on there,
17      the debt is still there.  So, I mean, I don't
18      know how it would just give it back to her.  I
19      mean, that doesn't -- To me, that doesn't make
20      good sense.
21   Q    Well, the only thing that made good sense for
22      Chase was it just keep the money; right?
23   A    No, that's not right.
24   Q    And then report her four times -- incorrectly
25      report her four times that she's more than 90
                                              224
```

56 (Pages 221 to 224)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

PETER KATSIKAS

| | | |
|---|---|---|
| 1 | | days past due to a credit agency? |
| 2 | A | No, that's not correct. |
| 3 | Q | So do you think this four times it reported |
| 4 | | she was more than 90 days past due and the -- |
| 5 | | added to the time that it reported that she |
| 6 | | was foreclosed on, do you think that that |
| 7 | | would have any affect on her credit? |
| 8 | | MR. TURNER: |
| 9 | | Object to the form. |
| 10 | A | If there was a foreclosure on her credit |
| 11 | | report; is that what you're asking me? |
| 12 | Q | And four times more than 90 days past due? |
| 13 | A | Yes. |
| 14 | Q | And would you think that that would harm her |
| 15 | | reputation for being a creditworthy person? |
| 16 | A | What do you mean by reputation? |
| 17 | Q | Do you know what reputation is? |
| 18 | A | You're talking about a credit history? I |
| 19 | | mean -- |
| 20 | Q | No. Do you know what the word "reputation" |
| 21 | | means? |
| 22 | A | Yeah. Your reputation like your -- I mean, |
| 23 | | are you talking credit history, are you |
| 24 | | talking the same thing as -- |
| 25 | Q | Just talking generalities. Do you know what |

225

| | | |
|---|---|---|
| 1 | | the concept of reputation is? |
| 2 | A | Yes. |
| 3 | Q | What is that? |
| 4 | A | Well, it's your reputation of how you present |
| 5 | | yourself. |
| 6 | Q | How the world thinks of you? |
| 7 | A | Correct. |
| 8 | Q | What people say about you? |
| 9 | A | Right. |
| 10 | Q | Good credit or bad credit, good person, bad |
| 11 | | person? |
| 12 | A | Right. |
| 13 | Q | Criminal, honest? |
| 14 | A | Right. |
| 15 | Q | Dead beat, not dead beat? |
| 16 | A | Yeah. Whatever. |
| 17 | Q | Yeah. It's kind of -- You think it's kind of |
| 18 | | funny? |
| 19 | | MR. TURNER: |
| 20 | | Let's not argue. Let's just ask |
| 21 | | questions and answer them. |
| 22 | A | I'm answering your questions. |
| 23 | Q | And so are you telling me that you don't know |
| 24 | | anything about the concept of credit |
| 25 | | reputation? |

226

| | | |
|---|---|---|
| 1 | | MR. TURNER: |
| 2 | | That's not his testimony. |
| 3 | A | I've never heard of that term, but I |
| 4 | | understand it's credit history. |
| 5 | Q | Okay. Let's call it "credit history." Did |
| 6 | | those reports of more than 90 days past due |
| 7 | | four times and foreclosure leave a black mark |
| 8 | | or marks on her credit history? |
| 9 | | MR. TURNER: |
| 10 | | Object to the form. |
| 11 | A | There's -- It shows a negative remark on that |
| 12 | | particular credit report. |
| 13 | Q | Would you lend April Barnett money on a home |
| 14 | | loan with that kind of credit report, back |
| 15 | | when you were making loans? |
| 16 | A | I don't know. |
| 17 | | MR. TURNER: |
| 18 | | Object to the form. |
| 19 | A | I don't know. There was different guidelines |
| 20 | | back in that time. |
| 21 | Q | Well, using the different guidelines, whatever |
| 22 | | was in effect, would you have lent her money |
| 23 | | on a home loan with that kind of credit |
| 24 | | history? |
| 25 | | |

227

| | | |
|---|---|---|
| 1 | | MR. TURNER: |
| 2 | | Object to the form. |
| 3 | A | There was different guidelines for different |
| 4 | | investors. I don't remember exactly what |
| 5 | | guidelines it was. |
| 6 | Q | Let's just take the Washington Mutual |
| 7 | | guidelines. |
| 8 | | MR. TURNER: |
| 9 | | Same objections. I think we're |
| 10 | | outside the scope of the corporate |
| 11 | | representative deposition notice, |
| 12 | | too. He's not answering on behalf of |
| 13 | | the corporate rep for these |
| 14 | | questions. |
| 15 | Q | Do you see any other black marks on April's |
| 16 | | credit history? |
| 17 | | MR. TURNER: |
| 18 | | Do you want to show him the report |
| 19 | | again? |
| 20 | Q | Yeah. See that word "delinquency" right |
| 21 | | there? What does "delinquency" mean? |
| 22 | A | Where do you see "delinquency"? |
| 23 | Q | Right in the middle of the page. |
| 24 | A | Oh, yeah. |
| 25 | Q | What does "delinquency" mean? |

228

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

**Page 229**

1   A   It just shows delinquent. I'm not sure on
2      that one.
3   Q   **Generally, what does the word "delinquent"**
4      **mean?**
5   A   It means you're delinquent on the loan. It
6      means you're past due.
7   Q   **That's a bad mark, isn't it?**
8   A   Actually, you know what, the answer to your
9      other question, the CC Mortgage Corp, that's
10     another -- shows a late one time 60, one time
11     30, as well.
12   Q   **Um-hum. Now you want to answer my question?**
13         MR. TURNER:
14           What was the question?
15   Q   **What does "delinquency" mean?**
16   A   It means you're past due.
17         MR. TURNER:
18           You've already answered it. But
19           answer it again.
20   Q   **And who put that on her credit record?**
21   A   Well, it would have been Creditco through
22     Experian, Transunion, and Equifax.
23   Q   **All right. Well, what are they?**
24   A   Those are the three major credit bureaus.
25   Q   **Right. So the three big ones, aren't they?**

**Page 230**

1   A   Yes.
2   Q   **So Chase would have reported the false**
3      **information about April Barnett being**
4      **foreclosed on not just to one credit agency**
5      **but to all three, wouldn't they?**
6         MR. TURNER:
7           Object to the form.
8   A   It wasn't false.
9   Q   **Okay. Give me the kindest word for it you can**
10     **come up with.**
11   A   Well, that particular time when it was pulled
12     on that date was February 17, 2011, that's
13     what the pay history showed on there.
14     However, it was corrected afterwards --
15   Q   **Yeah. I got that part.**
16   A   -- to reflect satisfactory and paid.
17   Q   **Didn't Chase not only report it to one credit**
18     **reporting agency, but reported it to three?**
19   A   Correct.
20   Q   **And that's the three biggest in the country?**
21   A   Yes.
22   Q   **Was it FICO, Beacon, and Equifax?**
23   A   Yeah. I refer them as Experian, Transunion,
24     and Equifax.
25   Q   **Okay. So it reported -- Let's use the kind**

**Page 231**

1      term. -- **"inaccurate" credit information about**
2      **foreclosure and four more than 90-day**
3      **delinquencies to three big agencies, didn't**
4      **it?**
5         MR. TURNER:
6           Object to the form.
7   A   Restate your question again. I'm sorry.
8   Q   **It reported those four inaccurate black marks**
9      **to three big credit agencies, the biggest?**
10        MR. TURNER:
11          Same objection.
12   A   It wasn't inaccurate. This is what was
13     reported to them. But, like I said before,
14     once you send it over to the credit bureaus,
15     that is what is put on the credit history.
16     But then, again, it was cleared up afterwards.
17   Q   **Yeah. What months make up the 4X90 days past**
18     **due?**
19   A   October 2010, November 2010, December 2010,
20     and January '11.
21   Q   **What months are used to calculate the 90 days?**
22   A   Well, I'm sorry, it was 90 plus days. If you
23     look at 4X90 plus, it's four times over 90 --
24     four months over -- That's 90 days plus past
25     due.

**Page 232**

1   Q   **So where are the 90 days plus?**
2   A   According to this document, it's showing
3     October, November, December, and January '11.
4   Q   **I thought you said she was just delinquent**
5     **July and August?**
6   A   Right. She was delinquent July and August.
7     However, the money that got satisfied, the
8     loan was in -- to satisfy the loan, it was
9     done end of January of 2011.
10   Q   **But she was, at best, only late two payments,**
11     **July 1 and August 1, 2010?**
12   A   That she was late, correct.
13   Q   **She wasn't 90 days past due on anything, was**
14     **she?**
15   A   Well, until it was actually cleared through
16     the system in January. It was then satisfied
17     on her.
18   Q   **But the truth of the matter is, she was never**
19     **90 days past due?**
20   A   Right. She was due for July and August.
21   Q   **Okay. So reporting she's 90 days past due at**
22     **any time is also in and of itself inaccurate,**
23     **isn't it?**
24   A   Well, based on the pay history -- for this
25     credit report pulled in February 17, it just

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

1    got satisfied January 28 -- I think it's on or
2    around January 28 of 2011, the loan was
3    satisfied.  And then after that, between --
4    sometime between then and -- I don't know what
5    months after that.  But the credit report,
6    hers shows it's been paid and satisfied and
7    there's no late pays.
8  Q    When the report of 90 days past due four times
9    was made, however -- Think about that:  When
10    it was made, when it was made, when it was
11    made, when it was made, when it was made, it
12    was not accurate, was it?
13  A   (No response.)
14  Q    Because she was never, ever, ever, ever, ever
15    90 days past due on anything, was she?
16        MR. TURNER:
17            Object to the form.
18  A   Well, the money was in restricted escrow
19    account.  That's --
20  Q    That's not my question.  You know --
21        MR. TURNER:
22            Let him answer your question.
23        MR. KILBORN:
24            He's not answering the question.
25            He's spent a whole day dodging
                                              233

1    questions, using whatever expertise
2    Chase's lawyers have taught him, I
3    guess, over the last however many
4    years he's been testifying.
5        MR. TURNER:
6            Well, let's ask a question and get an
7            answer.
8  BY MR. KILBORN:
9  Q    I want a real simple answer to a simple
10    question.
11        Isn't it true she was never, ever, ever
12    90 days past due on anything?
13        MR. TURNER:
14            Object to the form.
15  A   There was -- She was delinquent July and
16    August.  As far as when it got satisfied, the
17    way this was reported to the credit agency was
18    accurately reported.  After the fact -- Once
19    it got satisfied after the fact of January
20    2011, it went back and changed the credit and
21    corrected the credit.
22  Q    Okay.  I want to finish today.  But why don't
23    we try to get the answer to the question.
24        How do you calculate the 90 days?  From
25    when to when?
                                              234

1  A   This is showing October -- I don't -- I'll say
2    it again.  It's October 2010, November 2010,
3    December 2010, and January of 2011, according
4    to this document, LSI-16.
5  Q    How do you calculate the 90 days?  From when
6    to when?
7  A   July, August, September 2010.
8  Q    She wasn't -- She didn't miss September's
9    payment, did she?
10  A   (No response.)
11  Q    You told me she missed August and July?
12  A   She missed the July and August payment,
13    correct.  The check was received from State
14    Farm to Chase September 3, 2010.  It was
15    placed in a restricted escrow account.  There
16    is -- Chase needed a letter of authorization
17    in order to determine what to do with the
18    funds.  In her case, April would be to apply
19    it and pay off the loan.  It didn't get
20    satisfied until January of 2011.
21  Q    Did Chase need a letter of authorization to
22    apply the two payments that it got out of the
23    $301,000 to July and August?
24  A   No, the 301 was to pay off the loan, didn't
25    need authorization.
                                              235

1  Q    So did Chase apply part of the $301,000 to
2    satisfy July and August payments?
3  A   Well, yeah, they satisfied the 301 --
4    satisfied the mortgage around January 2011.
5  Q    So where is the letter of authorization to do
6    that?
7  A   Of which -- You're talking about the one that
8    was sent in November?
9  Q    Where's the letter of authorization to apply
10    any part of the $301,000 to July and August
11    payments?
12  A   I don't see anything in reference to that.
13  Q    There isn't one, is there?
14  A   I can't recall.
15        MR. TURNER:
16            Object to the form.
17  Q    Chase did it anyway, didn't it?
18  A   To satisfy the loan.  We satisfied the loan --
19    Chase satisfied the loan in January of 2011.
20  Q    Well, it specifically satisfied July and
21    August payments, didn't it?
22  A   Yeah.
23  Q    You looked at those MSP notes, I think.  It's
24    Plaintiff's Exhibit 10 to Ms. Landis'
25    deposition in front of you there?
                                              236

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

## PETER KATSIKAS

1  A  Okay.
2  Q  Just look at, for instance, Bates Number 821.
3  A  Okay.
4  Q  The first entry, COL, what does that mean?
5  A  Collection.
6  Q  I see 15 entries on that one page.  Do you see
7     that?
8  A  Yes.
9  Q  Okay.
10 A  I think there's more than 15.
11 Q  More than 15?  Okay.  How many you got there?
12 A  18, maybe.
13    MR. TURNER:
14       I got -- I count 15, but we'll let
15       the record speak for itself.  I don't
16       know.
17 A  15. You're right.  Sorry about that.
18 Q  Okay.  It says on there -- For instance, on
19    September 20, 2010, initiated.  What does
20    "initiated" mean?
21    MR. TURNER:
22       I think you mean December 20.
23 Q  Excuse me.  December 20, 2010.  What does
24    "initiated" mean?
25 A  I'm not sure ER -- I'm not familiar with that

237

1     contact, bad number.  Xfer is transfer to Loss
2     Mitt per notes on customer care work bench on
3     12/16/2010 that said response transfer to Loss
4     Submit.  And then inbound primary transfer
5     call.
6  Q  So you've got an Auto Dialer that's calling
7     her, it looks like, every day from December 10
8     to December 17?
9     MR. TURNER:
10       Object to the form.
11 A  On this 8/21, it shows -- What it shows:  No
12    contact, bad number.
13 Q  Why is it necessary for the Auto Dialer to
14    keep dialing?
15 A  They call -- They're calling every day.
16 Q  Was that just a computer that calls every day?
17 A  That's what Auto Dialer is, yes.
18 Q  Okay.  So they just plug in the borrower's number,
19    then it automatically dials every day?
20 A  Yeah, the number is put into the Auto Dialer
21    and it automatically dials the number once a
22    day.
23 Q  And the last date on here is December 20,
24    2010.  Why was the Collection Department still
25    making telephone calls to April Barnett in

239

1     ER on there.
2  Q  It says:  Refused to cooperate.
3        Who's refusing to cooperate?
4  A  It looks like whoever answered the phone.
5  Q  Okay.
6  A  I guess they were trying to talk to -- trying
7     to talk to the person.
8  Q  All right.  Let's see.  Then it says:  Call
9     interrupted.
10       What does that mean?
11 A  ER, call interrupted.  It's just saying call
12    was interrupted for some reason.
13 Q  The next one says:  Call aborted.
14       Do you see that?
15 A  Right.
16 Q  Okay.  And the next one says:  Transferred
17    calls.
18       Do you see that?
19 A  Yep -- Well, right before that, it says
20    inbound.  Because actually the way it goes, it
21    goes -- You read it from bottom up.  But, yes,
22    where it says inbound -- it starts off -- for
23    the 12/20, if you start, it says:  Vacant
24    secured condition.  It doesn't give it.  But
25    it says AUTDLR, which is Auto Dialer, no

238

1     December?
2  A  Because the Collections Department is showing
3     it was delinquent -- The account was
4     delinquent.
5  Q  Still delinquent?
6  A  Right.
7  Q  All right.  And Chase has been sitting with
8     the check in its account since September 3?
9     MR. TURNER:
10       Object to the form.
11 Q  This is three months later?
12 A  Yeah, I'm not -- It was in a restricted escrow
13    account.  I'm not sure if it went on the 3rd
14    or the 7th.
15 Q  It doesn't matter.  Three months late, you've
16    still got the Auto Dialer sicked on April
17    Barnett, don't you?
18    MR. TURNER:
19       Object to the form.
20 A  The Auto Dialer was calling her, yeah.
21    Because it was in the restricted escrow
22    account.  We still needed a letter of
23    authorization to go ahead and satisfy the
24    mortgage.
25 Q  What was the Auto Dialer going to say when it

240

60 (Pages 237 to 240)

PETER KATSIKAS

```
 1        got her?
 2   A    Well, it would -- Then a collector would get
 3        on-line once they make connection and see if
 4        there's like a promise to pay -- if it was
 5        hold for promise to pay or forbearance or a --
 6        you know, any kind of -- if it was some kind
 7        of Loss Mitigation, you know, activity, such
 8        as modification or short sale or forbearance,
 9        or something to that nature.
10   Q    So why was it necessary for, let's see, the
11        Collection Department to make hundreds of
12        calls after Chase already got the check to pay
13        off the loan?
14            MR. TURNER:
15                Object to the form.
16   A    Well, the Collections Department is showing
17        that the account hasn't been paid since July,
18        because the money is sitting in a restricted
19        escrow account waiting for the borrower's
20        authorization to come over so we could process
21        that in order to get the loan paid off and
22        satisfied.
23   Q    Well, let's see.  It looks like on September
24        27, 2010 --
25   A    Where are you looking at?
                                                     241
```

```
 1   Q    It's Bates Number 826, September 27, 2010.  It
 2        looks like the SER -- That's the Service
 3        Department. -- Customer Service?
 4            MR. TURNER:
 5                Which -- Did you say September 27?
 6   Q    826.  826 Bates Number, September 27, 2010.
 7        Do you see that?
 8   A    On 826 --
 9   Q    On 8/27/2010, order number -- it gives a
10        number -- property inspected on 9/9/10.  Do
11        you see that?
12   A    Yes.
13   Q    Okay.  So we know the property was inspected,
14        don't we?
15   A    On 9/9/10, correct.
16   Q    Okay.  And that was by a Chason vendor, wasn't
17        it?
18   A    Correct.
19   Q    And we know what they would have seen; right?
20   A    Yeah.
21   Q    Okay.  And it says:  Found home to be
22        occupied.  Damages, none visible.
23            How could that be?
24   A    I don't know.
25   Q    That's impossible, isn't it?
                                                     242
```

```
 1   A    That's what the vendor told us.
 2   Q    So what, the vendor lied about it?
 3            MR. TURNER:
 4                Object to the form.
 5   A    I don't know.  They -- I don't know the
 6        answer.  I don't know.
 7   Q    But this is something Chase is telling April
 8        Barnett, isn't it?
 9   A    It doesn't show communication to April
10        Barnett.
11   Q    It doesn't?
12   A    Where do you see --
13   Q    I thought this was a record of communication.
14   A    Just says order number, property inspected on
15        9/9/10, found to be occupied.  Damages, none
16        visible.
17   Q    Let's see.  We just got a letter here that
18        on -- let's see -- on August 27, 2010, Chase
19        found --
20
21            (Plaintiff's Exhibit Number 34 was
22             marked for identification.)
23
24   A    Okay.  Exhibit 34, on August 30, 2010, Chase
25        said they inspected and it was unoccupied;
                                                     243
```

```
 1        right?  (Showing.)
 2   A    34 says -- Yeah, it doesn't really give a
 3        date.  But the letter is dated August 30,
 4        2010.
 5   Q    So you're telling April that it's unoccupied
 6        then; right?
 7   A    It doesn't show that we told her it was
 8        occupied.
 9            MR. TURNER:
10                Just wait.  He's asking about the
11                August 30 letter, or are you back on
12                the notes?
13            MR. KILBORN:
14                I'm trying to find out -- I'm trying
15                to find out what's going on here.
16            MR. TURNER:
17                Well, I'm just trying to find out
18                which time period you're asking so we
19                can get an answer to your question.
20   BY MR. KILBORN:
21   Q    On August 30, you're writing April saying the
22        property is unoccupied; correct?
23   A    That's what Exhibit 34 says, correct.
24   Q    Exhibit 34; right?
25   A    Um-hum.
                                                     244
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

## PETER KATSIKAS

```
 1   Q   Okay.  And then we've got a note here on Chase
 2       826, which is part of Plaintiff's Exhibit 10,
 3       that says on September 27 it's now occupied
 4       and damages, none visible.
 5           You got any explanation for that?
 6           MR. TURNER:
 7               Object to the form.  Asked and
 8               answered.
 9   A   No, that's what this note says.  It doesn't
10       look like it was communicated.  But that's
11       what the note says.
12   Q   And then that same date, it says:  Tel prim
13       res RP unable to PTP.
14           What does that mean?
15   A   Telephone primary residence.  I'm not sure
16       what the "RP," off the top of my head right
17       now, is.  But unable to promise to pay.
18   Q   Okay.  So the telephone call was made to the
19       primary residence?
20   A   That's what it's showing.  Whatever the
21       primary residence was in our system.
22   Q   What was the primary residence?
23   A   Well, the primary residence number.  So it
24       would be listed under home number.
25   Q   Okay.  And it says:  Unable to pay.
```
245

```
 1           Is that right?
 2   A   Unable to promise to pay.
 3   Q   Okay.  Well, what the conversation really was
 4       is you've already been paid, isn't it?
 5           MR. TURNER:
 6               Object to the form.
 7   Q   She never said she was unable to pay.  She
 8       said we've already paid you, didn't she?
 9           MR. TURNER:
10               Object to the form.
11   A   On that day it says TT, talked to borrower.
12       She really started yelling and saying that the
13       home burned down and her insurance company
14       paid off the loan, and she hung up.
15   Q   Okay.  What's wrong with that?
16           MR. TURNER:
17               Object to the form.
18   A   That's just what it says.
19   Q   Well, if the Collection Department is calling
20       you on September 27, you got the check and
21       Collection is still calling her harassing her
22       for money.  You think it's unreasonable to
23       start yelling at whoever is calling?
24           MR. TURNER:
25               Object to the form.
```
246

```
 1   Q   That the home was burned down and the
 2       insurance company paid off the loan?
 3           MR. TURNER:
 4               Object to the form.
 5   A   I don't know.
 6   Q   Chase is just harassing the lady, isn't it?
 7           MR. TURNER:
 8               Object to the form.
 9   A   It doesn't show they were harassing her.
10   Q   You don't call calling every day demanding
11       money harassment?
12           MR. TURNER:
13               Object to the form.
14   Q   I'll rephrase it.  You don't call calling
15       every day to demand money that's not owed
16       harassment?
17           MR. TURNER:
18               I still object to the form.
19   Q   Excuse me?  What was your answer?
20   A   I'm trying to say the question you just asked
21       me.
22   Q   The question I asked you is this:  You don't
23       call you, being a Chase representative,
24       calling a borrower every day whose home has
25       burned down demanding money that's not owed
```
247

```
 1       because the loan has been paid off harassment?
 2           MR. TURNER:
 3               Object to the form.
 4   A   But at this time the system wasn't showing
 5       that it was paid off -- our servicing system.
 6   Q   I don't care what your system showed.  Don't
 7       you agree with me that that's harassment?
 8           MR. TURNER:
 9               Object to the form.
10   A   I don't know.
11   Q   Okay.  Don't know.  Well, give me an example
12       of what you would call harassment.
13           MR. TURNER:
14               Object to the form.
15   A   Well, I guess if you go back to those that
16       they violated those -- whatever those FD --
17       Fair Debt Credit -- the exhibit we just went
18       through, which was --
19   Q   One of them says "no harassing."  I'm trying
20       to get you to agree with me, this definitely
21       would be harassment?
22           MR. TURNER:
23               Object to the form.
24   Q   Calling every day demanding money that's not
25       due?
```
248

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1           MR. TURNER:
 2           Object to the form.
 3    Q    And you can say it's not harassment.  And, as
 4      a matter of fact, I wish you would.  Just tell
 5      me one way or the other.  Do you agree it's
 6      harassment or not?
 7           MR. TURNER:
 8           Same objection.
 9    A   I don't believe it's harassment.
10    Q    Okay.  And all these calls basically drove
11      April Barnett to such a stressful situation
12      that all she could think to do was to yell at
13      the person what happened and hang up the
14      phone?
15           MR. TURNER:
16           Object to the form.
17    Q    Isn't that true?
18    A   I don't know what she was thinking.
19    Q    Don't know what.  What would you think if
20      somebody called you at your home every day
21      demanding money that's not owed because you've
22      already been paid?
23           MR. TURNER:
24           Same objection.
25    Q    What would you call that?
                                            249
```

```
 1    A   I don't know.
 2    Q    Yeah.  Well, would you like that to happen to
 3      you?
 4    A   What, for someone to call me every day?
 5    Q    Yeah.  Collection Department calling you every
 6      day demanding money that wasn't owed?
 7    A   My credit has been good.  I don't know.  I
 8      mean, I don't have people calling me.  So I
 9      wouldn't know.
10    Q    Can you think of -- Can you think of any kind
11      of harassment at all?
12           MR. TURNER:
13           Object to the form.
14    A   I don't see -- You know, they're not cursing
15      at -- It doesn't look like they're cursing at
16      her or hanging up on her or --
17    Q    It doesn't look that way, huh?
18    A   No.
19    Q    Well, she's already protested all these calls
20      being made because the property is already --
21      I mean, the debt has already been paid.  If
22      you look at, for instance, 827, September 13,
23      2010, bottom of the page there:  Call received
24      from borrower in reference to loan being paid
25      off.  Per borrower, her check and -- Her check
                                            250
```

```
 1      -- I guess that means in the amount of 301,000
 2      was received on 9/3 and still is getting calls
 3      and letters in reference to a foreclosure and
 4      wants to know why calling.
 5           Don't you call that a protest of
 6      harassment?  Don't you call that a dispute of
 7      the claim?
 8           MR. TURNER:
 9           Object to the form.
10    Q    Don't you call that a completely reasonable
11      position that Chase ignored?
12           MR. TURNER:
13           Object to the form.
14    A   I don't know that Chase ignored it.  It's
15      showing -- the way this note is written, that
16      she's calling in to find out why she's
17      receiving letters and calls regards to -- This
18      is her words.  Looks like it says foreclosure
19      and wants to know why.
20    Q    Well, she's protesting all the calls and
21      letters, isn't she?
22    A   Well, just on these notes here.
23    Q    Just on the notes?
24    A   On the notes.  I don't see -- You're saying
25      letters that was sent to her?
                                            251
```

```
 1    Q    She said letter, didn't she?
 2    A   Sent a letter to Chase?
 3    Q    No.  She said she's getting calls and letters
 4      from Chase?
 5    A   Right.  I thought you said -- Okay.  I
 6      misunderstood what your question was.  Go
 7      ahead.
 8    Q    Well, she's protesting all this as early as
 9      September 13, isn't she?
10    A   Well, she just --
11    Q    She says quit calling -- She said quit calling
12      and sending me letters, didn't she?
13    A   She just says she wants to know why she's
14      getting letters.
15           MR. McDONALD:
16           Let's take a break.
17           MR. TURNER:
18           Yeah, let's do.
19           (A short break was taken.)
20
21           (Proceedings concluded at 3:50 p.m.)
22
23
24
25
                                            252
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

PETER KATSIKAS

```
 1              C E R T I F I C A T E
 2
 3    STATE OF ALABAMA  )
 4    COUNTY OF MOBILE  )
 5
 6        I, Patsy C. Poteat, CCR, as Commissioner,
 7    hereby certify that the above proceedings were taken
 8    down by me and transcribed by me using computer-aided
 9    transcription and that the above is a true and
10    correct transcript of said proceedings taken down by
11    me and transcribed by me.
12        I further certify that I am neither of kin nor
13    of counsel to any of the parties nor in anywise
14    financially interested in the outcome of this case.
15        I further certify that I am duly licensed by
16    the Alabama Board of Court Reporting as a Certified
17    Court Reporter as evidenced by the ACCR number
18    following my name found below.
19        So certified on this, the 31st day of January
20    2013.
21
22
23
      Commission Expires:       Patsy C. Poteat, ACCR #236
24    December 18, 2016          Freelance Court Reporter
25
                                               253
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**